# EXHIBIT A

## (State Court Pleadings)

STATE OF SOUTH CAROLINA )

COUNTY OF _DILLON_ )

FILED IN THE COURT OF COMMON PLEAS

GWEN T. HYATT

_BEATRICE WEAVER AND_
_GARY WEAVER_ )

2014 FEB 21 PM 1:28 CIVIL ACTION COVERSHEET

Plaintiff(s)

CLERK OF COURT        CP - _____

_PRO SE_        DILLON COUNTY

vs.

_DILLON DEPT of SOCIAL SERVICES_ )

2014-CP-17 **078**

_ET AL A_ )

Defendant(s) )

(Please Print)

Submitted By: _BEATRICE WEAVER_     SC Bar #: _____

Address: _1253 HARLLEES BRIDGE_     Telephone #: _843-841-1606_

_ROAD, DILLON SC 29536_     Fax #: _843-774-2030_

Other: _____

E-mail: _____

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendants along with the Summons and Complaint.

CERTIFIED TRUE COPY

## DOCKETING INFORMATION (Check all that apply)

*If Action is Judgment/Settlement do not complete

| ☒ | JURY TRIAL demanded in complaint. | ☐ | NON-JURY TRIAL demanded in complaint. |

☐ This case is subject to ARBITRATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.

☐ This case is subject to MEDIATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.

☒ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

CLERK OF COURT
DILLON COUNTY

## NATURE OF ACTION (Check One Box Below)

| Contracts | Torts - Professional Malpractice | Torts - Personal Injury | Real Property |
|---|---|---|---|
| ☐ Construction (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice (220) | ☐ Motor Vehicle Accident (320) | ☐ Foreclosure (420) |
| ☐ General (130) | Previous Notice of Intent Case # | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| ☐ Breach of Contract (140) | 20___ - CP - ____ | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | | ☒ Personal Injury (350) | ☐ Possession (450) |
| | ☐ Notice/File Med Mal (230) | ☐ Wrongful Death (360) | ☐ Building Code Violation (460) |
| | ☐ Other (299) | ☐ Other (399) | ☐ Other (499) |

| Inmate Petitions | Administrative Law/Relief | Judgments/Settlements | Appeals |
|---|---|---|---|
| ☐ PCR (500) | ☐ Reinstate Drv. License (800) | ☐ Death Settlement (700) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Judicial Review (810) | ☐ Foreign Judgment (710) | ☐ Magistrate-Civil (910) |
| ☐ Habeas Corpus (530) | ☐ Relief (820) | ☐ Magistrate's Judgment (720) | ☐ Magistrate-Criminal (920) |
| ☐ Other (599) | ☐ Permanent Injunction (830) | ☐ Minor Settlement (730) | ☐ Municipal (930) |
| | ☐ Forfeiture-Petition (840) | ☐ Transcript of Judgment (740) | ☐ Probate Court (940) |
| | ☐ Forfeiture-Consent Order (850) | ☐ Lis Pendens (750) | ☐ SCDOT (950) |
| | ☐ Other (899) | ☐ Transfer of Structured Settlement | ☐ Worker's Comp (960) |
| | | Payment Rights Application (760) | ☐ Zoning Board (970) |
| | | ☐ Confession of Judgment (770) | ☐ Public Service Commission (990) |
| | | ☐ Petition for Workers | ☐ Employment Security Commission |
| | | Compensation Settlement | (991) |
| | | Approval (780) | |

| Special/Complex/Other | | | |
|---|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | | |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | ☐ Other (799) | ☐ Other (999) |
| ☐ Medical (620) | ☐ Foreign Subpoenas (650) | | |
| ☐ Other (699) | ☐ Motion to Quash Subpoena | | |
| | in Out-of-County Action | | |
| ☐ Sexual Predator (510) | (660) | | |

FILED
GWEN T. HYATT

2014 FEB 21 PM 12:28

STATE OF SOUTH CAROLINA CLERK OF COURT IN THE COURT OF COMMON PLEAS
DILLON COUNTY FOURTH JUDICIAL CIRCUIT

COUNTY OF DILLON                    )
                                    )    CIVIL CASE NO. 2014-CP-17   078
                                    )
                                    )    VERIFIED COMPLAINT;
BEATRICE E. WEAVER AND              )    SUMMONS              078
GARY WEAVER,                        )
                                    )    (Non-vehicle Tort)
          PLAINTIFFS,               )
                                    )
              vs.                   )
                                    )
DILLON DEPARTMENT OF                )
SOCIAL SERVICES; AND JACKIE         )
ROWLAND; KAREN ENGLISH;             )
PANSY PAGE McELVEEN;                )
DILLON INTERNAL MEDICINE            )
ASSOCIATES P.A.; A SOUTH            )
CAROLINA CORPORATION; JAMES P.      )
WALLACE, M.D; FELICA GAINEY,        )
AND HARRIET SHEALEY, AND            )
COTTONWOOD VILLA ASSISTED           )
LIVING FACILITY, INC, A SOUTH       )
CAROLINA CORPORATION; DILLON        )
COUNTY SHERIFF'S OFFICE AND         )
DEPUTIES JOHNIE MAY SMITH,          )
CHADDIE HAYES AND LINDA             )
MAIMQUIST; DILLON COUNTY            )
EMERGENCY MEDICAL SERVICES,         )
FLORENCE VISITING NURSES            )
SERVICES, INC, A SOUTH CAROLINA     )
CORPORATION; JOHN D. McINNIS;       )
AND JOHN DOES 1-10, DOE             )
PARTNERSHIPS, CORPORATIONS          )
AND/OR OTHER ENTITIES 1-10,         )
                                    )
          DEFENDANTS.               )    JURY TRIAL REQUESTED
_____)

A CERTIFIED
TRUE COPY

CLERK OF COURT
DILLON COUNTY

## VERIFIED COMPLAINT

# TABLE OF CONTENTS

Table of Contents                                                        i

Verified Complaint                                                       1

Counts:

| | | |
|---|---|---|
| 1 | Venue, Jurisdiction and Judicial Notice | 6 |
| 2 | The Parties | 7 |
| 3 | The Factual Background | 23 |
| 4 | Three Documents as Inadmissable Evidence Filed in Family Court | 34 |
| 5 | The Wallace February 24, 2012 Memorandum the Determining Factor | 37 |
| 6 | Objections to the DDSS Ex Parte Order and Complaints | 38 |
| 7 | Procedural Misconduct, Errors and Omissions of Counsel and Family Court | 51 |
| 8 | Defendants' Malicious and Bad Faith Violations of DDSS Rules | 54 |
| 9. | Defendants' Violation of Their Public Duty, Responsibility and Trust of Plaintiffs | 57 |
| 10. | Caseworker Pansy Page's Lack of Due Diligence, Malicious and Bad Faith Violations of DDSS Service Rules | 60 |
| 11 | Caseworker's Violations of Adult Protective Service Rules (Chapter 4) | 70 |
| 12 | Defendant DDSS Exclusion and Failure to Provide Homemaker Services Racially Discriminated Against Plaintiffs and Violated Federal and State Policies and Civil Rights | 80 |
| 13 | The Primary Physician's Malicious, Incorrect, Negligent, and Inadmissable "Expert" Opinion | 91 |
| 14 | The Physician's Gross Professional Bad Faith, Misconduct, Negligence and Administrative Malpractice. | 94 |
| 15 | Plaintiff Beatrice Weaver's Physical Injuries | 96 |
| 16 | Plaintiff's Serious Psychological and Emotional Shock and Distress | 98 |
| 17 | Defendants' Abuse of Due Process and Judicial Conduct | 98 |
| 18. | Defendants and Each of Them Violated Rules 4, 5, 11 and 12 SCRCP, and the DSS Rules thus Denying Plaintiffs Their Constitutional Rights to Due Process and Equal Protection of the Law Vesting No Personal Jurisdiction in the Court | 102 |

19.  Defendants' Perversion of Process and Violations of Plaintiffs'
     Constitutional Rights and Privileges                                    105

20.  Defendants Civil Offenses and Wrongs Committed Against Plaintiffs       114

21   Defendants Violations of Plaintiffs Constitutional Right of Privacy      119

22.  Defendants' Negligence, Errors and Omissions Related To Financial
     Planning Of The Abduction And Incarceration Of Mrs. Weaver For
     Protective Custody Exposed Her Personal Assets To Court Ordered
     Expropriation To Be Sold                                               123

23.  Bad Faith and Malicious Actions and Abuse of Agency Discretionary
     Authority Denies Official Qualified Immunity from Civil and Criminal
     Justice in this Case.                                                  124

24   Gross Negligence                                                       127.

25   Emotional Distress                                                     128

26   Punitive Damages                                                       128

27   DOE Defendants                                                         129

28   Summary of Charges Against Defendants                                  130

29.  Relief                                                                 133

30   Demand for Jury Trial                                                  135

31   Summons                                                                136

32   Verification                                                           138

Supreme Court Rules Requiring Alternative Dispute Resolution

*A CERTIFIED
TRUE COPY*

*CLERK OF COURT
DILLON COUNTY*

**VERIFIED COMPLAINT**

FILED
GWEN T. HYATT

2014 FEB 21   PM 18:28

CLERK OF COURT
DILLON COUNTY

COME NOW, PLAINTIFFS PRO SE, BEATRICE E. WEAVER AND GARY WEAVER (hereinafter referred to as "Plaintiff(s)"), and pursuant to **Rules 1-7 (a), 8 (a), 11, 65 and 81 SCRCP** and for good cause for their claims for relief against the above-named Defendants, allege and aver as follows that the Defendants named herein, and each of them, willfully, knowingly, wantonly, negligently, tortiously and maliciously in bad faith, deliberately, directly and proximately injured and damaged Plaintiffs during the period November 1, 2011 through March 30, 2012, and subsequently, by their bad faith malicious actions, until the present date of filing the pleadings hereof.

Defendants and each of them are guilty of charges that may generally be categorized as technical, judicial; procedural; bad faith; malice; flagrant and wholesale violations of constitutional rights, statutes, agency rules and regulations; invasion of privacy; mal practice, unnecessary excessive abusive police force in the extreme; abduction, incarceration in a third rate facility out of county, gross negligence, incompetence, public agency discrimination and abuse of elderly, and other related violations discussed in detail herein.

Defendants and each of them respectively and egregiously, engaged in racial profiling and discrimination in violation of Federal and State laws, and rules, based on race, color, national origin, culture, age, gender, education, personality and social attributes, etc.

This complaint alleges that Defendants and each of them knowingly and negligently engaged in civil and criminal acts against Plaintiffs and flagrantly violated Plaintiffs civil rights. Thus, this is an action to redress the wrongs of Defendants' individual and collective breach of trust and duty in forcible abduction and incarceration of Plaintiff Beatrice Weaver resulting from Defendants' extreme abuse of State administrative and regulatory authority, licensure and tyrannical control, improper court procedures, unnecessary, impatient and excessive police force and poor judgment of the sheriffs, trespassing, intrusion and invasion of Plaintiffs privacy, denial of individual constitutional rights of Plaintiffs, administrative and judicial misconduct and malpractice, by each and every one of the Defendants named herein.

This action is to redress the deprivation of the Plaintiffs' Constitutional rights under at least the Fourth, Fifth, Sixth, Eleventh, Thirteenth and Fourteenth Amendments of the United States Constitution, and Article I, Clauses 3, 10 and 14 of the South Carolina Constitution, and to redress quid pro quo the dilatory, hostile, antagonistic Dillon Department of Social Services agency regulatory and administrative environment, abuse and legal, administrative and judicial harassment of Plaintiffs by each of the Defendants violations of the cited Code of Laws of South Carolina 1976 Ann. statutes and rules and regulations ("Code") and related Federal statutes and regulations.

This claim is derived from and based on centuries old ancient law. It is a claim that the Defendants and each of them violated the common law provisions of the U.S. and State Constitutions which date from June 15, 1215 when the Magna Carta, the "Great Charter" was executed at Runneymede, England by King John and his Barons. The Magna Carta has remained the basis of much of our State common law including the right to be tried by a panel of one's peers, and the right to trial by jury   Two of the four main clauses of the Charter remain after amendments made over the centuries, which directly relate to Plaintiffs claims in this action as to the freedom and privacy of the individual Plaintiffs, maliciously and negligently violated by Defendants. Translated from the original Latin ("we" being The Crown), these two ancient clauses are relevant in support of this complaint:

> "No freeman shall be seized, or imprisoned, or dispossessed, or outlawed
> or in any way destroyed, nor will we condemn him, nor will we commit him
> to prison, excepting by the legal judgment of his peers, or by the laws of the land.
> "To none will we sell, to none will we deny, to none will we delay right or justice."

These two clauses provided for the long standing traditional freedoms guaranteed the citizens and Plaintiffs of this state under the Federal and state Constitutions. When the actions of Defendants complained of herein, acting maliciously above and beyond the law so blatantly as alleged and averred herein, are understood, can the court and the jury comprehend what it means to Plaintiffs to have their rights and justice arbitrarily and negligently denied, to be destroyed and dispossessed without proper process of the laws of the State by each and every Defendant named herein. These protections and rights of Plaintiffs from Defendants' violations are further supported by the United States Supreme Court as follows:

2

"(Our) decisions have respected the private realm of family life which the state cannot enter." See, *Prince vs. Massachusetts*, 321 U.S. 158, 155 (1944), an opinion of the United State Supreme Court.

Plaintiffs allege that the Defendants and each of them have violated this Supreme Court ruling by their deliberate, planned, malicious premeditated intrusion and unwarranted and willful, bad faith invasion of Plaintiffs right to privacy, "which the State cannot enter"; by their denial of Plaintiffs' right to be informed and discussed in advance of the state's intentions and plans to force unexplained tests for tuberculosis prior to incarceration in a "locked" institution; to invade Plaintiffs' home, and forcible abduction and incarceration in a third rate institution of the state's arbitrary selection; their denial of Plaintiffs' right to be protected from forcible police harm under threat of arrest and being placed in chains; protected from being unceremoniously dragged out of bed with severely painful degenerative hips and back, and "dumped" and strapped onto an ambulance stretcher brought into their house over Plaintiff's objections, and removed to an unknown destination some seventy (70) miles away from her husband under police guard; threat of chains, without being informed whereto, and told to " be quiet", and other violations of statutes and rules as alleged herein. Plaintiffs claim damages and compensation for their frustration, embarrassment, loss of enjoyment and liberty, emotional and physical pain and distress resulting in post traumatic stress disorder, headaches and other physical pains.

The State Agency (DDSS) and Family Court denied Plaintiffs' their constitutional rights of due process and equal protection of the law by negligent, misplaced and incorrect court jurisdiction and misconduct resulting from incorrect, undocumented and unproven State deliberate **bad faith** and **malicious allegations** and **hearsay**, alleging Plaintiff Beatrice Weaver being "abused, neglected and vulnerable" and in "imminent danger of exploitation;" how and from persons or sources unknown and unidentified by DDSS, by other of the Defendants, or documented properly by the Family Court, and Defendants' misconduct by their blatant lack of respect for the "private realm of Plaintiffs' family life" which the U.S. Supreme Court says they "cannot enter."

Defendants and each of them knowingly, negligently and willfully violated the well established public legal doctrine universally recognized by professionals in elder law and practice, that the elderly preferred when possible, and are to be encouraged and facilitated by public agencies such as the Defendants, to stay in their own home instead of being incarcerated

3

in an alien public establishment, especially a third rate institution as in this case located some seventy miles from their residence. In short, Defendants, and each of them, violated the ancient dictum well established in historical common and statutory law: *debet sua euique domus esse perfugiumtutissimum*; that is, every man's house should be a perfectly safe refuge.

Defendants' joint and several actions described in this case, reflect the arrogant, uncontrolled, arbitrary, tyrannical and lawless extreme government regulation, police brutality, abuses, disrespect and disregard for the Rule of Law, legal and physical safety, citizens' rights, protections, and violation of privacy of citizens in their homes, all reminiscent of European and Asian fascist societies, all unworthy of an American community dedicated to the Rule of Law.

Defendants' acts were an outright regulatory unannounced attack on decent, law abiding, retired elder private citizens living in Dillon County, quietly minding their own business. Plaintiffs' rights were first violated by Defendant Phil. Wallace M.D. who on February 8, 2012, several weeks in advance before Mrs. Weaver's surprise unannounced police abduction on February 29, 2012, allowed his medical practice to be used for bogus regulatory and mis-placed court practices; i.e., conspiring and consenting without any explanation to Plaintiffs, to irregular administering elder Plaintiff Mrs. Weaver with anti-tuberculosis test injections necessary under law for admittance as a "detainee" in the "locked" Defendant Cottonwood facility. The DDSS and medical conspirators planned to confine the alleged "vulnerable" Mrs. Weaver ostensibly for life, using her assets.

On or about February 24, 2012 Defendant Wallace wrote an ambiguous, factually incorrect memorandum claiming Mrs. Weaver was "living alone" when he knew and should have known that her spouse Plaintiff Gary Weaver was at home as her caretaker. He stated Mrs. Weaver was "confused" while only a few months earlier and previously he certified that she was mentally competent. For two years his office refused to provide medical records, violating statutes. What motivated the said doctor and why would a "respectable" doctor be so negligent?

The irregular bad faith and malicious actions and malfeasance of DDSS case worker Defendant Pansy Page and her superiors are of dramatic legal proportions. The shameful regulatory violations and actions of the DDSS staff hiding behind the skirts of legal "immunity" for their statutory and administrative had faith infractions bordering on the criminal will astound the trial court and jury when the factual evidence is presented at trial.

The unannounced extreme forcible abduction of Mrs. Weaver by the three Defendant sheriff deputies and two burly E.M.S. staff who dragged Mrs. Weaver out of her bed by her arms and legs, and dumped and strapped her on a stretcher under threat of arrest and chains if Plaintiffs did not comply, was a pure fascistic physically abusive exercise of their police power over two elder unsuspecting, defenseless innocent victims of excessive, irresponsible regulatory and police authority, in violation of public trust and duty to Plaintiffs.

The foregoing recitation of Defendants' multiple legal and regulatory violations against Plaintiffs, documents the respective government agencies' flagrant abuses in denial of the Rule of Law, and the long established legal traditions and customs as provided in the Declaration of Independence, the second major underlying count in this Complaint. In relevant part, it states:

> "... Governments are instituted among Men, deriving their just Powers from the Consent of the Governed, that whenever any Form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government ... it is their Right, it is their Duty, to throw off such Government, and to provide new Guards for their future Security."
>
> Thomas Jefferson,
> *The Declaration of Independence*

The public policy roles and duty of the government agency and professional medical Defendants in this action are to administer their government responsibilities in accordance with, and not in abandonment or violation of the Rule of Law as provided in the Declaration. The government actions complained of herein are "destructive of these Ends;" i.e., of proper, non abusive, legally correct administration of government programs by the government agencies charged with public responsibility and accountability within the proper bounds of the law.

Notwithstanding their claim for damages herein, Plaintiffs believe it is incumbent on them as responsible law abiding citizens, to exercise their public duty and responsibility, their "Right and Duty" to petition the Court and Jury to hold the named Defendants publicly accountable for their flagrant legal violations, "to alter or to abolish such government" practices and "to institute new Government". Therefore, this Complaint is a petition to the Court and Jury to "throw off such Government and to provide new Guards" for the future security of the elderly community from further abusive government actions complained off herein.

Accordingly, this action duly filed in accordance with the Rule of Law, is for the Court and Jury to change and reform the government practices complained of herein, and for Plaintiffs

to recover for Federal and State law claims arising under the Federal and South Carolina Constitutions, the common and statutory laws and regulations, adherence to the Rule of Law, all of which arise or are generated or initiated from the same common accumulation and nucleus of Defendants' adverse actions, facts and circumstances of the case as presented herein. The causes of actions claimed herein against the Defendants collectively and respectively for good cause, are individual, multiple and cumulative as to actual and punitive damages and losses to Plaintiffs.

## COUNT I

### Venue, Jurisdiction and Judicial Notice

All incidents and events described herein took place within the personal and subject matter jurisdiction over the nature of the litigation and the parties, of the United States District Court, District of South Carolina, Florence Division, and the Dillon Court of Common Pleas, Fourth Judicial Circuit, Dillon County, State of South Carolina, Plaintiffs exhausted any applicable administrative and lower Family Court remedies and must resort to this civil and criminal action for relief, pursuant to **S.C. Code 1976 Ann. Section.15-77-50.**

Pursuant to **S.C. Code 1976 Ann. Section 19-3-120, et seq,** in its deliberations of this Complaint, this honorable court is respectfully requested to take formal judicial notice of Plaintiff Gary Weaver's **"Ex Parte Motion for Joinder or Alternatively for Interpleader; Objection and Rescission of Ex Parte Order of Custody, dated February 29, 2012; for Replacement of Guardian Ad Litem,"** filed in Dillon Family Court on March 12, 2012. This motion cites argument of law and fact that relates directly and supplements the arguments of law and fact relevant to this Complaint and documents Defendants violations of rules and statutes, etc.

Further, this honorable court is respectfully requested to take judicial notice of Plaintiff Beatrice E. Weaver's several legal documents that she timely filed with the Administrator of Defendant Cottonwood Villas Assisted Living Facility cited herein below, on the first day after her incarceration on February 29, 2012 at that third rate, substandard facility located (contrary to the rules) some seventy (70) miles out of Dillon County.. Said legal documents to be presented at trial, demonstrate and prove conclusively that Mrs. Weaver was not "confused", as claimed by Defendant Wallace herein, and was and who remains in complete control of her intellect and ability to think incisively, logically, clearly and correctly as to business and legal matters affecting her general welfare and social environment, contrary to Defendants' malicious and bad

6

faith affidavit claims to the Family Court on February 28 and 29, 2012. However, as a direct and proximate result of her unwarranted and illegal forced abduction and incarceration in a "locked" institution, Plaintiff Beatrice Weaver suffers *et alta*, from post traumatic stress disorder. (PTSD).

### COUNT 2

### The Parties

1.      BEATRICE E. WEAVER (hereinafter referred to as "Mrs. Weaver") is a resident at 1253 Harllees Bridge Road, Dillon S.C. 29536, since January 1995, and is a Plaintiff Pro Se in the above captioned action. Beatrice E. Weaver is a graduate of the University of Geneva in Switzerland where under her maiden name she undertook her doctoral "rigorosum" and obtained her academic degrees. She is a retired university educator and has traveled and lectured widely on her field of expertise. She is fluent in reading, writing and speaking in several languages, and in the 1960's, 70's and 80's she lectured widely as an expert on travel industry development. She was formerly a member of a Federal Commission on Travel Industry matters, and her career is listed in Who's Who.. At the time of the events complained of herein in 2011 and 2012, Mrs. Weaver was doing research and continues to do research for writing books and articles on elderly issues and world and national social and elderly issues. She actively participates as a volunteer in the organization and the conduct of several I.R.S. Section 501 (c) (3) organizations dealing with socio-economic issues affecting the elderly community. Mrs. Weaver is a mentally competent, exceptionally intelligent and intellectually astute, very aware, eighty seven (87) year old, elegant, sophisticated and worldly elder lady, who is in full control of her intellectual faculties. Since 2004, she has survived three different cancer bouts, a stroke, and two major surgeries. Because of arthritis, Mrs. Weaver walks with a cane very slowly, and occasionally uses a wheelchair. The factual evidence proves that at no time, under any circumstances, has she ever been an "abused, neglected, vulnerable adult in imminent danger of exploitation," by anyone, nor in need of "protective custody" as irresponsibly, incorrectly, capriciously, and maliciously and in bad faith, claimed by Defendants, and each of them, in their joint public court statements. Their false and collective statements and activities are sinister, and a gross miscarriage of justice, excessive abusive and violations of regulatory authority, control and license, and egregious judicial conduct irregularities, as complained of herein by Plaintiffs. In plain language, the Dillon Department of Social Services ("DDSS") action complained of herein, was a complete premeditated travesty of justice accommodated by a negligent and cooperative, ill informed

7

Family Court, Dillon County Sheriff Office, with a slipshod, negligent failure by all designated defendant parties and each of them, to undertake due diligence. The resultant fictitious and misleading DDSS allegations lack any factual evidence claimed of abuse, neglect or "vulnerability" which would require forcible police "protective custody" from some non existent imagined "imminent danger" to Mrs. Weaver from unidentified persons.

2.    GARY W. WEAVER. C.L.U., Ch, F.C., A.B., M. B.A. is a resident at 1253 Harllees Bridge Road, Dillon S.C. 29536, (hereinafter referred to as "Weaver"), spouse and full time caregiver of Beatrice E. Weaver, and is a Plaintiff Pro Se in the above captioned action. Gary Weaver is a graduate of Stanford University, and the Heubner School of Finance, American College. He is an elder retired professional whose career included military service, politics, legislation, academia, business and economic development in numerous countries of the world. On or about November 2, 2011 Plaintiff Pro Se Gary Weaver suffered a heart attack requiring four (4) bypass surgeries, hospitalization and rehabilitation until December 22, 2011, followed by a serious bout of pneumonia requiring hospitalization in April 2012. He has recovered from both ailments and is in full control of his faculties, and remains physically and mentally agile. In University, Mr. Weaver achieved success in several sports as a young man, and as a hobby was a martial arts student and instructor for some twenty five years. He was and is capable of being a full time caregiver to his spouse. This was a fact well known and should have been known to Defendants and each of them, prior to their ill advised, adverse, capricious and malicious regulatory and court activities and incorrect legal documents complained of herein. Following her incarceration described herein, Mrs. Weaver duly executed a Power of Attorney for Mr. Weaver to represent her. The Dillon Department of Social Services refused to recognize and accept the said Power of Attorney in violation of its Rules, thus negating Mr. Weaver's legal position as authorized caregiver with responsibility and authority to execute legal documents in connection with the Departments' illegal and ill fated activities complained of herein.

3.    From the outset, Plaintiffs were unfamiliar with the regulatory mandate, scope, administrative, legal and regulatory practices of DDSS which were never explained by DDSS to Plaintiffs. Plaintiff Beatrice Weaver who suddenly became a DDSS patient without having a proper understanding of its functions and the nature of their public services, thinking it was a State charitable organization, had a reasonable expectation that she would be in a safe and protected, properly delivered and managed DDSS service environment at all times while in

8

DDSS care. The DDSS and staff owed a duty to Plaintiffs to provide a safe and protected, properly managed service with such duty to include the proper screening, hiring and supervision of its employee Defendant Pansy Page, and Plaintiffs had a reasonable expectation that the case workers in the DDSS Dillon County jurisdiction would not violate the statutes, and regulations and the confidence and trust of its patients.

4.    At the time of the events complained of herein, Defendant DILLON DEPARTMENT OF SOCIAL SERVICES located at 1211 Highway 34 West, Dillon S.C. 29536 (herein referred to as "DSS"), a branch of the SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICE (hereafter referred to as "SCDSS"), both being agencies of the Government of South Carolina, were engaged in providing social services to the Dillon County community and Plaintiffs herein. Said DDSS services provided Plaintiffs, were comprised of at least four types as described in selected chapters of the SCDSS **"Adult Services Policy and Procedure Manual;"** Chapter 1: Referrals and Resources; Chapter 3:   Homemaker Services, Chapter 4: Adult Protective Services; and Chapter 5, Placement; (herein collectively and individually referred to as **the "Rules"**). All of these services (discussed further herein below) DDSS violated maliciously in a deliberate, planned and executed excessive abuse of regulatory authority and license. In bad faith, DDSS maliciously, tortiously and irresponsibly violated the DDSS Rules and damaged Plaintiffs as a direct and proximate result thereof by the willful and wanton negligent acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants, which include but are not limited to: improperly, capriciously, negligently, carelessly, maliciously, tortiously, and/or wrongly providing, denying and abusing social services to Plaintiffs at the time of the events complained of herein..

5.    At the time of the events complained of herein, Defendant JACKIE ROWLAND whose business address is 1211 Highway 34 West, Dillon S.C. 29536 (hereinafter referred to as the "Director,"), was the County Executive Director of DDSS responsible for supervising the implementation of the State Government statutes and stipulated policies, practices and rules of the DDSS agency in providing social services to the Dillon community and Mrs. Weaver. At the time of the incidents complained of herein, Defendant Rowland was an employee, and was at all times relevant herein, acting within the scope of her employment as supervising Executive Director. Inter alia, these executive duties include receiving referrals for services for an individual, assigning the request to a caseworker, responsibility as supervisor for being

9

knowledgeable about community and state resources in the community, to maintain cooperative relationships to assure maximum use is made of all local resources and help case workers know of all the services offered in the county and state. The supervisor is responsible for a client's "thorough needs assessment," which requires that the client and the DDSS caseworker "will discuss what needs to be done to help the client." A case plan with a goal and objectives will be formulated **and the client and DDSS** caseworker will decide what action each will take in order for the objectives to be met. **Ibid. Item 110.** The supervisor reviews the Needs/Risk Assessment and Case Plan, and signs the Case Plan. **Ibid, Item 149.** When a client receives direct services from the DDSS, an "Adult Services Face sheet" is used to maintain demographic information to assist in identifying resources for the client. **Ibid Item 124.** None of these services were carried out or were abused and neglected by DDSS under the supervision and direction of the Director. No plan of any kind as required by the DDSS Rules was ever made by anyone at DDSS under the direction of the Supervisor as described herein.

6.     Defendant KAREN ENGLISH whose business address is 1211 Highway 34 West, Dillon S.C. 29536 (hereinafter referred to as the "Manager") was the Manager/Administrator of DDSS, responsible for supervising the daily operations and activities of the DDSS personnel and their respective compliance pursuant to the government statutes and stipulated rules and regulations for providing social services to the Dillon community AND Mrs. Weaver. At the time of the incidents complained of herein, Defendant English was an employee, and was at all times relevant herein, acting within the scope of her employment as Manager/Administrator. This Defendant was negligent and participated in the violations of the Rules complained of herein by Plaintiffs and is liable for the damages sustained by Plaintiffs as described herein. None of the Administrative services required for proper delivery of DDSS social services were carried out or were abused and neglected by DDSS under the supervision and direction of the Manager. This defendant had a duty to Mrs. Weaver to examine the case in detail, when filing for protective custody under the Adult Protective Services mandate. The evidence indicates she never did any due diligence to verify the DDSS caseworker's claims, but conceded to DDSS Caseworker Pansy Page's bad faith and malicious misrepresentations, and failed to process and examine the veracity and factual bases in detail related to the Case which were built on evidentiary "sand." The Manager never contacted Plaintiffs to discuss the case as required by the DDSS Rules.

7.    Defendant PANSY PAGE-McELVEEN whose business address is 1211 Highway 34 West, Dillon S.C. 29536 , is a career, so-called "Caseworker" employee of DDSS as defined in the SCDSS Policy and Procedures Manual, infra, (herein referred to as the "DDSS Caseworker Page") At the time of the incidents complained of herein, Defendant DDSS caseworker Page was an employee, and was at all times relevant herein, acting within the scope of her employment as a DDSS caseworker. This caseworker was responsible for day to day provision of social services to Plaintiff Beatrice E. Weaver and other patients in the community, in accordance and compliance with the State statutes ( e.g., **S.C.. 1976 Code Ann. Sect. 43-35-10 et seq)**, and the stipulated Policy and Procedures rules and regulations governing the operations of DDSS. This Defendant was the main, direct and proximate perpetrator, participant and initiator of the many capricious, malicious, sinister, collusive, and secretive manipulations in **bad faith** and violations of the SCDSS Rules complained of by Plaintiffs herein. For example, inter alia and not limited thereto, this DDSS caseworker deliberately, neglectfully, wantonly, tortiously and maliciously in bad faith violated **Rule 503.01.01 "Level of Care," Rule 503.01.03, "Selection of a Facility", Rule 503-02. 01 "Signing Application Forms," Rule 503.02. 02 and SC. Code 1976 Ann. Sect. 43-7-350 "Plan of Care," and Rule 505 "Placement in Another County" and others of the DDSS Rules  Op cit.**

8.    These three DDSS Defendants wantonly, capriciously, recklessly, negligently, knowingly, willingly, deliberately, tortiously, and maliciously in bad faith violated judicial court and administrative conduct and regulatory procedures, and Plaintiffs' rights and privileges pursuant to the said state statutes and procedural rules and regulations as complained of herein. These defendants knew and should have known of the statutes and stipulated procedural rules and regulations that they knowingly, willingly and tortiously violated. These Defendants had a duty to Plaintiffs as recipients of publicly supported and provided social services to responsibly and with care to properly provide due diligence in the provision of DDSS services in accordance with and not in violation and dereliction of the DDSS and court procedural rules and regulations. By reason of the deleterious, negligent and malicious bad faith acts, errors and/or omissions of Defendants, and each of them, Plaintiffs suffered serious damages including but not limited to shock, fear, terror, invasion of privacy, severe gross emotional and psychological stress and trauma, physical post traumatic stress disorder, extreme pain, constitutional and civil rights violations; not to mention not practicing ordinary common care and decency in dealing with an

11

86 year old, disabled and sick elder woman. All three Defendants separately on different occasions, characterized Mrs. Weaver to her spouse as being "difficult" "demanding" and "unpleasant," which are not any logical reasons justifying the three defendants violating their rules and regulations and creating non existent allegations of abuse, negligence, vulnerability and imminent danger, etc. From the very beginning and throughout the relationship with DDSS, Mrs. Weaver requested a copy of the DDSS Rules on some ten occasions with the DDSS caseworker Page, in order to know and understand the services that could and could not be provided, etc. All three of the named DDSS personnel herein consistently refused to provide Mrs. Weaver (and Mr. Weaver who also requested a copy several times) with a copy of the Rules. Because of her repeated requests as an authoritative, competent former university professor, all three Defendants branded her a being "demanding," "difficult" and "unpleasant," the reasons underlying the abuses and neglect they maliciously administered to her as described herein.

9    The DDSS and Defendants Rowell and English were responsible for the selection, screening hiring supervision, administration and management of the DDSS staff including Defendant Case Worker Pansy Page, each of which were collectively and respectively responsible for the proper regulatory treatment of DDSS patients including Plaintiffs, in the Dillon County jurisdiction of DDSS, pursuant to the DDSS federal and state statutes and rules, and all three Defendants were acting within the course, scope and framework of their employment and professions and as agents, employees and servants of their DDSS jurisdiction.

10.    During the period of service provided Plaintiffs from November 2011 through March 2012, the DDSS Director and Manager knew or should have known that its case worker Defendant Pansy Page was **in bad faith**, violating DDSS rules and procedures, including inter alia, the following: refusal to provide patient records as requested by Plaintiffs; illegally re-directed payment of Plaintiff Beatrice Weaver's social security benefits to DDSS after the Family Court dismissed the DDSS Complaint for protective custody; filing two false and incorrect affidavits in Family Court; engaged in procedural court misconduct; mis-communications and no communications of her intentions and her adversary activities with Defendant Wallace, Plaintiff Beatrice Weaver's primary physician; all while undeclared, surreptitiously planning a false claim for protective custody and removal to an out of county facility, while allegedly only providing transportation and other services for Plaintiff Beatrice Weaver.

11.. The DDSS Director and Manager owed a duty to Plaintiffs to ensure these bad faith activities did not occur and that Plaintiffs were receiving DDSS services in accordance with its rules and regulations. Defendant Pansy Page owed a duty to Plaintiffs to conduct her professional responsibilities and obligations in accordance with DDSS rules and statutes, and not to violate in bad faith the trust and confidence extended to her and DDSS by Plaintiffs.

12. At the time of the events complained of herein, Defendant JAMES P. WALLACE, M.D. (hereinafter referred to as "Wallace") was a Principal of Dillon Internal Medicine Associates, P.A, a South Carolina Professional Association (hereinafter "Dillon Associates"), serving the Dillon County community and both Mr. and Mrs. Weaver, located at 705 North 8th Ave, Dillon S.C. 29536. At the time of the incidents complained of herein, Defendant Wallace was a principal, associate and/or employee, of Dillon Associates, engaged in internal medical practice and/or employment. Defendant Wallace, a practicing physician, was the Primary Physician attending Plaintiff Beatrice Weaver for some fifteen (15) years. At the time of the events complained of herein, Defendant Wallace was at all times relevant herein, acting maliciously in bad faith outside the scope of his internal medical practice, professionally unqualified in gerontology and gerontology forensics to dispense the comments and advice he delivered secretively in a memorandum dated February 24, 2012 addressed ambiguously without notarization, "To Whom It May Concern." Defendant Wallace secretively issued the said Memorandum "behind her back" without a copy or prior notice to or discussion with Mrs. Weaver his long time patient who trusted him. This Defendant negligently and wantonly exceeded his professional capabilities and qualifications, provided negligent medical services to Plaintiff Beatrice Weaver, engaged in medical malpractices, misinformation, intentional lies and misrepresentations, malicious, bad faith, coercive, secretive, sinister conspiratorial and surreptitious activities working collusively and cooperatively with DDSS Defendant Caseworker Pansy Page, jointly and severally in violation, but not limited only to violation of the DDSS agency's rules and regulations, relevant medical and DDSS State statutes, rules of procedure and state medical certification. In violation of medical regulations, Dillon Associates, Defendant Wallace and his staff, deliberately and/or negligently and maliciously engaged in withholding, falsifying and manipulating medical reports and records duly requested by Plaintiffs, and denied administering anti TB shots by his staff which were requested and approved by an unnamed staff member of Dillon Associates. .

13

13.    At the time of the events complained of herein, Defendant COTTONWOOD VILLAS ASSISTED LIVING FACILTY, INC, located at 800 West Church St, Bishopville S.C. 29010 (hereinafter referred to as "Cottonwood"). Cottonwood is a South Carolina corporation engaged in the business of providing assisted living services to elderly persons including those referred to it by DDSS. FELICIA GAINEY is the Executive Director of Cottonwood, · (hereinafter referred to as "Gainey"), and Defendant HARRIET SHEALEY (hereinafter referred to as "Shealy") is the Administrator of Cottonwood respectively. At the time of the incidents complained of herein, Defendants Gainey and Shealy were employees, and were at all times relevant herein, acting within the scope of their respective employment as Executive Director and Administrator. As a direct and proximate result of the cooperation, active and direct participation of these Defendants, in violation of the state's rules and regulations, and statutes, Plaintiff Beatrice E. Weaver was forcibly **kidnapped** against her will, without her consent or any prior notice, and forcibly relocated by ambulance under force and physical restraints, and forcibly admitted and incarcerated (intended permanently) in Cottonwood after approximately 7.00 p.m. on Wednesday, February 29, 2012. Contrary to **Rule 503.01,03, without the involvement or prior knowledge of Plaintiff Gary Weaver the "relative" and spouse in this case,** Defendant DDSS and Cottonwood placed Mrs. Weaver as an unwilling, protesting patient in Cottonwood a third rate substandard, socially and culturally incompatible facility with abusive, arrogant staff, and uneatable "cultural" food, against her wishes, preventing the involvement of her spouse who was not "absent", "especially in the selection of the facility" See, DDSS Rules on this point..

14.    Pursuant to **Rule 503.01.01**, placement by DDSS of a patient in a facility requires a medical statement completed by a physician on clients going into residential care facilities. The statement must demonstrate that the client's needs can be met in the facility and that the client is free of contagious or infectious disease. This rule was violated by DDSS and Cottonwood defendants who placed Mrs. Weaver in a very tiny room shared with one other very sick female patient, and a small bathroom smelling of urine, shared with three other patients, violating the SCDSS Rule requirement for "the third degree of consanguinity." Defendant Cottonwood caters to some 99% black patients and staff which provided an incompatible and alien cultural, physical and socio-economic environment for Mrs. Weaver, contrary to DDSS Rules. Incarceration in Cottonwood was akin to placement in prison under constant control of the aggressive,

14

uncooperative, abusive staff that stole personal items. The staff controlled every aspect of Mrs. Weaver's daily life. They searched and inspected her personal objects, clothing and possessions; expropriated personal items and medications which were not returned and not administered as needed; they stole her food, and clothing; they controlled her telephone calls with no telephone in her room, and she was confined under locked doors. Worse, the staff were abusive, antagonistic "rough" and physically and verbally abusive to Mrs. Weaver.

15.    To enter Plaintiff Beatrice E. Weaver as a patient of Cottonwood, Defendants Gainey and/or Shealy and Defendant caseworker Pansy Page, acting illegally and secretively without Mrs. or Mr. Weaver's legal authority, perpetrated fraud and fraudulent inducement without Mr. or Mrs. Weaver's participation, and perpetrated a fraudulent act. Thus they thereby fraudulently and illegally committed Plaintiff Beatrice Weaver, and each of them is liable for fraudulently executed legal documents without the knowledge or consent of Plaintiff Beatrice E. Weaver or her spouse. Said documents converted and illegally confiscated Mrs. Weaver's social security income and mis-directed them under the control of Defendants Gainey and Shealy and DDSS's caseworker Page., The said defective and illegal documents were intended to commit Mrs. Weaver (prior to the scheduled merits hearing, to actual and unpredictable future financial, other obligations and liabilities, and potential damages and losses, in violation of the state Rules and regulations and statutes. Thus, any accumulated deficiencies in Cottonwood monthly payments subjected Mrs. Weaver to loss of other personal assets to make up for any shortages (e.g. a forced sale of her home or personal possessions). See below discussion.

16.    SCDSS **Rule 503.02.01** refers to the **Signing of Application Forms** at a facility. This rule states: "**It is appropriate that a relative of the client sign the forms. In the absence of a relative willing to complete and sign the forms, the case worker may have to sign the forms in order for the client to be admitted.**" The Cottonwood Defendants and DDSS Caseworker knew and should have known that Mrs. Weaver was being physically man-handled, and admitted against her and Mr. Weaver's will, without their consent. Further, they knew and deliberately ignored the requirement that Plaintiff Gary Weaver, the spouse and caregiver of Mrs. Weaver, a "relative," should sign the forms pursuant to **Rule 503.02.01.** Note that plaintiff Gary Weaver was threatened with arrest if he did not comply with the bogus court order and complaint. Both the DDSS caseworker and the Cottonwood staff willingly, knowingly and deliberately denied this Rule requirement, violated this rule, and each of them are hereby

severally and jointly held accountable by Plaintiffs for endangering the financial future of both Plaintiffs without their knowledge or consent and in violations of the DDSS Rules See below discussion. Caseworker Page made no effort to have Mrs. Weaver remain in her residence, or for Plaintiff Gary Weaver to accompany his wife and travel to Cottonwood in order to comply with the rules and comply with Plaintiff's rights as to representation for admittance to Cottonwood.

17.    At all times during these events complained of herein, these three Defendants negligently, maliciously, and conspiratorially acted in bad faith outside the legal scope of their employment. The above described incidents took place as a direct and proximate result of the negligent and illegal acts and/or omissions of Defendants and each of them, which include but not limited to fraudulently, improperly, negligently, carelessly, tortiously, and/or wrongfully executing placement and legally binding documents in the name of Plaintiff Beatrice Weaver without her knowledge or consent, by reason of which she was committed fraudulently to actual and future financial dis-function and other damages.

18.    The Defendants DILLON COUNTY SHERIFF'OFFICE, (hereinafter referred to as the "Sheriff") and Defendant Deputy Sheriffs JOHNIE MAY SMITH, CHADDIE HAYES, and LINDA MAIMQUIST, (hereinafter referred to respectively as "Sheriffs"), are located at 303 West Hampton St, Dillon S.C. 29536. At the time of the incidents complained of herein, Defendant Deputy Sheriffs were respectively employees, and were at all times relevant herein, acting within the scope of their employment as Deputy Sheriffs in Dillon County.. On the evening of Wednesday, February 29, 2012, the three Defendant Deputy Sheriffs (one male and two females) accompanied two DDSS representatives, the caseworker and an unknown female "Doe 1," and two E.M.S employees, totaling a team of seven (7) persons, to Plaintiffs' residence at 1253 Harllees Bridge Road, Dillon S.C. 20536.

19.    By opening a twenty (20) foot wide front gate to the property, without prior notice or plaintiffs' permission or knowledge, or warrant, the said party of seven trespassed on the residence grounds  with their respective persons and automobiles unannounced without permission, without a required search warrant, or even an Inspection Warrant pursuant to Rule 403.07, and without any prior verbal or written notice of intent to Plaintiffs, from either the Sheriff or the DDSS personnel, or the defendant Wallace, as required under the Rules and statutes. Unknown to Plaintiffs, the purpose of the unannounced trespassing and illegal entry, was to illegally "search and seize" to take Plaintiff Beatrice Weaver into "protective custody"

16

pursuant to a bogus Family Court Ex Parte Motion incorrectly executed the day previous on February 28, 2012, and a DDSS Complaint and a Court Order executed that same morning of February 29th, at about 11.30 a.m; both documents being based on the aforesaid memorandum from defendant Wallace, and an sworn affidavit filed by the caseworker Page. Defendant Wallace's memorandum was inadmissible evidence under Family Court **Rule 7 (c)** and case law. The caseworker's affidavit contained inadmissible hearsay evidence. See, **Cook vs. Cobb, (1978) 271 S.C. 136, 245 S.E. 2d 612; DSS vs. Flemming, (1978) 271 S.C. 15; 244 S.E.2d 517.** The secretive and conspiratorial judicial procedures for the Family Court hearings on the execution of the said bogus and improper court documents remains a mystery at this time, subject to future discovery procedures in this action, particularly as to Defendants' unexplained collusion.

20.. Notwithstanding the DDSS questionable judicial procedures for obtaining the said court documents, Plaintiffs were denied due process and equal protection of the law; for example, pursuant to Family Court **Rule 9**, Plaintiffs were denied the opportunity to file objections to the admissibility of evidence which in this case, was determinative of the Court's illegal protective custody order and previous ex parte motion. **On February 28 and 29, 2012, Plaintiffs were denied and did not have legal representation before the court.**

21. Under threat of arrest and handcuffs if he resisted, Plaintiff caregiver Gary Weaver objected to the court documents to the sheriff deputies present and especially to their illegal entry, search and seizure of Mrs. Weaver and the premises, and was forced to let the Sheriff Deputies into the residence. Again, under threat of arrest if he interfered, he was not permitted to enter his residence or contact Mrs. Weaver without being accompanied by a deputy sheriff. Subsequently, he was forced to stand by and watch his wife Beatrice Weaver approached by the sheriffs in her bedroom. She was in shock, terror, fear, and pain, against her objections and without her consent, (a violation pursuant to the DDSS Rules), being physically dragged from her bed, bathroom and bed room by the three Deputy Sheriffs working together physically manhandling a physically disabled Mrs. Weaver pulling her by the arms and legs (she has two painful bad hips) and back, using excessive force amounting to unnecessary police brutality under the circumstances, and threatening to "put her in chains.". They knew and should have known (from Defendant Wallace and the court documents) about Mrs. Weaver's degenerative disease of her back and hips and the associated pain which was exacerbated by their forced

17

abduction of Mrs. Weaver. In the residence hallway, they handed her over to two huge, burly, physically threatening E.M.S. attendants who forcibly lifted and dumped her as if she was a criminal, strapped her dressed only in her nightgown and barefooted, on a stretcher they had placed in the hallway against Plaintiff Gary Weaver's objections and request to remain outside on the front porch. The two E.M.S. attendants wheeled the stretcher out of the residence hallway into the extreme cold of the night with Mrs. Weaver clad only in her "cuddle duds" three piece underwear without even socks, placed her in their police wagon with two deputies guarding her, and then drove away to an unannounced destination unknown to either Mr. or Mrs. Weaver, under guard of the two sheriffs. **Mr. Weaver was left behind in the residence and not told of the destination of the police wagon until several days later, the following Saturday...**

22.     During this illegal and threatening event, and lack of Defendants' sensitivity training, Mrs. Weaver who suffers from degenerative disease of the back and hips, suffered severe shock and trauma, extreme emotional and psychological stress, extreme physical pain, injury and discomfort from the three Deputy Sheriffs and EMS staff physical manhandling and excessive force in removing her from her bed, out of the bedroom and bathroom, into the hallway and handing her to the EMS Staff that they had called who physically dumped and strapped her on a gurney like a sack of potatoes, and driving her strapped in the ambulance with two sheriffs in attendance, to the unknown destination,.

23.     As a direct and proximate result of this experience, and negligent and incompetent acts and/or errors of judgment, harassment and omissions of Defendants, Plaintiff Beatrice Weaver suffered severe injuries to her back and hips and stomach, from which she has suffered in the past, and will continue to suffer in the future, embarrassment being dressed only in a flimsy three piece underwear, invasion of privacy, illegal search and seizure, violation of civil and constitutional rights, and post traumatic stress disorder which continues to this day. The unexpected appearance in her bedroom without prior notice of three Deputy Sheriffs all descending together on her in her bedroom and man handling her out of bed caused her extreme stress, shock, surprise, sheer terror and anguish from which she has not yet recovered.

24.     Defendants DILLON COUNTY EMERGENCY MEDICAL SERVICES (hereinafter referred to as ("EMS"), and Defendants DOE 2 and 3 (herein referred to respectively as "EMS Staff") are located at  1415 East Main St, Dillon S.C. 29536. At the time of the incidents complained of herein, the EMS Staff Defendants were employees, and were at all times

relevant herein, acting within the scope of their employment. On the evening of Wednesday, February 29, 2012, the two huge burly male EMS Staff were called to Plaintiffs' residence by a Deputy Sheriff when Plaintiffs objected and verbally resisted being placed under protective custody of DDSS and sheriffs who threatened to place her in chains. The EMS defendant staff arrived at the residence with an ambulance at about 6.00 p.m. They brought from the ambulance a very large mobile stretcher on wheels into the hallway of the house through the front door without the permission of Plaintiff Gary Weaver who requested the two EMS staffers to keep the stretcher out of the hallway on the front porch to avoid damages to the entrance, doors, carpets and furniture, antiques, etc. They ignored the request. This was invasion of privacy and without a warrant and over the objections of Plaintiff Gary Weaver. .

  25.  The three Deputy Sheriffs manhandled Plaintiff Beatrice Weaver, dragged her out of her bed, bedroom and bathroom into the hallway over her objections and verbal resistance, where they handed her over in her underwear to the two huge burly EMS Staff who lifted her bodily and dumped her onto the stretcher and strapped her down like a criminal and sack of potatoes, so she could not move. Then they took the stretcher out of the hallway, down the four front stairs and rolled the stretcher some 100 yards to the front gate, and placed the stretcher and Plaintiff Beatrice Weaver, in the sheriff's wagon, again with Mrs. Weaver verbally objecting all the way. Plaintiff Gary Weaver was forced to watch this whole process under threat of arrest and handcuffs if he interfered. The EMS ambulance then drove her out of the county, some seventy (70) miles to Defendant Cottonwood in Bishopville, S.C. with Mrs. Weaver ignorant of the destination where she was being taken against her will. All this time Plaintiff Beatrice Weaver was dressed only in her three piece underwear, without even socks, personal belongings, etc, in violation of DDSS Rules. During this event, Mrs. Weaver who suffers degenerative disease of the back and hips, suffered trauma, extreme emotional and psychological stress, physical pain, injury and discomfort from the EMS physical manhandling and excessive force in dumping her on the stretcher and transporting her in the ambulance against her will into a cold winter night without even socks on her feet for warmth. Caregiver Gary Weaver asked the sheriff to hand Mrs. Weaver a brown house coat.

  26.  As a direct and proximate result of this experience, and/or negligent acts and/or errors and omissions and incompetence of Defendants, Plaintiff Beatrice Weaver suffered severe

19

injuries to her back and hips from which she has suffered in the past, and will continue to suffer in the future, extreme embarrassment and post traumatic stress disorder.

27.    Defendant FLORENCE VISITING NURSES SERVICE, Inc (hereinafter referred to as "Nurses"), is a South Carolina business organization located at 1605-C West Palmetto St, Florence S.C. 29502. Defendant Nurses claim to have visited Mrs. Weaver on two occasions on November, 8 and 10, 2011. The attending Nurses employees are unknown at this time and are classed herein as DOE Defendants 4 and 5. Accordingly, at the time of the incidents complained of herein, said DOE 4 and 5 Defendants were employees of Nurses, and was at all times relevant herein, acting within the scope of their employment. The said two Nurses visits were apparently in the nature of DDSS "Homemaker Services" described herein below, and pursuant to Medicare rules and procedures. Any such social services offered to Plaintiffs were considered to be incompetent, innocuous, inappropriate, ineffective, uncooperative, useless and a waste of taxpayer's funds and potentially dangerous to Plaintiff's health, and factually incorrect in their formal reports to Medicare..

28.    Notwithstanding the incompetence and lack of service, Nurses is reported by DDSS Caseworker Page in her affidavit to the Family Court, to have filed a Report she obtained in some unknown manner, pertaining to Nurses alleged two brief innocuous visits to Plaintiff Weaver in her residence on two occasions reportedly on November 8 and 10, 2011. Nurses have refused to provide Plaintiffs with evidence as to who opened the 20 foot closed front gate to permit them to enter the premises. The Nurses Report was cited in the Affidavit of Defendant Page filed in support of the DDSS Complaint and bogus improper Ex parte Order for Protective Custody from the Family Court filed on February 28, 2012, which cited it as part justification for granting the Order. The Nurses Report as cited in the said Affidavit, was factually incorrect, misleading, and malicious, reflecting Nurses response to Plaintiff's refusal to utilize their incompetent and ineffective time wasting services. It is not clear from the Affidavit, if the Nurse's Report to DDSS or the caseworker Page, was a verbal filing or in writing to the DDSS. In any event, the cited Report was not notarized, and a copy was not included in the Caseworker's Affidavit to the Court and Nurses were apparently not present as witnesses in court. Neither was the Plaintiffs permitted to be present in court to cross examine the Nurses as to the accuracy, mistakes and misinformation of their cited Report. **The said Report was inadmissible hearsay evidence and should have been ignored by the DDSS attorney and**

caseworker, and the Family Court, all of which knew or should have known the Nurse's Report was inadmissible hearsay evidence. In violation of DDSS rules, and court procedures, a copy of the Nurses' Report as cited was never made available to Plaintiffs by DDSS which refused to remit same. In short, the Family court was negligent in accepting the Nurses report whish along with Defendant Wallace's February 24, 2012 letter, was in admissible evidence.

29.    Defendant Caseworker Page's Affidavit was misleading and factually incorrect in toto, and with respect to the Nurse's Report, it was inadmissible hearsay evidence, irrelevant and inadmissible as evidence under **Rules 402, 802 Rules of Evidence (SCROE")** and **Rule 7 (d) SCFCR. See, State vs. LaCoste (S.C. App. 2001) 347 S.C. 153, 553 S.E. 2d 464.** The secretive and conspiratorial judicial procedure for the Family Court hearings on the said court documents is a violation of judicial conduct subject to discovery procedures in this action.

30..    Notwithstanding the DDSS questionable judicial procedures for obtaining the said court documents, Plaintiffs were denied due process and equal protection of the law; for example, pursuant to Family Court **Rule 9**, Plaintiffs were denied the opportunity to file objections to the admissibility of the Affidavit hearsay evidence which in this case, was determinative of the Court's inappropriate protective custody order and previous ex parte motion. On February 28 and 29, 2012, Plaintiffs were denied legal representation to cross examine DDSS witnesses, to testify and oppose the motions, etc.

31.    As a direct and proximate result of this experience, and/or negligent acts and/or errors and omissions of Defendant Nurses, Plaintiff Beatrice Weaver suffered severe damages as described herein, violations of court procedures rules, constitutional violations, injuries to her back and hips from which she has suffered in the past, and will continue to suffer in the future, duress, extreme, pain and embarrassment, and post traumatic stress disorder.

32.    Defendant JOHN D. McINNIS, JR, (hereinafter referred to as "DDSS Counsel"), whose address is 304 West Harrison Street, Dillon S.C. 20536, represented DDSS as its legal counsel before the Family Court in this action. Said DDSS counsel violated **Rule 11, SCRCP** by violating the Family and Circuit Court rules of procedure by negligently, carelessly and incorrectly executing and filing defective court documents thereby negligently misleading the Family Court as discussed herein, that resulted in Plaintiff Beatrice Weaver being ordered taken into protective custody against her wishes and of her caregiver, and causing her injuries and damages as described herein. As a direct and proximate result of the above described defective

21

court procedures and judicial conduct, and/or negligent and careless professional acts and/or errors and omissions of Defendant DDSS Counsel, Plaintiff Beatrice Weaver suffered severe damages as discussed herein. .

33.. Defendants JOHN/JANE DOES1-10, DOE PARTNERSHIPS, CORPORATIONS AND/OR OTHER ENTITIES 1-10 are named here under fictitious names for the reason that their true identities are presently unknown to Plaintiffs except that that they are persons and/or entities who are agents, associates, masters, servants, employees, employers, or representatives of the named Defendants; and/or who were in some manner presently unknown to Plaintiffs engaged in activities alleged herein; and/or who are in some manner, together with Defendants, responsible for the injuries or damages to Plaintiffs and/or who conducted some activities in a negligent, irregular, illegal, malicious, careless, pre-mediated, fraudulent or dangerous manner, which negligent or dangerous conduct was a proximate cause of duress, injuries and damages to Plaintiffs and/or who are in some manner related to the named Defendants.

34. In an attempt to determine the names and identities of any other person and/or entities, Plaintiffs have attempted to contact witnesses to the events that occurred in this action. Plaintiffs at this time are unable to identify the names and identities of the persons and/or entities described in this section until Plaintiffs proceed with discovery. Plaintiffs pray leave to insert herein their true names and capacities, and/or responsibilities when the same are ascertained.

35. Plaintiffs allege that the causes of action against the Defendants and each of them are grounds for the charges filed herein, inter alia: As a result of all the activities of Defendants, each of them and collectively, the Plaintiffs' public reputation and economic wellbeing, have been seriously damaged. Plaintiff Beatrice Weaver has seriously suffered physical, mental and emotional anguish and stress with permanent harmful effect with such damages having been a proximate and actual result of the acts, errors and omissions of the Defendants and each of them. Plaintiffs have incurred medical, legal and other related expenses as a result of the acts, and/or omissions of the defendants and each of them. As a result of the harmful activities perpetrated against his wife and his efforts to protect her against the DDSS, Plaintiff Gary Weaver was denied the well being, companionship, comfort and coverture of his wife, and seriously suffered mental and emotional anguish and stress, expense, with permanent

harmful effect with such damages having been a proximate and actual result of the acts, errors and omissions of the Defendants and each of them.

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 3

### The Factual Background

For a separate and distinct claim for relief, Plaintiffs allege as follows:

36.    Plaintiffs reallege and incorporate the introduction and paragraphs 1-35 as if fully set forth herein, and wherein certain facts are alluded to in defining the parties and their respective roles in this action.  Following are more detailed accounts of the facts pertinent to this action. .

37.    On or about November 2, 2011, Plaintiff Gary Weaver was hospitalized at McCloud Hospital in Florence, and underwent four by pass heart surgeries. On or about November 7, 2011, he was transferred to Health South in Florence for rehabilitation services. On or about November 28, 2011 Weaver was transferred to Florence Rehabilitation and Nursing Center in Florence. On or about December 22, 2011 he was discharged from the latter Center and returned to his residence at 1253 Harllees Bridge Road, Dillon S.C. 29536 He was present at the time on February 29, 2012, the DDSS team came unannounced to the house to take Plaintiff Mrs. Weaver into "protective custody" from some mysteriously imagined mythical "imminent danger" as a "vulnerable adult."

38.    Prior to his discharge from the Florence Center, on or about December 18, 2011 two officials (DOES 5 and 6) of the Florence Center accompanied Weaver to his residence and conducted an inspection of the premises. The express specific purpose of the inspection was to determine if Weaver could physically act as a full time caregiver to his wife given his heart condition. While at the Center, the staff knew of this intention and specially designed physical therapy for Weaver with that purpose in mind. The inspection of the house and Weaver's ability to physically act as caregiver was very thorough. For example, the two staff members measured the height, length and width of front and back stairs and Weaver's ability to navigate them. They inspected the bedrooms, bathrooms and kitchen to see if he could handle the cupboards, utensils and cooking instruments, etc. They determined that Weaver could physically assist his wife as caregiver on his release from the Florence Center on December 22, 2011. During this visit the

23

DDSS caseworker Page was present and witnessed the activities of the team investigating the house and Weaver's ability to be a caregiver upon his release from the Center. Caseworker Page was introduced to the team members and she confirmed the role of DDSS.

39.    On or about December 28, 2011 and in January, 2012 both Plaintiffs visited the offices of Dillon Internal Medicine Associates, P.A. for medical appointments. Plaintiff Gary Weaver met with his primary care physician Dr. Clifford Medina at 4.00 p.m., and Mrs. Weaver met with defendant Wallace her primary care physician at 4.00 p.m.. Plaintiff Gary Weaver was seen and spoke with the receptionist, staff, the accountant, Dr. Wallace, and his nurse "Peggy, on those occasions. **This was before February 24, 2012 when defendant Wallace incorrectly claimed in his ambiguous memorandum to the Family Court and DDSS that Mrs. Weaver was alone in her house without Mr. Weaver.** Defendant Wallace knew and should have known that he personally and his staff saw, spoke to, and provided medical services to Plaintiff Gary Weaver (and Mrs. Weaver) in his offices on December 28, 2011 and in January, 2012, prior to his misrepresentations and malevolent lies filed on February 24, 2012 with DDSS.   .

40.    Defendant Wallace's February 24, 2012 memorandum addressed ambiguously "To whom It May Concern," was cited by the Family Court and DDSS as justification for executing the bogus improper Ex Parte Court Order for Protective Custody. The significance of this inaccurate, misleading **un-notarized memorandum** attached to and filed in Caseworker Page's notarized Affidavit to the Family Court on February 28, 2012, was such, **that Defendant Wallace owed a duty to plaintiffs and the Court to conduct due diligence and ascertain the correct facts.  Defendant Wallace should have determined for certain that indeed Mrs. Weaver was "alone" and in fact "vulnerable" in her house as he stated, prior to capriciously, negligently, wantonly and recklessly, executing the said determinative memorandum with malice aforethought, which was inadmissible evidence in any case.**

41.    Mrs. Weaver met with defendant Wallace on two scheduled visits for consultations. On or about November 7, 2011 while visiting the Storm Eye Institute in Charleston, Mrs. Weaver had an accident, a fall that required immediate urgent medical treatment at MUSC to the damage to her left hip in the fall. On her return to Dillon she had an appointment with defendant Wallace on Friday, November 11, 2012 concerning the accident. Following an examination, Dr. Wallace gave Ms Weaver some pain pills to alleviate the pain in her left hip.  He did not prescribe any other treatments.

24

42.     Unknown to Mrs. Weaver, defendant Wallace referred Visiting Nurses ("Nurses") to see Mrs. Weaver because Mr. Weaver at that time was in hospital for several weeks from November 2, until December 22, 2011. Nurses' visit to Mrs. Weaver was not satisfactory as Nurses were unable to assist her in the way she required and she cancelled their services. See below. In an Affidavit to the Family Court, Nurses are reported by the DDSS caseworker to have filed either a verbal or written Report, undated and not notarized, with DDSS about the visits to Mrs. Weaver. This report was inadmissible hearsay evidence and was inaccurate in every detail as reported in the said affidavit. In violation of DDSS rules, a copy of the Nurse's Report was not made available to Plaintiffs before, to date, or since the March 12, 2012 merits hearing. In fact there was no visit made by Nurses to Mrs. Weaver on November 8, 2011.

43.     The said Affidavit filed with the Family court by DDSS caseworker Pansy Page was inaccurate and misleading in every detail. See below. First, the affidavit claims that the caseworker received a report filed on **June 9, 2011, nine months before,** from an unstated, un-notarized source, alleging that Mrs. Weaver fell at the Medical University of S.C. on **November 7, 2011** and broken ribs and had a concussion, and "refused" to be admitted to the hospital and that defendant Wallace had sent Visiting Nurses to her home "yesterday," (June 8, 2011 or February 28, 2012 ?). The evidence will show these allegations to be completely inaccurate and misleading. The inadmissible affidavit by Caseworker Pansy Page then goes on to cite the said Visiting Nurses report which was also completely inaccurate and misleading. See below.

44     Caseworker Pansy Page's inadmissible affidavit was cited and accepted by the Family Court and DDSS as justification for executing the bogus improper Court Order for Protective Custody. The significance of this inaccurate, misleading **notarized affidavit** as to the truth and facts, was such that it misled the Family Court; the DDSS caseworker (and the Family court) owed Plaintiffs a duty to conduct due diligence and ascertain that the accuracy of the Nurses hearsay un-notarized statements and her own allegations were in fact true, correct and accurate, and were in proper legal form. This due diligence was necessary prior to the DDSS caseworker capriciously, negligently, wantonly and recklessly, executing the said inaccurate notarized affidavit attesting that the information was "...true according to her own knowledge"; while the affidavit was not true and in fact, inadmissible hearsay evidence in any case. **The affidavit was in fact an illegal document and a violation of the caseworker's oath.**

25

45.     DDSS Caseworker Pansy Page first came to visit Mrs. Weaver in November 2011 accompanied by a Deputy Sheriff. The referral source is said to be Defendant Wallace. She introduced herself to Mrs. Weaver who knew absolutely nothing about the DDSS. Mrs. Weaver thought the caseworker was representing a community or state organization when she offered assistance.

46      In fact, unknown to Mrs. Weaver, the caseworker was conducting an investigation of a report of an "abused, neglected and vulnerable adult" exposed to nonsensical "imminent danger of exploitation" by persons unknown. From the very outset the caseworker never admitted or made known to Mrs. Weaver or Mr. Weaver at any time, of the secretive investigation, in violation of the DDSS Rules. See below. The caseworker coordinated the secretive effort with defendant Wallace by conferring with him on numerous occasions which they knowingly, willingly, secretively and collusively kept secret from Plaintiffs for unknown reasons and motives, and in violation of the Rules. Based on the history of the relationship and communications between Mrs. Weaver and Defendants Wallace and Page, it is alleged that both Defendants "had eyes on Mrs. Weaver's residence."

47.     Plaintiff Gary Weaver returned home from hospital on December 22, 2011, a fact known to both Defendant Wallace and the caseworker. On February 24, 2012 and February 29, 2012, when they filed untrue, inaccurate, misleading inadmissible evidence with the court, both of the Defendants knew and should have known that Mrs. Weaver was not alone in her home from December 22, 2011 and that she had a full time caregiver in the form of her spouse. Both Defendants knowingly, willfully, negligently, recklessly and wantonly gave false witness to the Family Court causing the court to execute the bogus improper Order for Protective Custody and the sheriff to enforce the order with unnecessary excess force. **The immediacy of the unannounced protective custody is a mystery to Plaintiffs who were never under any imminent danger of vulnerability from any source.**

48.     The Ex Parte Order for Protective Custody was executed by the Family Court on February 28, 2012.(and filed on February 29, 2012) one day before the filing of the first complaint, and three days before the second complaint was filed on March 1, 2012. Any papers filed with the court were not served on the Plaintiffs in accordance with court rules and DDSS rules. There is no proof of service of any documents extant, to the best of Plaintiff's knowledge.

26

49.    The Ex Parte Order signed on February 28, 2012, one day before the filing of the complaint, **states that the matter is before the court pursuant to a complaint and affidavit seeking an ex parte order for protective custody to protect a vulnerable adult. This Court statement was untrue.** The matter was NOT before the court pursuant to a complaint that had NOT been filed. The first complaint was filed on February 29, 2012 **one day after** the execution of the Es Parte Order on February 28, 2012. The said Complaint was NOT filed nor titled as an ex parte submittal to the Court, nor noticed, nor served on Plaintiffs, and therefore subject to SCRCP and SCFCR rules and procedures. See below.

50.    · Inter alia, some questions at trial are: **How did the court sign an ex parte order on February 28, 2012, one day before the first complaint was filed on February 29, 2012 and three days before the second amended complaint was filed on March 1, 2012, which** complaints were not even filed, nor noticed, nor served on Plaintiffs, nor formally before the court?. Did the court negligently abuse its discretion in considering an inadmissible Defendant Page's two affidavits that referred to a non existent document that was not filed, titled nor captioned as an ex parte document? Other court procedural irregularities exist to be addressed at trial. This includes the question as to whether or not Plaintiffs have been denied due process and equal protection of the law by the Family Court's negligent procedures.

51.    **Rule 7 (b) (2) SCRCP** requires that the rules applicable to captions, signing, and other matters of form or pleadings, apply to all motions and **other papers** provided for by these rules. There was no **"Ex Parte Order of Removal "**referred to in the DDSS caseworker's Affidavit, nor was any complaint filed and before the court for consideration on February 28, 2012. The complaint was not filed nor was a formal motion, and the inadmissible affidavit and February 24, 2012 defendant Wallace's memorandum were filed in support thereof, without the opportunity for Plaintiffs to file an opposing affidavit in any case, notwithstanding the DDSS violation of court rules. This denial violated the intent of **Rule 6 (d) SCRCP** and others. For example, **Rule 8 (f) SCRCP** provides that all pleadings shall be so construed as to do substantial justice to all parties. Plaintiffs in this case were denied the protection of this and other court rules, including the right and opportunity to cross examine any DDSS witnesses.

52.    A corollary question is: How did the court execute an ex parte order based on inadmissible and hearsay evidence without the presence of witnesses of both parties, or the Plaintiffs? Were any defendant witnesses present before the court at the dock or before the

bench, in chambers, or other on February 28 and 29, 2012 ?. The court record is silent on these issues.

53.    On February 20, 2012 the DSS Case Worker Pansy Page, telephoned Cottonwood Villa, out of county in Bishopville, and made a reservation for Mrs. Weaver .for a bed for occupation on Saturday, February 25, 2012. **This reservation was made in violation of DDSS rules, and eight days before the court executed the bogus improper Ex Parte Order of Custody on February 28, 2012, and nine days before the filing and execution of the first complaint.** Subsequently, (date unknown) the DSS Case Worker changed the "bed" reservation for February 25, 2012 to the evening of February 29, 2012; the same date the second DSS amended complaint was filed at 11.30 am.

54.    At trial: <u>How was it possible that the DSS Case Worker Pansy Page knew eight days ahead of the outcome of the signing of the bogus improper Ex Parte Order on February 28, 2012, and nine days ahead of the filing of the second complaint on February 29, 2012, that court approval would be forthcoming, justifying her advance reservation for "a bed" for the defendant?</u>

55    On this point, trial discovery will request disclosure and copies of any prior meetings between the court and DDSS staff, or any correspondence or formal or informal approvals of the court before the filing of the formal order and complaints that justified the DDSS advance reservations for the forced abduction and incarceration of Mrs. Weaver with a "bed" in the same small room with a sick elder woman on February 29, 2012.

56.   · Trial discovery will address how and when is it that the DSS worker reserved a bed for Mrs. Weaver at the Bishopville facility out of Dillon County for February 25, 2012 and then changed it to February 27, 2012, one day before the Court approved the bogus Ex Parte Motion on February 28, 2012 without a complaint or summons being filed, noticed or served on Plaintiffs, all in violation of DSS rules and court rules of procedure? Discovery will provide full disclosure if the Family Court did know and approve of such action?

57.    Why was there such urgency or "immediacy" for DDSS to arrive at the Defendants residence at 5.00 p.m. on February 29, 2012 at the end of the business day, after approval of the DDSS second Complaint at 11.30 a.m. on that day, using "excessive force" to remove and abduct Mrs. Weaver an 86 year old, fragile and disabled lady, with a team of seven comprised of three Deputy Sheriffs, two EMS attendants and two DSS staff? DDSS and the sheriff Deputies were in violation of Rule 405.01 "**Emergency Protective Custody**," as

28

Weaver was in the property office adjacent to the front porch and came out to meet them on the front porch of the residence in front of the front door to the hallway of the house. One Deputy (male) informed him that DDSS was there under court order for DDSS to take Mrs. Weaver into protective custody as an "abused, neglected, and vulnerable person" in "imminent danger" of "exploitation". The Deputy presented Weaver with a scrambled copy of an Ex Parte Motion improperly executed by the Family Court Judge on Tuesday, February 28, 2012, the Day before in violation of the SCRCP, and a scrambled copy of a Court Order executed by the Family Court Judge the next day at 11.30 a.m. on Wednesday February 29, 2012, that same morning. This was the first surprise and unexpected knowledge of the existence of any such documents and the DDSS sinister and secretive efforts in that direction in blatant violation of the DDSS Rules.

61.    This court action was a shock and a complete unexpected surprise to Plaintiff Gary Weaver, the full time caregiver to Mrs. Weaver as well known to DDSS, who knew and should have known Mrs. Weaver was not "alone" since December 22, 2011. This visit without prior notice of any kind was the first time that Plaintiffs heard of any such action being undertaken by DDSS (a violation of the SCDSS Rules). The DDSS Defendants, the Family Court Judge, and the Sheriff Deputies were jointly and severally in violation of the SCDSS Rules and SCRCP in that, inter alia, the Ex Parte Order was executed before a Complaint had even been filed with the court, the judge approved the ex parte motion and complaint based on inadmissible hearsay evidence which the Judge knew or should have known, no prior verbal or written notices or service was made by DDSS or the Sheriffs on Plaintiffs, no consent was given or discussed with Plaintiffs in advance for removal, all of which was in violation of the DDSS rules and regulations and state statutes. See below

62.    Plaintiff Gary Weaver informed the Deputies that Mrs. Weaver was inside the residence, and requested time to read the documents handed to him by the sheriff (ex parte order and complaints, etc); the documents were unclear being in disarray mode. He also informed the sheriff that he wanted to attempt to contact the Family Court Judge, the DDSS attorney and his own attorney, before bothering Mrs. Weaver. Being after 5.00 p.m. Weaver could not contact anyone. DDSS probably knew that would be the case by deliberately coming after 5.00 p.m. to make it impossible for plaintiffs to contact anyone at the end of the business day.

63.    Plaintiff Gary Weaver asked the Deputy Sheriff what would be the consequences if he and Mrs. Weaver refused to obey the order, that she was obviously not "alone" since Mr.

30

Weaver was present as her caretaker, that there was no imminent danger to Mrs. Weaver from anyone, and that she was not abused, neglected or vulnerable, and neither of them would consent to the Order for an abduction or confinement. The Defendant Sheriff informed Mr. Weaver that if he did not consent he would be in contempt of a court order, that it would be a criminal act, and that he would be arrested. The Deputy asked to see Mrs. Weaver. The Deputy informed Mr. Weaver that he could not enter the residence and meet with Mrs. Weaver without being accompanied by a Deputy Sheriff. Mr. Weaver disagreed and asked for the legal authority for such a condition. The Deputy Sheriff could not cite an authority but told Weaver if he disobeyed it would be his duty to arrest Weaver and if he resisted he would be put in chains. Under that threat, Weaver agreed to enter the residence and chose the senior Sheriff Deputy, a female whom he knew to accompany him to the kitchen. They went to the kitchen together, but Mrs. Weaver was not there. Weaver said she was probably asleep in her bedroom, so they went there together. She was asleep there and Weaver woke her and informed her of the situation. She was shocked and surprised and refused to agree to go into custody.

64.    Plaintiff Beatrice E. Weaver was in her bed in underwear (three piece "cuddle duds"). The three Deputy Sheriffs went into the bedroom and forcibly removed her from the bed. One female deputy pulled one leg, and the other female Deputy pulled the other leg and the male Deputy had her by both arms dragging her out of the bed and bedroom and bathroom into the hallway. Mr. Weaver objected to this manhandling and excessive force as unnecessary and violative of her situation. These actions caused and aggravated Mrs. Weaver's extreme pain in her spine and hips which the Sheriffs knew or should have known about, and caused her extreme shock, emotional distress and embarrassment being dressed only in her underwear.

65.    Following a threat to place her in chains in response to her objections, the three sheriff deputies together dragged Mrs. Weaver out of her bed into the hallway where they dumped her like a carcass into the hands of the waiting E.M.S. attendants. The latter then dumped and strapped her like a criminal onto the ambulance stretcher they had brought into the hallway against the objections of Mr. Weaver. They then pushed the stretcher out of the hallway into the cold winter night and some 150 yards to the waiting ambulance located at the front gate. Mrs. Weaver was barefoot and screaming of cold. Mr. Weaver grabbed a brown housecoat and asked a sheriff to give it to her in the ambulance. With two sheriff deputies sitting on a bench inside the ambulance the ambulance as driven out of the county to Bishopville without Mrs.

Weaver knowing the destination or what was to follow. After the forced abduction from her home, Mrs. Weaver was taken to the defendant COTTONWOOD Villas facility at about 7.00 p.m. Mr. Weaver was not permitted to accompany her in the ambulance to supervise the procedures and treatment of his wife, etc. This was a violation of the DDSS Rules at to the execution of the forms required for admittance to the defendant COTTONWOOD facility.

66.    On arrival at the COTTONWOOD facility, the ambulance staff "dumped" Mrs. Weaver onto a small single bed dressed only in her underwear in a tiny 10 foot by 20 foot bedroom together with a second bed and very sick female patient, and a tiny bathroom that smelled of urine, shared with three other patients

67.    The COTTONWOOD Administrator, Ms. Shealy, and the DDSS caseworker Page illegally executed the admittance papers into COTTONWOOD ALF. In violation of DDSS rules, this was done in the absence of caregiver Mr. Weaver who was denied the right to accompany his wife to the facility with the sheriffs. These admission papers committed Mrs. Weaver to financial obligations and liabilities to which neither she nor her husband knew about, nor consented to at any time. The DDSS caseworker illegally signed these papers on behalf of Mrs. Weaver in the absence of Mr. Weaver a relative who should sign as required by DDSS Rules, who was prevented from accompanying Mrs. Weaver to COTTONWOOD with the sheriffs or who could have been taken to the facility the next day to sign the papers.

68.    Within one day, after getting over the initial shock, anguish and fear of the forcible manhandling by the Sheriffs and EMS staff, Mrs. Weaver took control of the situation. On or about March 3, 2012, Mrs. Weaver obtained a copy of the DDSS Rules from the Executive Director of COTTONWOOD. After dinner Mrs. Weaver started to work on legal documents and finished at 3.00 .a.m that same night. She prepared two detailed, professional quality legal briefs (respectively 7 pages, and 5 pages) documenting the DDSS lack of due diligence, and specific violations of the statutes and Rules and the DDSS violations of due process and equal protection of the law, etc., which she filed and notarized with the COTTONWOOD Executive office for submittal to the Family court at the hearing set for March 12, 2012. Mrs. Weaver also prepared a Power of Attorney to Mr. Weaver, and a five page list of instructions for activities and personal items that she wanted Mr. Weaver to bring to her since she had nothing other than her flimsy underwear and housecoat that she was forced to live in for several days.

69. These legal and other documents were not prepared by a "confused" elder lady or an "abused, neglected and vulnerable adult in imminent danger of exploitation by forces unknown. **These documents to be presented as evidence at trial,** were prepared by hand, without staff, furniture or proper office facilities, by a well informed, very intelligent, capable elder lady in full control of all her mental and intellectual faculties, far superior to any of the intellectually handicapped DDSS or COTTONWOOD personnel she was dealing with.

70. The services received at COTTONWOOD were primitive and far inferior to the services described in COTTONWOOD brochures and in fact were an insult to any informed person. The facility staff were verbally abusive, offensive and uncooperative with Mrs. Weaver, and the "cultural" food was literally uneatable. The facility patients and staff comprised some 99 percent black persons, and some half dozen white persons.

71. On or about March 5, 2012 the DDSS staff drove Plaintiff Gary Weaver to visit his wife at COTTONWOOD, which was additional evidence that she was not "alone" without a caregiver as claimed. Since December 22, 2011 the DDSS staff knew that Mr. Weaver temporarily lacked personal transportation since his car was out of order being repaired.

72. The DDSS Complaint and Ex Parte Motion and Order provided for a "merits" hearing on March 29, 2012 within the 40 days limit set by the DDSS Rules. Plaintiff Gary Weaver formally objected that Mrs. Weaver, a sophisticated, elegant old lady, would not survive at COTTONWOOD for that period due to the lousy uneatable cultural food, confinement in a single bed in a substandard tiny room shared with one other very sick elder lady, abusive staff treatment, lack of services, and the adverse deprived social and cultural environment. So the "merits" hearing was set for Monday, March 12, 2012.

73.. On the morning of March 12, 2012, Plaintiff Gary Weaver filed an **"Ex Parte Motion for Joinder or Alternatively for Interpleader; Objection and Rescission of Ex Parte Order of Custody filed February 29, 2012, For Replacement of Guardian Ad Liter."** The court appointed Attorney and Guardian Ad Liter for Mrs. Weaver (Ms. Holly Wall) who met with Mrs. Weaver for the first time at COTTONWOOD on March 12, 2012 at noon, and drove her to the Family Court for the hearing and to meet with Gary Weaver.

74. At the court hearing, the Family Court dismissed the DDSS second Complaint and ordered Mrs. Weaver free to return to her home that same day, which she did. At about 5.00 p.m. that same day, Plaintiff Gary Weaver went to COTTONWOOD with a church clergyman

33

and obtained Mrs. Weaver's belongings. Returning home, it was discovered that a particular nightgown of special significance for Mrs. Weaver, some fruit and special food that Mr. Weaver had brought the day before for Mrs. Weaver, had been stolen by COTTONWOOD staff. At the time of writing the COTTONWOOD office has refused to return the said nightgown and compensate Mrs. Weaver for the missing items. Also they have refused to provide an accounting for her stay.

75.    On March 13, 2012, the day after the court hearing on dismissal of the case and Court repudiation of the inadmissible evidence provided by Defendant Wallace, he reportedly wrote a letter to Mrs. Weaver which she never received, discharging her as a patient. As of this writing any such letter was not posted to Mrs. Weaver.

76.    The same day on March 13, 2012, DDSS Caseworker Page apparently wrote a letter to the federal and state Social Security Administration changing the address from Mrs. Weaver's home to hers at the DDSS Office in Dillon to receive Mrs. Weaver's social security payments. Mrs. Weaver subsequently received the said monies after the intercession of a Church clergyman.

77.    The Family Court executed the Order dismissing the DDSS case dated April, 24, 2012.

78.    The foregoing events are a direct and proximate result thereof by the amoral, willful negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to: wantonly, improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing so-called Adult Protective Services, Homemaker and Placement Services on Plaintiff Beatrice Weaver over the objections of both Plaintiffs at the time of the events complained of herein, in a wholesale violation of the DDSS procedural rules and regulations, state statutes and court rules...

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 4

### Three Documents as Inadmissible Evidence Filed In Family Court

For a separate and distinct claim for relief, Plaintiffs allege as follows:

79,    Plaintiffs reallege and incorporate paragraphs 1-78 as if fully set forth herein.

34

80.    The subject incidents complained of in this action are the direct and proximate result of three inadmissible documents initiated by Defendants. These documents were:

A.    A misleading, factually incorrect and malicious **Memorandum** dated February 24, 2012, addressed ambiguously "To Whom It May Concern" was handed to Defendant DDSS caseworker Pansy Page by Defendant Wallace at approximately 2.00 p.m., on February 27, 2012. This was during Mrs. Weaver's visit to the office of Dillon Medical Associates when the DDSS caseworker Page transported Mrs. Weaver to that office for an anti-tuberculosis injection on February 27, 2012. In violation of DDSS Rules Defendant Wallace and the DDSS caseworker Page had been conferring regularly on this matter without prior informing Mr. or Mrs. Weaver who was not informed of the on-going conferences and defendant Wallace's memorandum, and did not receive a copy of the Memorandum. The said document was not notarized for legal purposes, and was used as inadmissible evidence by DDSS and improperly accepted by the Family Court as justification for executing the improper Ex Parte Order for Protective Custody on February 28, 2012 before the filing, service or notice to Plaintiffs of any complaint or summons. The case was in fact not properly before the Court which thus lacked jurisdiction and the said motion was bogus.

Note that Defendant Caseworker Page transported Mrs. Weaver to Defendant Wallace's offices on February 27, 2012, then following the administration of a TB shot by Wallace's personal nurse ("Peggy") out in the parking lot, who patted Mrs. Weaver on the arm and wished her goodbye, (apparently knowing that DDSS planned to incarcerate Mrs. Weaver), Caseworker Page then transported Mrs. Weaver to her hairdresser (the Salon) and left her there for Mrs. Weaver's friend to later return Mrs. Weaver to her residence.

B.    A second misleading and factually incorrect written **Report** was filed with Medicare by the Visiting Nurses organization. The date and how a copy of this Report was filed with or obtained by DDSS caseworker Page are unknown as of this writing. The said questionable Report, also not notarized for legal purposes, is cited as inadmissible hearsay supporting evidence in the third document, the caseworker's "Affidavit." Nor was there any November 8, 2011 visit as alleged in the report.

C.    An **Affidavit** executed on February 29, (and March 1), 2012 by DDSS caseworker Pansy Page was filed as inadmissible hearsay evidence in support of the two DDSS Complaints filed with the Family Court on February 29, 2012 at 11.21 a.m., and March 1, 2012

35

at 10.24 a.m. and the DDSS Ex Parte Order of Custody filed on February 29, 2012 at 11.21 a.m,
but executed by the Family Court on February 28, 2012, one day in advance of filing of the first
Complaint.

81.    The said Affidavit(s) was pivotal in the Family Court's mistaken and negligent
execution of the Ex Parte Order for Custody on February 28, 2012, when no action was filed and
legally before the court on that day. The Affidavit cited the factually incorrect and misleading
Visiting Nurses Report, and the said defendant Wallace's misleading February 24, 2012
Memorandum as the reasons and justification for declaring Mrs. Weaver to be abducted and
taken into protective custody by force, and incarcerated in a substandard third rate institution,
because she was an alleged but **unproven**, "abused, neglected and vulnerable adult in imminent
danger of exploitation."

82.    The said inadmissible Wallace memorandum and Nurses Report were used  in the
Affidavit as supporting "expert" evidence by DDSS and the Family Court in this action, in a
breach of judicial conduct ( see below), to order the protective custody abduction of Plaintiff
Beatrice Weaver. In fact, pursuant to case law (cited herein above) in this State, **the said
memorandum was inadmissible evidence and the court knew or should have known of this
fact at the time of executing the order for protective custody complained of herein.** The
court cited the memorandum as justification for executing the Protective Custody Order. By
reason of Wallace's negligence, professional incompetence and malicious activities, his false
witness resulted in the adverse events and damages complained of herein, particularly
condemning Plaintiff Beatrice E. Weaver **to permanent incarceration** in a state sponsored
abduction and forced relocation to Defendant Cottonwood Villas Assisted Living Facility, a third
rate; substandard, facility located some 70 miles out of Dillon County in violation of the DDSS
rules and regulations, and the attempted confiscation of her all of her income. The latter could
finally lead to the loss of all of her personal property and possessions as her social security
income was insufficient to cover the costs for her forced stay at the Cottonwood ALF The
malevolent intent and obvious conspiracy is obvious. In such event, her possessions would be
sold off at auction to pay the Cottonwood bills. Who would benefit from such a fire sale?
Wallace and Page are prime candidates based on past communications with both.

83.    Moreover, notwithstanding the fact that both the Memorandum and the Report
were inadmissible as evidence in the Family Court, neither document presented one shred or iota

or scintilla of evidence that Mrs. Weaver was "abused", "neglected" "vulnerable", and "in imminent danger" From whom? Since December 22, 2011 Plaintiff Gary Weaver was at home permanently and acting as full time caregiver of his wife, facts known to DDSS workers. The fact is that the factual and circumstantial evidence is that the only abuse, neglect, vulnerability and imminent danger to Mrs. Weaver emanated directly and proximately from the actions of defendant Wallace, the mis-placed, illegal, and malicious, bad faith actions of DDSS, COTTONWOOD Villas in Bishopville; and in particular the DDSS Caseworker Pansy Page, from the wanton, reckless, deliberate and damaging misbehavior and violations of the statutes, procedural rules and SCDSS Rules, from the outset of this case..

**WHEREFORE,** Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

COUNT 5

**The Wallace February 24, 2012 Memorandum Is The Determinative Factor in this Case**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

84.     Plaintiffs reallege and incorporate paragraphs 1-83 as if fully set forth herein.

85.     The defining determinative factor n this case emanates from the incorrect and misleading deliberate negligent misleading lie issued by Defendant Wallace on February 24, 2012 in referring to Mrs. Weaver, that "(S)he is at risk staying by herself."

86.     Defendant Wallace knew and should have known otherwise that Mrs. Weaver was not alone and had not been alone since December 22, 2011 and permanently before November 2, 2011 when Plaintiff Gary Weaver had an unexpected, surprise heart attack. Mrs. Weaver was only "staying by herself" for the short six week period November 2, 2011 to December 22, 2012, a period when she had plenty of support from church and close friends who were in constant contact with Mrs. Weaver during this period, which fact was known to DDSS caseworker Page.

87     The incorrect charge that Mrs. Weaver was "staying by herself" was deliberately and maliciously misused by DDSS caseworker Page who referred to the misleading negligent charge in her Affidavit filed on February 29, 2012 with the court seeking custody of Mrs. Weaver by which time she knew Mr. Weaver was home since December 22, 2011. DDSS Caseworker Page knew and should have known this was not a true fact. During the period December 22, 2011 through February 29, 2012, DDSS Caseworker Page was in regular contact with both Plaintiffs providing transport service to medical appointments on February 13, 14, 27,

37

2012. Plaintiff Gary Weaver as caregiver, was present at home on February 29, 2012 when the DDSS team including DDSS caseworker Page came to forcibly take Mrs. Weaver into custody knowing that Mr. Weaver was at home as her full time caregiver and had been since December 22, 2011...

88.    Moreover, between the period December 22, 2011 and February 29, 2012, Defendant Wallace and his staff and associate doctors had intermittent contact with Plaintiff Gary Weaver at his office on **December 28, 2011, January 5, and February 13, 14, and 27, 2012 and knew before February 24, 2012 that his memorandum was incorrect as Mrs. Weaver was NOT "alone" as he falsely stated.**

89.    In short, both Defendants Wallace and the DDSS caseworker Page, knew and should have known that Mrs. Weaver was not alone after December 22, 2012 and at the time of forcibly taking her into custody on February 29, 2012 when Plaintiff Gary Weaver was at the home and dealt with the DDSS team. Since he was at home and Mrs. Weaver was not alone in the house, Plaintiff Weaver objected to the sheriffs and was told that if he interfered or resisted the court order for custody, he would be arrested. The conversation between Weaver and the sheriffs was civil despite the fact that they were manhandling his wife and were illegally invading her privacy, and denying her due process of law.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth**

### COUNT 6

**Objections To The DDSS Ex Parte Order and Complaints In This Action.**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

90.    Plaintiffs reallege and incorporate the introduction and paragraphs 1-89 as if fully set forth herein,

91.    DDSS filed two complaints in this action; one on February 29, 2012, and the second amended complaint on March 1, 2012. Neither complaint, nor summons or notice, other papers were properly served on Plaintiffs at any time; no proof of service exists; all in violation of the due process clauses of the two state and federal constitutions and the rules of court procedures. Both documents were based on false, misleading, and incorrect facts, inadmissible evidence, and false testimony, errors and omissions based on speculation and guesswork rather than facts adduced from proper due diligence by defendants who in fact knew and should have

known the correct facts from the outset. The DDSS regulatory process in this case was sinister, furtive, and carried out in secret and in collusion and conspiracy for unknown reasons to Plaintiffs.

92.    In summary, the false allegations in the two complaints were that Mrs. Weaver was an abused, neglected and vulnerable adult in imminent danger from exploitation, all unfounded in fact and without any substantial proof or evidence whatsoever. Moreover as the discussion herein establishes, it is Defendants who threatened, intimidated and attempted to intimidate Mrs. Weaver and Plaintiff Gary Weaver in taking Mrs. Weaver into so-called "protective custody" on February 29, 2012. It is the acts, errors and omissions of the Defendants and each of them who knowingly and willfully abused, neglected and placed in imminent danger of exploitation the alleged vulnerable adult that caused Mrs. Weaver great bodily harm, impairment and injury. In short, Defendants as persons knowingly and willfully violated **S.C. Code 1976 Ann. Section 43-35-85, <u>and are thereby subject to charges of misdemeanors and appropriate fines.</u>**

93.    For further complaint herein, Plaintiffs address the deliberate, misleading and factually incorrect allegations presented in the said two DDSS complaints underlying the bogus improperly executed and granted Ex Parte Order for Protective Custody.

1.    The Ex Parte Order of Custody incorrectly filed and granted on February 28, 2012 one day prior to the filing of the first complaint on February 29, 2012, states that it is based on the allegations in the **first Complaint** which in fact did not exist at that time, and was filed the next day on February 29, 2012, and with the supporting inaccurate affidavits

2.    The **first complaint** alleges that the "Plaintiff DSS is informed and believes that the adult (Mrs. Weaver) is a vulnerable adult because of her health, and lack of appropriate housing, heat, and caregiver," and is in "substantial danger of abuse, neglect and exploitation." Further, that "by reason of abuse, neglect, or exploitation, there is substantial risk to this vulnerable adult's life or physical safety, and the vulnerable adult is unable to protect herself... and protective services are necessary to protect the vulnerable adult from substantial risk of abuse neglect, or exploitation."

3.    On February 29, 2012, the day following the issuance of the Ex Parte Order on February 28, 2012, the court reviewed the **first complaint** and the supporting inadmissible affidavits. Based on these unsupported, undocumented allegations based on

39

*hearsay*, and incorrect facts, the court states in the order for the first complaint, that Mrs. Weaver is a vulnerable adult:

> "...because of her medical condition of degenerative joint disease. She has great difficulty with her mobility. She is often confined to a wheel chair. She has difficulty at times with confusion which substantially impairs her from adequately providing for her own care and protection *and the vulnerable adult and/or the guardian ad litem and/or others exercising temporary or permanent control of the vulnerable adult consent to this protective custody.* (emphasis added)

    4.    The court relied on "information concerning her health and conditions stated in a letter from Mrs. Weaver's primary care physical (sic), Dr. Phil Wallace."

    5.    The court goes on to say that there is probable cause to believe that *by reason of neglect,* there exists *imminent danger* to this vulnerable adult's life and physical safety because Mrs. Weaver's health is deteriorating and she is no longer able to live in her home. **Her primary care physician feels she is at risk staying in her home.** She also suffers from confusion at times. In fact, the only "imminent danger" to Mrs. Weaver was the secretive, conspiracy and collusion between Defendants Wallace and Page for motives and unstated reasons to be discovered at trial. .

    6.    The court's order is based on the DDSS inadmissible hearsay affidavits, and the primary physicians three line memorandum dated February 24, 2012. The order is based on egregious errors and omissions, misrepresentations, subjective unsubstantiated conclusions, inadmissible hearsay evidence, fraud upon Plaintiffs and fraud upon the court. The Family Court was negligent in not conducting proper due diligence to ascertain and document the correctness of claims and facts that were undocumented hearsay in the affidavits. Let us examine the actual facts.

    94    <u>The Issue of Abuse, Neglect and Vulnerability.</u>

    1.    <u>DDSS and the defendant physician Wallace have provided no proof, documentation or evidence that Mrs. Weaver suffered abuse or neglect of any kind, or is likely to suffer any abuse or neglect in the future as defined by the DDSS Rules.</u> **S.C. Code 1976 Ann. Section 43-35-10 ("Code")** defines the DDSS false allegations In dealing with Mrs. Weaver, DDSS has engaged in wholesale abuse of the DDSS Rules and Regulations.

2.    Code 43-35-10(1) (8) (10) defines "abuse" as physical or psychological. Mrs. Weaver has suffered neither abuses as defined, and DDSS produced no evidence to the contrary in its allegations cited in the two complaints or the affidavits. The only abuse and neglect experienced by Mrs. Weaver has been caused by DSS. On the 29th February the DDSS seven member team descended on Mrs. Weaver's residence without prior notice or discussions, and forcibly abducted her with the assistance of three Deputy Sheriffs who man-handed her out of bed, out of her bedroom and house, in her underwear and strapped her in a stretcher down like a common criminal, with the assistance of two burly EMS medics.

3.    Additional abuse caused by DDSS relates to the removal to, and the general conditions at the Defendant Cottonwood Assisted Living Facility located out of Dillon County in Bishopville, Lee County, in violation of DDSS Rules.

4.    Code 43-35-10(6) defines "neglect" as meaning the failure or omission _of a caregiver_ to provide the care, goods or services necessary to maintain the health or safety of a vulnerable adult including, but not limited to food, clothing, medicine, shelter, supervision, and medical services. Neglect includes the inability of a vulnerable adult, in the absence of a caretaker, to provide for her own health or safety which produces or could reasonably be expected to produce serious physical or psychological harm or substantial risk of death.

5.    The issue of "neglect" was not documented nor defined in the two DDSS complaints, merely alleged without proof presented to the court other than unsubstantiated claims in hearsay evidence. The fact is that there has not been any neglect. Plaintiff Mr. Weaver is a full time caregiver and fully capable of providing care to Mrs. Weaver which he has done since 2004. During the 50 days that Mr. Weaver was in hospital (November 2, -December 22, 2011), several friends and church members visited, or called Mrs. Weaver daily or several times weekly to ensure she was cared for, to be documented at trial.

6.    Other than to offer transportation to and from doctors and to provide once a limited supply of heating fuel during Mr. Weaver's absence with heart problems, DDSS did nothing else for Mrs. Weaver while Mr. Weaver was in the hospital between November 11 and December 22, 2011.

7.    Code 43-35-10(3) defines "exploitation" The **"exploitation" issue is a** mystery to Plaintiffs. No evidence exists or was presented to the court to justify such a claim or

41

allegation in the two DDSS complaints. There was no evidence presented that Mrs. Weaver was forced to engage in any activity or labor which is improper, unlawful, or against her reasonable and rational wishes; there was no evidence produced of any improper, unlawful or unauthorized use of funds, assets, property, etc., by any third party; and there was no evidence produced of any improper purchase of goods or services for the benefit of a third party involved. The only exploitation in this case is the inadequate medical treatments Mrs. Weaver received from Defendant Wallace, without cures over a period of 15 years. The only current exploitation that exits is the abusive and negligent treatment she received at the Defendant COTTONWOOD facility in Bishopville where she was confined and treated as if she is in a prison, with uneatable "cultural" food, a horrific bed, and inadequate services, etc.

95.    **Wheel Chair Confinement Issue.**

1.    Mrs. Weaver prefers to use a wheel chair when she is with third parties, because she walks slowly due to her hip problems. Her mobility is not impeded nor is she confined as claimed by Defendant Wallace, who has not witnessed and knows nothing about her activities outside his office, or as regurgitated in the two DDSS complaints and inadmissible Affidavits. .

96.    **Alleged Confusion**

1.    The issue of alleged "confusion" which allegedly "…substantially impairs her from adequately providing for her own care and protection", is a mystery to Plaintiffs. Mrs. Weaver is in full control of all her faculties. She has a mind like a "steel trap" that is very well organized, extremely logical, lucid, cogent and creative.

2.    First, Mrs. Weaver does not suffer from confusion in the management of household affairs. She competently, efficiently and timely takes care of all family banking, utilities, bills, household matters, postage, etc. The domestic arrangement is that Mrs. Weaver takes case of matters "inside" the residence, and Mr. Weaver takes care of matters "outside" the residence

3.    Mrs. Weaver is writing two books. She rigorously collects and studies books, reports, studies, magazines and similar research materials on a vast arrangement of subjects: bio chemistry, medicines, supplements, ageing, longevity, agriculture, tourism, economic development, etc. This explains the defendants' alleged so-called "clutter" accumulated on the kitchen table and elsewhere in the house.,

42

4.    .Contrary to the misleading DDSS affidavit, Mrs. Weaver is fully capable and does adequately provide for her own personal care, particularly with respect to medications and the vegetarian food that she prefers. She is a lacto vegetarian and refused to eat canned goods or meats served at the defendant COTTONWOOD facility.

5.    Plaintiff Mr. Weaver, who is in full control of all his faculties, carefully cares for Mrs. Weaver and can verify that she is never confused about anything. She is particularly erudite in dealing with legal matters, and medications that are prescribed, ensuring there are no contradictions, etc., that may be detrimental to her health.

6.    Finally, Mrs. Weaver has an excellent legal mind. As noted, she prepared legal documents immediately on entry to defendant Cottonwood Villa including a Petition to the Family Court for Release etc., which the DDSS and Cottonwood refused to file. Mrs. Weaver has participated in the preparation of this Complaint and the Motion for change of Venue to Florence County. These are not the product of an alleged "confused" mind.

97.    **The Imminent Danger Issue.**

1.    No evidence has been provided or adduced and there was NOT probable cause that Mrs. Weaver was in imminent danger of vulnerability as defined in the DDSS Rules and the cited Code statutes. There has never been and there is no current imminent danger, and she is under the care of a fulltime caregiver her husband with the constant regular support of friends.

2.    The Defendants opinion and the court's mistakes on this issue are misguided and are absent of any basis of fact or experience in dealing with Mr. or Mrs. Weaver. Defendant Wallace knows nothing about plaintiffs' personal matters outside the medical treatments that he provided Mrs. Weaver. He never visited her home. For example, the doctor has been her physician for some fifteen years. During that time she complained about her back pain, and the "so called degenerative joint disease" developed while under his care without his demonstrated knowledge. Plaintiffs ask where has the good doctor been for fifteen years of patient care, and why the egregious neglect in dealing with her pain.

3.    The imminent danger charge was nonsense and a "boiler plate" condition associated with the DDSS long list of "boiler plate" charges to conform to the statutes cited in the two Complaints and Order. For example, DDSS caseworker Page claims in her affidavit that she commenced activities related to Mrs. Weaver on June 9, 2011, which is not true. The fact is

that DDSS has made wholesale violations of the DDSS Rules and Code and the "imminent danger" charge is nonsense.

98.    **Admissibility of Documents.**

1..    The bogus Family Court Ex Parte Order relied on two documents: the malicious and bad faith, misleading and inadmissible Affidavit of DDSS case worker Page, and the inadmissible Defendant Wallace's letter dated February 24, 2012. The inadmissibility of these documents is discussed above. It has been stated that written affidavits and reports generally constitute inadmissible hearsay, with some exceptions, although they may become admissible in whole or in part when a proper foundation is laid by a witness's testimony.

2.    Here, a proper foundation has not been laid by witness testimony <u>and the Visiting Nurses alleged report relied on by the DDSS affidavit and by the court, is inadmissible hearsay evidence quite apart from being in gross error of the facts.</u>

3.    (a)    The memorandum dated February 24, 2012 submitted by Defendant Wallace which was relied on by the court and the DDSS in its affidavit, did not cite that the patient was treated at certain times, nor the type of ailments. For example, the doctor's memorandum did not say that he was treating Mrs. Weaver for degenerative joint disease, or confusion. He made a subjective opinion NOT based on any medical facts or experience. We have shown that for 15 years Defendant Wallace neglected to effectively treat Mrs. Weaver for "degenerative joint disease" or for alleged "confusion". He used no medical or other basis other than possibly "ageing" for stating that Mrs. Weaver's health was deteriorating.

.(b)    Moreover, the evidence at trial will show the fact is that on several occasions over the years, defendant Wallace issued certified statements to the effect that Mrs. Weaver is of "sound mind" and capable of handling her estate and other affairs without any "problems."

(c)    . The question arises as to Wallace's motives. Mrs. Weaver was a good knowledgeable patient usually well prepared for her consultations which Wallace resented, who kept her appointments on time, and paid her bills.

( d)    **Plaintiff Beatrice Weaver trusted Defendant Dr. Wallace who knowingly and maliciously violated doctor-patient confidentiality without any verbal or written release to discuss any of her medical matters with Defendant Pansy Page at any time, which he did secretively and collusively..**

44

4.      Defendant Wallace had no basis for stating that Mrs. Weaver is "no longer able to live in her home" or that she is at risk staying in her home. During Plaintiff Gary Weaver's 50 day hospitalization Mrs. Weaver cooked all her own meals, made her own bed, kept house, paid all the bills and fed her dogs without any difficulties, and she had plenty of regular assistance from friends and church. She was not confused and never has been. Now that her spouse and caregiver is home from hospital there is no doubt about her living in her house; she is not alone as claimed by the doctor who knows nothing about the living conditions in the house. He has never visited the house in 15 years. However he was a potential "buyer" of Mrs. Weaver's house when it first came on the market and presumably knows its physical setup.

5.      In short, all of the statements made in the memorandum are hearsay evidence and unfounded in fact or experience. Furthermore, the doctor's memorandum dated February 24, 2012 was made in conjunction with conferences and in sinister conspiracy with the DDSS case worker Page who met with him in his office on February 27, 2012, while Mrs. Weaver was receiving a TB shot, and other days leading up to February 29, 2012 when the court order was issued. They worked secretly behind Mrs. Weaver's back in **breach of trust** and in violation of the DDSS Rules. Neither the case worker nor the doctor provided full disclosure or notice of their intentions regarding the protective custody action at any time.

6.      On February 24, 2012, Defendant Wallace and his staff knew or should have known that Mr. Weaver was home from hospital on December 22, 2011 and that Mrs. Weaver was not alone in her house. Between December 22, 2011 and February 24, 2012 Mrs. Weaver visited Defendant Wallace's offices and met with him and his staff on several occasions. The DDSS case worker knew this also. Defendant Wallace's statement that Mrs. Weaver is alone in her house on February 24, 2012 was a deliberate lie. On that day at the conclusion of Mrs. Weaver's meeting with Dr. Wallace office for a TB test conducted out in the parking lot (a Wallace staff member came out to the car and said good bye to Mrs. Weaver, who did not understand why), Defendant Page drove Mr. and Mrs. Weaver from the Wallace medical office to Wal-Mart in Dillon for brief shopping by herself and Mr. Weaver, and then drove them to their residence. Defendant Page knew that she was going to file to confine Mrs. Weaver in Cottonwood ALF, but did not inform either Plaintiff.

7.      Case studies support Plaintiffs' contention that defendant Wallace was out

45

of order in issuing a misleading and erroneous letter with misleading and outright lies. **The cases also support our contention that Mrs. Weaver was denied due process of law and equal protection of the law at all levels in this action.** Example: A report of a child doctor based on interviews with grandparents, parents and the child, which was replete with hearsay as in this case, was inadmissible as a written statement by a physician under **item (c) of Rule 17 SCFCR**, as the report was procured in anticipation of litigation and not for the purpose of treating the child for an ailment and was of a self serving nature. See, **Cook vs. Cobb, (1978) 271 SC 136, 245 SE 2d 612.** Here we have a doctor's letter not issued for the purpose of treating Mrs. Weaver, and a case worker's affidavit, both documents filed in anticipation of litigation (DDSS Ex Parte Order and two complaints). Under **Rule 17 (c) SCFCR** it is hearsay and not admissible.

8.    It has been stated by the court that **item (c) of Rule 17 SCFCR** contemplates a written statement to the court, showing the mere fact of medical treatment, without requiring the physician to be present; it was not intended to encompass written statements concerning contraverted diagnosis of medical conditions. **S.C. Dept. of Social Services vs. Flemming Op cit.** Here we have the same situation as in that case of a doctor writing a letter unverified by a notary concerning a contraverted diagnosis of a medical condition which was for the purpose of the letter to be used for litigation purposes. The doctor should have been present in court testifying under oath instead of issuing an unverified letter ambiguously To Whom It May Concern, and not specifically to the court and subject to cross examination of Plaintiffs.

9.    Yet another case demonstrates the procedural errors and denial of due process to Mrs. Weaver. Admission of a doctor's written statement in a paternity action that the respondent was sterile was erroneous under Item (c) of Rule 17 SCFCR, as the statement constituted diagnosis of a physical condition was a dispositive issue in the case, and denied appellant the right to cross examine a critical witness. **Ibid.** Here we have a doctor stating certain undocumented medical conditions related to Mrs. Weaver which were dispositive in the Complaint, and the issuing of the Order of Custody and Mrs. Weaver was denied the right to cross examine the doctor, the DSS case worker and the Visiting Nurses.

10.    Clearly these cases document the **denial of due process and equal protection of the law** to Mrs. Weaver in this whole affair, by the DSS, the doctor and the court in disposing of the Ex parte Complaint.

.99.    **The Hospitalization of Plaintiff Mr. Weaver, the Caregiver for Mrs. Weaver.**

1.    As noted elsewhere herein, Mr. Weaver cared for Mrs. Weaver for eight (8) years, since 2004 when she contracted the first of three bouts of cancer. During the 50 day period of his hospitalization, between November 2, 2011 and December 22, 2011 Mrs. Weaver adequately took care of herself.

2.    Since December 22, 2011 Mr. Weaver has been caring for Mrs. Weaver until the present and is ready, willing and able to do so in the future.

3.    Without any documented proof or evidence, the two Complaints stated unequivocally "He cannot care for her at the level she requires", (Item 2, line 10), and that Mrs. Weaver lacks an "appropriate caregiver" (Item 3, line 3). Apparently this misguided view is based on the fact of Mr. Weaver's hospitalization for 50 days between November 11 and December 22, 2011. This statement is sheer nonsense. Moreover, the DDSS and Defendant Page did not offer to provide any Homemaker Services in accordance with the DDSS rules. Also, Defendant Page was present at the Plaintiffs residence on or about December 15, 2011 when Mr. Weaver was present visiting with two staff members of the Florence Rehabilitation Center where he was a patient, for the purpose of their inspection of the house to determine and approve Mr. Weaver physically capable of providing caregiver services to his wife. This report is a matter of record to be presented at trial.

4.    The DDSS has no basis for making such an allegation which is made in factual error and without any documented proof of his alleged inability to provide adequate care. Moreover there is no discussion as to what the criteria are and the conditions required for proper care "at the level she requires" that Mr. Weaver has allegedly not made available or cannot make available. **Here again there is denial of due process. and DDSS is in violation of the Rules.**

5.    Finally, Plaintiffs respectfully draws the attention of the Court to the fact that during the rehabilitation treatments at the Florence Nursing and Rehabilitation Center in Florence S.C. in late December 2011, the Center senior staff knew that Mr. Weaver was the full time caregiver for his wife, Mrs. Weaver. They designed a rehabilitation course of exercises to prepare him for that service. As stated, prior to his release, the senior staff accompanied by Mr. Weaver visited Mrs. Weaver's residence in Little Rock for an inspection.

6.    The staff wanted to assess and did approve prior to Mr. Weaver's

47

release, his physical ability to navigate the house, get up and down the steps, and handle the kitchen and bathrooms and provide proper care for his wife as her full time caregiver. On February 24, and 29, 2012 and December 22, 2011 the DDSS case worker and the defendant physician knew and should have known that Mr. Weaver was at home taking care of his wife and that she was not alone in her house

### 100. Alleged Consent to the Custody

1. The Ex Parte Order of Custody, incorrectly, misleadingly and mistakenly alleges that "...the vulnerable adult, and/or the guardian ad litem, and/or others exercising temporary or permanent control over the vulnerable adult, **consent to this protective custody.**" (Order, Item 1, line 5, p.1) For example, no guardian ad litem had been appointed by the court.

2. This claim is another example of error and denial of due process in this case and equal protection of the law. The alleged **"vulnerable adult"** at no time consented to custody and she received no advance notice or discussions concerning custody. This was collusion between Dr. Wallace and Defendant Page who initiated the illegal documentation and abduction, and a DDSS violation of the Rules and Regulations. At the time of her abduction by the three Deputy Sheriffs and DDSS on February 29, 2012 both Mr. Weaver and Mrs. Weaver separately made it crystal clear in no uncertain terms that they did not consent to the custody and objected strongly and repeatedly while Mrs. Weaver was being illegally abducted by the three Deputy Sheriffs.

3. There was no guardian ad litem appointed and should not have been appointed by the court on February 29, 2012 when the court granted the DDSS first complaint. The court incorrectly appointed Attorney Hall to be the guardian ad litem on March 6, 2012.

4. There were no "others exercising temporary or permanent control over the alleged vulnerable adult", nor should there have been any such persons or organizations without due process and in conformity with the Statutes and DSS Rules and Regulations.

5. There is no document of record or testimony by any party that consents to the custody. In short the Ex Parte Order was issued without any proof of any consent from any party. **Here again we have denial of due process and error of fact and law by the court. On this point the court has abused its discretion.**

48

101.  <u>The Guardian ad Litem Issue.</u>

      1.      We have noted that at the time of the illegal abduction on February 29, 2012, the Family Court had not appointed a guardian ad litem or if it had, it was accomplished in secrecy, denial of due process and in abuse of discretion by the court which lacked the authority to appoint a guardian ad litem. Neither the S.C. Code, the DDSS Rules, nor the court rules of procedure provide for appointment of a guardian ad litem for a "vulnerable adult." **Rule 405.08.01** provides that the Probate Court may appoint a guardian for an "incapacitated adult", who should be "a trusted relative or friend." Mrs. Weaver is not incapacitated. On February 29, 2012 at registration of Mrs. Weaver as a patient of Defendant Cottonwood ALF, Defendant Page appointed herself as guardian ad litem and illegally signed the entry documents in the absence of Mr. Weaver who should have been present pursuant to the DDSS Rules, as cited hereinabove.

      2.      The first and second Complaints filed on February 29, and March 1, 2012 did not request the Family Court to appoint a guardian ad litem for Mrs. Weaver. The record indicates that the Family Court, *sua sponte*, appointed attorney Wall as a guardian ad litem on its own initiative on March 6, 2012 in denial of Plaintiffs wishes and consent **and without legal authority**. Plaintiffs objected.

      3.      The Ex Parte Order for Custody dated February 28, 2012 incorrectly and improperly states that the … "vulnerable adult, and/or **the guardian ad litem,** and/or others…consent to this protective custody" No guardian ad litem existed until March 6, 2012, and could not consent, and no others with any authority consented to the Order. March 6 2012 was the first time that Mrs. Weaver knew of the appointment of attorney Wall as the guardian ad litem. On the morning of the March 12, 2012 Merit Hearing, Mrs. Weaver met the guardian ad litem for the first time. <u>This process was an abuse of process, abuse of discretion and a violation of Mrs. Weaver's constitutional rights, misconduct and negligence of the Family Court.</u>.

      4.      Pursuant to S.C. Code 1976 Ann, Section 15-5-310 & 360 (mentally incompetent person), Sect. 15-5-320,370 (imprisoned person), Sect. 15-5-330, 340, 350 (infant), the court may appoint a guardian ad litem. <u>**This part of the Code does not provide for appointment of a guardian ad litem for a "vulnerable adult."**</u>

      5.      Pursuant to Rule 17, SCRCP under certain conditions the court can appoint a guardian ad litem for **minors, incompetent persons and prisoners.** Pursuant to **Rule 17 (d) (5) SCRCP and Code Sect. 15 -5-310/360**, the court may appoint a guardian ad litem for

an "incompetent person". Here again, there is an absence of any reference to appointment of a guardian ad litem for a "vulnerable adult" in connection with a protective custody action.

6.        Incompetency has been defined as lack of ability, legal qualification, or fitness to discharge the required duty. See, **Black's Law Dictionary, 4th Edit.p. 906.** The S.C. Rules of the Family Court do not define an "incompetent person" as used in **Rule 17. SCRCP.** How is it measured? In New York, the word "incompetency" is used to designate the condition or legal status of a person who is unable or unfitted to manage his own affairs by reason of **insanity, imbecility or feeble mindedness,** and for whom therefore, a committee may be appointed, and such a person is designated an "incompetent." **Ibid.**

7.        As noted, there appears to be no legal authority for the Family Court to appoint a guardian ad litem for a vulnerable adult. **The action taken in this case may be designated as an abuse of court discretion under the laws and rules of procedure.** The DDSS filed a "Petition for Appointment of a Guardian Ad Litem and Attorney for a Vulnerable Adult" on March 1, 2012. The Family Court obliged the petition on March 6, 2012. There was no justification for the court in this action to appoint a guardian ad litem for Mrs. Weaver who is not incompetent and never has been. Moreover it is not correct for the Family Court to *sua sponte,* appoint an attorney for Mrs. Weaver as the guardian ad litem, **in the same person,** even if an argument could be made for court appointment of an attorney. In any event, when needed, Mrs. Weaver is protected by her husband who was present in the residence when the DDSS seven man team came to illegally abduct her on February 29, 2012, after business hours at 5.00 p.m. The S.C. Code Sections cited herein do not define "incompetency" and we have disposed of the "confusion" issue which in any event is not "incompetency". Under no measure can Mrs. Weaver be considered incompetent or confused. Here we have dispossession of her liberty in violation of her constitutional rights and protections, statutes, regulations, abuse of process and abuse of discretion. (See Mrs. Weaver's handwritten Petition to the Court dated March 3, 2012. prepared by her following her illegal confinement at Defendant Cottonwood ALF)

8.        There is a question of legality to be determined at trial, when DDSS caseworker Page stated that she signed Mrs. Weaver's admission documents for entry to Cottonwood also as a guardian ad litem. Who empowered her and accepted her statement of authority?

102.    <u>Failure to File an Answer</u>

1.    Last but not least, we address the procedural requirement for a formal answer to be filed by the defendant to the two DDSS complaints, pursuant to **Rules 5 (a), 7 (a)** SCRCP. <u>The rules under SCFCR are silent on this issue as to adults.</u>

2.    **Rule 8 (d)** SCRCP provides that allegations made in a complaint that are not denied in the answer, are deemed admitted.

3.    Generally a failure to plead an affirmative defense is deemed a waiver of the right to assert it. See, **Plyler vs. Burns (S. C. 2007) 373 SC 637, 647 SE 2d 188,**

4.    The denial of the need or opportunity for Plaintiffs herein to file a formal timely Answer to the two DDSS Complaints was a calculated violation of due process and equal protection of the laws resulting in a forced admittance of the DDSS claims by default caused by the Family Court and Defendants' procedural transgressions.

5.    The DDSS Ex Parte Motion for Protective Custody filed on February 28, 2012 and the first complaint and summons documents filed on the morning of February 29, 2012, were shown (in a "scrambled form") to Plaintiff Gary Weaver (and not to Mrs. Weaver) at about 5.00 p.m. after the close of business hours, without prior proper timely service, or notice to Plaintiffs. This procedural violation was calculated by Defendants to prevent Plaintiffs from filing a formal Answer under the procedural rules of court to the Motion and Complaint, from cross examination of witnesses, and from contacting their attorney, the Family Court Judge or the DDSS attorney which Plaintiff Gary Weaver unsuccessfully attempted.

103.    The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the Defendants and/ or each of them, and the Family Court, which include, but are not limited to those outlined in the counts discussed herein.

**WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth**

### COUNT 7

<u>Procedural Misconduct, Errors and Omissions of Counsel and Family Court</u>

For a separate and distinct claim for relief, Plaintiffs allege as follows:

104.    Plaintiffs re-allege and incorporate paragraphs 1-103 as if fully set forth herein.

105.    On February 28, 2012, Counsel for DDSS filed in court the Ex Parte Motion for Protective Custody, based on the improper hearsay and factually incorrect sworn Affidavit of DDSS Case Worker Pansy Page; said Affidavit was based by DDSS Counsel, DDSS officers, and the Family Court on an improper misleading, factually incorrect, ambiguously addressed, informal, unsworn hearsay letter from Defendant Wallace dated February 24, 2012, and on hearsay evidence of Defendant Visiting Nurses cited by said Pansy Page, and misleading incorrect factual misrepresentations of said Defendant Pansy Page as to the alleged facts claiming undocumented, unproven abuse, negligence, vulnerability and imminent danger of Plaintiff Beatrice Weaver. Defendant Wallace is an unqualified gerontology and gerontology forensic physician who failed to document his subjective opinions on the subject at hand.

106    The said DDSS Ex Parte Motion was improperly filed by DDSS counsel, and improperly granted a' priori by Family Court, one day before DDSS filed the formal Complaint and Summons next day, on the morning of February 29, 2012. **Thus there was no matter properly before the court's jurisdiction. Pursuant to Rule 7 SCRCP the said Ex Parte motion should have been filed a' posteriori after the filing and service of the Summons and Complaint pursuant to Rules 1, through 8, 65 and 81 SCRCP.** Accordingly the said Ex Parte motion could not be granted in retrospect as a result of improper court procedures known and should have been known by the DDSS agency, DDSS Counsel and the Family Court. Hence Plaintiffs herein were negligently, willfully and knowingly denied their Federal and State constitutional rights to due process and equal protection of the law by both the court and the DDSS Counsel.

107.    Plaintiffs allege herein that these facts raise reasonable questions as to the improper court procedures and non compliance by the Family Court and DDSS Counsel contrary to DDSS rules, State statutes and the rules of SCRCP and SCRFC which both knew and should have known existed and had to be complied with in processing procedures for DDSS's misguided compulsory protective custody in violation of Plaintiffs objections.

108..    DDSS failed to file a summons and complaint before the filing of the ex parte order; there was no prior discussion of the proposed action with Plaintiffs as required by the DDSS rules, no notice of the said order provided Plaintiffs herein; there was no temporary retraining order filed; the evidence DDSS filed with the court was inadmissible and hearsay, and factually incorrect, and there was no emergency filing by the Sheriff office pursuant to the DDSS

rules. With malice aforethought, Plaintiffs were denied the right to respond to the motion and complaint and to cross examine critical witnesses before Mrs. Weaver was improperly taken into protective custody and incarcerated in a "locked" third rate facility located seventy miles from Dillon while there were locally available similar facilities. The facts document that there was a collusion and conspiracy of silence by Defendants. DDSS and the sheriffs failure to provide any notice of the motion and pleadings was done in bad faith and in violation of DDSS rules to keep patients fully informed, etc of their doings. The Sheriff did not receive any written acceptance of service of the ex parte motion and pleadings and vociferously objected to by Plaintiff Gary Weaver, and the sheriff was unable to comply with **Rule 4 (j) SCRCP** and file written proof of service with the court clerk.

109.    In summary, with respect to perpetrating improper code, court, regulatory and administrative procedures as cited herein, Defendants and each of them knowingly, willingly and negligently **in bad faith**, deliberately violated the above cited rules and case law, and at least **S.C. Code 1976 Ann. Sect. 43-35-45, and Sect.15-9-20; Rules 1-8, 65, and 81 SCRCP; SCRFC Rules 2, 6, 8 and 21; and DDSS Rule 405.03, et al.**

110.    Clearly the law, cited rules, the facts and circumstances document Plaintiffs claims herein that DDSS, their counsel and the Family Court, negligently, willfully and knowingly violated Plaintiffs Federal and State constitutional rights to due process and equal protection of the law.

111.    Therefore given the facts, laws, rules and circumstances there was no case to refer ex parte to the alleged defendants (plaintiffs in this case). DDSS' and other defendants individual and cumulative violations of the respective court rules denied plaintiffs herein their Federal and State constitutional rights to due process of law and equal protection of the law, along with additional constitutional violations as stated herein. Moreover, these respective bad faith actions of DDSS et alia, in fact perpetrated physical and psychological abuse and neglect and placed Plaintiff Beatrice Weaver in a vulnerable situation subject to imminent danger, in violation of Chapter 35, Adult Protection Act, of the S.C. Code. Further, pursuant to **Code Sect. 43-35-80**, the respective Defendants are subject to action as may normally be appropriate by the State Attorney General office which is unlikely unless ordered by the Trial Court.

112.    The foregoing events are a direct and proximate result thereof by the amoral, willful, negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by

and through the acts of their employees, agents, and/or servants which include but are not limited to: wantonly, improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing so-called Adult Protective Services, Homemaker and Placement Services on Plaintiffs Beatrice and Gary Weaver over the vociferous objections of both Plaintiffs at the time of the events complained of herein, in a wholesale violation of the DDSS procedural rules and regulations, state statutes, court rules and case law.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

### COUNT 8

**DDSS Defendants' Malicious and Bad Faith Violations of DDSS Service Rules**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

113.    Plaintiffs reallege and incorporate paragraphs 1-112 as if fully set forth herein.

114.    The above described incidents and events, were a direct and proximate result of the negligent acts and/or errors and omissions of the DDSS Defendants and/ or each of them, which include, but are not limited to the following:

115.    On Wednesday, February 29, 2012 at 5.00 -7.00 p.m.., DDSS negligently and maliciously in bad faith, forcibly abducted Beatrice Weaver without prior verbal or written notice or correct administrative conduct pursuant to the Rules, using excessive police force, under the rubric of administering a judiciously incorrectly executed court motion and order for protective custody for Plaintiffs alleged unproven and factually incorrect "abuse, neglected and vulnerable adult in imminent danger." DDSS negligently, deceitfully and fraudulently in a blatant and arrogant abuse of regulatory authority and license, using "police state" "shock" tactics, arbitrarily misapplied and abused the legal authority of four social services described in the Rules: DDSS Referrals and Resources; Homemaker Services; Adult Protective Services, and Placement Services. See, **DSS "Adult Services Policy and Procedure Manual," Chapters 1, 3, 4 and 5. supra.**

116.    **DDSS Resources.** (Chapter 1, DDSS Manual, supra) The DSS services violated by Defendants include providing social services to eligible adults through direct provision of services by DSS staff and through referrals to other social agencies for services which they provide. The State agency also develops agreements with other Agencies so that County DSS offices may follow uniform practices in using their resources. DSS may arrange Special Services

for Handicapped and Disabled Adults, to provide habilitative and rehabilitative services to handicapped and disabled adults in order to assist individuals to attain or maintain as high a level of functioning and independence as possible. Social services for aged, blind, and disabled adults vary when remaining in their own homes or community. Community Based Counseling permits clients to remain in their homes while receiving assistance to remedy illness, alcohol and/or drug abuse, emotional instability or behavioral problems. There are times when a client cannot remain in his/her home to receive assistance for mental illness, behavioral problems, alcoholism or emotional disturbances. In such instances the client may be institutionalized in a facility in the community or state to receive needed treatment, but not some 70 miles away under the circumstances. See, DSS "Adult Services Policy and Procedure Manual," Chapter One, Item 110, p.1, 01/06/1984. Plaintiff Beatrice Weaver did not receive nor did she need or request any such services from DDSS under this program.

117.  Homemaker Services. (Chapter 3, DDSS Manual, supra)  The DDSS Homemaker Services Program provides in-home services to eligible citizens of South Carolina. These services include a variety of in-home services geared to individual client needs. Frail, elderly and disabled individuals are often unable to manage normal household chores such as grocery shopping, meal preparation, and light housework, in addition, some of these individuals need personal care such as assistance with bathing. Without Homemaker Services, the clients would be forced to seek alternate living arrangements or be placed in institutions. Through Homemaker Services, families receive valuable assistance in learning to manage households, parenting skills, and budgeting. No person shall be excluded from receiving Homemaker Services on the grounds of race, color, national origin, or religion. No qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under this program. Ibid. Chapter 3, Items 310,321.10  Mrs. Weaver qualifies for such services which were not provided by defendant DDSS and Nurses and is damaged accordingly,

118.  Adult Protective Services. ('APS') (Chapter 4, DDSS Manual, supra)  This APS service has the legal authority and responsibility to assess "reports" of alleged abuse, neglect, and exploitation of vulnerable adults in certain settings. In addition there is a mandate to protect victims, or potential victims, from abuse, neglect, and exploitation. "While meeting the legal mandates, attention must be given to the client's right of self determination, the client's life style

and culture, and the requirement that services be provided in the least restrictive environment." These are services whose objective is **to protect a vulnerable adult from harm caused by the vulnerable adult or another.** These services include but are not limited to, evaluating the need for protective services, securing and coordinating existing services, arranging for living quarters, obtaining financial benefits to which a vulnerable adult is entitled, and securing medical services, supplies, and legal services. See, **Manual: Op cit, Chapter 4, Items 400, 401.01.** Mrs. Weaver neither requested nor required this service from DDSS which flagrantly violated the Rules in its ill fated, mistaken efforts to incarcerate Mrs. Weaver by forcible abduction for which it is reprehensible.

119.    **Placement,**    (Chapter 5, DDSS Manual, supra). According to the DDSS out of home placement may be necessary when client needs cannot be met through formal or informal services in the community. Most senior adults prefer to remain in their own homes rather than go into a facility and the philosophy of the DDSS is to provide and arrange in-home services to delay or prevent placement. However, some adults have few support systems and have such excessive medical problems that their needs cannot be met in the community. Placement then becomes necessary. Clients may ask the DDSS to assist them in arranging for placement, may agree to placement when it is suggested by the caseworker, or it may be necessary to place the client through a court order. **Ibid. Chapter 5. Items 500 and 501.01.** As a direct and proximate result of the above described abuse of the Rules including the excessively forcible DDSS and police abduction of Plaintiff Beatrice Weaver as an alleged "abused, neglected, and vulnerable adult in imminent danger," which were negligent and abusive regulatory acts and/or errors and omissions of Defendants, and each of them, DDSS on its own initiative without prior conference with Plaintiff pursuant to the Rules, executed **an involuntary** "Placement Service" by forcibly moving Plaintiff against her wishes and her voluble and vehement lack of consent, from her home to an alternate arrangement. This action was diametrically opposite to the stated philosophy of the DDSS  to provide and arrange in-home services to delay or prevent placement. DDSS made no effort to that end, and operated in a furtive, secret and sinister manner in violation of the rules as cited herein and placing Plaintiffs under extreme duress.

120.    The removal placement was to Defendant Cottonwood Villa, a primitive, third rate, sub standard, culturally and socially incompatible, licensed Assisted Living Facility (ALF) located some seventy (70) miles out of Dillon County, in violation of the Rules. On arrival

56

Plaintiff was unceremoniously "dumped" by the EMS staff onto a small single bed, in a room approximately ten (10) feet by fifteen (15) feet, containing two beds, one other very sick female patient of indeterminate illness, sharing a small bathroom , and toilet smelling of urine, with three other persons , with minimal furniture and facilities. The Cottonwood ALF "cultural" food was uneatable, the bathroom stank of urine, and the second patient in the same room spread her feces all over the floor of the room the majority of the time. The ALF staff were all black, abusive, threatening and uncooperative when dealing with Mrs. Weaver.

121.    Defendants and each of them had a responsibility and duty to Plaintiffs to ensure that the Rules and social services were properly administered in the best interests of Plaintiffs and that their ministrations would not create stressful, hazardous and difficult conditions of duress, and above all that their exercise of regulatory authority and license was conducted properly within the usual and customary norms of law and strict adherence to the intent and practice of the DDSS Rules all of which were arbitrarily, flagrantly, irresponsibly with malicious intent, abused by DDSS and in violation of Plaintiffs' constitutional rights to due process and equal protection of the laws. (See below)

122.    All of the social services and Rules described herein, DDSS maliciously and in bad faith, violated and damaged Plaintiffs as a direct and proximate result thereof by the willful negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to: improperly, negligently, carelessly, maliciously, tortiously, wantonly and/or wrongly imposing Adult Protective Services, and Placement Services on Plaintiff Beatrice Weaver over the objections of both Plaintiffs at the time of the events complained of herein, in a wholesale violation of the DDSS procedural rules and regulations. At no time did DDSS offer Plaintiffs and Homemaker Services, only transportation to and from medical appointments.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 9

### Defendants Violation of their Public Duty, Responsibility and Trust of Plaintiffs

For a separate and distinct claim for relief, Plaintiffs allege as follows:

123.    Plaintiffs reallege and incorporate paragraphs 1-122  as if fully set forth herein.

124.   Plaintiffs allege that the causes of action against the Defendants and each of them are grounds for the following charges:

1.   As a result of all the activities of Defendants, each of them and collectively, the Plaintiffs' public reputation and economic wellbeing, have been seriously damaged. Plaintiff Beatrice Weaver has seriously suffered physical, mental and emotional anguish and stress with permanent harmful effect with such damages having been a proximate and actual result of the acts, errors and omissions of the Defendants and each of them. Plaintiffs have incurred medical, legal and other related expenses as a result of the acts, and/or errors and omissions of the defendants and each of them.

2.   As a result of the harmful activities perpetrated against his wife and his efforts under threat of arrest to protect her against the DDSS, Plaintiff Gary Weaver who only recently recovered from four bypass heart surgery known and should have been known to Defendants, was denied the well being, companionship, comfort and coverture of his wife, and seriously suffered mental and emotional anguish and stress, expense, with permanent harmful effect with such damages having been a proximate and actual result of the acts, errors and omissions of the Defendants and each of them.

3.   That Plaintiffs have suffered actual damages, including but not limited to embarrassment, humiliation, enforced isolation from the spouse, friends, associates, and the community, post traumatic stress disorder, anxiety, grief, emotional upset, serious stress, and other related psychological injuries, physical pain, and disruption of her life..

125..   Defendants collectively, and each of their respective conduct constituted gross negligence, recklessness, and willfulness, in particular as follows:

1.   Failure of Defendants Rowland, Director and England, Manager, to provide Plaintiffs case records upon request, and to properly screen, train, manage and supervise Case worker Pansy Page to ensure that she was trained, prepared and culturally and psychologically suitable to properly and professionally interact with DDSS patients such as Plaintiffs in good faith, and in accordance with and not to ignore the DDSS rules.

2.   DDSS' failure to inform Plaintiffs of the existence, and to provide proper services under the DDSS rules such as Homemaker Services, patient's continued residence in her home instead of enforced removal by unnecessary police brutality by Defendant Dillon Sheriff, to an arbitrary designated third rate facility such as Defendant Cottonwood Villas, for which

58

such services DDSS Defendants were responsible and under the direct duty and obligation pursuant to the DDSS rules, and supervision of the DDSS Defendants.

3.    Failure of DDSS personnel, Counsel and the Family Court to observe the SCRCP rules and State statutes in promulgating a bogus Ex Parte Order for Protective Custody on February 28, 2012, before filing a Complaint, Summons and Service with Plaintiffs the next day, on February 29, 2013, all without any prior verbal or written formal notice or advice to Plaintiffs according to the statutes and rules.

4.    Failure of DDSS in allowing bad faith violations of the rules and procedures and exposing Plaintiffs to be in a position where physical and emotional harm and danger could be inflicted on elder citizens, and without any prior notice or discussions or information of DDSS intent, pursuant to the procedures and rule requirements.

5.    DDSS Director Rowland and Manager English's failure to properly supervise their employee case worker Pansy Page in her conduct relating to Plaintiffs. For example, Defendant Page who went out of bounds in her personal vendetta and resentment of Plaintiff Beatrice Weaver, had reserved a very small room for Plaintiff Weaver (shared with another very sick woman) at Defendant Cottonwood Villa in Bishopville 70 miles away, for February 25, 2012. That was three days prior to the Ex Parte Order being improperly filed and granted on February 28, 2012, and she knew and should have known, that Plaintiff Gary Weaver lacked personal transportation to visit Mrs. Weaver due to his automobile being in the mechanic's shop for major repairs.

6.    DDSS failure to have a policy or program of staff training and prevention to prohibit such incidents of bad faith behavior and violations of rules, and to ensure compliance with all applicable regulations, rules, Code statutes, industry standards, and related guidelines and specifications.

7.    At about 5.00 p.m on February 29, 2012, without any prior notice to Plaintiffs, Defendants Dillon County Sheriff Office and Emergency Medical Services entered Plaintiffs property without any warrant, intentionally and recklessly invaded Plaintiffs privacy and subjected Plaintiff Beatrice Weaver to unnecessary physical injury and pain, shock, and severe emotional distress which was so severe, traumatic and extreme under the circumstances, that no reasonable person (and especially an 86 year elder woman suffering from severe hip, abdomen and other injuries and illnesses of a female nature, known or should have been known

to Defendants and each of them, ) could be expected to endure the surprise, shock and pain inflicted while unexpectedly manually pulling her out of her sick bed and dumping and strapping her onto a stretcher dressed only in her nightgown by two burly EMS officers, and forcibly abducting her in an ambulance under guard of two sheriff deputies seated inside and one acting as driver. Plaintiff Gary Weaver was told by the Sheriff officer present not to interfere under threat of arrest and chains for non compliance with a court order that subsequently proved to be bogus and improperly granted by the Family Court.

      8.    Defendants and each of their acts before and especially on February 29, 2012 at Plaintiffs residence, were in extreme violation of Plaintiffs right to privacy. Defendants' collective, collusive and respective conduct set forth in this complaint was such as to amount to a willful, wrongful and illegal intrusion in both Plaintiffs lives with permanent and irreversible psychological and physical damages, especially to Plaintiff Beatrice Weaver with a residue of PTSD.

      9.    Additionally, Defendants collective conduct resulted in publicizing and involving third parties (such as friends and associates, a church and guardian ad litem improperly appointed by the Family Court) in private matters related to two elder citizens one in ill health and doing no harm to anybody, and minding their own business, which was of no particular public interest.

      10.,    The illegal action of Defendants in invading Plaintiff's property without notice, their privacy and their physical wellbeing, constituted an unwarranted and unnecessary intrusion into the psychological solitude and seclusion of the elder Plaintiffs resident in their beautiful old home, who value their privacy, rights and protections under the law that were unexpectedly violated by Defendants..

      11.    Plaintiffs are requesting court judgment for actual and punitive damages, and other related relief in amounts and other punishments to be determined by a jury of Plaintiffs' peers (elderly, educated women and men), and the court.

    **WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 10

### DDSS Caseworker Page's Lack of Due Diligence, Duress, Malicious and Bad Faith
### <u>Violations of DDSS Service Rules</u>

60

For a separate and distinct claim for relief, Plaintiffs allege as follows:

126.    Plaintiffs reallege and incorporate paragraphs 1-125 as if fully set forth herein.

127.    The violations against Plaintiffs described herein were a direct and proximate result of the grossly negligent and malicious acts and/or errors and omissions of Defendants, and/or each of them, which particularly include but are not limited to the determinative and definitive violations and lack of due diligence of the DDSS Caseworker Page as follows:

128.    As noted herein, the DDSS caseworker stated in an Affidavit dated February 29, 2012 filed in support of the DDSS Complaint filed with the Family Court on February 29, 2012 at 11.30 a.m., that she began an investigation on or about **June 9, 2011** or November 9, 2012:

> "...to determine if the subject (Mrs. Weaver) were (sic) a vulnerable adult in need of protection or removal. I have determined that the subject is in need of protection or removal because: she is not able to provide care for herself. She suffers from severe degenerative disease and has difficulty moving around in her home. She has to use a wheel chair at times. Ms. Weaver is often confused. Case Manager has discussed Ms. Weaver's health with her primary care physician, Dr. Phil Wallace. He feels she is at risk remaining in her home."

129.    The stated "discussion" with the primary physician of Mrs. Weaver's health occurred without any hard evidence or proof and was not sufficient justification for an illegal abduction and confinement. These observations are not factually based on any evidence of investigation or in-field due diligence conducted by the DDSS caseworker who simply repeats the incorrect comments and facts provided in the discredited February 24, 2012 inadmissible Memorandum of the Defendant Wallace as an "expert" witness, and the inadmissible hearsay evidence of the Visiting Nurses, as incorrectly accepted by the Family Court on February 28, 2012, and subsequently rescinded on March 12, 2012 when it dismissed the DDSS Complaints based on inadmissible evidence, and returned Mrs. Weaver to her home forthwith. In dereliction of their public duty, the DDSS made no effort to mitigate the alleged problems by offering to provide Mrs. Weaver with Homemaker Services.

130.    The said Affidavit includes further uninformed, incorrect and adverse comments about the condition of the beautiful, century old, heritage, historic manor house Mrs. Weaver occupies, from which she was forcibly abducted and dumped into a third rate substandard facility to share a small two patient bedroom about half the size of Mrs. Weaver's bedroom at home, with another patient. This duress, abusive and neglectful experience caused by DDSS was some "protection" for a "vulnerable adult" from "imminent danger" and a serious downgrade in

quality of life forced on Mrs. Weaver by DDSS caseworker Page's egregious violations of its Rules and statutes, not to mention Mrs. Weaver's constitutional rights. Mrs. Weaver has been an innocent victim of abusive government actions for whatever motives or reasons.

131.    During the period November, 2011 and February 29, 2012, the DDSS caseworker or other DDSS personnel, or Nurses, never had the privilege of access to the house other than viewing one room and the central hallway, not to mention their non access to the ancillary facilities such as the porches, laundry, etc. During the period she was associated with Mrs. Weaver, Caseworker Page never had the opportunity to inspect and evaluate the living quarters or Mrs. Weaver's daily living conditions that the DDSS caseworker complained of in her uninformed, ignorant comments in the Affidavit. For example, the DDSS caseworker never evaluated whether a wheel chair could be used inside the residence and never observed Mrs. Weaver using a wheel chair inside the house, where Mrs. Weaver was completely physically mobile without a wheel chair inside the house, contrary to the views expressed in the Affidavit citing Defendant Wallace who also was never a visitor to the house in fifteen years and never conducted any due diligence to back up his ignorant comments in the "expert" Memorandum.. Moreover, Mrs. Weaver very often walked without a wheelchair to and from Room 32 and the dining hall at Defendant Cottonwood facility, which is some 100 yards distance. All Defendants in this case are guilty of failing to do their due diligence to check the facts alluded to in the Affidavit, the Wallace Memorandum and Nurses' Report. The details of the caseworker's deficiencies and violations are to be shown at trial and discussed in Plaintiff's Ex Parte Motion to Interplead, for dismissal of DDSS complaint filed March 12, 2012, etc., cited herein above.

132.    The DDSS caseworker Page's Affidavit cited an inadmissible hearsay Report from Visiting Nurses, undated, not notarized and incorrect. Here again, the DDSS Caseworker never conducted any due diligence to investigate the Nurses claims to determine the accuracy of their claims which were in fact incorrect, ignorant and uninformed. The Nurses had no access to the house except for one room and the hallway and the Report as cited is factually incorrect; the details to be shown at trial. For example, a Nurses visit to Mrs. Weaver's residence on November 8, 2011 as claimed was not possible. Mrs. Weaver was in bed the whole day, and the previous day November 7, 2011, the front gate to the property was closed and locked by Mrs. Hazel Carter on return from a visit to MUSC in Charleston S.C. The Family Court dismissed the Case

on March 12, 2012 following the interjection of the court appointed attorney and Mr. Weaver's Motion to Dismiss the DDSS case.

133.    During the period November 9, 2011 to February 29, 2012, the DDSS caseworker Page never once informed Mrs. Weaver of her secretive, defective, so-called "investigation", her secretive conferences with Defendant Wallace, and Nurses, or her secretive intent to abduct Mrs. Weaver from her home on questionable grounds and misleading statements to the Court. The caseworker's Affidavit was not based on facts observed or investigated in extreme lack of due diligence by the caseworker, but as stated, who relied on two inadmissible hearsay reports from two other defendants, Nurses and Wallace. All of this secretive activity was conducted surreptitiously by DDSS caseworker Page under the supervision and approval of the DDSS Director and Administrator in violation of the SCDSS Rules, statutes and court rules of procedure.

134    **A.**    Inter alia, DDSS Caseworker Page violated **Rule 121.10** in toto and in collusion with defendant Wallace: **"Worker Duties in Service Provision" (Chapter 1: Referrals and Resources, Adult Services Policy and Procedure Manual)** (hereinafter referred to as **"Rule(s)."** The DDSS Caseworker has responsibilities in serving clients that were flagrantly and irresponsibly violated by caseworker Page in this case. She did NOT do the following activities as required under the DDSS Rule 121.10:

1.    "Assist the client to identify the problems;
2.    Help explore possible solutions to problems;
3.    Help the client to decide which problems need an immediate solution;
4.    Inform the client of appropriate services within the Dept., etc;
5.    Discuss with the client which services the Dept. will provide directly;
6.    Discuss with the client referrals to other agencies;
7.    With the client's permission, make referrals to the appropriate agency, etc;
8.    Explain in detail to the client, the agency's role and involvement in the services to which she is being referred'"

**B.**    **Note: The only on-going service caseworker Page provided for Mrs. Weaver was to drive her to medical appointments once or twice a week.**

**C.**    Significantly, in a serous breach of bad faith and malevolence and negligence, DDSS Caseworker Page violated Rule 121.10, cited Items (1) –(8) relating to a referral for physical therapy that she obtained for Mrs. Weaver from defendant Wallace's office on or about November 15, 2011. Caseworker Page did not inform Mrs. Weaver that she had

63

been called by defendant Wallace's office to pickup the referral, nor that she had obtained such a referral, and she did not make an appointment for Mrs. Weaver with the physical therapy department at McCloud Hospital. Mrs. Weaver only discovered this matter eight (8) months later on August 28, 2012 when she obtained the information from defendant Wallace's office. Thus Mrs. Weaver was deprived of this important therapy for Mrs. Weaver's arthritic left hip and arm as a direct and proximate result of caseworker Page's bad faith, negligence and depriving her of the benefits of physical therapy ordered by defendant Wallace on November 15, 2011 some nine months prior to this date. Furthermore, Defendant Page's theft of documents and failure to inform and deliver the said medical referral to Mrs. Weaver was malice aforethought in that her inaction eliminated a third party witness from the Case.

135.    **Rule 122.10** requires that the DDSS caseworker "… must establish a positive relationship with the client, thus enabling the client to identify his/her problems and/or the worker to sense them." The DDSS caseworker failed in meeting this condition. During one trip to hospital, she complained to Plaintiff Gary Weaver that Mrs. Weaver was "difficult", "unpleasant" and "demanding". Upon investigation, it was determined that Mrs. Weaver had requested the caseworker to obtain a copy of the DDSS Rules no less than ten times, so that she could study them and know the limits of services provided, etc. The said Rule provides that the client "…cannot use a DDSS resource (e.g., physical therapy) unless he knows something about what it has to offer him and what it will expect of him." The caseworker refused or could not provide the Rules during a four month period dating since November 2011, through February 29, 2012, and resented Mrs. Weaver's repeated requests made every time she transported Mrs. Weaver to a medical appointment. .

136.    The DDSS Caseworker violated **Rules 131** and **132** with respect to arranging for the provision of DDSS services.

137.    Pursuant to **Rule 152 "Needs Assessment"** the DDSS Caseworker neglected, and failed completely to carry out due diligence and violated all of the DDSS guidelines for conducting needs assessment interviews with Mrs. Weaver the client, or her caregiver and spouse Gary Weaver, as follows, for "County Duties:"

I.    Nature of Needs Assessment. No "service plan" was ever discussed nor agreed by the Caseworker and Mrs. Weaver as required and not recorded on appropriate forms to be signed by Mrs. Weaver.

2.    Guide for Needs Assessment:  The DDSS caseworker failed and neglected to make an effort to develop a climate and working relationship with Mrs. Weaver conducive to preparation of an agreed needs assessment and service plan.

3.    Initial Interview:   The DDSS Caseworker neglected and never conducted an Initial Interview in accordance with the guidelines that are designed to convey a climate and feeling of acceptance and empathy through the use of the caseworkers "skillful interviewing techniques" to develop a service plan. There was no Initial Interview conducted for those purposes.

4.    The DDSS Caseworker violated each of the several guidelines for "Things to Avoid During the Needs Assessment Interview."

5.    The DDSS caseworker violated each of the DSS guidelines for "Things to Do During the Needs Assessment Interview." For example, the caseworker did not develop "an atmosphere of acceptance and openness;" did not ask questions to develop "fruitful channels;" Did not encourage the client "to talk;" did not "respect the client's right to make decisions" and in fact deliberately violated any client's rights pursuant to the DDSS guidelines leading up to the mysterious reasons for abducting Mrs. Weaver and removing her to the Cottonwood facility.

6.    The Needs Assessment Interview: "Normally the needs assessment is formulated by inquiry and client response."  In this case the caseworker violated this guideline since there was no caseworker inquiry of the client as to alleged problems or needs, and no response from the client, since the caseworker carried out her activities in secret and coordinated collusively with Defendant Wallace, unknown at any time to Mrs. Weaver or her spouse. The initial procedure involving Defendant Page's following her arrival at the house was that she parked her car on the front walkway, entered the house up the front steps into the foyer, sat at a small table and waited for Mrs. Weaver who was already dressed. Ms. Page asked Mrs. Weaver for some signatures on forms. Then they went to Page's car and Mrs. Weaver was helped into the back seat by Ms. Page and of they went to a medical appointment. The same procedure was followed for subsequent transportation services for Mrs. Weaver. At no time did Ms. Page enter any rooms in the house other than one time she went to the kitchen with Mr. Weaver who was interviewing two officers from the Florence Rehabilitation Center who were there to inspect and approve him as a caregiver for his wife.

65

7.    Identifying and Stating the Problems: Under this guideline identifying the alleged problems "is a joint undertaking by the caseworker and client" to identify problems, solutions, resources, etc. The misguided DDSS alleged "abused, neglected, and vulnerable adult" in "imminent danger" and need of DDSS protective custody, were needs arbitrarily created by collusive efforts of uninformed Defendants, and their misguided evaluation based on lack of understanding and real knowledge, and were never discussed with Mrs. Weaver or her spouse at ay time prior to February 29, 2012 when the DDSS in a surprise appearance, illegally forcibly abducted and removed Mrs. Weaver over her objections and lack of consent, from her comfortable residence. The DDSS caseworker knowingly and wantonly denied Mrs. Weaver her due process and regulatory rights under the SCDSS Rules to be actively involved and informed of the DDSS activities, which were deliberately denied.

8.    Factors Related to Client's Problems: At no time did the DDSS Caseworker discuss the "Referral Source: for a misguided unnecessary "investigation" of Mrs. Weaver. As of this writing it is not known who initiated the DDSS abduction action; defendant Wallace or the DDSS caseworker, which subject is for discovery before trial. Nor was there an in depth, proper discussion of the family situation and the permanent role of Plaintiff Gary Weaver as full time caregiver. **Defendant Wallace stated on February 24, 2012, that Mrs. Weaver was alone in her house, which he knew and should have known was factually untrue.** Gary Weaver had returned from hospital rehabilitation on December 22, 2012, well known to Defendants. Dr. Wallace and the DDSS caseworker Page knew or should have known that fact from due diligence and repeated contacts with both Plaintiffs, before Wallace wrote the misleading factually untrue Memorandum on February 24, 2012 which caused the Family Court to issue a Protective Custody Order on February 28, 2012, citing Wallace's memorandum, one day before the DDSS filing of a Complaint.

On February 27, 2012, Plaintiff Gary Weaver was seated in the front seat of Ms. Page's car which she parked in front of the entrance door to Dr. Wallace's offices and went in to obtain his "certificate" memorandum dated February 24, 2012 the previous date that she went into his office. On February 24, 2102 Mrs. Weaver had received a TB shot while waiting in the car also parked at the entrance door to his offices, and Dr. Wallace's staff member ("Debra") came out to the car to greet Mrs. Weaver and bid her "goodbye" which Mrs. Weaver did not

understand. Thereafter, Ms. Page drove both Plaintiffs to Wal-Mart in Dillon where she and Mr. Weaver went shopping, and then she drove Plaintiffs to their home.

        9.    Patient's Financial Functioning and Household Management:  No discussions took place with Mrs. Weaver or her spouse concerning the financial functioning and household management which was totally mischaracterized and misleading in the DDSS caseworker's inadmissible Affidavit she submitted to the Family Court. These complex matters were under the direct, astute, control, management and supervision of Mrs. Weaver on a day to day basis, without any "confusion" as claimed by Defendants and with the complete cooperation of her spouse who is content not to have to deal with such matters. Contrary to the DDSS caseworker's Affidavit claim relating to Plaintiffs financial situation, Plaintiffs require no assistance from Defendants which fact would have been properly established had the Caseworker taken the trouble and initiative to discuss the matters openly and constructively during due diligence with Plaintiffs, instead of secretly, furtively planning an abduction and incarceration for reasons and motives unknown, but exuding racial discrimination based on her demeanor and "attitude" towards Mrs. Weaver on a day to day basis. During Mr. Weaver's recuperation period from his heart attack, reflecting her lack of knowledge of such matters, Mrs. Weaver requested assistance from DDSS to obtain LP gas during January 2012. DDDS did provide some limited assistance in this matter, but not for monetary reasons.

        10.    Living Arrangements:  The DDSS caseworker totally mis-characterized Mrs. Weaver's living arrangements of which she in fact knew nothing, and relying on the incorrect statements of the Defendant Visiting Nurses inadmissible hearsay Report discussed herein above. The caseworker had Mrs. Weaver removed from her comfortable residence in good condition, to a very small bedroom shared with another very sick female patient "for protective custody."

        11.    Health Functions:  The DDSS Caseworker's Affidavit totally mis represented the mental and physical condition of Mrs. Weaver in violation of the DDSS guidelines. For example, contrary to the said Affidavit, Mrs. Weaver never uses a wheel chair in her residence, and only uses one on visits to medical facilities. Her degenerative spine condition is a direct and proximate result of Defendant Wallace's consistent neglect and medical malpractice which condition developed under his care and in the absence of any relief spanning

some fifteen years. Within two months of separation from defendant Wallace as her primary physician, Mrs. Weaver obtained relief for her spine and hips from another doctor.

12.     Social Functioning:  In planning the abortive abduction and removal of Mrs. Weaver to the Defendant Cottonwood Villas facility, the DDSS caseworker made no attention to the social and cultural functioning aspects of their actions in this regard in accordance with the DDSS guidelines. The DDSS action totally isolated Mrs. Weaver from her community, family, and important persons associated with Mrs. Weaver and her spouse. Mrs. Weaver was placed in a socially and culturally incompatible facility and patients, with third rate, sub standard services, uneatable cultural food, and abusive staff that steal.

13.     Analyzing the Dynamics of the Social Situation:  No effort was made to comply with this guideline by the DDSS caseworker Page. This guideline requires that the DDSS Caseworker "...must elaborate the initial statement of the problem(s) in a more detailed analysis of the dynamics of the problematic situation." The aim of this effort is to develop an understanding of how various elements in the situation are operating to produce or maintain given behavioral or social conditions. Firstly, the Caseworker never produced an initial statement of the problems which of course obviated the opportunity for any further in depth investigation of the social conditions which were completely ignored by the DDSS caseworker who in violation of the Rules imposed her values on Mrs. Weaver. The dynamics of the social situation in this case were totally alien to the DDSS caseworker who did nothing along the lines of the guideline in the best interests of Mrs. Weaver. Incarceration in a single room with another sick patient would not be one of the elements of a plan for Mrs. Weaver given her education, social and cultural dynamics, lifestyle and values, totally alien to the DDS caseworker's experience and lifestyle.

On the contrary, with malice aforethought, Caseworker Page viciously, and deliberately chose a "locked" facility requiring the TB shots referred to herein, that accommodated culturally alien 99 percent black inmates and staff, 70 miles out of Dillon County and difficult for access for Mr. Weaver whose car was in for repairs. Defendant Cottonwood ALF provided horrible inedible cultural food, no recreation and social amenities or benefits, no readily accessible telephone, etc. There was a good reason that caseworker Page wanted Mrs. Weaver to be confined for the rest of her life and not be able to escape under the DDSS rules and laws. She misappropriated Mrs. Weaver's social security checks and had them re-addressed to her address

at DDSS. Her intent appears to have been to eventually dispossess Mrs. Weaver of her possessions for which both she and defendant Wallace apparently had designs. That was the true and real reason they jointly and severally attempted to incarcerate her for life, an elder person whom they would eventually dispossess of her possessions when they were sold at auction to pay the bills imposed on her by the illegal incarceration. The monthly cost of a stay at Defendant Cottonwood ALF was some three times Mrs. Weaver's monthly social security income which Defendants knew and should have known while planning to confine her for life at her expense...

14.    Establishing Goals, Objectives and Plans: This guideline never featured in the action plan that the DDSS imposed on Mrs. Weaver without her knowledge or participation. It is stated that on the basis of the DDSS caseworker's understanding of the dynamics of the problem, the caseworker " ... **with the client**, must establish goal(s: and objective(s) for the planned change which were never discussed with Mrs. Weaver, and decide upon tasks with respect to the objective(s)." This focuses on "feasibility and priorities." None of these activities were done with or without the involvement of Mrs. Weaver in the whole DDSS process. Mrs. Weaver was denied the right to proper social services planning in which she would participate, and which in the first place would have made it crystal clear that the DDSS program as planned and carried was totally without any factual basis, totally inappropriate, a denial of due process and as matters proved, a waste of Family Court time, effort and expense. There never was any need for "change". All Mrs. Weaver ever wanted was to obtain a "cleaning woman", a reasonable request for an elder woman. Instead defendants kidnapped Mrs. Weaver and attempted to incarcerate her for life with malevolent bad faith intent..

15.    Stabilizing the Change Effort:  Under the DSS guidelines, the final consideration in problem assessment is anticipating what new problem(s) or need(s) might arise as a result of the change effort, and what can be done to see that the change is maintained once it is achieved. Changing one aspect of the client's social situation will have consequences for other aspects, and new problems may be brought to light. DDSS negligence and lack of due diligence in planning completely ignored this aspect of the program it proposed for Mrs. Weaver, an independent strong willed, competent, highly educated elder woman used to privacy, management of personal matters such as banking, insurance and taxes, etc, professional research and writing, good eatable food, and who was used to an elegant lifestyle and comfortable living in her residence, with pets. This is hardly socially and culturally compatible with being

69

incarcerated for life by a misguided government agency negligently and maliciously abusing its regulatory authority and license, in a very small bedroom with another sick patient, sharing a small bathroom with three other patients, served food that is "not fit for pigs to eat" , in a third rate substandard facility in Bishopville where Mrs. Weaver has no community contacts or social life, 70 miles distant from her husband who DDSS caseworker knew had no transportation to visit his wife on a regular basis, etc. Even worse, is the fraudulent, malicious and **possibly criminal** conversion on March 13, 2012 of Mrs. Weaver's social security payments to persons and an address unknown to her, pursuant to excessive, forced, abusive regulatory authority, denying her due process rights. .

16.     All of the social services and Rules described herein, DDSS maliciously and in bad faith, violated and damaged Plaintiffs as a direct and proximate result thereof by the wanton, willful, negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to: improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing Adult Protective Social APS, Homemaker and Placement Services on Plaintiff Beatrice Weaver over the objections of both Plaintiffs at the time of the events complained of herein, in a wholesale and negligent and malicious bad faith violation of the DDSS procedural rules and regulations and Plaintiffs constitutional rights, as cited herein.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth**

### COUNT 11

**DDSS Caseworker's Violations of Adult Protective Services Rules (Chapter 4)**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

138.     Plaintiffs reallege and incorporate paragraphs 1-137 as if fully set forth herein.

139.     This Complaint charges DDSS with the negligent and deliberate wholesale violations of the SCDSS Rules which include **Adult Protective Services ("APS")** Rules as follows:.

140     According **to Rule 400**, the APS program has the legal authority and responsibility to assess reports of abuse, neglect, and exploitation of vulnerable adults in certain settings. Additionally a mandate exists to protect victims or potential victims, from abuse, neglect, and exploitation. While meeting the legal mandates, attention must be given to the

70

client's right to self determination, the client's lifestyle and culture, and the requirement that services be provided in the least restrictive environment. **Ibid.**

141    Each of the **Rule 400** conditions were wantonly, maliciously, negligently and deliberately violated by Defendants and each of them, and as a direct and proximate result of these violations, Plaintiffs were seriously damaged as described herein.

142.    Pursuant to **Rule 401.01**, violated in toto by DDSS, the objective of APS is to protect a vulnerable adult from harm caused by the vulnerable adult or another. These services include but are not limited to, evaluating the need for protective services, securing and coordinating existing services, arranging for living quarters, obtaining financial benefits to which a vulnerable adult is entitled, and securing medical services, supplies, and legal services.

143.    Pursuant to **Rule 401.02** a "**Vulnerable Adult**" is a person 18 years or older, who has a physical condition or mental condition, which substantially impairs the person from adequately providing for her own care or protection. This includes impairments due to infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction. Legal competency is not an issue for consideration. Under this definition, there is no way that DDSS could declare that Mrs. Weaver was a "vulnerable adult," especially based on the inadmissible and incorrect Memorandum provided by Defendant Wallace and the inadmissible Report provided by Visiting Nurses. In her notarized petition to the court for release from custody, to be presented at trial as evidence, Mrs. Weaver stated emphatically that she is not a vulnerable adult stating that she has no mental impairment whatever; that her physical impairment of degenerative joints is not, and most certainly should not be the reason for an abduction and custody by an DDSS team instructed to use all necessary force in forcibly removing her from her bed; one sheriff pulling on each one of her legs and a third sheriff pulling her up with both hands and with the EMS staff, dumping her in her underwear, without socks, in bare feet in winter, on-to a stretcher, and tying her down with straps like a criminal, then driving her out of the county into the cold winter night, to a destination unknown to her. Those are the facts related to the manner in which DDSS treats "vulnerable adults" without the prior knowledge, notice or consent. Mrs. Weaver's medical condition of pain in joints did not "impair" her from adequately providing for her care while her spouse and caregiver, was hospitalized for some two months prior to the abduction on February 29, 2012. On March 12, 2012, the family court agreed with Plaintiffs that Mrs. Weaver was not a "Vulnerable Adult" and dismissed the

71

DDSS Complaint, dismissed the complaint, and freed Mrs. Weaver from "protective custody" and sent to her home.

144.    **Rule 401.03** addresses the DDSS claim that Mrs. Weaver was an abused adult as defined in **SC Code 1976 Ann. Section 43-35-10 (8) and (10).** The DDSS Complaints filed with the Family Court never defined if the alleged **abuse** was physical, mental or psychological abuse. In any case, such abuse never existed, and DDSS never produced any evidence that Mrs. Weaver was abused and therefore vulnerable.

145.    **Rule 401.04** defines "neglect" pursuant to **SC Code 1976 Ann. Section 43-15-10 (6). Rule 401.04.01** defines **"Neglect by a Caregiver."** Plaintiff Gary Weaver was the fulltime caregiver and present at the time Mrs. Weaver was abducted from her home on February 29, 2012. The DDSS Affidavit made an unsubstantiated false claim that due to sickness Mr. Weaver was not able to take care of Mrs. Weaver There is no evidence to support that erroneous claim. For the period November 2 through December 22, 2011 Mr. Weaver was hospitalized and in post op. care from four bypass heart surgery. Thus he cannot be accused of "neglect" during that period and certainly not as justification and proof of the need for protective custody. Moreover, Plaintiff Gary Weaver had been taking care of Mrs. Weaver since December 22, 2011 on his return from hospital and for many years prior to November 2, 2011 when he was admitted to hospital. The DDSS Caseworker was ill advised to file this negligent and malicious charge.

146.    **Rule 401.05** defines "exploitation" and Rule 401.05.01 defines **"Exploitation of a Person"** as used in Mrs. Weaver's case, pursuant to **SC Code 1976 Ann. Section. 43-35-10 (3).** The latter definition means causing or requiring a vulnerable adult to engage in activity or labor which is improper, unlawful, or against the reasonable and rational wishes of the vulnerable adult. **Ibid.** DDSS caseworker Page produced no evidence at Court in support of this misleading unproven false claim.

147.    **Rule 402** refers to **"Reporting."** Under this statute, DDSS staff is required to report and any person with **"actual knowledge of abuse, neglect, or exploitation of a vulnerable adult"** is required to report within 24 hours or the next business day. It is not clear from the Rules to which entity the report is to be submitted; Plaintiffs assume it is DDSS. The key condition under this rule is that there has to be "actual knowledge" of abuse, neglect or exploitation. In this case, it has been pointed out above that the DDSS caseworker had no

actual knowledge of the claims submitted to the court, but reliance on inadmissible evidence, and in contravention of the facts in any case, Defendant Wallace lied to the DDSS and the Family court when he incorrectly claimed in his memorandum of February 24, 2012 that Mrs. Weaver was "home alone", when he knew and should have known this was untrue. The rest of the claims were sheer speculation on the part of defendants with no shred, not one iota or scintilla of evidence of alleged abuse, neglect or vulnerability of Mrs. Weaver. The only abuse, neglect and vulnerability flowed from the DDSS and caseworker Page with their inaccurate and misguided malevolence and bad faith for perpetrating regulatory excesses.

148.    Plaintiffs submit that the DDSS false claims filed with the Family court documented herein, were simply DDSS government agency, standard bureaucratic "boilerplate" regulatory language, negligently and conveniently used in this case to expedite the false claims.

149.    **Rule 403** and **Rule 403 .04** refers to "**Assessments**" to determine **IF** the targeted adult is an existing or a potential vulnerable adult and a victim of abuse, neglect, psychological abuse, self neglect, exploitation. The DDSS assessment of the facts and circumstances in this case were completely in error, deficient in due diligence, based on speculation, misleading inadmissible evidence and entirely ignorant of the real facts of the situation. The DDSS caseworker failed and never bothered to fully explore or find out the real facts and circumstances by not communicating with Mrs. Weaver or involving her in the whole process, proceeding in a blanket of erroneous assumptions and misleading guesswork. The DDSS assessment was totally "off the mark" as recognized by the Family Court in dismissing the DDSS Complaints on March 12, 2012. For example, Defendant Wallace admitted to the court that he was wrong and that Plaintiff Gary Weaver was at home and Mrs. Weaver was not alone and not at risk  See **Transcript**, p.2. Defendant Wallace and Caseworker Page both knew and should have known this fact during the DDSS Risk Assessment process pursuant to **Rule 403.08.01**.and **Rule 403.12** for making the "Case Decision." The real facts and circumstances of the case are such that DDSS Risk Assessment process, negligently and maliciously violated **Rule 403.13** in not closing the case. Pursuant to **Rule 405.07**, the DDSS should have dismissed Mrs. Weaver, whose safety does and did not "depend" on "being in DDSS custody"; on the contrary Mrs. Weaver needed to be saved and protected from the so-called "protective custody." at the March 12, 2012 hearing on the case when the Court dismissed the protective custody and returned Mrs. Weaver to her home.

150.    Pursuant to Rule 404.01, having erroneously decided that Mrs. Weaver was a vulnerable adult, etc., DDSS should have prepared a "Service Plan" within fifteen (15) Days of the case decision, which they did not. Under Rule 404.01, DDSS services are planned with the client, "to the extent that the client is able to participate". Ibid. DDSS violated this rule on two points: first a "Service Plan" was not planned by DDSS as required. If it was, it was never discussed with Mrs. Weaver. Second, Mrs. Weaver was able to participate, but was never given the opportunity in violation of the rule. She never even knew a Service Plan" existed. The DDSS caseworker also failed under Rule 404. 02 and 12 to provide Mrs. Weaver special consideration. She was not mindful of Mrs. Weaver's preferred lifestyle, and imposed her values on Mrs. Weaver. In deciding to confine Mrs. Weaver in a small bedroom in a sub standard third rate facility she aced in bad faith, underhandedly, colluded with other parties and entities and entirely ignored DDSS guidelines that "clients have the same rights of self determination that all adults have." Above all, there was absolutely no reason for any "removal." The only service help Mrs. Weaver required, was the assistance of a "cleaning woman;"i.e., house worker assistance.

151.    Rule 404.12 providing for "Special Conditions" were wantonly, negligently and maliciously ignored by the DDSS caseworker Page and the supervising Director and Administrator, as well as the executive staff of Defendant COTTONWOOD. This rule requires that the DDSS caseworker, in providing services and conducting assessments,

> " must be mindful of the client's preferred life style, and not impose her values on the client. Clients have freedom of choice in personal appearance, keeping pets, lovers and other matters which society leaves to individual choice. Clients have the same rights of self determination and choice that all adults have. Eccentric behavior does not necessarily endanger the client. The Caseworker's concern is with behavior and living arrangements that present danger to the client. While eliminating danger to the client, services must be provided in the least restrictive setting. Preference is given to in-home services with court ordered placement/services as a last resort." Ibid. (emphasis added).

152.    With no "Service Plan" as required by DDSS Rule 404.01, the DDSS staff failed completely in meeting the Rule 404.02 requirement that preference for services is given to in-home services, with court ordered placement and custody as a last resort. At no time did the DDSS staff discuss the placement issue or even the custody issue with Mrs. Weaver or her spouse caregiver as required by the Rules. It is hard to imagine the third rate, substandard services and slum accommodations, inedible food and abusive staff available at Defendant COTTONWOOD, being in any way compatible with Mrs. Weaver's "preferred lifestyle" of

74

privacy, pets and personal choices, research and writing, etc. DDSS and COTTONWOOD staff imposed their own values on the client, Mrs. Weaver with total indifference to her lifestyle, social and cultural values, in their clumsy, and malicious haste to incarcerate her for life in a third rate substandard facility with the suspected malevolent intent to eventually dispossess her of her possessions.

153.    During the period November 10, 2011 through February 29, 2012, Mrs. Weaver was unable to obtain a copy of the DDSS Rules which she requested repeatedly from the caseworker Page, every time she met with her. These repeated and regular requests irritated the caseworker and resulted in her "bad attitude" and behavior towards Mrs. Weaver (yelling, roughness, etc), and the executive staff claiming Mrs. Weaver was a "demanding.," "difficult," and an "unpleasant person" This DDSS attitude is contrary to the DDSS Rules relating to the development and maintaining a comfortable working relationship between the DDSS staff and the clients. On the second day at the Defendant COTTONWOOD facility, Mrs. Weaver on her initiative, managed to obtain a copy of the DDSS Rules which she reviewed for the first time in three months of fruitless effort dealing with an uncooperative, reluctant and obstructive DDSS caseworker and executive Staff, who for some reason did not want Mrs. Weaver to have a copy of the said Rules which they refused to provide her in malicious violation of the said Rules.

15.4    Following her review of the DDSS rules, Mrs. Weaver in the first few days of incarceration at Defendant COTTONWOOD, managed to prepare on her own initiative several legal documents using handwritten means, without a computer or other office facilities and supplies in a tiny cramped bedroom shared with another sick female patient...

155.    Therefore, pursuant to **Rule 404.03.01**, following her review of the DDSS Rules during the first few days of her forced incarceration at Defendant COTTONWOOD, Mrs. Weaver on her own initiative, prepared several handwritten "advance directives" which will be presented as evidence at trial.. These legal documents included a notarized power of attorney to her spouse, a legally detailed and referenced Petition to the Family Court to Dismiss the DDSS Complaint and Rescind the Ex Parte Court Order for Protective Custody; (a legal brief, pp.6), and Instructions to the Caregiver (pp5) with a lengthy detailed list of personal items and food Mrs. Weaver required since she was abducted wearing only her underwear and house coat which she had to wear for four days at COTTONWOOD, and food because the COTTONWOOD food was not fit to feed to pigs. These initiatives and activities and documents are not the product of

an allegedly "confused" elder woman The legal documents are proof positive of her intellectual and mental competence.

156.    `Rule 404.05 gives DDSS the authority to provide an "Emergency Caretaker," which means placing a responsible adult in a home of a protective services client who is in need of protection and supervision. The client must agree to Caretaker Services. Quite apart from the fact that Mrs. Weaver did not need protection or supervision, having made their misguided decisions in this case, the DDSS failed to consider this solution to the situation and neglected discuss it with Mrs. Weaver or her souse caregiver in their misguided action to incarcerate Mrs. Weaver in an alien environment that was socially and culturally so far distant from her normal lifestyle as to be **criminal negligence** under the DDSS rules for governing such matters..

157.    **Rule 405** provides for DDSS "Legal Action", which rule they flagrantly violated in full. This Rule provides that legal intervention becomes necessary when the client or caregiver will not agree to the services necessary to protect the client, **Ibid.** Neither Mrs. Weaver nor the Caregiver, Plaintiff Gary Weaver, ever knew, nor were ever consulted or informed by DDSS who acted secretively and furtively in this matter from the very beginning, including their decision to file an Ex Parte Order for Protective Custody and two Complaints, etc. with the Family Court **without notice to Plaintiffs.**. These Family Court approved documents came as a complete surprise on February 29, 2012 when the DDSS arrived without prior notice at the residence with a seven member team, producing the illegal Court documents for the first time to Plaintiffs, to forcibly abduct Mrs. Weaver and remove her from her comfortable home with a full time caregiver, for her "Protection.".

158.    **Rule 405.01** provides for **"Emergency Protective Custody"** As discussed herein above, a law enforcement officer may take a "vulnerable" adult into protective custody **without** an Ex Parte Court Order, and remove the adult to a "place of safety" that is not a jail and will notify DDSS. The emergency procedure provides for a court hearing within forty days of taking the adult into custody.

In this case, the DDSS obtained a bogus improper ex parte court order on the basis of incorrect and inadmissible hearsay evidence, and obtained law enforcement in advance of the abduction into incarceration with a "bed" at Defendant COTTONWOOD, while not a "jail", it operated like one under the statutes and rules.

76

From the evidence it is not entirely clear if DDSS initiated the abduction under this **Rule 405.01**, or operated in some version of the rule, as Plaintiffs fail to see any aspect or degree of "emergency" associated with Mrs. Weaver's case. In fact the evidence is just the opposite. Testimony to the fact that there was no "emergency" situation is the small attractively packaged "gift bracelet" that Mrs. Weaver attempted to give to Defendant Page while she was sitting at the small table in the foyer of the residence, as appreciation for the transportation services she provided Mrs. Weaver. Reflecting a guilty conscious related to her secretive confinement plans for Mrs. Weaver, Ms. Page rejected the gift, and contemptuously pushed the small package aside commenting that she was employed by DDSS and paid a wage and did not want any gifts. The facts of the case clearly document that there was no emergency other than in the misdirected imagination and unexplained motives of the DDSS staff. To wit:

159.   On Monday, **February 27, 2012** at 2.00 p.m., two days before the February 29, 2012 abduction for "Protective Custody," caseworker Page drove Mrs. Weaver to defendant Wallace's office to receive a **third** anti TB inoculation. She parked the car at the front entrance to the clinic, left Mrs. Weaver in the car, and went to defendant Wallace's office, apparently to obtain his February 24, 2012 Memorandum. In the meantime, the clinic staff wanted to vaccinate Mrs. Weaver for the third time through the window of the car, which Mrs. Weaver refused. Caseworker Page then drove Mrs. Weaver to her hairdresser appointment at the salon, and dropped her of there on or about  3.00 p.m. A friend of Mrs. Weaver, Mrs. Hazel Carter then picked her up at 5.00 p.m. and drove Mrs. Weaver to her home.. Having hair done does not indicate "confusion" or "immediate danger," or "vulnerability" to "exploitation," etc.

160.   On Wednesday, February 29, 2012, at 3.00 p.m., the medical equipment supply provider **Lynncare** staff came to Mrs. Weaver's home to check on her oxygen supply equipment and left in good spirit, and did not note any "imminent danger" or "vulnerability", or "abuse" or "neglect," etc. Two hours later, at 5.00 p.m., the real imminent danger, abuse, neglect and vulnerability arrived in the form of the DDSS/sheriff/EMS seven member team to forcibly abduct Mrs. Weaver and drove out of the county some 70 miles to incarcerate her at defendant COTTONWOOD in Bishopville.

161.   **Rule 405.02** provides for "**Ex Parte**" action. As noted DDSS caseworker Page obtained a bogus Ex Parte Order for Custody on February 28, 2012, one day before the first Complaint had even been filed on February 29, 2012 a violation of SCRCP Rules. An ex parte

77

order may be obtained from the Family Court to provide services, "When a vulnerable adult is at substantial risk to be abused, neglected, or exploited, and consent cannot be obtained to provide services or placement...." **Ibid**. Further, "In an emergency situation involving imminent danger, an **Ex parte Complaint** will be presented to the Court: by DDSS. **Ibid** First of all as explained above there never was any emergency situation involved, and DDSS never discussed the matter with Plaintiffs and never attempted to seek "consent to provide services or placement," thus in violation several rules including this one.

162.    Rule 405.03 provides for a **"Merits Hearing"** within forty (40) days of the execution of the bogus Ex Parte Order. Caseworker Page will conduct a comprehensive evaluation and write a report to cover the items addressed in **SC Code 1976 Ann. Section 43-35-45 ( c )**. A copy of the said report **will be provided** to the court, the guardian ad litem and the attorney for the client **at least five working days before the hearing. This report was never written by the DDSS, or at least no copy was ever provided to the client or client's attorney.** This is another violation of the DDSS rules. The DDSS requested and was granted a merits hearing within forty days, presumably on the grounds that this was an "emergency" case, and not to be deferred requiring a "full hearing" under **Rule 405.04**. As noted, Plaintiffs fail to see how on any grounds based on the evidence that the DDSS could remotely consider this to be an emergency situation requiring immediate removal from Mrs. Weaver's home to be incarcerated in a "bed" in a third rate substandard facility 70 miles away. .

163.    Rule 405.04 provides for a **"Full Hearing"** on a non emergency situation, as opposed to a "merits hearing' within forty days of the Ex Parte Order. It is stated that this full hearing action is necessary because a vulnerable adult is at substantial risk to be or has been abused, neglected or exploited and consent to provide services cannot be obtained. **Ibid** The reporting conditions are the same as for the merits hearing. Here again DDSS Caseworker is in violation. Since there was no emergency as defined by the Rules related to Mrs. Weaver, there was no need of a merits hearing for immediate placement at Defendant COTTONWOOD. The caseworker could have taken time, done things in the right way, discussed the situation with the Plaintiffs as required by the rules, and amicably resolved the matters of concern, instead of instigating a police brutality abduction to a third rate sub standard incarceration and forced confiscation of Mrs. Weaver's funds without her consent or even her knowledge...

164.    Rule 405.06 provides "Special Provisions" which were not requested by the caseworker or the Court. Nor were Plaintiffs given the opportunity at the Ex Parte Motion hearing to demand any special provisions for their protection from the invasion of DDSS with their abusive, negligent endangering of Mrs. Weaver by placing her in imminent danger of incarceration. DDSS explains its actions like the official military explanation for destroying a Viet Nam village: "We had to destroy the village in order to save it." Using police brutality tactics with extreme unnecessary force, DDSS placed Mrs. Weaver in extreme painful danger in order to protect her from some imaginary vulnerability created by DDSS itself...

165..    Rule 4-5.06.01 provides rules for "Adults in Agency Custody." This provision was flagrantly violated by DDSS in its entirety. Vulnerable adults who have been adjudicated in to DDSS custody, will be provided "appropriate living and healthcare arrangements... that is least restrictive, ... with preference to community based living situations over institutional settings." Ibid   More importantly it is stated that "in home or community based services, should be utilized when ever appropriate and available to meet the vulnerable adult's needs." Mrs. Weaver has her comfortable home with pets and a fulltime caregiver that meets all the needs of this rule, assuming the rule was needed in the first place. At trial the evidence will be adduced to determine if the DDSS Caseworker met the requirements of this rule to document all legal action, placement and the risk assessment to verify that the placement meets the client's needs physically, mentally, socially, psychologically and medically, or if it is at all necessary. Categorically, Defendant Cottonwood's third rate sub standard accommodations and services provided for Mrs. Weaver, failed all of these tests as to Mrs. Weaver.

166.    Rule 407 provides for Case Management Procedures to be followed by DDSS. This includes Rule 407.01 for "Case Policy"; Rule 407.02 for "Contents of the Case Record;" Rule 407.03 for "Contents of the Case Narrative;" Rule 407.04 for "Responsibilities;" Rule 407.04.01 for "Case Manager Responsibilities;" Rule 407.04.03 for the "Supervisor Responsibilities;" Rule 407.04.03 for the County Director Responsibility;" and Rule 407.05 for " "Organization of APS Case File." The relevance of these rules to this Case is complex and the available record is incomplete for Plaintiffs to address in this Complaint and must be left for trial discovery procedures.  These rules require that the caseworker "has a thorough understanding of the client's problems" and has followed "a sound plan to meet the needs of the client." The case narrative report must be dated and signed by the "case manager" who is required to have once

79

per month a "face to face" interview with the APS client. All documents and reports are to be reviewed signed off by the County Director who must ensure compliance with all documentation time frames, etc. On balance, given the facts and circumstances of this case, no body can accuse the DDSS of full and professional compliance with the Rules as cited. They failed miserably on all counts.

167.   **Rule 402.02** refers to immunity for a person who makes a report or participates in an assessment or judicial proceeding in good faith. Plaintiffs claim herein that the Defendants and each of them did not participate in good faith in this illegal unconstitutional action of abducting Mrs. Weaver, but acted wantonly, in ignorance, malicious bad faith, neglect, and without due diligence, and with malevolent intent to dispossess Mrs. Weaver of her possessions. Defendants knew and should have known their actions were incorrect and not based on real facts, to be shown at trial. Moreover, this repeated negligence, police state excessive force and brutality, and non compliance with the rules will have a chilling effect on the community and the state, if not nationally, once this case becomes public knowledge and debated as intended by Plaintiffs

168.   All of the social services and Rules described herein, DDSS maliciously and in bad faith, violated and damaged Plaintiffs as a direct and proximate result thereof by the wanton, willful, negligent and illegal acts, errors and/or omissions, and malevolent intent of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to: improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing Adult Protective Social APS, Homemaker and Placement Services on Plaintiff Beatrice Weaver over the objections of both Plaintiffs at the time of the events complained of herein, in a wholesale and negligent and malicious bad faith violation of the DDSS procedural rules and regulations and Plaintiffs constitutional rights, as cited herein..

.WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 12

**Defendant DDSS's Invasion of Privacy, Exclusion and Failure to Provide Homemaker Services Racially Discriminated Against Plaintiffs and Violated Federal and State Policies and Civil Rights for Which the County is Liable**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

169.    Plaintiffs reallege and incorporate paragraphs 1-168 as if fully set forth herein.

I.    **Invasion of Privacy is a Civil Rights Violation**

170.    DDSS Constitutional Violations: Invasion of Privacy Terrorism of Elderly
Pursuant to the accumulation and nucleus of claims alleged herein. Defendants and each of them
have violated Plaintiffs civil rights provided in the 13th and 14th **Amendments**, various acts of
Congress and S.C. **Code Sections 16-5-10, 20 and 60**. Said acts amounting to terrorism of the
elderly.

171.    In constitutional law, Plaintiffs rights are classified as natural, civil and political,
and also "personal rights." Here, Plaintiffs allege Defendants' violation of their civil rights which
belong to every citizen in this State or country. These rights include the rights of property,
marriage, protection by the laws, freedom of contract, trial by jury of peers, life, liberty, privacy
and good reputation, etc. Rights are capable of being enforced in a civil action such as this
complaint. .

172.    A major component in this Complaint, is Defendants' violation of the Plaintiffs'
right of privacy, which is the right to be left alone without government interference or egregious
intrusion such as occurred in this case. This includes the right to be free from unwarranted
publicity including the right to withhold himself and his property from public scrutiny consistent
with law and public policy. Equity and law will provide remedy to be prevent or punish an injury
threatened or by act infringed upon this right from motives of curiosity, gain, or malice as in this
case.

173.    There are several incidents where Defendants invaded the privacy of Plaintiffs
engaged in terrorism of the elderly Plaintiffs, and violated their rights to life, liberty and pursuit
of happiness. First, at approximately 5.00 p.m on Wednesday, February 29, 2012, the DDSS
team of five members arrived in four vehicles without notice of any kind to Plaintiffs. The team
somehow opened the 20 foot solid "front gates" to Plaintiffs' property, which are firmly closed
to public access, without permission, or even knowledge, to gain access in a furtive, surprise
conspiracy raid on Plaintiffs. Uninvited, the team parked their vehicles at random in a circle
around the front of the residence and was observed by Plaintiff Gary Weaver to advance on the
residence in a threatening manner as if Plaintiffs were criminals that needed to be surrounded.

1.    First, Defendants and each of them are guilty of **trespass** against
Plaintiffs. This means Defendants are guilty of doing an unlawful act or of a lawful act in an

81

unlawful manner to Plaintiffs' injury of person and property. The unlawful act was both actual and implied in law causing injury and misfeasance to Plaintiffs and their rights Defendants acts included not only forcible wrongs, but also acts the consequence of which makes them tortious. Defendants' peaceable, but wrongful entry upon Plaintiffs property and residence without a search warrant on February 29, 2012 at 5.00 p.m., was an implied injury that is tortious. Defendants are guilty of joint trespass against Plaintiffs where two or more persons (three Deputy Sheriffs, and two DDSS staff),united in committing trespass, where some (the Deputy Sheriffs) actually committed the tort, and the others (DDSS staff) command, encourage or direct it, as in this case. See, **Black. Op cit, p.1674**

  2. .The second incident of invasion of Plaintiffs' privacy, occurred when the male Deputy Sheriff served scrambled copies of the bogus Exparte Order and the first complaint without a summons, on Plaintiff Gary Weaver who accosted him on the front porch of the residence. Plaintiff requested time to read the papers when the Deputy requested to meet Mrs. Weaver to take her into protective custody. Having read the papers Plaintiff informed the Deputy that he was surprised, shocked and without prior notice or discussion from DDSS in violation of its Rules, and objected to the Order and Complaint and did not consent to custody, and further that, Mrs. Weaver would not consent. Plaintiff requested time to telephone his attorney, the Family Court Judge and the DDSS attorney, none of whom were available at that time of the day, which was an unreasonable time for the custody action to occur. The Deputy permitted Plaintiff to make the telephone call inside the Hallway of the residence, but only on condition that he accompany Plaintiff into the hallway and listen to the phone call, which he did. Plaintiff objected, but the Deputy informed him he would be arrested and handcuffed if he did not comply and let him accompany Plaintiff into the house. This act by the Deputy Sheriff constituted a clear second invasion of Plaintiffs privacy, violation of due process and equal protection of the law. Plaintiff Gary Weaver in fact was not the subject of any legal action related to the DDSS activities and it is questionable if the sheriffs had authority to threaten him with arrest if he refused them entry into his residence under any pretext, particularly since they did not have a warrant.

  3. Following the unsuccessful phone calls Plaintiff asked the Deputy what would be the consequences if he did not obey the bogus court order and refused the team to take Mrs. Weaver into custody. The Deputy informed Plaintiff that in that case, Plaintiff would be in

contempt of a court order and would be arrested. The Deputy then asked to meet with Mrs. Weaver. Plaintiff said he thought she was in the kitchen and offered to go and fetch her. The Deputy again informed Plaintiff that he could not go into the house to find Mrs. Weaver, without a Deputy accompanying him. Plaintiff selected a female Deputy whom he knew, to accompany him to the kitchen to find Mrs. Weaver. This was a third invasion of privacy  Mrs. Weaver was not in the kitchen and Plaintiff and the female Deputy returned to the Hallway where the male deputy was waiting uninvited.

4.    Plaintiff then informed the Deputies that Mrs. Weaver was likely in her bedroom which adjoined the Hallway and her bathroom They called the third Deputy into the Hallway. Plaintiff then went into the bedroom where he found Mrs. Weaver sound asleep. He woke her up and informed her of the situation. She objected and refused to consent to the custody. She got out of bed, and despite her degenerated hips and spine, painfully tried to block the bathroom door leading to the bedroom, but the male Deputy pushed the door open. Mrs. Weaver returned to the bedroom and got back into bed. Then all three Deputies invaded her privacy, and went into Mrs. Weaver's bedroom without being invited and without a search warrant. The three Deputies then pulled Mrs. Weaver out of her bed, one female pulling on each leg, and the male pulling on her arms. They pulled her out into the Hallway dressed only in her three piece "cuddle duds"underwear, and handed her over to two burly E.M.S. attendants who manhandled her onto a stretcher they had brought into the hallway over Plaintiff Gary Weaver's objections, and strapped her down like a common criminal. The procedure caused disabled Mrs. Weaver shock, extreme pain in her hips and back and she was embarrassed being dressed only in her underwear without even slippers. The EMS attendants pushed the mobile stretcher out of the hallway to an ambulance standing outside the "front gate" and drove her to defendant Cottonwood some 70 miles away, without Mrs. Weaver knowing where she was going. During this process, Plaintiff Gary Weaver was forced to stand by and witness the proceedings under threat of arrest if he interceded.

5.    These incidents of invasion of privacy, reflecting the DDSS team's violations of "search and seizure," were carried out by the DDSS team in flagrant unreasonable and malevolent violation of **Article I, Clause 10, of the S.C. Constitution, and the Fourth Amendment of the U.S. Constitution.** Mrs. Weaver was subjected to terror, shock, fear physical abuse, and intimidation, in her own bedroom and house, by three Deputies and two

EMS attendants, causing shock, physical and emotional stress and trauma, not to mention horror and terror at being un-expectantly attacked by three Deputies. Plaintiffs were denied their rights to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, and unreasonable invasions of privacy by the DDSS team on February 29, 2012. No warrant was issued by the court justifying the search and seizure and the invasion of privacy and Plaintiffs' property and house as described herein. During this illegal police violation of Plaintiffs legal rights and protections, Defendant Page and another unidentified DDSS worker remained outside the residence in the front walkway next to her car, and watched the sheriff/EMS proceedings as described.

## II.     DDSS Constitutional Violations: Illegal Search and Seizure

174.     As noted above, DDSS came to Plaintiffs property and residence, armed with scrambled copies of a bogus Ex Parte Order for Custody and a Complaint. The DDSS team came to Plaintiffs property furtively without prior notice, in secret, and conspired without a summons or a warrant issued for probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained. The evidence is prima facie, that DDSS violated **Article I, Clause 10 of the S.C. Constitution, and the Fourth Amendment of the U.S. Constitution.**

175.     The action taken by DDSS, the Court and the Deputy Sheriffs was not authorized pursuant to **DDSS Rule 405.01. "Emergency Protective Custody."** Under this Rule the Deputies initiate the action to take into custody an alleged vulnerable adult "in a life threatening situation" and only after "placement". the case becomes a DDSS responsibility. The whole regulatory process revolves around that initiative by the Sheriffs, not the DDSS. This "emergency" situation does not exist in this case.

176.     This custody legal action was initiated by DDSS under **Rule 405.02** which provides that the family court may be petitioned for an Ex parte order to provide the necessary services for an alleged vulnerable adult. In an emergency situation an "ex parte complaint" will be presented to the Family Court by the DDSS counsel. The bogus Ex Parte Order wrongfully executed in this case does not represent probable cause for a warrant for search and seizure and invasion of privacy under Article 1.Clause 10.

177.     **The bogus improperly granted Ex Parte Order is not a warrant. It does not authorize search and seizure, or invasion of privacy as described herein. The Order does**

84

not describe the place to be searched or the person to be seized by force and intimidation. "Search" implies invasion and quest, and that implies some sort of force, actual or constructive, much or little. See, State vs. Morris, 243 SC 225, 133 SE 2d 744 (1963). "Seizure" contemplates a forceful dispossession of the owner Ibid.

178. The Ex Parte Order does not provide for search or seizure notwithstanding that its credibility as a court document is null and void in any case. A warrant is required to seize in those instances where the seizure is assisted by a necessary search as in this case. The Ex Parte Order as a warrant to enter, search and seize in this case, is a nullity and the invasion of Plaintiffs' privacy the search and seizure of Mrs. Weaver was the result of an unconstitutional search and seizure by the DDSS team.

179. In South Carolina and Dillon County, specific statutes protect Plaintiffs' civil rights from the violations of Defendants and each of them. Pursuant to **Code Sect. 16-5-10, 20 and 60,** Plaintiffs allege that Defendants conspired, colluded, banded together and went upon the premises with intent to injure, oppress and violate the person and property of Plaintiffs, and attempted by any means, measures and acts to hinder, prevent and obstruct Plaintiffs in their free exercise and enjoyment of any right or privilege secured to them by the Constitution and laws of the United States or this State, including inter alia, egregious and bad faith, malicious violations of due process and equal protection of the laws, privacy rights, judicial misconduct, etc...

180. Pursuant to **Code Section 16-5-60,** Plaintiffs have been damaged by Defendants bad faith violations of their Constitutional rights and privileges and injured in their person and property, such as the improper Ex Parte Order for Protective custody, the Deputy Sheriffs' and E.M.S. rough handling of Mrs. Weaver, threatened unlawful arrest of Gary Weaver, and threatened hand cuffing both Mr. and Mrs. Weaver, the forcible abduction, transportation under guard and incarceration in a third rate sub standard facility, incorrect damaging and injurious factual representations and affidavits, etc.

181. Thus pursuant to **Code Sect. 16-5-60, Plaintiffs may claim and prosecute the County in which the offenses shall have been committed for any damages sustained thereby, (e.g., by DDSS, Sheriff Office and E.M.S.) and the county shall be responsible for the payment of such damages as the court may award as a soon as a certified copy of the court judgment roll is delivered to the county.**

182.    Hence, pursuant to Code Sections 16-5-10, 20 and 60, Defendants and each of them are guilty of misdemeanors and should be fined or imprisoned or both at the discretion of the Court, and shall thereafter be ineligible to hold and disabled from holding any office of honor, trust, or profit in this State.

**III.    Defendants Discriminatory Denial of Services to Mrs. Weaver Violated her Civil Rights for Which the County is Liable for Damages Pursuant to Code Sections 16-510-20-60.**

183    Pursuant to **Rule 404.01.02** and **Rule 405.07**, Mrs. Weaver's case was closed when the Family Court ruled on March 12, 2012 that Mrs. Weaver was not dependent on DDSS APS services and was released from the illegal custody. From the outset of this case, Mrs. Weaver was eligible to receive so-called DDSS "Homemaker Services," as a handicapped person. These social services were denied her by the DDSS's negligent non conformity with **Rule 123 and Rule 321.30** which provides that homemaker services are provided without fee to all eligible clients which includes handicapped elders such as Mrs. Weaver.

184.    **DDSS Violation of Plaintiffs' Civil Rights:** S.C. Code 1976 Ann. **Section 43-33-520** provides that the opportunity to obtain public services such as DDSS services, **without discrimination because of a handicap,** is guaranteed by the statute and **"is a civil right." Code Section 43-33-540** provides for injunctive relief or **civil damages** for persons discriminated against. **Code Section 43-33-560** defines "handicapped" which means a substantial physical impairment acquired by accident, injury or disease, where the impairment is verified by medical findings, and appears reasonably certain to continue throughout the lifetime of the individual without substantial improvement. Defendant Wallace certified plaintiff Mrs. Weaver as being "handicapped," etc. **Code Section 43-33-570** defines "reasonable justification" for public services such as DDSS Homemaker Services, must be determined in light of several factors: safety, efficiency, and cost.

185.    DDSS assessment of Plaintiffs' case completely omitted any review of Mrs. Weaver's social service needs that could have been adequately provided by homemaker services, instead of protective custody for imagined problems that proper DDSS in depth, in-field due diligence and conferences with Plaintiffs, would have been revealed as absurd. Proper due diligence and on-going good faith conferences with Plaintiffs as required by the Rules, by the Defendants and each of them, would have demonstrated to DDSS conclusively that Mrs.

Weaver's need for social services was the need for assistance with normal household upkeep related to her stroke, spine and hip pains as a **"handicapped person"** that prevented her from regular household chores. Defendant Wallace in fact issued Mrs. Weaver a handicapped certificate for state automobile parking permits. Mrs. Weaver's handicapped situation, did not amount "to abuse, neglect, or vulnerability", or "imminent danger" requiring forcible "protective custody." Proper, in depth, and responsible due diligence, investigation and correct, incisive "risk assessment" in conformity with the DDSS Rules would have revealed the limited housekeeping scope of social services Mrs. Weaver required (a good housekeeping woman) as a "handicapped person," far short of protective custody and removal to a third rate, substandard facility 70 miles away from friends, associates, community, pets, and comfortable home, etc; not to mention the advantageous cost/benefit ratio in savings of taxpayer's funding. . .

186.    The statutes cited herein above, and given the facts and circumstances of Mrs. Weaver's case, reveal that in addition to <u>racial discrimination,</u> **DDSS discriminated against Mrs. Weaver as a handicapped person** for the reason that she suffers permanently from the aftermath of her earlier stroke, and the degenerative hip and spine problems as stated in defendant Wallace's Memorandum dated February 24, 2012. Said DDSS ignoring and denial of appropriate "reasonable justification" for homemaker services, instead of costly protective custody (see below)<u>, has violated Mrs. Weaver's civil rights and subjected the County to civil damages **pursuant to Code Sect. 43-33-540.**</u>

187.    **Rule 323** provides that the DDSS caseworker is responsible for determining eligibility for Homemaker Services, and for "providing a **case plan,** which will include objectives for services related to each client's individual needs." <u>No such case plan was prepared by DDSS caseworker Page for Mrs. Weaver. No explanation of homemaker services was provided either for Mrs. Weaver pursuant to **Rule 323.20., or Rule 323.40.** DDSS and its caseworker Page **discriminated** against Mrs. Weaver by knowingly, neglectfully, maliciously, and deliberately denying her homemaker services in violation of Federal Regulations referred to by **Rule 321.10:**</u>

> "No person shall be excluded from receiving Homemaker Services on the grounds of race, color, national origin, or religion. No qualified handicapped individual shall, solely by reason of his/her handicap, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under this program."

188.   Mrs. Weaver was deliberately denied specific selected homemaker services provided for handicapped persons according to Rule 325.10 as follows, that pertain to Mrs. Weaver's particular needs:

"Item 1:   Routine cleaning, sweeping, dusting, changing bed linen, defrosting and cleaning the refrigerator, cleaning the range, light laundry, ironing, mending and mopping;

"Item 5:   Running errands to laundromat, drugstore, to pay utility bills, etc;

"Item 6:   Doing essential shopping;

"Item 7.   Helping client follow treatment prescribed by the physician (physical therapy)

Item 9:   Providing transportation for access to homemaker services. If transportation is provided it should be a vital part of Homemaker Services, such as grocery shopping, or to the Laundromat or medical appointments;

"Item 10:   Providing personal services such as help with bathing, dressing, care of hair.

189.   The defendants DDSS Director, Administrator, and Caseworker Page, and each of them, owed Mrs. Weaver a duty to properly investigate in depth, conduct good faith conferences with Plaintiffs, and undertake a risk assessment and prepare a plan in accordance with the cited Rules, that included evaluation of Mrs. Weaver's social service needs that they knew and should have known through proper due diligence, that her needs as a handicapped person were limited and could be adequately provided for by a competent, well managed homemaker service provider (a cleaning woman or service).

190.   Apart from the DDSS insidious mis-directed and illegal protective custody action, there are several complaints associated with Mrs. Weaver's ill fated forcible incarceration. First, is the unnecessary and irresponsible waste of taxpayer's funds in the DDDS unnecessary, time consuming and wasteful processing of the case through the court system, and involving the sheriff's office and the EMS service. Second, the facts of this case suggest a sinister and furtive motive for the convoluted abusive and irresponsible DDSS bureaucratic incompetence in the handling and administration of Plaintiff Mrs. Weaver's social services needs that could have been adequately provided with the services of a competent homemaker provider pursuant to the cited Rules and Statutes. This raises the issue of the potential expropriation of Mrs. Weaver personal property by the defendant COTTONWOOD facility or DDSS or Wallace to cover any shortage of payments at the third rate facility where she was incarcerated.

191.   Assuming a homemaker service (cleaning woman or service) would cost about $200 per month to provide services to Mrs. Weaver, the total cost to the DDSS/State for a five year period would be some $12,000.00 ($200 x 12 x 5). Room and Board rental for private/bath at the facility (not available to Mrs. Weaver), is $1,750.00 per month, or some $105,000.00 for a

five year period ($1750 x 12 x 5). The five year total cost to Mrs. Weaver, less $600 per month social security payments would be some $97,800.00 ($105,000 less $7,200), plus the cost of payments at her residence, say $1,000 per month, or $60,000 for five years, for a total five year outlay of some $157,800.

192.    The Admission Agreement with the defendant COTTONWOOD facility illegally signed by DDSS caseworker Pansy Page committed Mrs. Weaver to these potential financial obligations and liabilities. Instead of the DDSS/State paying for low cost homemaker services of about $12,000 annually, Mrs. Weaver was subjected to a liability of potentially $160,000 for a five year period, or $320,000 for a ten year period. ..

193.    Clearly, the DDSS acted in bad faith, and did not have Mrs. Weaver's best interests in mind with their protective custody plans which intended her to be incarcerated for life in a third rate, substandard facility, and to charge her the sum of $320,000 for ten years for the privilege. Even worse, some questions remain: **How was it intended by DDSS for Mrs. Weaver to pay the sums noted?** Why did DDSS not prepare a financial plan for discussion with Mrs. Weaver and her caregiver as required by the Rules?

194.    **Rule 503.02.03** provides for the DDSS "**Disposal of Personal Property.**" This is a convoluted, expensive and time consuming system for disposal of Mrs. Weaver personal property of "significant value" such as her personal possessions, which pursuant to this Rule in this case, would probably involve a "conservator" appointed through the Probate Court. Nevertheless, the question arises as to whether or not this whole scheme to incarcerate Mrs. Weaver permanently was not some sinister, collusive plot to acquire her possessions through the fraudulent and malevolent misuse of DDSS regulatory authority and license to deprive her of her possessions..

195.    All of this bureaucratic conundrum would be eliminated with the DDSS exercising responsible, informed and clear thinking with proper in depth due diligence as required under the Rules. **Limited homemaker service is all the DDSS solution needed to meet Mrs. Weaver's social service needs.** Thus a suspicion of the true motives of the defendants Wallace and caseworker Page may be examined at trial. Certainly bad faith and malevolence are present whatever the real motives for incarcerating Mrs. Weaver, such as a design to acquire her properties in a sinister manner utilizing improper court procedures and abusive regulation.

196.    The facts, rules and laws cited in this Complaint recognizes the inadequate management of the DDSS in the handling of this case, and raises serious and legitimate doubts as to the ability of the incumbent leaders to fulfill the stated missions of this County agency. And the public and Plaintiffs rightly should expect the public resources to be properly managed and accounted for. This Complaint cites and documents the DDSS violations of its own Rules, statutes constitutions, and its inhumane and incompetent handling of this case. The Dillon County Board possesses authority to impose disciplinary sanctions on county directors of social services upon receipt of a report of alleged violations of State DSS policies and procedures. **1984 Op. Atty. Gen. No. 84-135. p. 322.**

197.    Plaintiffs claim that the named employees of the DDSS knowingly, deliberately, malevolently and wantonly, in secrecy spanning some four months of planning, conspired with all the defendants and each of them named herein, in violation of **S.C. Code 1976 Ann. Section 16-5-10. Conspiracy Against Civil Rights**, as follows: If any two or more persons shall band or conspire together with intent to injure, oppress or violate the person or property of any citizen and shall attempt by any means, measures or acts to hinder, prevent, or obstruct any citizen in the free exercise and enjoyment of any right or privilege secured to him by the Constitution and Laws of the United States and the State, such persons shall be guilty of a misdemeanor, and on conviction thereof, be fined a stipulated amount, or be imprisoned not less than six months, nor more than three years , or both, at the discretion of the court.

198.    Further, pursuant to **S.C. Code 1976 Ann. Section 16-5-60,** any citizen who shall be hindered, prevented or obstructed in the exercise of the rights and privileges secured to him by the Constitution, and laws of the United States or this State, or shall be injured in his person or property because of his exercise of the same,  **may claim and prosecute the county, in which the offense shall be committed for any damages he shall sustain thereby, and the county shall be responsible for the payment of such damages as the court may award, which shall be paid by the county treasurer of such county on a warrant drawn  by the** governing body thereof. Such warrant shall be drawn by the governing body as soon as a certified copy of the judgment roll is delivered to them for file in their office.

199.    As discussed herein, Plaintiffs claim herein their constitutional civil rights have been flagrantly violated by the Dillon County, through DDSS and its employees. Accordingly, Plaintiffs submit that this honorable court should issue an Order to the Dillon County Board

directing it to fire, sanction, or obtain the resignation of the Director, Manager/Administrator and Caseworker of DDSS and award Plaintiffs civil damages, inter alia, for discrimination and pursuant to Code Section 16-5-60.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth

## COUNT 13

### The Primary Physician's Malicious, Negligent and Inadmissible "Expert" Opinions

For a separate and distinct claim for relief, Plaintiffs allege as follows:

200. Plaintiffs reallege and incorporate paragraphs 1-199 as if fully set forth herein.

201. As noted above, on February 24, 2012 Defendant Wallace in furtive and secretive cooperation and collusion with Defendant DDSS caseworker Pansy Page, executed an "expert" medical memorandum addressed ambiguously "To Whom It May Concern." It was not notarized and a copy was not given to Mrs. Weaver at any time prior to the Court hearing on March 12, 2012. Earlier the said memorandum was incorrectly used as "expert" evidence in the Family Court despite the fact that it was inadmissible as hearsay evidence under case law. The Memorandum was apparently received by caseworker Page on Monday, February 27, 2012 when she drove Mrs. Weaver to defendant Wallace's clinic at 2.00 p.m for a TB shot, and subsequently to her hairdresser at 3.00 p.m.

202. The illegal inadmissible "expert" memorandum stated: "To Whom It May Concern:"

> " Beatrice Weaver has severe degenerative joint disease. She is confined to a wheelchair. She can no longer take care of herself at home. Patient has difficulty at times with confusion. She is at risk staying by herself."

203. Defendant Wallace is certified as an internal medicine doctor. He is not Board Certified to indulge gratuitously in psychological, psychiatric, forensic or family court issues He had no evidence that Plaintiff Mrs. Weaver was unable to take care of herself at home. Evidence at trial will prove otherwise. Mrs. Weaver took care of herself when Mr. Weaver was hospitalized from November 2, 20122 to December 22, 2012. She also had the constant assistance of church members and friends. Defendant Wallace never visited the home, nor consulted with either Plaintiff Gary Weaver or Mrs. Weaver on the subject. This "expert" opinion was an uninformed, subjective gratuitous, wanton, reckless and damaging observation by

an unqualified doctor operating outside his area of medical and legal expertise. Moreover, this Memorandum exceeded his Board Certification authority.

204.    Under no circumstances has or does Mrs. Weaver suffer from "confusion" at times as suggested in the Memorandum. This will be demonstrated with evidence at the trial. Of particular relevance will be the evidence presented at trial of Mrs. Weaver's knowledgeable and immediate legal activities during the several days immediately following her illegal incarceration at the COTTONWOOD Villas facility, related to her abduction and release from the Protective Custody. Defendant Wallace had no basis for making such a misleading and damaging statement. Anybody who meets Mrs. Weaver will observe her strong authoritative and commanding personality and aura, and that she is very alert, not confused and mentally quite capable of taking care of herself which she does very well. Moreover, no evidence was presented sufficient to warrant her removal from the comfort of her home on any basis, and especially not an issue of alleged "confusion", to be incarcerated in a small two bed room sharing a bathroom wit three other elders.

205.    Defendant Wallace knew and should have known that caregiver Plaintiff Gary Weaver had returned from hospital on December 22, 2011, two months before Dr. Wallace issued his incorrect and misleading written statement. On several occasions between December 28, 2011 and March 12, 2012 Defendant Wallace saw and greeted Plaintiff Weaver who visited his offices and met with his staff and Dr. Medina in their office. Also Plaintiff Gary Weaver visited his office and met with his staff while escorting Mrs. Weaver to the office for consultations and anti tuberculosis injections. The evidence to be presented at trial will show that Defendant Wallace greeted Mr. Weaver on December 28, 2011, in January and February 2012. On February 24, 2012 he knew and should have known that Gary Weaver was available and acting as a full time caregiver to his spouse Plaintiff Mrs. Weaver. Furthermore Defendant Wallace consulted and cooperated secretly with DDSS Caseworker Page in February 24 and 27, 2012 when she came to his office to arrange for and pick up the said Memorandum from Wallace and both of whom knew that Mr. Weaver was at home at that time acting as full time caregiver to Mrs. Weaver.

206.    The evidence at trial will show that Mrs. Weaver was not "at risk staying by herself" because she was not alone at home in February 2012. Plaintiff Gary Weaver was at home taking care of her full time, which fact Defendant Wallace and DDSS Caseworker Page

92

knew and should have known because of the frequent visits to his office and staff by both Plaintiffs with Page before February 24, 2012 when he issued the said misleading Memorandum.

207.    Defendant Wallace never discussed this situation with either Plaintiff, and never took the time to check the facts. As a direct and proximate result of his negligence, arrogance, mistakes and irresponsible wanton behavior on this issue, he caused irreparable damages and harm to Plaintiffs. This issue of Mrs. Weaver allegedly being alone, in particular was used by the court to execute the bogus improper Ex Parte Order for Custody on February 28, 2012.

208.    As noted above, Defendant Wallace incorrectly and mis-led when he stated that Mrs. Weaver is "confined to a wheelchair". The evidence at trial will show the fact is that she is not "confined" to a wheelchair which she uses when with third parties due to her hip disabilities..

209.    Because of her hip and spine problems Mrs. Weaver walks very slowly using a cane for assistance. Had Defendant Wallace or the DDSS caseworker taken the time to investigate this situation or use his staff to investigate he would not have made the misleading, incorrect gratuitous statement referring to Mrs. Weaver's alleged "confinement" to a wheelchair at all times. That mis-leading, damaging comment was used by DDSS and the Family court against Mrs. Weaver.

210.    Rule 7 ( c ) SCRFC, contemplates a written statement to the court (not ambiguously "to whom it may concern" which should also include Mrs. Weaver) showing the simple fact of medical treatment, without requiring the physician to be present in court; as such, this form as not intended to encompass written statements concerning controverted diagnosis of a medical condition. See, **S.C. DSS vs. Flemming**, (1978) 271 SC 15, 244 SE2d 517. Here Plaintiffs controvert the statements of Defendant Wallace, as not being medical diagnoses for ailments, but subjective opinions presented as "expert" medical opinions and which are not for purposes of treatment for ailments, but were issued ambiguously in apparent anticipation of DDSS litigation and Family court action, and was of a self serving nature and thereby inadmissible as evidence in court. See, **Cook vs. Cobb**, (1978) 271 SC 136, 245 SE 2d612.

211.    Defendant Wallace's inadmissible statement was used in the aforesaid Caseworker's Affidavit to the court and the court incorrectly referred to the statements therein to justify execution of the bogus Custody Order and improper complaints. The comments were fraudulent and erroneous under **Rule 7 ( c ) SCFCR** as the statements constituted diagnosis of physical conditions and was dispositive in the case before the Family Court and denied Plaintiffs

the right to cross examine the doctor as an critical so called "expert" witness. Plaintiffs were denied due process and equal protection of the law. See SCDDS vs. Flemming, op cit.

212. The Court Records do not show whether or not there was a Family Court Hearing on February 28, 2012 when the court executed the DDSS Motion for Ex Parte Order for Custody, notwithstanding that no Complaint was filed and before the bench for consideration. Nor do the court records reveal if there was a hearing on the DDSS two Complaints filed on February 29, and March 1, 2012. If there were no hearings without notice and service to Plaintiffs, then they were denied due process. If there were hearings and Plaintiffs were not noticed and served, then they were also denied due process. In both cases, Plaintiffs were denied the opportunity to cross examine the witnesses or challenge with objections the inadmissible evidence.

213. Plaintiffs note **Rule 9 (b)** SCRFC that provides no argument shall be made on objections to admissibility of evidence or conduct of trial, unless specifically requested by the court. In this case the Court never provided Plaintiffs an opportunity to argue objections to the admissibility of defendant Wallace's Memorandum, the Nurses Report, or the caseworker's Affidavit, contrary to the two DDSS Complaints, and the Ex Parte Order filed on February 28, 2012 without a Complaint.

214. The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the Defendants and/ or each of them, which include, but are not limited to the those outlined in the counts discussed herein.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 14

### The Physician's Gross Professional Bad Faith, Misconduct, Negligence and Administrative Malpractice.

For a separate and distinct claim for relief, Plaintiffs allege as follows:

215. Plaintiffs reallege and incorporate paragraphs 1-214 as if fully set forth herein.

216. As noted above, Defendant Wallace's Memorandum was inadmissible as evidence pursuant to Case law and Rules of SCFRC, a denial of due process for Plaintiffs, prepared secretly and conspiratorially, issued in violation of DDSS Rules, factually incorrect, and negligently and maliciously prepared in collusion with the DSS caseworker in violation of

94

statutes and court rules of procedure and DDSS rules. There remains the task at trial to prove violation of medical practice rules and regulations.

217.    Defendant Wallace's Memorandum makes a statement of alleged fact that "Beatrice Weaver has severe degenerative joint disease."

218.    After fifteen (15) years of serving as Mrs. Weaver's primary physician, despite her many complaints about back and hip pain, Defendant Wallace finally "discovers" this condition during a medical examination of Mrs. Weaver on November 11, 2011, following an accident she had at Medical University of South Carolina in Charleston S..C. on November 7, 2011. Plaintiff Gary Weaver was in hospital at that time having open heart surgery, returning on December 22, 2011. Defendant Wallace provided no treatment to alleviate Mrs. Weaver's accident conditions, other than some useless pain pills with no follow up attention.

219.    Subsequently, both Mr. and Mrs. Weaver had medical appointments with Defendant Wallace and Dr. Medina on December 28, 2011, and in January, February and March, 2012 for consultations relating to treatment for her spine and hip pains, and Mr. Weaver's heart. During these visits to the office and clinic, Defendant Wallace and his staff greeted Mr. Weaver and knew he was back from hospital. The DDSS Caseworker transported Mrs. Weaver to defendant Wallace's office on all occasions. Wallace prescribed no treatments to alleviate her pains, and did nothing to discover her serious illnesses that he had been supervising for many years. During this period Defendant Wallace was conspiring with the DDSS caseworker to incarcerate Mrs. Weaver for life in the Defendant COTTONWOOD Villas facility.

220.    Mrs. Weaver was negligently and wantonly denied proper medical treatments by her primary physician for seven months while she suffered excruciating pain in her spine and hips.

221.    On February 27, 2012, just three days after Defendant Wallace executed his Memorandum on February 24, 2012, the DDSS caseworker Page drove Mrs. Weaver to Defendant Wallace's office for a third tuberculosis injection. On three occasions the office staff ("Nicole") came out to the automobile Ms. Page used to transport Mrs. Weaver and parked at the office entrance, to give her the TB injections in unhygienic conditions. Mrs. Weaver rejected the third injection as unnecessary, and Dr. Wallace's personal nurse assistant ("Peggy") came out to the parking lot and bid Mrs. Weaver "good bye."

222.    As noted above, while Mrs. Weaver was discussing the third TB injection on February 27, 2012, caseworker Page went into the office and obtained the February 24, 2012 letter from Dr. Wallace who lied about Mr. Weaver being at home and Mrs. Weaver not being alone in her house. As noted, following completion of events at Dr. Wallace's office on February 27, 2012, at about 3.00 p.m., DDSS caseworker Page drove Mrs. Weaver to her hairdresser ("Joyce") in Dillon and left her there for hair treatment. At about 5.00 p.m. Mrs. Weaver was picked up at the hairdresser by a friend, Mrs. Carter, who drove her home where they enjoyed a congenial refreshments and conversation. There was no "emergency" requiring any "protective custody", Mrs. Weaver was not in "imminent danger" of "exploitation" by anyone, and she was not "abused, neglect nor vulnerable" as claimed by DDSS in its fatuous Complaints and Ex Parte Order filed with the court the very next day on February 28, 2012.

223.    **From the period November 11, 2011 through February 29, 2012 the DDSS caseworker was surreptitiously working with Defendant Wallace who violated Mrs. Weaver's trust and patient-doctor confidentiality, preparing a case for protective custody behind Mrs. Weaver's back, in a misdirected malevolent bad faith activity, and in wholesale violation of the DDSS Rules requiring full disclosure, cooperation, and inclusion of the patient etc. Defendant Wallace's medical mal practice violations under the medical professional regulations and ethics will be addressed at trial.**

224.    The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the Defendants and/ or each of them, which include, but are not limited to the those outlined in the counts discussed herein.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth:

## COUNT 15

### Plaintiff Beatrice Weaver's Physical Injuries

For a separate and distinct claim for relief, Plaintiffs allege as follows:

225.    Plaintiffs reallege and incorporate paragraphs 1-224 as if fully set forth herein.

226    The above described violations against Plaintiffs were a direct and proximate result of the negligent and malicious acts and/or errors and omissions of defendants, and/or each of them, which are not limited.

96

227.   As a direct and proximate result of the actions of the Defendants as described herein, Plaintiff Mrs. Weaver has been subjected to serious and severe permanent physical injuries from which she has suffered in the past and which have been aggravated since the events described herein, including but not limited to her degenerative spine, and hips conditions and heart conditions. These aggravated conditions cause her great pain requiring continuing medical and rehabilitation treatments and therapies and from which she will continue to suffer in the future. Defendants knew or should have known that the degenerative spine and hip joints existed since this condition was cited as part of the DDSS documents and the Family Court's justification for the execution of the protective custody order. With the exercise of ordinary care and consideration DDSS and the sheriffs and EMS Staff could have avoided the unnecessary pain caused by the unnecessary mishandled DDSS forced abduction and transfer to the Cottonwood facility.

228.   The disabling spinal and hip degenerative injuries and heart conditions were negligently, wantonly and maliciously ignored by the Sheriffs and the EMS Staff during the forced abduction. The injuries are the kind with which a person normally constituted would not be adequately able to cope as a result of but not limited to experiencing and witnessing the forcible abduction using "police state" tactics and violations of constitutional rights, judicial conduct and rules of procedure, sustained directly by Mrs. Weaver and Gary Weaver as described herein. The forced abduction manhandling, shock, procedures used by the three deputy sheriffs and the two EMS Staff members by physically manhandling and dragging Mrs. Weaver by her arms and legs in her underwear only, out of her bed, bedroom and bathroom, on bogus issues, and based on an illegal court order, and dumping her onto the EMS stretcher, and transporting her 70 miles to an unknown destination, caused Mrs. Weaver extreme physical pain, aggravated her spine and hip pain, and caused her severe emotional shock and distress followed by the forced physical discomfort and emotional stress of the DDSS removal strapped into an ambulance stretcher,  to an address unknown which turned out to be a third rate, substandard facility some 70 miles away, a terrifying experience from which she has not yet recovered..

229.   As a further direct and proximate result of the above described adverse events caused by DDSS negligent, wanton and malicious acts and/or omissions of Defendants, and each of them, since the occurrence of the adverse events described herein, Plaintiffs have incurred

medical and rehabilitation treatments, therapies, inconvenience and expenses, in excess of the No-Fault tort threshold in the past and will continue to incur in the future.

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth

## COUNT 16

### Plaintiffs Serious Psychological and Emotional Distress

For a separate and distinct claim for relief, Plaintiffs allege as follows:

230.    Plaintiffs reallege and incorporate paragraphs 1-229 as if fully set forth herein..

231.    The above described violations against Plaintiffs were a direct and proximate result of the grossly negligent and malicious acts and/or errors and omissions of defendants, and/or each of them, which include but are not limited.

232.    As a direct and proximate result of the actions of the Defendants as described herein, Plaintiffs herein, especially Mrs. Weaver have been subjected to serious and severe physical and continuing psychological and emotional distress, the kind with which a person normally constituted would not be adequately able to cope as a result of but not limited to experiencing and witnessing the injuries, damages, constitutional violations, forcible abduction using "police state" tactics and violations of judicial conduct and rules of procedure, sustained directly by Mrs. Weaver and Gary Weaver.

233.    As a direct and proximate result of the above described negligent, wanton and malicious acts and/or omissions of Defendants, and each of them, since the occurrence of the events described herein, Plaintiff Mrs. Weaver has sustained severe and continuing Post Traumatic Stress Disorder (PTSD) and severe disruption of her Circadian Sleep Cycle causing severe ongoing nightly sleeplessness for which she requires regular ongoing medical and rehabilitation treatments, expenses, inconvenience, permanent injuries and damages as described hereinabove and below, Medical treatments require, inter alia, 200 mile motor trips to doctors at MUSC in Charleston and Richland in Colombia, which ailments will continue into the near future.

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth

## COUNT 17

### Defendants' Abuse of Due Process and Judicial Conduct

98

For a separate and distinct claim for relief, Plaintiffs allege as follows:

234.   Plaintiffs reallege and incorporate paragraphs 1-233 as if fully set forth herein..

235.   Plaintiffs' several requests to DDSS for the Case Records have been denied for two years, in violation of DDSS rules and statutes. The DDSS Case Records are needed by Plaintiffs to document this Complaint in full. **Article IX, Rules 77- 82, SCRCP and Rule 6, SCFCR** provide the legal authorization for Plaintiffs demand for DDSS case records that may (or should) exist with respect to the issues discussed herein. The above described violations against Plaintiffs were a direct and proximate result of the grossly negligent and malicious acts and/or errors and omissions of defendants, and/or each of them, which include but are not limited to the following:

236.   Additional to the DDSS negligent and deliberate abuses of the DDSS Rules for dealing with elder persons as documented herein, Plaintiffs claim that the DDSS also abused the judicial due process and judicial conduct.

237    It has been noted herein that **Rule 405.03** provides for a **"Merits Hearing"** within forty (40) days after the ill advised DSS Ex Parte Order was executed by the Family Court on the basis of inadmissible hearsay evidence.. This rule further provides that the SCDSS  Caseworker will conduct a comprehensive evaluation and write a report to cover the items addressed in **SC Code 1976 Ann. Section 43-35-45 ( c ). A copy of the said report will be provided to the court, the guardian ad litem and the attorney for the client, at least five working days before the merits hearing.** That is, by March 7, 2012. The court records reveal that despite several requests, a copy of this report was never filed with the guardian ad litem and attorney for Mrs. Weaver The Family Court record. shows that  DDSS did not file the said report with the court as required..

238    The DDSS attorney failed his due diligence pursuant to **Rule 11, SCRCP,** by not filing the said report in violation of the **Rule 405.03,** but instead filed inadmissible hearsay evidence in the form of the caseworker's inadmissible affidavit and a copy of an inadmissible memorandum from a physician. Both the DDSS attorney and the Family Court which never demanded that the said report be filed, knew and should have known on the basis of their professional knowledge and experience that the report should have been filed and the inadmissible evidence should never have been filed, and certainly it should never have been used

to justify and the granting of the Ex Parte Order for Protective Custody. Mrs. Weaver was denied the right to review said report required by law, and the right to rebut as appropriate. Mrs. Weaver was denied due process of law and equal protection of the law on this ground alone.

239.    .The Ex Parte Order signed on February 28, 2012, one day before the filing of the complaint, states that **"the matter is before the court pursuant to a complaint and affidavit seeking an ex parte order for protective custody to protect a vulnerable adult." In fact there was no complaint and no affidavit before the court on February 28, 2012. This is a violation of court procedure and SCRCP.**

240.    .The Family Court and DDSS are in violation of **Rule 79 ( c ) SCRCP** with respect to the execution, filing and service of the Ex Parte Order of Custody signed by the Court Judge on February 28, 2012, one day before any complaint was filed with the clerk of court. **There was no action before the Court justifying an ex parte order.**

241.    No proper motion for the Ex Parte Order, or a Complaint was filed with the clerk of court on February 28, 2012. It is assumed that the Family Court Judge signed the Ex Parte Order in anticipation of DDSS filing a Complaint, and overlooked the rules for procedural requirement, especially notice and service on Defendant. Thereby in abuse of discretion, and denial of Mrs. Weaver's due process rights.

242.    The question arises: What procedure was followed by DDSS and the Family Court Judge for the Ex Parte Order to be placed before the court for consideration? This should be in the court record, but it is not

243    Rule 79 (c) SCRCP provides that no jury or non jury action shall be heard by "…other inferior court" (Family Court) until the action has been first entered in the file book and all pleadings in the action filed with the Clerk of Court.

244.    Here we have a Family Court Judge signing an Ex Parte Order of Custody **for incarceration of an elderly disabled lady, without a proper timely motion of record, without service and notice to Mrs. Weaver, without a proof of service or filing with the court before DDSS took any action, without a hearing, without witnesses and cross examination, and without any appearance for defensive action to be taken by Plaintiffs, etc.**

    Plaintiffs may reasonably claim that the Family Court Judge failed to perform his duty to Plaintiffs by misconduct and his inattention to detail, negligence and "routine" processing of improperly documented and prepared court documents incorrectly

100

filed by the DDSS legal counsel, in violation of statutes, court rules of procedure and proper care for the rights of Plaintiffs to due process and equal protection of the law. In this way, it may be claimed that the Family Court judge's mistakes condoned, promoted and led directly and proximately to the subsequent irregularities and damages performed by the Defendants as claimed herein. The role and public accountability of the presiding Family Court judge will be addressed at trial.

245.    Rule 6, SCFCR provides for Family Court Records. This rule relates to "Domestic Relations" and "Juvenile Actions", and does not refer specifically to actions related to protective custody of alleged "vulnerable adults" as is the case here. It is assumed that for the latter actions we must rely on the rules cited in SCRCP. Nevertheless, there are specific SCFCR rules that by implication may apply in this case.

246    Rule 6 (c) SCFCR (reiterates Rule 79 (c) SCRCP cited herein above) provides that no domestic relations or juvenile actions shall be heard by Family Court until the action has been first entered in the file book and all pleadings in the action filed with the Clerk of Court.

247.    Rule 6 (e) SCFCR is more directly related to the issues we raise for this action. Without referring specifically only to domestic relations and juvenile actions, importantly, this rule provides:

> "Attorneys shall advise the Clerk of Court to note on the motion calendar all requests for appearance on preliminary motions, and other matters requiring a summary hearing before a family court judge. The family court motion calendar shall contain the case number, date of request, name of the action, attorneys involved, and the nature of the motion to be presented."

248    Rule 6 (g) SCFCR provides for Failure to Comply, which applies to the DDSS attorney in this case:

> "Failure to comply with the requirements of this rule, shall subject the person so failing, to penalties as for contempt of court; which contempt shall be enforced by the court on motion **of any aggrieved party,** or by the court on its own motion."

249.    Here we have a blatant ignoring and non compliance of the SCRCP and SCFCR rules of procedure in the handling of court papers and court procedures designed to forcibly incarcerate an elderly, disabled lady for life, by surprise, without prior notice or service of court or DDSS intent. Plaintiff Mrs. Weaver is an aggrieved party as described in the rules. It is the

purpose here to seek sanctions or penalties. For the record we note that the DDSS attorney is in blatant violation of Rule 11, SCRCP.

250.　Availability of the case records, if any, should shed light on these DDSS procedural violations and violations of any court rules as cited herein. This limited discussion of DDSS violations of court rules and its own rules, is presented to the court and jury to justify Plaintiffs' need for the formal detailed case records related to the due process procedures with respect to the DDSS handling of legal process in this case during the period November 1, 2011 through March 31, 2012, and to the present..

251　In conclusion, Plaintiffs reiterate their claim that defendant DDSS and iyts legal counsel violated due process relating to the filing, review, processing and determination of the complaint and the ex parte order of custody issued one day before the filing of the complaint and without representation of the defendant and any other court activities related to the DDSS and Court handling of this case. (Example: proof of service of summons and notice- Rules 4 (g) and 5 (d) SCRCP). During trial discovery Plaintiffs will seek copies of the family court records and recorded procedures employed and the court records which DDSS has denied Plaintiffs.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 18

**Defendants and Each of Them Violated Rules 4, 5, 11 and 12 SCRCP, and the DSS Rules thus Denying Plaintiffs Their Constitutional Rights to Due Process and Equal Protection of the Law Vesting No Personal Jurisdiction in the Court**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

252.　Plaintiffs reallege and incorporate paragraphs 1-251 as if fully set forth herein.

253.　As stated hereinabove, Defendant's attorney filed the said Ex Parte Motion for Protective Custody on February 28, 2012, **one day before filing the Complaint and Summons on February 29, 2012 and six days before filing a second Complaint on March 6, 2013.** The Family Court improperly granted the said Ex Parte Motion **before the Complaint and Summons** were filed with the court or served on Plaintiffs on February 29, 2013 at about 5.00 p.m. The matter as claimed by the DSS Motion was not before the court which lacked personal jurisdiction at that time. (see, **Rules 4, 5, SCRCP**); quite apart from the unproven and undocumented facts and allegations considered by the Court.

102

254    Pursuant to **Rule 4 (a)** SCRCP, the Summons shall be issued by the DSS attorney and served upon the Plaintiffs (then Defendants) as "individuals" under **Rule 4 (d) (1)**. The Summons and Complaint must be served together and were not duly served. A sheriff deputy served Mr. Weaver, but **not Mrs. Weaver personally** with a "scrambled" copy of the complaint, summons and Ex Parte Motion, as required by law. In addition to violating the rules of procedure, by not serving Mrs. Weaver personally with copies as the subject of the process the sheriffs discriminated against her, treated her as a "second class citizen" and denied her equal protection of the law and due process in her own right as a competent experienced elder individual.

255.    Pursuant to **Rule 4 (g)** SCRCP, the person serving the process shall make proof of service thereof promptly and deliver it to the officer or person who issued same, in this case the DDSS attorney and the Family court judge. A "scrambled" indecipherable copy of the process, together with a copy of the said Ex Parte Motion, was served on Plaintiff Gary Weaver on February 29, 2012 by the Dillon Sheriff Deputy who "... **shall make proof of service by his certificate."** No such certificate was filed by the Sheriff Deputy stating the date, time and place of such service and such person. **The Sheriff Deputy did NOT serve process on Mrs. Weaver and did not file a proof of service on her personally as required.**.

256.    Neither Mr. (nor Mrs) Weaver accepted service of process pursuant to **Rule 4 (j)** SCRCP and in fact strenuously objected, and refused to accept the process and comply. They only complied with the Sheriff's demands to comply under threat of alleged contempt of an incorrect court order, lack of notice, and the immediate arrest of both persons in chains, like common criminals. Plaintiff's act of acceptance and compliance under threat of arrest did not demonstrate their intent to submit to the Court's jurisdiction. See, **Stearns Bank Nat. Assoc'n. vs. Glrnwood Falls,L.P. (S.C. App. 2007)373 S.C. 331, 644 S.E. 2d. 793, reh'g dnd, cert. dnd.**

257.    Plaintiffs "appearance" in this case is questionable and involuntary since compliance was against their will and was neither implied nor expressly given to the Sheriffs illegally present in their home. Mrs. Weaver was never served with the Ex Parte Motion, complaints or summons, and no proof of services was made. **Consequently the Family Court did not obtain personal jurisdiction.** Under duress, Plaintiffs did not waive any defense of lack

of personal jurisdiction in the proceedings for the forcible removal of Mrs. Weaver from her residence and the evident care of her husband caregiver. **Here we have an error of law.**

258.    The SCRCP Rule governing personal service of process serves at least two purposes: it confers personal jurisdiction on the court, and assures the defendant of reasonable notice of the action. See, **BB & T. vs. Taylor**, (S.C. App. 2006) 369 S.C. 548, 633 S.E. 2d 501. A judgment is void if a court acts without personal jurisdiction. See, **Ex Parte S.C. Dept. of Revenue.** (S.C. App. 2002) 350 S.C. 404, 566 S.C. 2d 196. And a court ordinarily obtains personal jurisdiction by the service of a summons. **Ibid.**

259.    In this case, the Family Court did not have personal jurisdiction on February 28, 2012 when it granted the bogus Ex Parte Motion for Protective Custody of Mrs. Weaver on the basis of invalid DSS arguments. Process had not been filed with the court, nor served on the parties until after the incorrect granting of the said Ex Parte Motion, without proof of service filed by the Sheriff within ten days after service of the complaint and summons pursuant to Rules 4 (g) and 5(d) SCRCP, and without court personal jurisdiction. Accordingly, the Ex Parte Motion was void and unenforceable by the Sheriff and the court.

260.    Plaintiffs were denied proper and timely notice of the proposed DSS court action having been given no prior notice by the DSS or the court before February 29, 2013 at 5.00 p.m., in violation of DSS rules, and service of process was made with improper court documents simultaneously together with the threat of arrest if the parties did not immediately comply with a bogus court order. Plaintiffs were given and had no opportunity to reply to the complaint and summons or the Ex Parte Motion. The Family Court lacked personal jurisdiction if Plaintiffs had no notice of the proceedings. See, **BB&T, op cit.**

261.    The summons and complaint must be filed with the court, prior to their service. Pursuant to **Rule 4 (g) SCRCP**, failure to make proof of service does not affect the validity of the service. However, as in this case, a service of summons permitting no timely response is fatally defective vesting no personal jurisdiction in the court, since **Rule 12 (a) SCRCP** entitles a defendant (Plaintiff Mrs. Weaver here), to thirty (30) days in which to respond. See, **State Bd. Of Med. Examiners vs. Fenwick Hall, Inc.** (S.C. 1990) 387 S.E. 2d 458

262.    Clearly Plaintiffs have been denied their constitutional right to due process, there has been Rule 11 SCRCP violations by the DSS attorney, and abuse of discretion and misconduct on the part of the Family Court in handling the initial processing of the case,:

inadequate notice to Plaintiffs, denial of thirty days to respond, lack of personal jurisdiction of the court as to granting the Ex Parte Motion and incomplete service of process by the Sheriff, and Plaintiffs objections and lack of implied or express waiver or intent to submit to the court's jurisdiction and appear under threat of arrest and handcuffs by the sheriff's forcible abduction of Plaintiff Mrs. Weaver.

   **WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

COUNT 19

<u>Defendants' Perversion of Process and Violations of Plaintiffs Constitutional</u>

<u>Rights and Privileges</u>

For a separate and distinct claim for relief, Plaintiffs allege as follows:

263.    Plaintiffs reallege and incorporate paragraphs 1-262 as if fully set forth herein

264    Defendants, and each of them, jointly and severally, have violated Plaintiffs' United States and State constitutional rights and privileges, as follows:

1.    **South Carolina Constitution:**

   1.    <u>Article I, Clause 3</u>:  Defendants have abridged Plaintiffs' privileges and immunities, and through their illegal activities have deprived and attempted to deprive Plaintiffs' of life, liberty and property (and pursuit of happiness) without due process of law, and denied equal protection of the laws.

   2.    <u>Article I, Clause 10:</u>  Search and Seizure; Invasion of Privacy. Defendants have violated and attempted to violate Plaintiffs' right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures and unreasonable invasions of privacy, and warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

   3.    <u>Article I. Clause 14</u>:  Trial by Jury; Witnesses; Defense. Defendants' violated Plaintiffs' right to be fully and timely informed of the nature and cause of the DDSS' accusation or claims for protective custody and abduction for incarceration; to be confronted with the witnesses against them; to have compulsory process for obtaining witnesses in Plaintiffs' favor, and to be fully heard in Plaintiffs' defense, objections and denial of consent to be taken into

105

protective custody, abducted, and incarcerated in a third rate substandard facility away from their community.

2. **United States Constitution**.

1. Amendment IV, Article IV: Searches and Seizures. Defendants have violated Plaintiffs' right to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized. (S.C. Const. Art. 1 Cl 10)

2. Amendment IV. Article IV: Right to Privacy. Defendants did not safeguard the privacy and security of Plaintiffs against the arbitrary invasions by governmental officials without due process. (S.C. Const. Art. 1. Cl 10). Defendants and each of them, conspired against Plaintiffs' "right to be left alone" the most comprehensive of rights and the right most valued by civilized men. See, **Rumler vs. Bd. of School Trust for Lexington Cty. Dist, No, 1, 327 F.Supp. 729 (D.S.C. 1971)**

3. Amendment V, Article V. Rights of Accused in Criminal Proceedings; Due Process; Eminent Domain. Defendants and each of them conspired to deprive Plaintiffs of life, liberty or property, without due process of law. (S.C. Const. Art.I, Cl 3). See also U.S. Amend. XIV re state due process

4. Amendment VI. Article VI. Trial by Jury, Witness, etc. Defendants and each of them denied Plaintiffs the right to be timely informed of the nature and cause of the DDSS' accusation or claims for protective custody and abduction for incarceration; be confronted with the witnesses against them; to have compulsory process for obtaining witnesses in Plaintiffs' favor. (See S.C. Const. Article I, Clause 14)

5 Amendment XI. Article XI.. Restriction of Judicial Powers. Defendants and each of their employees have committed **individual acts** against Plaintiffs' constitutional rights and privileges  Pursuant to **S.C. Code Section 43-35-75 (A) and Rule 402.02** DDSS employees have immunity from civil and criminal suits except for their bad faith and malevolent acts as in this case. Non state employees (Defendant Wallace) are not exempt. However, Plaintiffs' constitutional rights are protected by this Amendment XI. And this case is riddled with bad faith and malevolent acts of Defendants

6. Amendment XIV. Article XIV, Clause 1: Citizens rights, etc.

106

Defendants, and each of them have conspired to deprive Plaintiffs of their rights and privileges granted under this Amendment. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction, the equal protection of the law. (S.C. Const. Art I. Cl.3). See discussion in Amend. XI about state immunities).

265.. **Due Process of Law:** This implies the right of Plaintiffs herein affected by the DDSS process to be present before the tribunal which pronounces judgment upon the question of life, liberty or property; in its most comprehensive sense; to be heard by testimony or otherwise, and to have the right of controverting by proof, every material fact which bears on the question of right in the matter involved. **Black op cit, p.590**

The essential elements of "due process of law" are **notice** and opportunity to be heard and to defend in orderly proceeding adopted to the nature of the case, and the guarantee of due process requires a that every man have the protection of a day in court and benefit of general law. **Ibid.** These rights were denied by the DDSS court procedures as discussed herein.

266. **Abuse of Process:** This procedural violation against Plaintiffs exists when an adversary (DDSS), through the malicious and unfounded use of some regular legal proceeding obtains some advantage over his opponent. **Black op cit, p. 25.** The gist of an action for abuse of process is improper use or perversion of process after it has been issued. **Ibid.** Action for abuse of process rests upon improper use of regular process, while "malicious prosecution" has reference to the wrong in issuance of process. **Ibid.** Here we have DDSS and the Family Court abusing process in applying for and executing an Ex Parte Order one day before filing a Complaint or serving a Summons, based on hearsay affidavits, which they knew or should have known were not admissible and failing to serve complaints, summons and notices pursuant to court rules of procedure.

267 **Abuse of Discretion:** In this case Plaintiffs charge the Family Court has abused its grant of an Ex Parte Order for Custody, and approving or condoning the DDSS failure to issue proper notices and summons and the Complaints. This Court abuse is synonymous with a failure to exercise a sound reasonable and legal discretion, which means the clearly erroneous conclusions and judgments that are clearly against logic and effect of such facts as are presented in support of the DDSS application for custody, or against the reasonable and probable

107

deductions to be drawn from the facts disclosed upon the hearing; an improvident exercise of discretion; an error of law. **Ibid.** Where the Family Court did not exercise discretion in the sense of being discreet, circumspect, prudent, and exercising cautious judgment, it was an abuse of discretion. **Ibid.**

268    **Equal Protection of the Law:** Defendants and each of them and the Family Court willfully and knowingly denied Plaintiffs the equal protection of the law from start to finish of this action. This means that equal protection and security shall be but were not given to all under like circumstances in Plaintiffs life, liberty, and property, and in the pursuit of happiness, and in the exemptions from any greater burdens and charges than are equally imposed upon all others under like circumstances. **Black, op cit, p.631**

Equal protection of the law for Plaintiffs means it is extended to them as persons within the state within the meaning of the constitutional requirement, when the Family Court is open to them on the same conditions as to others, with like rules of evidence, and most modes of procedure, for the security of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; when they are subjected to no restrictions in the acquisition of property, the enjoyment of personal liberty, and the pursuit of happiness which do not generally affect others; when they are liable to no other or greater burdens and charges than such as are laid upon others; and when no difference or greater punishment is enforced against them for a violation of the laws. **Ibid** Mrs. Weaver was **not served with court papers and thus denied due process and equal proection of the law.**

269    <u>**Due Process Violation: Improper DDSS Ex Parte Order**</u>

1.    On February 28, 2012 Counsel for Defendant DDSS executed a first Complaint, which he filed with the court on February 29, 2012, together with an **inadmissible** Affidavit executed by Defendant Page on February 28, 2012, also filed on February 29, 2012.

2.    **An Ex Parte Order of Custody was prepared and filed by Counsel for DDSS on February 28, 2012. Said Order was executed by the Family Court Judge the same day, February 28, 2012.**

3.    The Ex Parte Order signed on February 28, 2012, one day before the filing of the first complaint, <u>states that the matter is before the court pursuant to a complaint and affidavit seeking an ex parte order for protective custody to protect a vulnerable adult.</u>

**(Order, lines 1 and 2)** However, the first complaint was filed on February 29, 2012 **one day after** the execution of the Ex Parte Order on February 28, 2012.

4.    The Order states improperly and incorrectly, that "After review of the (non existent) complaint and (non existent) supporting inadmissible affidavit(s)…that it executes the Order". That was improper on the part of the Court.

5.    The fact is that the **said matter was not properly before the court, pursuant to a complaint, which had not been filed with the court and the first complaint and notice and summons had not been served on Plaintiffs.**

6.    The Ex Parte Order was improperly filed and improperly executed by the Court which in the absence of the first Complaint and Notice and Summons, **did not have jurisdiction of the subject matter or the personal jurisdiction at that time.** (Order, line 3). Moreover, the demand for the said order was totally unsupported by the inadmissible and factual evidence, and the order was manifestly influenced or controlled by error of law and fact in violation of Plaintiffs due process constitutional rights.

7.    The Court, misled by the misrepresentations of the DDSS Counsel, and based on incorrect misleading facts cited in the inadmissible affidavit and other evidence, **abused its discretion** by executing an order based on factually incorrect evidence filed and executed, and in violation of the rules of civil procedure. **The Family Court knew and should have known the evidence was inadmissible and that the first Complaint, Notice and Summons had not been filed giving the Court jurisdiction,**

8.    The improper Ex Parte Order was prejudicial to Plaintiffs and unreasonable and improper judicial conduct in denial of due process to Plaintiffs. Both the Family Court and the DDSS Counsel violated Plaintiffs due process and equal protection of the law constitutional rights.

**270    Due Process Violation; Ex Parte Order Violated DDSS Rules**

1.    The Court, DDSS and Sheriff Deputies failed to follow the dictates of **DDSS Rule 405.01** for Emergency Protective Custody, and the DDSS counsel filed false evidence and improperly sought an Ex Parte Order for Custody in violation of DDSS **Rule 405.02** in that there was no imminent danger, Mrs. Weaver was not a vulnerable person and there was no immediate urgency even hinting of an emergency that required accelerated court action. Certainly there was no life threatening situation confronted by Plaintiffs Moreover DDSS did all

of its court, administrative and regulatory activities furtively, in secret and did not seek consent or even discuss the proposed actions with Plaintiffs, in direct and flagrant violation of the DDSS Rules and ethics. **The Court concurred with these facts at the March 12, 2012 merits hearing when it dismissed the DDSS's second Complaint filed on March 2, 2012.**

2.    The Court records show that the Family Court did not hold a hearing within three business days of a DDSS petition under the Rules for emergency proceedings, to which Plaintiffs should have had access and the right to confront and cross examine witnesses. Instead the Family Court just simply abused its discretion and signed ("white washed") the Ex Parte Order in violation of **Rules 405.01 and .02.** Due process of law requires that a person shall have a reasonable opportunity to be heard by a legally appointed and qualified impartial tribunal before any binding decree, order or judgment can be made affecting his rights to life, liberty or property. See, **State vs. Brown, 178 SC 294, 182 SE 838 (1935).**

3.    Here we have a bogus Ex Parte order based on inadmissible evidence, granting the Deputy Sheriffs and DDSS staff the right to take Mrs. Weaver into protective custody, **without service of process or a hearing,** against her consent and even though the DDSS did not even attempt to seek her consent., Denying a litigant a hearing in a pending case, deprives Plaintiffs of due process of law "in its primary sense of an opportunity to be heard and to defend (his) substantive rights" as in this case,  See, **Bouie vs. Colombia, 378 US 347, 84 S. Ct. 1697.**

4.    If the government act injures an individual, it must be consonant with due process.  In this case the Constitution requires that the act be consonant with Article XIV. See **Rumler, supra.** The DDSS and Family Court violations may be considered State acts injurious to Plaintiffs in violation of the due process clause which requires no particular form of procedure. See, **S.C. State Ports Authority vs. Kaiser, 254 SC 600, 176 SE 2d, 532 (1970).**

5.    Plaintiffs adversely affected by the cited due process and other constitutional violations perpetrated by the Family Court, DDSS and the Deputy Sheriffs claim that the violations are so unreasonable as to amount to a confiscation of their rights and privileges under the guise of regulatory authority and license, in violation of the due process clause of Amendment XIV.

271    **Due Process Violation: Unreasonable and Improper DDSS Service and Notice of Ex Parte Order and First Complaint.**

110

1.    On February 29, 20122, at 11.21 a.m., DDSS filed the bogus Ex Parte Order and the first complaint, both executed on February 28, 2012, the day before.

2.    At 5.00 p.m., at the end of the business day, without any prior discussions or notice to Plaintiffs in violation of DDSS Rules, DDSS arrived at Plaintiff's residence with a team of three Deputy Sheriffs, two EMS employees and two DDSS staff members to take Mrs. Weaver into so-called "emergency protective custody."

3.    Execution of the Ex Parte Order the day before on February 28, 2012 by the court, one day before the first complaint was filed on February 29, 2012, occurred **before** personal service of summons and notice of process which confers personal jurisdiction on the court, and assures Plaintiffs of reasonable notice of the action. **(Rule 4 SCRCP). A judgment is void if a court acts without personal jurisdiction.** Ordinarily a court obtains jurisdiction by the service of a summons. No summons or notice served as in this case was fatally defective vesting no personal jurisdiction in the Family Court since **Rule 12 SCRCP** entitles a party to 30 days in which to respond following the filing of a first complaint. And the presumption of proper service exists only when the rules governing service are followed

4.    Thus the validity of the procedural service and notice comes into question when the Family Court issues an improperly executed Ex Parte Order, unreasonably delivered to Plaintiffs just five hours after the issuance of an improper first Complaint without Summons or Notice, executed with inadmissible evidence, one day after the execution of the said improper Ex Parte Order, to take physical custody of Mrs. Weaver against her consent and without proper prior service and proper notice in violation of DDSS Rules and SCRCP...

5.    Service of the bogus improper Ex Parte Order of Custody and the first Complaint **without notice or summons** was made on Plaintiff Gary Weaver as spouse and caregiver at approximately 5.00 p.m. on Wednesday, February 29, 2012 by the male Deputy Sheriff. The said papers were not in order but were so scrambled that Plaintiff had to sort them out in proper order to make any sense of them, in violation of the rules of procedure.

6.    Defendants herein, as Plaintiffs in the first complaint issued that morning, must serve a notice and summons and a complaint as prescribed in **Rule 4 SCRCP**. Since summons can only be obtained if plaintiffs have filed a complaint, effective service presupposes a properly filed complaint. Consequently the service of the bogus Ex Parte Order of Custody was not valid when the first complaint was served, had not been filed first, but the next day after the execution

111

of the bogus Ex Parte Order. Inter alia, the service of the bogus issued Order was a violation of the due process clause of the two constitutions.

**272.    Due Process Violation:   Improper Service of Second Complaint, Summons, Notice.**

1.  ·    DDSS filed a <u>second Complaint</u>, a "Summons, Notice of Hearing," a second inadmissible Affidavit, and a "Petition for Appointment of Guardian Ad Litem and an Attorney" for Mrs. Weaver, with the Dillon County Family Court on <u>March 1, 2012</u>, with reference to a (40 day merits) hearing scheduled for March 29, 2012. The Notice was addressed to Plaintiff Mrs. Weaver who was incarcerated at defendant COTTONWOOD on February 29, 2012, two days before DDSS filed the said <u>second Complaint</u> and Notice, etc. **None of which were served on Plaintiffs.** The second Complaint included an inadmissible second Affidavit signed by DDSS caseworker Page on February 29, 2012, one day after she signed the first inadmissible Affidavit on February 28, 2012. The first and second Affidavits were the same inadmissible misinformation and hearsay evidence, prejudicial to Plaintiff Mrs. Weaver.

2.    DDSS <u>never filed a copy</u> of the said <u>second Complaint</u> <u>or the Summons and Notice with Plaintiff Mrs. Weaver,</u> in violation of **Rules 4 (a) (b) (c) (d) (1), (g), Rule 5 (a) (b), Rule 6 (d), Rule 7 (a), Rule 8, Rule 9, Rule 10, SCRCP..**<u>DDSS has no proof of service</u> on Mrs. Weaver, or her attorney, or her caregiver. Proper service and notice of pleadings and papers are the hallmarks of due process requirements of the two Constitutions. (See above). On the morning of March 12, 2012, Mrs. Weaver's court appointed attorney Ms. Holy Wall (on March 6, 2012) informed Mrs. Weaver of the hearing, and came to defendant COTTONWOOD in Bishopville, and took Mrs. Weaver in her car to the hearing in Dillon. Notwithstanding the fact that Plaintiff Mrs. Weaver (defendant at the hearing),  "appeared" at the Family Court hearing re-scheduled for March 12, 2012 instead of March 29, 2012, **on two hours notice by her attorney,** DDSS prejudiced Mrs. Weaver and stands in violation of Mrs. Weaver's constitutional rights and privileges to due process and equal protection of the laws.

3.    The said March 1, 2012 <u>second Complaint</u> per se, was defective on at least two counts. First count: It was an "Amended Complaint" based on changed conditions and facts different from the first Complaint and repeating alleged facts and false allegations contained in the first Complaint filed on February 29, 2012. Procedurally, the complaint was filed in violation of **Rule 10 (a) SCRCP**. However, of greater constitutional significance, Mrs. Weaver was

112

denied the reasonable opportunity to respond to either the first or second complaints, pursuant to **Rule 7 (a) and Rule 15 (a)** SCRCP. Here again, DDSS prejudiced Mrs. Weaver and stands in violation of Mrs. Weaver's constitutional rights and privileges to due process and equal protection of the laws.

4.      The <u>second count</u> relates to the lack of proper service and notice of the said "Petition for Appointment of Guardian Ad Litem and an Attorney" for Mrs. Weaver. Defendants and each of them, knew and should have known that Plaintiff Gary Weaver, Mrs. Weaver's spouse and caregiver, was at home since December 22, 2012, some two months prior to the ill advised abduction of Mrs. Weaver on February 29, 2012. Moreover, he was physically present, witness to, objected and refused consent to the illegal forcible abduction and incarceration of his spouse on February 29, 2012, all in full knowledge of Defendants present at Mrs. Weaver's residence at that time. There was no need for a Guardian Ad Litem at all. Furthermore, the Court ignorantly and irresponsibly appointed the same person as attorney and guardian, for Mrs. Weaver, which is a conflict of interest. Here again we have DDSS in violation of Plaintiffs right to privacy, life, liberty and pursuit of happiness, not to mention the denial of due process.

273     **Due Process Violation:   Defendants' Refusal to File Plaintiff Mrs. Weaver's Petition to Dismiss**

1.      Plaintiff Mrs. Weaver was abducted and incarcerated at the Defendant COTTONWOOD facility at approximately 7.00 p.m. on Wednesday, February 29, 2012.

2.      After recovering from the terror, shock, trauma, fear, stress, pain, and surprise of the illegal abduction without her consent, Mrs. Weaver regained her emotional stability and intellectual prowess. The next day, March 1, 2012, Mrs. Weaver immediately began to prepare legal papers to obtain her release from the so-called protective custody.

3.      Accordingly, she obtained a copy of the DDSS Rules governing her abduction and protective custody from the director of COTTONWOOD, which document she was unable to obtain from DDSS in Dillon during three months of fruitless attempts.

4.      Immediately she prepared .prepared a hand written Petition to the Family Court for her release from custody. She prepared a detailed itemized rebuttal to the arguments DDSS presented to the Family Court and a rebuttal to the inadmissible Affidavit filed by the DDSS Caseworker Page. She executed a notarized Power of Attorney to Mr. Weaver <u>which the DDSS</u>

113

director refused to recognize. She also prepared a detailed list of several pages of instructions to her husband related to her clothing of which she had nothing but her underwear DDSS brought her with the day before.

5.    These efforts were done without a typewriter or computer in hand writing in a small cramped room without any furniture, shared with another very sick elder woman.. These efforts were not the product of an elder woman who was "confused" as claimed by defendant Wallace and the court.

6.    Mrs. Weaver gave the legal papers to the director of COTTONWOOD and requested that they be filed with DDSS and the Family Court. This request was refused. The DDSS instructed the COTTONWOOD director and administrator of the facility that they were not to be present at the merits hearing and not to be present any at testimony in favor of Mrs. Weaver. This was denial of due process, and intimidation and tampering with potential witnesses and evidence..

274.    All of the constitutional violations described herein, Defendants maliciously and in bad faith, damaged Plaintiffs as a direct and proximate result thereof by the wanton, willful, negligent and illegal acts, errors and/or omissions of Defendants, and each of them, by and through the acts of their employees, agents, and/or servants against Plaintiffs in a wholesale, negligent and malicious bad faith violation of the DDSS procedural rules and regulations and Plaintiffs constitutional rights, and Federal and State statutes as cited herein.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 20

### Defendants' Civil Offenses and Wrongs Committed Against Plaintiffs

For a separate and distinct claim for relief, Plaintiffs allege as follows:

275.    Plaintiffs reallege and incorporate paragraphs 1-274 as if fully set forth herein

276.    Defendants and each of them have committed State civil offenses and wrongful acts and conduct against Plaintiffs. This means DDSS committed wrongful conduct against Plaintiffs that contravened its duty which the law attached to the relations between the Plaintiffs and DDSS, that was injurious, heedless, unjust, reckless, unfair and an infringement of Plaintiffs' statutory, Rules, constitutional and case law rights and privileges. Defendants and each of them were wrongdoers who committed an injury, and invasion of Plaintiffs' rights to the damage of

114

Plaintiffs who suffered such invasion. Bad faith and bad motive, is for DDSS to intentionally do a wrongful act against Plaintiffs knowing at the time that it is wrongful, particularly applicable to the actions of Defendants DDSS caseworker Page and Wallace in this case, if not criminal.

277    The idea of Plaintiffs' "rights" invaded by Defendants in this action suggests the correlative one of "wrongs"; for every right is capable of being violated as in this case. Thus, a right to live in personal security and the protection of one's house, is a wrong on the part of who commits trespass, invasion of privacy, illegal search and seizure, and personal violence or manhandling such as the three Deputy Sheriffs and the two E.M.S. attendants. While the law is intended for the establishment and maintenance of rights, on closer examination it is found to be dealing both with rights and wrongs. It first fixes the character and definition of rights, and then with a view to Plaintiffs effectual security, proceeds to define wrongs, and to devise the means by which the latter shall be prevented or redressed, **Black, Op cit, p, 1788.** There are several outstanding features of this case which constitute civil offenses, "wrongs," Defendants moral delinquency and breach of duty and trust, committed against Plaintiffs: inter alia, Defendants' collusive, sinister, secretive, surreptitious and furtive bad faith and malevolence; their lack of due diligence; their gross negligence in the processing of this case, their violation of DDSS Rules, and their interference in the presence of witnesses at the merits hearing, all of which caused serious damage to Plaintiffs as complained of herein. This Complaint seeks redress of Defendants wrongs against Plaintiffs.

278.    **Defendants' Bad Faith, and Malevolent Acts**    Defendants and each of them have deliberately and willfully engaged in Bad Faith and malevolent acts and conduct towards Plaintiffs. "Bad faith" is the opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive which is intentionally doing a wrongful act knowing at the time that it is wrongful. **Black op cit, p.176** The actions of Defendants Caseworker Page and Wallace as discussed herein are riddled with bad faith and bad motives, removing the former public official from any claim to immunity in this action.

279.    **Defendants' Moral Delinquency:**  Defendants and each of them are guilty of committing moral duress and moral turpitude in dealing with Plaintiffs. Moral duress consists of Defendants' imposition, oppression, undue influence through misdirected regulatory authority

115

and license and the taking of undue advantage of the stress and the extreme necessity or weakness of Plaintiffs in dealing with the unexpected, surprise, unannounced onslaught of excessive government and police force on February 29, 2012 and subsequently.

280    These moral turpitude actions by Defendants were moral delinquency and terrorism perpetrated against two relatively defenseless elder citizens taken completely by surprise due to the furtive and secretive actions of defendants against all of DDSS Rules. Thus Defendants and each of them engaged in acts of baseness, vileness or depravity in the private and social duties which a man owes to his fellow man or to society in general, contrary to the accepted and customary rule of right and duty between man and man; that is, conduct contrary to justice, honesty, modesty or good morals. **Black, op cit, p. 1160.**

281.    Thus, Defendants neglected their duty to follow the DDSS Rules, to comply with Plaintiffs' constitutional rights, to follow the due process and court rules of procedure, to process the case openly according to the Rules, and not furtively, secretively in a sinister conspiracy, and generally be solicitous of Plaintiffs' welfare rather than to forcibly invade her home and attack Mrs. Weaver and incarcerate her in a foreign facility that does not even provide edible food.

282.    **Defendants Lack of Due Diligence**:    Defendants have violated all three degrees of diligence in their processing of this case: (1) Defendants and each of them, neglected to exercise common or ordinary diligence, which men in general exert in respect of their own concerns; (2) neglected high or great diligence which is extraordinary diligence or that which very prudent persons take of their own concerns; and (3) neglected low or slight diligence, which is that which persons of less than common prudence or of no prudence at all, take of their own concerns, **Black, op cit, p.544,**

283.    Plaintiffs expect that Defendants would exercise special due diligence in the instant case, given the seriousness of the consequences of their illegal custody actions. This means Defendants should have exercised the measure of diligence and skill exercised by a good business man or an experienced professional DDSS social worker, in their particular specialities which must be commensurate with the duty to be performed and the individual circumstances of the case; not merely diligence of an ordinary person or non specialist.

284.    Defendants knowingly, recklessly, wantonly and willfully neglected to exercise any degree of diligence in checking the accuracy of their facts and allegations in the respective inadmissible testimonies presented to the Family Court seeking an Ex Parte Order of Custody

116

and filing the two fatuous complaints. The egregious errors and omissions presented in bad faith and malevolently, seriously damaged Plaintiffs who seek redress herein.

285.    **Gross Negligence:**    The facts and circumstances of this case indicate that Defendants and each of them, intentionally failed to perform a manifest duty to Plaintiffs in reckless disregard of the consequences as affecting the life or property of Plaintiffs and especially Mrs. Weaver's liberty. There was such a gross want of care and regard for Plaintiffs rights exercised by Defendants, as to justify the presumption of their willfulness, wantonness, bad faith and malevolence. There are degrees of care that Defendants should have exercised in dealing with Plaintiffs case, and their failure to exercise a proper degree of care is considered to be "negligence," but there are no degrees of negligence. Classification of "negligence" as "gross", "ordinary" and "slight" indicates only that under special circumstances great care and caution or ordinary care or slight care are required, but Defendants' failure to exercise any care demanded of them is :negligence."

286.    Defendants wanton and willful negligence per se was conduct whether or not of action or of omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances either because it is in violation of a statute as in this case, or valid DDSS Rule as in this case, or because it is so palpably opposed to the dictates of common prudence that it can be said without hesitation or doubt that no careful person would have been guilty of it. See, **Black, op cit. p.1187.**

287.    **DDSS Violation of Rules:**    Defendant Caseworker Page's willful, wanton, reckless and negligent bad faith violations of the DDSS Rules are documented herein above. These violations constitute a violation of Plaintiffs' constitutional rights and privileges to due process and equal protection of the laws. However the egregious violations are so damaging in their consequences that they may reasonably be cited as civil wrongs. For example, the willful effort to deprive Mrs. Weaver of her liberty without any documented justification whatsoever.

288.    **Defendants Conspiracy:**    S.C. Code 1976 Ann. Section 16-17-410 defines conspiracy as a combination between two or more persons for the purpose of accomplishing an object either criminal or unlawful, by criminal or unlawful means. Case law provides that to establish a criminal conspiracy, it is not necessary that the purpose of the conspiracy be accomplished, and it may be proved by any relevant competent direct and circumstantial evidence. Hearsay evidence is an exception and admitted as evidence of conspiracy; under S.C.

law no overt act need be shown to establish a conspiracy; the crime consists of the agreement or mutual understanding. Defendants and each of them entered into an agreement between two or more persons, for accomplishing an unlawful end, or a lawful end by unlawful means. Even if, *arguendo,* Defendants acts were lawful, the means by which they proceeded to process this case were unlawful in any case. Thus we have here an agreement between two or more persons who conspired to wrongfully injure or prejudice Plaintiffs in any manner, and conspired to commit any criminal or civil offense as in this case punishable by law, and who acted with intent to prevent the course of justice, and to effect a legal purpose with a corrupt intent and by improper means such as a forcible abduction of Mrs. Weaver. Finally, Defendants have committed perjury in their inadmissible hearsay evidence submitted to the Family Court. Giving false information in a document or report required by the laws of the State is "perjury". See. **State vs. Stanley ( S.C. App. 2005) 365 S.C. 24, 615 S.E. 2d 455**

289. **Defendants' Breach of Duty and Trust:**    The factual evidence in this case clearly establishes beyond a reasonable doubt, that Defendants and each of them were guilty of breaking or violating the laws and rules of this state, Plaintiffs' rights, and Defendants duty, either by commission or error and omission. In a general sense we have here Defendants violations and omissions of their legal or moral duty towards Plaintiffs pursuant to the DDSS stated Mission and statutory obligations and duties. More particularly, we have Defendants and each of them in neglect or failure to fulfill in a just and proper manner the duties of a State government office or fiduciary or medical employment. Defendants are in breach of duty to Plaintiffs. This means every violation of their duty which equity lays upon them, whether willful and fraudulent, or done through their negligence or arising through mere oversight or forgetfulness is a breach of duty. **Black, op cit, p. 235**

290.    Defendants were in breach of Plaintiffs' trust violated by the sinister, conspiracy to incarcerate Mrs. Weaver under the guise of regulatory authority. Defendant Wallace violated the trust of Mrs. Weaver as a medical patient by conspiring with DDSS Caseworker Page who violated Mrs. Weaver's trust as a social services patient in acting in direct and proximate violation of DDSS Rules against secrecy in processing a case. Thus we have Defendants documented herein in violation of patients trust by any of their acts contrary to the terms of their duties and obligations to Mrs. Weaver, or acting in excess of their authority and to the detriment of Mrs. Weaver, or the wrongful omission of any act required of them by the statutes and DDSS

118

Rules as documented herein  Every violation by Defendants of a duty to Plaintiffs, which equity lays upon them, whether willful or fraudulent, or done through negligence, or arising through mere oversight and forgetfulness, is a "breach of trust." **Black, op cit, p.236**  The term  therefore includes every omission and commission in carrying out Defendants duties of care and diligence and of using perfect good faith. **Ibid.**

291.    Defendants maliciously and in bad faith, violated and damaged Plaintiffs as a direct and proximate result thereof by their moral delinquency, wanton, willful, gross negligent and illegal acts, errors and/or omissions of Defendants, and each of them.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth**

## COUNT 21

### Defendants Violations of Plaintiffs Constitutional Right of Privacy

For a separate and distinct claim for relief, Plaintiffs allege as follows:

292.    Plaintiffs re-allege and incorporate paragraphs 1-291 as if fully set forth herein.

293    Defendants violated Plaintiffs Constitutional protection of liberty and privacy contained in the Fifth and Fourteenth Amendments of the U. S. Constitution in the Due Process Clause which prohibit a deprivation of "liberty ,,, without due process of law." The Fourteenth Amendment imposes the same constitutional obligation upon the States. This concept of liberty carries with it real enforceable "rights", and not just a guarantee that the government will provide basic procedures, such as notifying individuals of the government's proposed action for protective custody in a timely manner and affording the person an opportunity to be heard, such as at a trial or hearing before being deprived of liberty, privacy or property. Defendants and each of them flagrantly and egregiously violated such rights of Plaintiffs, violating the concept of "substantive" due process. By tradition and history the meaning of "liberty" as protected by the Due Process Clause has been guided and long been settled by the century-old interpretation that due process of law means that certain liberties of the people merits constitutional protection of various un-enumerated liberties, for example the right of privacy, which Plaintiffs claim herein. As noted herein above, Defendants, and each of them, violated the ancient dictum well established in law: *debet sua euique domus esse perfugiumtutissimum*; that is, every man's house should be a perfectly safe refuge.

294    For this complaint it is unnecessary to argue that the concept of "liberty" carries with it the right to privacy violated by Defendants and each of them. Supreme Court and other case law have established that argument. For example, the 1965 Supreme Court case of *Griswald vs. Connecticut* (married persons' right to marital privacy); *Roe vs. Wade* in 1973 established that the Constitution's protection of privacy encompasses a women's right to abortion, reaffirmed in *Planned Parenthood vs. Casey* in 1992. Again, a complaint such as this making a "liberty" claim including a claim of violation of privacy and liberty of person, invokes **the Fifth and Fourteenth Amendments whereby a person may not be forcibly deprived of liberty and privacy without due process of law, as occurred in this case.** In such cases the court and the jury must determine the meaning of the term *liberty,* which includes also in this case determining the term *privacy.* In courts, constitutional liberty has been defined as the right or prerogative of the individual to carry on activities or to enjoy human relationships that historically had been protected by law such as common law or statutes in clearly articulated ways. In the absence of such laws, the liberty might be protected less formally-in the history and traditions of the American people. These are, in short, culturally based protections. **Thus, a claim of liberty and hence privacy can be protected even if it did not enjoy specific legal footing. Accordingly, this complaint claims Defendants and each of them, violated Plaintiffs constitutional right to protection of liberty and privacy on** *stare decisis* **legal, historical and cultural grounds.** .

295.    The violation of Plaintiffs constitutional right to liberty and privacy, commenced with the secretive, collusion and bad faith, malicious conspiracy of Defendants Wallace and DSS' Pansy Page to have Plaintiff Mrs. Weaver taken (improperly) into court ordered protective custody on specious, unfounded grounds, for nefarious selfish reasons yet unknown, but open to speculation based on past experience with both defendants. This conspiratorial action involved the collusive effort whereby Defendant Wallace wrote a factually incorrect un-notarized Memorandum dated February 24, 2012 addressed ambiguously "To Whom It May Concern" which he reportedly hand delivered to Defendant Pansy Page on February 27, 2012. This was one day before the DDSS incorrectly filed its Motion for an Ex Parte Order for Protective Custody the next day on February 28, 2012, one day before filing their Complaint on February 29, 2012.. The said motion included an Affidavit of Pansy Page citing the said factually incorrect Memorandum from Wallace as justification for the requested protective custody which the Family Court also cited in improperly granting the Order.

120

296    Defendants Wallace (and Defendant Pansy Page under oath) violated the privacy rights of Plaintiff Mrs. Weaver on at least three counts:

1.    Additional to violating the patient's trust, Defendant Wallace knowingly and willingly violated Mrs. Weaver's right to "doctor-patient" confidentiality by secretively discussing Mrs. Weaver's medical situation with DDSS' officers and Ms. Page and in writing the factually incorrect Memorandum which under case law, was inadmissible as hearsay evidence in any case, and improperly accepted by the Family Court as justification for granting the custody documents...

2.    Defendants Wallace (and DDSS and Pansy Page) violated Mrs. Weaver's privacy rights by improperly administering a tuberculosis test without informing her of the purpose and intent, before, during and after administering the test on several occasions in the parking lot at the entrance door to his office: ( on February 13, 15, 24 and 27, 2012)

3.    Defendant Wallace and his nursing staff violated Mrs. Weaver's rights by falsifying her medical records and refusing to provide Plaintiffs the said records relating to the TB tests that were required by regulation before a potential patient is incarcerated in a "locked" institution such as Defendant Cottonwood Villas as described herein.

297.    Defendant Pansy Page violated Mrs. Weaver's privacy by discussing factually incorrect and confidential matters with other named defendants, by misrepresenting without any proof whatsoever the DSS case to the Family Court based on hearsay evidence, and without prior discussion or notice to Mrs. Weaver or her caregiver, contrary to agency rules, causing incarceration of Mrs. Weaver in a third rate, culturally incompatible institution in a very small bed in a very small room occupied by a another very sick woman, all in violation of statutes and the DSS rules.

298.    Defendants Sheriff Deputies violated Plaintiffs' constitutional privacy rights on several grounds:

1.    After close of business, at 5.00 p.m., on February 29, 2012, they entered Plaintiffs property without a warrant, and without notice, forcing open the "front gate" located some 100 yards from the residence, and entered with several Sheriff and DSS vehicles into the property;

2.    They presented caregiver Gary Weaver without prior notice or proper service in violation of the court rules, with a scrambled disorganized copy of the Family Court's

Ex Parte Order for Protective Custody and the Complaint filed one day later, which was the first time this matter was brought to the attention of Plaintiffs;

      3.     They refused Plaintiff Gary Weaver entry into his own home without being accompanied by a deputy while he unsuccessfully after 5.00 p.m., attempted to telephone the Family Court judge, his attorney and the DSS counsel;

      4.     They refused Gary Weaver the opportunity to find his wife in the house without being accompanied by a deputy, under threat of arrest if he refused;

      5.     They did not have a search and seizure warrant which they violated by entering Plaintiffs' home to find Mrs. Weaver over objections of Plaintiff Gary Weaver under threat of arrest if he resisted;

      6.     All three deputies entered Mrs. Weaver's bedroom un-announced, over objections of Gary Weaver under threat of arrest, where she was in bed, and forcibly pulled her out of her bed by her arms and legs and "frog marched" her causing her to be unceremoniously and painfully with serious hip problems, physically "dumped" and strapped down by two burly E.M.S. attendants onto a stretcher in the hallway of the house over Mr. Weaver's objections;

      7.     They did not present Mrs. Weaver with a copy of the bogus Ex Part Order for Protective Custody and the Complaint for her to read as justification for their forcible removal of her from her bed;

      8.     They placed her, an 88 year old woman, strapped on a stretcher which was moved some 100 yards from the house to in a police vehicle, dressed only in her light 3 piece underwear without even socks, on an extremely cold evening;

      9.     In the ambulance still strapped on a stretcher like a prisoner, she was placed under the guard of two officers who instructed her to lie still and not to speak;

      10.     They drove the ambulance some 70 miles with Mrs. Weaver strapped on the stretcher under guard to an undisclosed destination, to incarcerate her in Defendant Cottonwood Villas in Bishopville.

      11.     Two burly EMS attendants came to the front porch of the residence with a stretcher, and over Gary Weaver's objections and request to keep the stretched outside the house, they brought the stretcher through the front door into the foyer. There they took Mrs. Weaver from the sheriff deputies and physically dumped her in her nightgown, like a sack of potatoes

122

onto the stretcher and strapped her down like a common criminal. Then, in the very cold air, without a cover, rolled her out to the police vehicle waiting at the front gate...

12.    At Cottonwood Villa Mrs. Weaver was unceremoniously dumped on a small bed in a small bedroom occupied by another very sick lady, in contrast to the reply of Defendant Page responding to Plaintiff Gary Weaver's request at to the type of accommodations that Mrs. Weaver would have her own small apartment unit.

299.    The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the Defendants and/ or each of them, which include, but are not limited to the those outlined in the counts discussed herein.

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 22

**Defendants' Negligence, Errors And Omissions Related To Financial Planning Of The Abduction And Incarceration Of Mrs. Weaver For Protective Custody Exposed Her Personal Assets To Court Ordered Expropriation To Be Sold**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

300.    Plaintiffs reallege and incorporate paragraphs 1-299 as if fully set forth herein.

301,    By gross negligent violation of the DDSS rules, Defendants DDSS Caseworker Page and Cottonwood failed to discuss and plan in advance or at the time of the forced entry of Mrs. Weaver as an unwilling patient into Cottonwood, the financial plan, and financial consequences resulting from the actual and potential costs, payments, responsibilities, obligations and liabilities of the incarceration (proposed for life). Plaintiffs were entirely ignorant of the financial situation and liability ramifications associated with the incarceration of Mrs. Weaver in Defendant Cottonwood. DDSS Caseworker Page neglected her statutory/rules obligation, duty and responsibility to brief Plaintiffs and discuss the financial aspects in advance of their court action for protective custody and at the time of incarceration.

302.    Eventually, upon investigation, it became clear to Plaintiffs that Mrs. Weaver's monthly income was inadequate to cover the monthly cost of the incarceration at Cottonwood and that her Social Security benefits were assigned to Cottonwood and DDSS by way of

123

signatures of the latter without the knowledge nor consent of Plaintiffs. This was never discussed with Plaintiffs before the forced abduction into custody as required by the DDSS rules.

303.    . Furthermore, the evidence shows that Defendants Caseworker Page and Cottonwood officials in violation of the DDSS rules, signed documents without Plaintiffs knowledge or consent obligating Mrs. Weaver financially such, that it would eventually be destructive for her.

304.    In time, the cumulative compound effect of the monthly short fall in funding would expose Mrs. Weaver to potential loss of her personal assets which could be expropriated and sold under official court action to pay for the shortfall. For example, a $600 monthly shortfall for ten years would result in a liability of $72,000, plus interest and costs. This potential liability shortfall, was not discussed nor planned for, with Plaintiffs by Defendants..

305.    . Circumstantial and anecdotal evidence leads to the reasonable allegation that the negligent and obfuscated approach related to finances by Defendants including Defendant Wallace, would eventually make Mrs. Weaver's valuable house available on the market at a forced fire sale for use as a medical clinic, undertaker establishment, or other similar uses for which it is suited.

306.    . The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the Defendants and/ or each of them, which include, but are not limited to the those outlined in the counts discussed herein.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 23

**Bad Faith Actions and Abuse of Discretionary Authority Denies Official Defendants Qualified Immunity from Civil and Criminal Suits**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

307.    Plaintiffs reallege and incorporate paragraphs 1-306 as if fully set forth herein

308.    Defendants and each of them have committed individual acts against Plaintiffs' constitutional rights and privileges. S.C. Code 1976 Ann. Section 43-35-75 (A) and DDSS Rule 402. 02 provide that a person who makes a report or participates in an assessment or judicial proceedings in good faith, is immune from civil and criminal liability. In this civil or

criminal proceeding, the lack of good faith or Defendants bad faith and malevolent acts in this case are proven  Non state employees such as Defendants Wallace, Cottonwood and Nurses are not exempt under these laws under the facts and circumstances of this case. .

309.    Amendment XI. Article XI., Restriction of Judicial Powers. Plaintiffs' constitutional rights are protected by Amendment XI. Plaintiffs are protected against state immunity from civil suit on two counts. First the state employees have acted in bad faith and malevolently and thus are not exempt from suit. Second, for the purposes of this Amendment XI, state action involving constitutional violations is considered to be the individual act of a particular state official or employee when it is found to be unconstitutional, as in this case; but for purposes of the Fourteenth Amendment, it is considered state action; although this amendment has been construed as barring suits against the state without its consent, even where the suit is brought by a citizen of the state, suits against states have been allowed where constitutional violations are involved. (See, Eslinger vs. Thomas, 340 F.Supp. 886 (D.S.C. 1972)

310.    Case law provides that an official may claim qualified immunity only as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority. See, Leverette vs. Bell, 247 F.3d 160 (4th Cir. 2001) eet, dnd, 122 S.Ct. 460 (US 2001).  Here we are concerned with the deliberate, flagrant and reckless abuse of the discretionary authority exercised by public officials relevant to the conduct of this case, as follows:

A.    The DDSS' egregious abusive and neglectful actions, particularly the lack of due diligence in their respective documented violations of the DDSS Rules, statutes, and the respective due process, and equal protection of the laws constitutional rights of Plaintiffs, beyond the boundaries of the DDSS discretionary authority, amounting to extreme "bad faith" of the DDSS officials that was prejudicial to Plaintiffs;

B.    The abuse of process and discretion and abuse of judicial conduct of the Family Court Judge beyond the boundaries of his discretionary authority, in issuing a bogus Ex Parte Order on the grounds of inadmissible hearsay, factual and other evidence which he knew or should have known existed; incorrect facts presented in the inadmissible DDSS Affidavit the court relied on in issuing the bogus Ex Parte decision, such as the absence of the consent of Plaintiffs as claimed; due process and equal protection of the law constitutional violations such as executing the bogus Ex Parte Order one day before DDSS filed a first Complaint and the

125

inadmissible Affidavit and incorrectly claiming the matter was before the court pursuant to a non existent Complaint and Affidavit; appointment of a guardian ad litem without legal authority or consent of Plaintiffs, all invalidating the probity of the said Order, and nullification of the said Order, and the decision for "probable cause, " etc, that was prejudicial to Plaintiffs; and

C.     The abusive and prejudicial actions perpetrated beyond the boundaries of the discretionary authority of the three Deputy Sheriffs' violation of Plaintiffs due process, search and seizure and the privileges and immunities constitutional protections as described herein, particularly against the Deputies' trespass, forcible and verbal threats and terrorism of elder citizens who refused to give consent for placement, as described herein.

311.     Germane to this Complaint, is that the relevant court consideration to the qualified official immunity question, is not whether the officials actions were a proper or even legal exercise of their discretionary authority; rather the court must ask whether a reasonable official in the official's position should have known that the conduct was clearly to be beyond the scope of their authority, **Ibid.**

312     Determination of the validity of a qualified immunity defense by DDSS requires a two step sequential analysis: Initially, the court must determine de novo whether the facts viewed in the light most favorable to Plaintiffs, establish DDSS' deprivation of actual constitutional rights; if so, the court then proceeds to consider whether that constitutional right was clearly established at the time of the purported violation, **ibid.** The court is required to analyze the constitutionality of the challenged conduct before addressing whether the law regarding the right at issue was clearly established at the time of the violation, and thus cannot bypass, and thereby evade, constitutional determination wherever the law is uncharted or ambiguous. **Ibid., USCA Amend IV.**

313.     For this Complaint as discussed herein, the applicable law is unambiguous and the facts and law are clearly established, especially as to Defendants' neglect, bad faith and malevolent actions. Defendants maliciously and in bad faith, violated and damaged Plaintiffs as a direct and proximate result thereof by the wanton, willful, negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to terrorism of the elder Plaintiffs, improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing Adult Protective Services ( APS), and Placement Services on Plaintiff Beatrice Weaver over the

126

objections of both Plaintiffs at the time of the events complained of herein, in a wholesale and negligent and malicious bad faith violation of the DDSS procedural rules and regulations and Plaintiffs constitutional rights, as cited herein.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 24

### Gross Negligence

For a separate and distinct claim for relief, Plaintiffs allege as follows:

314.    Plaintiff realleges and incorporate paragraphs 1-313 as if fully set forth herein.

315.    The subject incidents complained of in this action are the direct and proximate result of Defendant's joint and several gross negligence, lack of proper care, forcible physical mis-handling, and failure to observe ordinary care and consideration in the physical and psychological treatment of a bed ridden 87 year old lady who they knew and should have known was disabled and physically impaired.

316.    Plaintiffs claim relief for Defendant's dilatory behavior and gross negligence resulting from the following elements:

1.    Defendants and each of them owed a responsibility and duty of care and consideration to Plaintiff Mrs. Weaver as a patient, and Mr. Weaver as a caregiver and members of the public in accordance and conforming with the constitutions, statutes, court rules, agency rules and regulations, to exercise care and consideration with due diligence and strict adherence to the law in administratively and physically pursuing their unproven, undocumented claims based on faulty hearsay evidence, that Mrs. Weaver was in imminent danger from unproven alleged abuse, negligence and vulnerability, and exercising their authority granted by faulty court orders; and

2.    A breach of that duty by the Defendant's negligent and reckless acts, errors and omissions; and

3.    The resultant damages there from to Plaintiffs, and

4.    The damages directly and proximately resulted from the Defendant's breach of duty and responsibility

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

127

## COUNT 25

### Emotional Distress

For a separate and distinct claim for relief, Plaintiffs allege as follows:

317.    Plaintiff realleges and incorporates paragraphs 1-316 as if fully set forth herein.

318.    Plaintiff claims relief in this action for emotional distress and physical and stress which are the direct and proximate result of Defendant's reckless and wanton negligence as follows:

1.    Defendants and each of them recklessly inflicted severe physical and emotional shock, emotional distress and anguish, and such distress directly and proximately resulted from their gross negligent conduct in exercising their authority in the conduct of their actions to enforce faulty court documents alleging abuse, negligence and vulnerability of Mrs. Weaver in imminent danger based on unproven, undocumented claims and faulty hearsay evidence; and

2.    Defendant's wanton conduct, negligent and irresponsible actions to incarcerate Mrs. Weaver in a third rate facility ostensibly for life, instead of leaving her alone in her residence with her husband, was extreme and outrageous for a major public regulatory agency , police and a primary physician, such as to exceed all possible bounds of responsibility and accountability, and must be regarded as utterly intolerable in such experienced public agencies dealing with the public such as Plaintiffs on a daily basis;  and

3.    Defendant's lack of proper, normal and standard careful safety handling measures and actions, caused Plaintiff's severe emotional distress and anguish; and

4.    The emotional distress and anguish suffered by the elderly Plaintiffs was so severe and painful that no reasonable person could be expected to endure it without consequences.

**WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

## COUNT 26

### Punitive Damages

For a separate and distinct claim for relief, Plaintiffs allege as follows:

319.    Plaintiffs reallege and incorporate paragraphs 1-318 as if fully set forth herein.

128

320    The acts, errors and omissions of Defendants as described herein, were willful, wanton, malicious and negligent conduct perpetrated in bad faith in total callous and cruel disregard for the welfare, physical, psychological, and emotional comfort, and general well-being of Plaintiff Mrs. Weaver and Plaintiff Gary Weaver.

321.    As a direct and proximate result of Defendants' and each of their negligent, willful, wanton, and malicious conduct and acts and/or errors and omissions, Plaintiffs have been damaged physically, emotionally, psychologically, socially, permanently, giving rise to the issue of granting substantial punitive damages as a deterrent to future DDSS aberrations in the conduct of their regulatory authority and license in dealing with the elder community..

322    In the event the court and jury grant Plaintiffs punitive damages for the transgression of defendants and each of them, as requested herein, Plaintiffs will assign the said damages to a non-profit, I.R.S. Section 501 ( c ) (3) charitable organization of their choosing that is dedicated to assisting elderly women in distress through no fault of their own and require legal, medical, and other related help on a short term basis, and working with other similar organizations that exist for such purposes.

**WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

COUNT 27

DOE Defendants

For a separate and distinct claim for relief, Plaintiffs allege as follows:

323.    Plaintiffs reallege and incorporate paragraphs 1-322 as if fully set forth herein.

324.    DOE Defendants and each of them, negligently filed and warranted a verbal or written Report with DDSS the purpose, origin and initiation of which remains unsettled. The said Report as cited in Defendant DDSS caseworker's Affidavit filed with the Family Court, was incorrectly filed with the DDSS Complaint and Ex Parte Order for Protective Custody as inadmissible hearsay evidence, that willfully, wantonly and maliciously in bad faith misrepresented inaccurate and misleading facts and assertions pertaining to Mrs. Weaver's condition, which was used as justification by DDSS and the court for issuing the bogus Court Order for Protective Custody.

325.    Said DOE Nurses Defendants owed a duty to Mrs. Weaver to file a proper written and notarized Report to DDSS if such was necessary at all, that was accurate, and with a copy

promptly made available to Mrs. Weaver which they did not do. The Deputy Sheriffs and EMS DOE Staff owed a duty to handle Mrs. Weaver gently with care and consideration instead of roughly manhandling her in lifting her onto the ambulance stretcher and strapping her down on the stretcher like a criminal on February 29, 2012 dressed in her underwear and house coat only, causing her extreme embarrassment, and severe aggravated physical pain in her spine and hips.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth

## COUNT 28

### Summary of the Charges Against Defendants

For a separate and distinct claim for relief, Plaintiffs allege as follows:

326.    Plaintiffs reallege and incorporate paragraphs 1-325 as if fully set forth herein.

327.    In summary, this Verified Complaint charges Defendants and each of them with at least the following civil and criminal offenses against Plaintiffs: racial profiling and discrimination, judicial negligence and misconduct; violations of the court's rules of procedure; use and application of undocumented, incorrect and negligent hearsay evidence by the Family Court, DDSS legal counsel and staff in violation of case law; after hours at the end of business when Plaintiffs had no access to their attorney, the Family Court judge of DDSS counsel, a team of three sheriffs, two DDSS staff and two E.M.S. staff invaded Plaintiffs' property without prior notice or discussion in violation of rules and regulations to take Plaintiff Beatrice Weaver into "protective custody" without any documented substantive proof of "abuse, neglect, or vulnerability, under imminent danger," under threat of arrest if Plaintiffs resisted; forcible entry under threat of arrest and excessive police forcible adduction of a physically disabled elder over Plaintiffs objections by sheriff deputies and E.M.S staff, causing her extreme pain, emotional stress and discomfort; strapping her down onto a stretcher like a common criminal; transferring her to an ambulance over some 100 yards on a cold February night dressed only in a thin 3 piece underwear without socks; constitutional invasion of privacy of the person and property; illegal search and seizure without warrants; violations of the United States and South Carolina constitutional rights of Plaintiffs; egregious incompetent and negligent violations of the DDSS rules and regulations spanning a period of several months;  bad faith, malicious, abusive, negligent, incompetent, secretive and collusive behavior of DDSS staff and Plaintiffs' primary physician and staff; secretive and furtive administration of TB tests preparatory to incarceration

in a culturally incompatible third rate facility; repeated refusal of DDSS, Cottonwood Villa and primary physician staff to provide case records on Plaintiffs demand pursuant to statutes and rules; and last but not least, egregious and repeated violations of Plaintiffs rights to life, liberty and the pursuit of happiness.

328.     That Plaintiffs have suffered actual damages, including but not limited to embarrassment, humiliation, enforced geographic isolation from the spouse, friends, associates, and the community, post traumatic stress disorder, anxiety, grief, emotional upset, serious stress, and other related psychological injuries, physical pain, and disruption of her life..

329.     Defendants collectively, and each of their respective conduct, constituted recklessness, willfulness, gross negligence and breach of duty as defined in *Bergstrom vs. Palmetto Health Alliance, (S.C. App. 2002) 353 S.C. 221, 573 SE 2d. 805*, in particular as follows:

1.     Failure of Defendants Rowland Director and Manager English of DDSS, to provide Plaintiffs case records upon request, and to properly screen, train, manage and supervise Case worker Pansy Page to ensure that she was trained, prepared and culturally and psychologically suitable to properly and professionally interact with DDSS patients such as Plaintiffs in good faith, and in accordance with and not to ignore the DDSS rules in bad faith..

2.     DDSS failure to provide proper services under the DDSS rules such as Homemaker services, patient's continued residence in her home instead of enforced removal by unnecessary police brutality by Defendant Dillon Sheriff and EMS, to a designated facility such as Defendant Cottonwood Villas, for which such services DDSS Defendants were responsible and under the direct obligation pursuant to the DDSS rules, and supervision of the DDSS Defendants.

3.     Failure of DDSS personnel, Counsel and the Family Court to observe the SCRCP rules and State statutes in obtaining a bogus Ex Parte Order for Protective Custody on February 28, 2012, before filing a Complaint with the Court, and the Summons and Service with Plaintiffs on February 29, 2013, all without any prior verbal or written formal notice to Plaintiffs according to the statutes and rules.

4.     Failure of DDSS in allowing bad faith violations of the rules and procedures and exposing Plaintiffs to be in a position where physical and emotional harm and

131

danger could be inflicted on elder citizens, and without any prior notice or discussions or information of DDSS intent, pursuant to the procedures and rule requirements.

5.    DDSS Director Rowland and Manager English's failure to act and properly supervise their employee case worker Pansy Page in her conduct relating to Plaintiffs. For example, Defendant Page had reserved a bed in a very small room for Plaintiff Weaver (shared with another very sick woman) at Defendant Cottonwood Villa in Bishopville 70 miles away, for February 25, 2012 which was three days prior to the improper Ex Parte Order for Protective Custody being filed and granted on February 28, 2012, one day before filing the Complaint...

6.    DDSS failure to have a policy or program of training and prevention  to prohibit such incidents of bad faith behavior and violations of rules, and to ensure compliance with all applicable regulations, rules, Code statutes, industry standards,  and related guidelines and specifications.

7.    At about 5.00 p.m on February 29, 2012, without any prior notice to Plaintiffs, Defendants Dillon County Sheriff Office and Emergency Medical Services trespassed on Plaintiffs property without any warrant, intentionally and reeklessly invaded Plaintiffs privacy over objections and threat of arrest and handcuffs, and subjected Plaintiff Beatrice Weaver to unnecessary physical injury and pain, shock, and severe emotional distress which was so severe, traumatic and extreme under the circumstances, that no reasonable person (and especially an  86 year elder woman suffering from severe medical conditions, injuries and illnesses known or should have been known to Defendants and each of them, ) could be expected to endure the shock and pain inflicted while unceremoniously waking her from her sleep and three officers manually pulling her out of her bed and bedroom to dump and strap her onto a stretcher while she was dressed only in her underwear, by three officers and two burly EMS officers, and forcibly abducting her in an ambulance under guard of two Deputy Sheriffs. Plaintiff Gary Weaver objected to the proceedings and the invasion of privacy, and was told by the Sheriff officer present not to interfere under threat of arrest for non compliance with a court order, which subsequently proved to be a bogus document improperly granted by the Family Court.

8.    Defendants and each of them, acts before and especially on February 29, 2012 at Plaintiffs residence, were in extreme violation of Plaintiffs right to privacy and protection from extreme physical abduction. Defendants' collective, collusive and respective

conduct set forth in this complaint was such as to amount to a willful, wrongful and illegal intrusion in both Plaintiffs lives with permanent and irreversible psychological and physical damages, especially to Plaintiff Beatrice Weaver with a severe PTSD, and infliction of emotional distress as defined in *Bergstrom op. cit.* Additionally, Defendants collective conduct, resulted in publicizing and involving third parties (such as a church and guardian ad litem improperly appointed by the Family Court) in private matters related to two elder citizens both in ill health and doing no harm to anybody which was of no particular public interest.

9.     The illegal action of Defendants in invading and trespassing without notice or proper court documents, Plaintiff s property , their privacy and their physical wellbeing, constituted an unwarranted and unnecessary intrusion into the psychological solitude and seclusion of the elder Plaintiffs who value their privacy and protections under the law.

10.     Defendants and each of them engaged in bad faith in abuse of regulatory authority and excessive abuse of the control of the state over individual freedom of Plaintiffs to conduct their own lives without intrusive, excessive illegal government interference

11.     Plaintiffs pray for court and jury awarded compensation for the damages caused by Defendants actions as described herein, including but not limited to physical and emotional injuries, time and effort expended and lost in seeking dismissal of the original DDSS complaints, searching unsuccessfully for legal representation, medical related and future costs, research and preparation of this complaint and related procedural activities, trail preparation, conduct and post trial matters, etc.

12.     Plaintiffs are requesting court judgment for actual and punitive damages, and other related relief in amounts and other punishments to be determined by a jury and the court.

**WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth:**

## COUNT 29

### Relief

For a separate and distinct claim for relief, Plaintiffs allege as follows:

330.     Plaintiffs reallege and incorporate paragraphs 1-329 as if fully set forth herein.

331.     <u>Actual Damages</u> in such amounts as shall be shown at trial, including but not limited to Plaintiffs costs and expenses, and efforts expended to rescind and cancel the bogus

Family Court Order for Protective Custody to return Mrs. Weaver to her residence under the care of her spouse..

332    **Special Damages** in such amounts as shall be shown at trial, including but not limited to Plaintiffs costs and expenses, and efforts expended to rescind and cancel the bogus Family Court Order for Protective Custody to return Mrs. Weaver to her residence under the care of her spouse.

333.    **General Damages** in the sum shown at trial but no less than the minimal jurisdictional amount for Defendants and each of them for commission of abuse, neglect exploitation and crimes against Plaintiffs.

334.    **Punitive Damages** in the amount to be shown at the time of trial and that the court and jury deems just and proper under the circumstances of this case as a significant `deterrent to Defendants, their employers, and others dealing with the elderly community.

335    **Civil damages** for discrimination pursuant to **Code Sect.43-33-540 and Sect. 16-5-10.20 and 60** for constitutional violations.

336.    For an order to DDSS to provide **Homemaker Services** to Plaintiffs pursuant to **Rule 321.30.**

337.    For a Court Order to the Dillon County Board of Social Services to fire, or demand the resignations of the DDSS Director, Administrator and Caseworker Page, for their respective incompetence, bad judgment, and perfidious violations of DDSS Rules, Statutes, and constitutional rights, and administrative mal-treatment of Plaintiffs.

338    Sanctions against the DDSS counsel for violations of **Rule 11 SCRCP.**

339.    For a court order holding the Defendants and each of them, guilty of contempt of **S.C. Code 1976 Ann. Section 16-5-10. 20 and 60, Conspiracy Against Civil Rights,** and impose penalties against the County, their employer, deemed appropriate by the court.

340.    Pursuant to **S.C. Code 1976 Ann. Section 43-35-80,** for a court order assessing a fine of thirty thousand dollars ($30,000.00) against Defendant COTTONWOOD for negligence, acting and failing to act, and for lack of reasonable care in its operations that resulted in the commission of abuse, neglect and exploitation against a vulnerable Plaintiff herein.

341.    For a court order charging Defendants and each of them liable for misdemeanors and fines as persons who knowingly and willfully threatened, intimidated and attempted to intimidate, abused, neglected and placed an alleged vulnerable adult in imminent danger of

134

exploitation for excessive regulatory purposes and violated S.C. Code 1976 Ann. Section 43-35-85

342.    Such other and further relief as the Court may deem just and proper, including, but not limited to reasonable attorney's fees and costs of court, and fines against DDSS and Sheriff personnel and each of them for committing abuse, neglect and exploitation and crimes against Plaintiffs.

DATED:    Little Rock, S.C. September 7, 2013

_____
BEATRICE E. WEAVER, Plaintiff Pro Se

_____
GARY WEAVER, Plaintiff Pro Se


## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by a jury of Plaintiffs peers.

DATED: Little Rock S.C. September 7, 2013.

_____
BEATRICE E. WEAVER, Plaintiff Pro Se

_____
GARY WEAVER, Plaintiff Pro Se

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
) FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON )
) CIVIL CASE NO.
)
BEATRICE E. WEAVER AND ) SUMMONS 2014-CP-17   078
GARY WEAVER, )
)
PLAINTIFFS, )
)
vs. )
)
DILLON DEPARTMENT OF )
SOCIAL SERVICES; AND JACKIE )
ROWLAND; KAREN ENGLISH; )
PANSY PAGE-McELVEEN; )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A; A SOUTH )
CAROLINA CORPORATION; JAMES P. )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE AND )
DEPUTIES JOHNIE MAY SMITH, )
CHADDIE HAYES, AND LINDA )
MAIMQUIST; DILLON COUNTY )
EMERGENCY MEDICAL SERVICES, )
A SOUTH CAROLINA CORPORATION; )
FLORENCE VISITING NURSES )
SERVICES, INC, A SOUTH CAROLINA )
CORPORATION; JOHN D. McINNIS; )
AND JOHN DOES 1-10, DOE )
PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10. )
)
DEFENDANTS. ) JURY TRIAL REQUESTED
)

**TO THE DEFENDANTS ABOVE NAMED:**

136

**YOU ARE HEREBY SUMMONED**, and required to answer the Complaint in this action, a copy of which is hereby served upon you, and to serve a copy of your Answer to said

Complaint on the subscribers at their address at 1253 Harllees Bridge Road, Dillon S.C. 29536, within thirty (30) days after the service hereof, exclusive of the date of such service; and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

_____

BEATRICE E. WEAVER, Plaintiff Pro Se

_____

GARY WEAVER, Plaintiff Pro Se

DATED:        Little Rock, S.C. September 7, 2013

137

## VERIFICATION

PERSONALLY APPEARED, Gary W. Weaver, who, first being duly sworn, deposes and says:

    A.    My name is Gary W. Weaver, a resident at 1253 Harllees Bridge Road, Dillon S.C. 29536, spouse and full time caregiver of Beatrice E. Weaver a Plaintiff Pro Se in the above captioned action.

    B.    I am a Plaintiff Pro Se in the above captioned action.

    C.    I have read the foregoing PLAINTIFFS' ORIGINAL VERIFIED COMPLAINT, and SUMMONS and know the contents thereof and the same are true to the best of my knowledge, except as to the matters therein stated to be on information and belief, and as to those matters I believe them to be true.

Gary W. Weaver, Plaintiff Pro Se

Sworn to and Subscribed
Before me this 20th
Day of _____, 2014.

Notary Public for South Carolina;
My Commission expires: 2-8-16

FILED
GWEN T. HYATT
2014 FEB 21 PM 12:28
CLERK OF COURT
DILLON COUNTY

A CERTIFIED TRUE COPY
CLERK OF COURT
DILLON COUNTY

13%

#1

FILED
GWEN T. HYATT

2014 FEB 21  PM 1: 28

CLERK OF COURT
DILLON COUNTY

P.O Box 539
Little Rock S.C. 29567
Ph: 841 1606; Fx: 774 2050

February 9, 2014

The Hon. Gwen Hyatt
Clerk of Court, Dillon County
PO Box 1220
Dillon SC 29536

Fax: 841 3706; Ph: 774 1425

Subject:  Transmittal for Filing of Verified Complaint Documents.

Ref:   Beatrice & Gary Weaver vs. Dillon Dept. of Social
Services, et alia

Dear Ms. Hyatt:

Enclosed please find for timely date/time filing, copies of our Verified Complaint documents, as follows:

1.  Original copy of Verified Complaint (loose leaf).
2.  Two copies of the said complaint for date/time filing and return.
3.  Copy of Supreme Court ADR Process exempt notice attached. Please note that Dillon County is exempt from mandatory ADR.
4.  Civil Action Coversheet
5.  Check for Filing Fee: $159.00

Said complaint is timely filed pursuant to the statute of limitations.

Respectfully submitted.

*Beatrice E Weaver*

Beatrice E. Weaver, Plaintiff Pro Se:

Copy to:

Named Defendants.

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

IF THE DOCKETING INFORMATION ON THE REVERSE SIDE OF THIS COVER SHEET INDICATES THAT THIS CASE IS SUBJECT TO MEDIATION, YOU ARE NOTIFIED THAT MEDIATED SETTLEMENT CONFERENCES ARE REQUIRED IN THIS CASE, AND THAT YOU ARE REQUIRED TO TAKE THE FOLLOWING ACTIONS(S):

    1.    The parties shall select a mediator within 120 days of the filing of this action, and the plaintiff shall file "Stipulation of Mediator Selection" within 14 days thereafter. If the parties can not agree upon the selection of the mediator within 120 days, the plaintiff shall notify the court by filing a written "Request for the Appointment of a Mediator" within 14 days thereafter. The court shall then appoint a mediator from the court-approved mediator list.

    2.    A party must make any motion to dispense with or defer mediation, or to refer the case to an alternative dispute resolution (ADR) process other than mediation, no later than 10 days after the court order appointing a mediator. Please note that you are not required to wait for an order appointing a mediator before making this motion. It may be made at any time prior to the expiration of 10 days after the court order appointing a mediator.

    3.    The initial mediated settlement conference must be held within 60 days after either the Notice of Selection of Mediator or the court appointment of a mediator.

    4.    Motion of a party to be exempted from payment of mediator fees due to indigency should be filed with the court within 10 days after the settlement conference has been concluded.

    5.    The mediator shall report the results of the mediated settlement conference on the court-approved form.

    Please note: Attendance at a mediated settlement conference is mandatory. You must comply with the Supreme Court Rules regarding court-ordered mediation. Failure to do so may affect your case or may result in sanctions.

IF THE DOCKETING INFORMATION ON THE REVERSE SIDE OF THIS COVER SHEET INDICATES THAT THIS CASE IS SUBJECT TO ARBITRATION, YOU ARE NOTIFIED THAT AN ARBITRATION HEARING IS REQUIRED IN THIS CASE, AND THAT YOU ARE REQUIRED TO TAKE THE FOLLOWING ACTIONS(S):

    1.    Within 20 days after the filing of the last responsive pleading or the expiration of the time for filing responsive pleadings, the plaintiff, on behalf of the consenting parties, shall file either a "Stipulation of Arbitrator Selection" identifying the choice of an arbitrator or shall notify the court that the parties cannot agree upon an arbitrator by filing a "Request for Appointment of Arbitrator." Upon receipt of a "Request for Appointment of Arbitrator" the court shall appoint an arbitrator from the court-approved arbitrator list.

    2.    The parties may choose an arbitrator who is not on the court-approved list, or who is not certified, only if requirement of Arb. Rule 2(c) are met. The "Stipulation of Arbitrator Selection" form must be completed and signed by the parties and the proposed arbitrator, and approved by the court if the proposed arbitrator is not certified.

    3.    A party must make any motion to exempt or withdraw an action from arbitration at least ten (10) days before the arbitration hearing, and make a showing that (1) the amount of the claim(s) exceeds $25,000; or, (2) the action is expected from arbitration under Arb. Rule 1(a); (3) there is a strong and compelling reason to do so. Please note that you are not required to wait for an order appointing an arbitrator before making this motion.

    4.    The arbitration hearing must be scheduled, with notice to the parties, to begin within 60 days after the filing of the "Stipulation of Arbitration Selection" or "Order Appointing Arbitrator."

    5.    The right to proceed in forma pauperis is not affected by the Rules for Circuit Court Arbitration.

    Please Note: Attendance at an arbitration hearing is mandatory. You must comply with the Supreme Court Rules regarding court-ordered arbitration. Failure to do so may affect your case or may result in sanctions (Arb. Rule 3).

## FOR MANDATED ADR COUNTIES ONLY

Aiken, Allendale, Anderson, Bamberg, Barnwell, Beaufort, Berkeley, Calhoun, Charleston, Cherokee, Clarendon, Colleton, Darlington, Dorchester, Florence, Georgetown, Greenville, Hampton, Horry, Jasper, Kershaw, Lee, Lexington, Marion, Oconee, Orangeburg, Pickens, Richland, Spartanburg, Sumter, Union, Williamsburg, and York

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

You are required to take the following action(s):

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs. (Medical malpractice mediation is mandatory statewide.)

4. Cases are exempt from ADR only upon the following grounds:

   a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

   b. Requests for temporary relief;

   c. Appeals

   d. Post Conviction relief matters;

   e. Contempt of Court proceedings;

   f. Forfeiture proceedings brought by governmental entities;

   g. Mortgage foreclosures; and

   h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute.

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:**    **You must comply with the Supreme Court Rules regarding ADR.**
**Failure to do so may affect your case or may result in sanctions.**