# (State Court Pleadings)

## Supplemental Amendments to Verified Complaint; Summons

STATE OF SOUTH CAROLINA )
                          )   IN THE COURT OF COMMON PLEAS
COUNTY OF DILLON S.C. )
                          )
BEATRICE WEAVER AND       )   CIVIL ACTION COVERSHEET
GARY WEAVER.    Plaintiff(s) )
                PRO SE    )   2014   CP-17-078
         vs.              )
                          )
DILLON DEPT./SOCIAL SERVICES )
ET. DLLA       Defendant(s) )
(Please Print)            )
                              A CERTIFIED TRUE COPY

Submitted By: BEATRICE WEAVER        SC Bar #:
Address: 1253 HARCLETTS BRIDGE       Telephone #:
ROAD, DILLON SC 29536                Fax #:
                                     Other:
                                     E-mail:

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint.

DOCKETING INFORMATION (Check all that apply)
*If Action is Judgement/Settlement do not complete

[X] JURY TRIAL demanded in complaint.   [ ] NON-JURY TRIAL demanded in complaint.
[ ] This case is subject to ARBITRATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
[X] This case is subject to MEDIATION pursuant to the Court Annexed Alternative Dispute Resolution Rules.
[ ] This case is exempt from ADR. (Proof of ADR/Exemption Attached)

NATURE OF ACTION (Check One Box Below)

FILED 2014 MAR 2_ GWEN T. HYATT CLERK DILLON

| Contracts | Torts--Professional Malpractice | Torts--Personal Injury | Real Property |
|---|---|---|---|
| [ ] Construction (100) | [ ] Dental Malpractice (200) | [ ] Assault/Slander/Libel (300) | [ ] Claim & Delivery (400) |
| [ ] Debt Collection (110) | [ ] Legal Malpractice (210) | [ ] Conversion (310) | [ ] Condemnation (410) |
| [ ] Employment (120) | [ ] Medical Malpractice (220) | [ ] Motor Vehicle Accident (320) | [ ] Foreclosure (420) |
| [ ] General (130) | Previous Notice of Intent Case # | [ ] Premises Liability (330) | [ ] Mechanic's Lien (430) |
| [ ] Breach of Contract (140) | 20___-CP-____ | [ ] Products Liability (340) | [ ] Partition (440) |
| [ ] Other (199) | | [X] Personal Injury (350) | [ ] Possession (450) |
| | [ ] Notice/File Med Mal (230) | [ ] Wrongful Death (360) | [ ] Building Code Violation (460) |
| | [ ] Other (299) | [ ] Other (399) | [ ] Other (499) |

| Inmate Petitions | Administrative Law/Relief | Judgments/Settlements | Appeals |
|---|---|---|---|
| [ ] PCR (500) | [ ] Reinstate Drv. License (800) | [ ] Death Settlement (700) | [ ] Arbitration (900) |
| [ ] Mandamus (520) | [ ] Judicial Review (810) | [ ] Foreign Judgment (710) | [ ] Magistrate-Civil (910) |
| [ ] Habeas Corpus (530) | [ ] Relief (820) | [ ] Magistrate's Judgment (720) | [ ] Magistrate-Criminal (920) |
| [ ] Other (599) | [ ] Permanent Injunction (830) | [ ] Minor Settlement (730) | [ ] Municipal (930) |
| | [ ] Forfeiture-Petition (840) | [ ] Transcript of Judgment (740) | [ ] Probate Court (940) |
| | [ ] Forfeiture-Consent Order (850) | [ ] Lis Pendens (750) | [ ] SCDOT (950) |
| | [ ] Other (899) | [ ] Transfer of Structured Settlement Payment Rights Application (760) | [ ] Worker's Comp (960) |
| | | | [ ] Zoning Board (970) |
| | | [ ] Confession of Judgment (770) | [ ] Public Service Commission (990) |
| Special/Complex/Other | | [ ] Petition for Workers Compensation Settlement Approval (780) | [ ] Employment Security Commission (991) |

| | | | |
|---|---|---|---|
| [ ] Environmental (600) | [ ] Pharmaceuticals (630) | [ ] Other (799) | [ ] Other (999) |
| [ ] Automobile Arb. (610) | [ ] Unfair Trade Practices (640) | | |
| [ ] Medical (620) | [ ] Foreign Subpoenas (650) | | |
| [ ] Other (699) | [ ] Motion to Quash Subpoena in Out-of-County Action (660) | | |
| [ ] Sexual Predator (510) | | | |

Submitting Party Signature: Gary Weaver  Beatrice Weaver   Date: March 19, 2014

Note: Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

SCCA / 234 (06/2013)                                          Page 1 of 2

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
) FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON )
) CIVIL CASE NO. 2014-CP-17-78
)
BEATRICE E. WEAVER AND ) SUPPLEMENTAL AMENDMENTS TO
GARY WEAVER, ) VERIFIED COMPLAINT; SUMMONS
)
PLAINTIFFS, PRO SE ) (Non-vehicle Tort)
)
vs. )
)
DILLON DEPARTMENT OF )
SOCIAL SERVICES; AND JACKIE )
ROWLAND; KAREN ENGLISH; )
PANSY PAGE McELVEEN; )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A.; A SOUTH )
CAROLINA CORPORATION; JAMES P. )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE AND )
DEPUTIES JOHNIE MAY SMITH, )
CHADDIE HAYES AND LINDA )
MAIMQUIST; DILLON COUNTY )
EMERGENCY MEDICAL SERVICES, )
FLORENCE VISITING NURSES )
SERVICES, INC, A SOUTH CAROLINA )
CORPORATION; JOHN D. McINNIS; )
AND JOHN DOES 1-10, DOE )
PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10, )
)
DEFENDANTS. ) JURY TRIAL REQUESTED

A CERTIFIED
TRUE COPY

CLERK OF COURT
DILLON COUNTY

FILED
GWEN T. HYATT
2014 MAR 21  PM 1: 58
CLERK OF COURT
DILLON COUNTY

## SUPPLEMENTAL AMENDMENTS TO VERIFIED COMPLAINT

## SUPPLEMENTAL AMENDMENTS TO VERIFIED COMPLAINT

## INTRODUCTION

COME NOW, PLAINTIFFS PRO SE, BEATRICE E. WEAVER AND GARY WEAVER (hereinafter respectively referred to as "Plaintiff(s)"), and file these Supplemental Amendments to the Verified Complaint which was duly and timely filed on February 21, 2014

Following further legal research and review of the original Verified Complaint, this amended pleading is duly and timely filed for good cause, pursuant to Rules 3 – 8 (a), 11, **and Rule 15 (a) SCRCP** which authorizes amendments to pleadings once as a matter of course at any time **before,** or within 30 days after a responsive pleading is served. Pursuant to **Rule 5 (a) SCRCP** Plaintiffs' Supplemental Amended Complaint and Summons are served upon each of the parties of record hereof.

The amendments filed herein relate to the neglect, violations and trespass of statutes, Court Rules and judicial misconduct of Defendants and the Dillon Family Court related to abuse of process and service of process Rules, statutes and the adverse legal consequences and damages thereof for Plaintiffs.

## THE RELEVANT FACTUAL BACKGROUND

1.    The facts and circumstances of this case are discussed at length in **Count 3, (pp.23-34)** of the original Verified Complaint. The following reiterated facts and circumstances are cited relevant to this Supplemental pleading.

2.    On **February 28, 2012,** Defendant Pansy Page executed a sworn Affidavit based on hearsay evidence and misrepresentations of facts filed in support of an Ex Parte Motion for Protective Custody filed in the Dillon Family Court the same day. A second Affidavit citing the same arguments as claimed in the first Affidavit filed by the Defendant was repeated on or about March 1, 2012 and filed in support of a **second Complaint** filed in Family Court by Defendants against Plaintiff Mrs. Weaver, on or about March 1, 2012 **after** the previous abduction of Mrs. Weaver on February 29, 2014.

1

3.    As stated, the said first Affidavit was filed in support of the Dillon Department of Social Services ("DDSS") **Ex Parte Motion for Protective Custody** which was filed with and improperly granted by the Dillon Family Court on **February 28, 2012**, one day before a first DDSS **Complaint and Summons** together with the first Ex Parte Motion had been filed or served on Plaintiffs and Mrs. Weaver abducted on February 29th..

4.    As stated, the day after, on **February 29, 2012**, the DDSS filed the first **Complaint and Summons** at about 11.30 a.m. with the Dillon Family Court.

5.    That same day, on **February 29, 2012** at 5.00 p.m, a team comprising two DDSS personnel, three Dillon county Deputy Sheriffs, and two Dillon County Emergency Medical Service ("EMS") personnel, entered through the locked gates of Plaintiffs' residence **without a warrant,** and presented a "scrambled" copy of the said first Ex Parte Motion, Complaint and Summons to Plaintiff Gary Weaver, the spouse and caregiver of Plaintiff Beatrice Weaver who was present in the residence and the actual subject of the said pleadings.

6.    This event occurred less than five hours following the filing of the first DDSS Complaint and Summons on February 29, 2012, and one day following the filing of the Ex Parte Motion for Protective Custody the day before on February 28, 2012.

7.    At no time during the events that followed the team's intrusion on Plaintiffs' residence, did any member of the said team serve Beatrice Weaver who was present in the residence, with a copy or explanation of the said pleadings, or explain her legal rights to her, or the supposed legal authority and reasons for their abusive forcible actions, while forcibly physically manhandling her, under threat of handcuffs and arrest, abducting her for alleged so-called "protective custody."

8.    That same day, at approximately 7.00 p.m. the DDSS forcibly transported physically disabled and seriously ill Plaintiff Mrs. Weaver double strapped down on a stretcher inside a vehicle, to Defendant Cottonwood Villa ALF in Bishopville 70 miles from Dillon County (in violation of DDSS Rules), under the guard of two deputies who refused to reveal the destination and told her to "be quiet" during the more than one hour trip

9.    The Ex Parte Order for Protective Custody was executed by the Dillon Family Court on February 28, 2012.(and filed on February 29, 2012) <u>one day before the filing of the first Complaint and Summons, and three days before the DDSS second Complaint was filed on March 1, 2012.</u>

2

10.    The DDSS papers filed with the Court were **not served** on the Plaintiffs in accordance with Court Rules and DDSS Rules. **According to the Court's response to Plaintiffs' enquiries, and to the best of Plaintiffs' knowledge, there is no proof of service of any documents filed with the Court by the Deputy Sheriffs.**

11.    The said Ex Parte Order signed on February 28, 2012, one day before the filing of the first Complaint, **incorrectly states that "...the matter is before the Court pursuant to a Complaint and affidavit seeking an ex parte order for protective custody to protect a vulnerable adult."**

12.    **This Court statement was untrue.** The matter was NOT before the Court pursuant to a Complaint that had NOT been filed until the next day. The first Complaint was filed on February 29, 2012 **one day after** the execution of the Es Parte Order on February 28, 2012. The said Complaint and Summons were NOT filed nor captioned before the filing of the first Ex Parte Motion the day before; nor were the said papers noticed, nor properly served on Plaintiffs, and therefore subject to SCRCP and SCFCR Rules and procedures and were not formally nor properly before the Court..

13.    Plaintiffs in this case were denied the protection of Court Rules including for example, **Rule 6 (d), Rule 8 (f) and Rule 7 (b) (2) SCRCP** including denial of the right and opportunity to cross examine and rebut any DDSS witnesses, allegations and evidence cited in hearsay support of the DDSS papers..

14.    There is no evidence in the public records of the case, that there were any Plaintiffs or Defendants witnesses present before the Court at the dock or before the bench, in chambers, or other on February 28 and 29, 2012 for evidence, cross examination, or rebuttal. The Court record is silent on these issues.

15.    On **February 20, 2012** the DSS Case Worker Pansy Page, telephoned Defendant Cottonwood Villa, out of county in Bishopville, and made a reservation for Mrs. Weaver ,**for "a bed"** for occupation on **Saturday, February 25, 2012. This reservation was made in violation of DDSS Rules, and eight days before the Court executed the bogus improper Ex Parte Order for Protective Custody on February 28, 2012, and nine days before the filing and execution of the first Complaint and Summons on February 29, 2012.**

16.    Subsequently, (date unknown) the DDSS Case Worker Page changed the "bed" reservation for February 25, 2012 to the evening of February 29, 2012; the same date the first

3

DDSS Complaint and Summons were filed at 11.30 am. And Mrs. Weaver was abducted on February 29, 2012, some five hours later at 5.00 p.m. The abduction occurred two days after Mrs. Weaver n good faith, had given Defendant Page a gift of a genuine pearl bracelet earlier on February 27, 2012 when she drove Mrs. Weaver to Defendant Wallace's office for a last TB inoculation. Revealing her personal antagonism (or guilty feelings for the pending abduction planned for two days later), towards Mrs. Weaver, Defendant Page ungraciously objected to the gift stating that she was adequately paid for her work. It is now documented that Defendant Page knew since before February 20, 2012 that the DDSS was planning to abduct and incarcerate Mrs. Weaver more than nine days before February 29, 2012, without informing and discussing the situation with Mrs. Weaver or her spouse as required by DDSS Rules as discussed at length in the original Verified Complaint.

17.    The facts and circumstantial evidence of this case, the egregious violations of Court Rules and procedures, the abuse of due process and Court negligence, as discussed herein below, it may be in fact and be inferred there were illegal and improper **ex parte communications** by and between the DDSS Defendants and the Dillon Family Court before, during and following the filing of the DDSS pleadings and papers, to be examined at trial.

18.    The last most relevant fact is the violation of DDSS Rules and statutes relating to the irregular and illegal execution of documents by the DDSS Defendant Page and the officers of Defendant Cottonwood Villa ALF on the evening of February 29, 2102, when the DDSS delivered, registered and formally physically deposited Plaintiff Mrs. Weaver as a patient at the third rate substandard, Cottonwood Villa ALF, in a very small room inhabited by a second very sick bed ridden elder woman.. The said irregularities related to tuberculosis inoculations, physician's report on the health of proposed patients, unknown to the Plaintiffs DDSS committing Plaintiffs to financial obligations and liabilities, and subsequently on March 13, 2102 illegally diverting Mrs. Weaver's social security benefits to DDSS.

## COUNT 1

**The Dillon County Family Court and the Dillon County Social Services Agency Negligently and Willfully Initiated the Case in Violation of Rule 3, SCRCP Denying Plaintiffs' Constitutional Protection of Due Process and Equal Protection of the Law.**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

1.     Plaintiffs reallege and incorporate the pleadings cited herein above and in the original Verified Complaint as if fully set forth herein.

2.     The subject incidents complained of in this action are the direct and proximate result of negligent violation of **Rule 3 (a) and (1) SCRCP** by the Dillon Family Court and DDSS.

3.     Pursuant to **Rule 3 (a)** SCRCP, inter alia, a civil action as in this case, is commenced when the Summons and Complaint are filed with the clerk of Court and are served within the statute of limitations in any manner prescribed by law.

4.     Thus the question arises as to whether or not this case was properly commenced, and served in accordance with the Court Rules. The facts cited hereinabove and discussed in the original Verified Complaint, indicate the negative case to be discussed at trial. Thus, Plaintiffs are denied proper due process on two issues: proper and correct commencement of the action and proper service of process. The former matter is the subject of this count and the latter matter is discussed herein below.

5.     Here the relevant fact is that the Dillon Family Court negligently and improperly commenced the case by granting the DDSS Ex Parte Motion for Protective Custody on February 28, 2012, on three prime grounds:

(1)     The Complaint and Summons **had not been filed** nor **served giving notice** before granting the said DDSS Ex Parte Motion, and therefore the case was **not commenced** under **Rule 3 (a), SCRCP;**

(2)     The Complaint and Summons **had not been served** and **notice not given** Plaintiffs and therefore **not commenced** under **Rule 3 (a) (1), SCRCP** (see below); and;

(3)     From the facts and circumstances it is reasonably inferred that there occurred improper and illegal ex arte communications by and between the DDSS Defendants and the Family Court before and during the commencement of the case.

6.     Case law and the facts support Plaintiffs' contention that the case was not properly commenced pursuant to **Rule 3, SCRCP.** It has been said: "(U)ntil an action is commenced pursuant to Rule 3, **there is no proceeding pending** and therefore nothing to refer ...." Here the case was Ruled to be incorrectly referred to a Master since the Plaintiffs had not filed and served their Summons and Complaint in their action for reformation; hence on several grounds the Master lacked personal jurisdiction of the case. See, **Chabeck vs. Nationwide. Mut. Fire Ins. Co. (1990 app.) 303 S.C. 26, 397 S.E. 2d 786.** Further it has been declared

5

that "(A)n action for claim and delivery was 'commenced' on the date the service of the Summons and Complaint was effectuated ... and subject matter jurisdiction vested in the circuit Court upon commencement of the action." See, **First Palmetto State Bank and Trust Co. vs. Boyles (1990), 301 SC 136, 394 SE 2d 313.**

7.    As noted, the Complaint and Summons in this case were not duly filed nor served on February 28, 2012, the day the Family Court granted the Ex Parte Motion. Case law states that the Family Court lacked personal jurisdiction of the case on several grounds. Accordingly, the Family Court erred and improperly granted the DDSS Ex Parte Motion for Protective Custody since the Court lacked personal jurisdiction of the case that day.

8.    Moreover the Ex Parte Order signed on February 28, 2012, one day before the filing and improper service of the Complaint and Summons, improperly **states that "...the matter is before the Court pursuant to a Complaint and affidavit seeking an ex parte order for protective custody to protect a vulnerable adult.** " This Family Court statement was untrue, and the Court erred and knew and should have known, but negligently failed to diligently check the facts and allegations and failing to examine the hearsay and verity of the affidavits, and failing to determine if any alleged emergency requiring custody actually existed, and not permitting Plaintiffs to file rebuttal or examine witnesses, etc .

9.    As stated, the matter was NOT before the Court pursuant to a Complaint and Summons that had NOT been filed nor served. The first Complaint was filed on February 29, 2012 **one day after** the execution of the Es Parte Order on February 28, 2012 by the Court lacking personal jurisdiction.

10.    Thus, since the said Complaint and Summons were NOT filed nor noticed, nor served on Plaintiffs, under **Rules 3 (a) and (1) SCRCP** the Family Court lacked personal jurisdiction to grant the said Ex Parte Order for Protective Custody. *Ipso facto,* the said Ex Parte Order for Protective Custody of Plaintiff Beatrice Weaver was a bogus, null and void order and completely prejudicial to Plaintiffs in violation of due process.

11.    The above described incidents and events, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the cited Defendants and/ or each of them, and abuse of discretion, due process and violation of law and fact by the Dillon Family Court, which include, but are not limited to those outlined in the respective counts discussed herein and the original Verified Complaint.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 2

### Improper Service of Process Was Prejudicial to Plaintiffs and Negligent Denial of Constitutional Due Process and Equal Protection of the Law.

For a separate and distinct claim for relief, Plaintiffs allege as follows:

12.     Plaintiffs re-allege and incorporate paragraphs 1-11 as if fully set forth herein.

13.     As stated herein above, **Rule 3 (a) (1) SCRCP** requires that the civil action is commenced when the Summons and Complaint are filed and are served in any manner prescribed by law. **Rule 4 (a) SRCP** requires that Plaintiffs (Defendant DDSS in this case) shall issue a Summons and copies shall be served upon each Defendant (Plaintiff Beatrice Weaver in this case). **Rule 5 (a) SCRCP** provides for service of pleadings and other papers shall be served on each of the parties of record. **Rule 5 (a) (1)** requires service of **written orders** which means the bogus Ex Parte Order for Protective Custody that was "served" the day after it was improperly granted by the Dillon Family Court which lacked jurisdiction of the case and authority over Plaintiff Beatrice Weaver (then Defendant). Under this Rule ex parte motions properly granted by a Court with jurisdiction of the case are not required to be served. **Rule 5 (d) SCRCP** provides that the Summons and Complaint shall be filed before service.

14.     Defendants flagrant irregular violation of at least these Rules, creates at least three issues to be faced at trial:

1.     As noted in Count 1 herein above, Defendant DDSS's failure to file and serve the Summons and Complaint under **Rule 3 SCRCP** on February 28, 2012 when the Family Court improperly granted Defendant DDSS the said Ex Parte Motion for Protective Custody, means no formal legal commencement of the action occurred, the Family Court was not vested with personal jurisdiction and authority, and thus the said Ex Parte Motion was null and void, of no legal effect, and seriously prejudicial to Plaintiffs particularly under the Sheriff's threat of arrest for non compliance with a bogus Court order in violation of Court authority...

2.    Incorrect service of the Court papers to the named Defendant's spouse (Plaintiff Gary Weaver) instead of the named Defendant Mrs. Weaver (Plaintiff Beatrice Weaver herein, who was present) of a bunch "scrambled" papers that were copies of the pleadings.

3.    The short unreasonable 5 hour timing and incorrect manner of delivery of the Summons and Complaint to Defendants (Plaintiffs herein), denied the named receiving party Mrs. Weaver an opportunity to file an Answer to the Complaint (and rebuttal of the Ex Parte Motion), as required by **Rule 7 (a) SCRCP; and** also denied Plaintiffs the opportunity to examine and rebut the evidence and witnesses before the Family Court.

4.    Failure to serve the Summons, Complaint and the ex parte motion on the named Defendant (Plaintiff Beatrice Weaver herein) on February 28, 2012, invalidated the Family Court's jurisdiction and Order, thus rendering the Deputy Sheriffs' demand to Plaintiffs for immediate compliance under threat of arrest of Court authority for refusal, to be null and void, damaged and prejudiced Plaintiffs.

15.    Service of the Summons: **Rule 4 (a) SCRCP** requires that the Summons shall be issued by Plaintiffs with copies of the original served upon each Defendant, and the Summons and Complaint shall be served together.

16.    As noted, Plaintiffs herein allege that the lack of service of the Defendants' pleadings and ex parte motion prior to February 28, 2102, the date the Family Court Order for Protective Custody, was granted, invalidated the said Ex Parte Order because the Family Court was not vested in jurisdiction.

17.    Case law supports this allegation: Service of the Summons brings a civil Defendant within the Court's jurisdiction, and gives the Court the power to render personal judgment against the person served. See, **Louden vs. Moragne (S.C. App. 1997) 327 SC 465, 486 SE 2d 525.** A Summons is not a mere notice, but a means for giving jurisdiction to the Court, and unless it is waived, the Court cannot otherwise obtain personal jurisdiction. See, **Brown vs. Evatt ( S.C. 1996) 322 SC 189, 470 SE 2d 848.** A judgment is void, if a Court acts without personal jurisdictional. See, Ex Parte S.C. Dept. of Revenue (S.C. App. 2002) 350 SC 404, 566 SE 2d 196.

18.    Clearly under case law, in the absence of a filed and served Summons on February 28, 2012, the Family Court lacked jurisdiction of the case. The Court lacked the power to

render personal judgment when it improperly granted the DDSS Ex Parte Order on February 28, 2012 pursuant to the Court's stated claim that "the matter was before the Court." It was not before the Court because a Summons and Complaint had not been duly and timely filed nor served on or before February 28, 2012. Nor did Plaintiffs waive any requirements related to filing or service of the Summons, and did not demonstrate any intent to submit to the Court's jurisdiction at any time, even under threat of arrest, and did not "appear" before the Court prior to incarceration in the substandard Defendant Cottonwood Villa ALF facility on February 29, 2012 the day following the improper granting of the Ex Parte Order.

19.    No proof of service on or before February 28, or even next day on the 29th, 2012 was filed with the Court by the Deputy Sheriff who threatened Plaintiffs with arrest for ignoring Court authority and non compliance with a bogus null and void Court order, on February 29, 2012, the day after the granting of the bogus order.

19.    The above described violations of due process and equal protection of the law,  and non compliance with Court Rules by Defendants and each of them and the Dillon Family Court, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the cited Defendants and/ or each of them, and abuse of discretion, process and violation of law and fact by the Dillon Family Court, which include, but are not limited to those outlined in the respective counts discussed herein and the original Verified Complaint.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth

## COUNT 3

**Defendants Negligence, Violations And Failure To Comply With The "Due Process" Requirements For Filing And Service In The Court Rules Of Civil Procedure, Lack Of Court Jurisdiction And Authority Discriminated And Arbitrarily Denied Plaintiffs Reasonable Notice And To File An Answer Damaged And Prejudiced Plaintiffs.**

For a separate and distinct claim for relief, Plaintiffs allege as follows:

20.    Plaintiffs re-allege and incorporate paragraphs 1-19 as if fully set forth herein.

21.    **Rule 5 (a) SCRCP** refers to service of orders and motions. In this case we are dealing with an Ex Parte Motion followed by an Ex Parte Order improperly granted by a Court

9

lacking jurisdiction and authority since the Complaint and Summons had not been filed or served at the time the Court processed the ex parte motion which is a paper filed subsequent to required service of the Complaint and Summons. **Rule 5 (a) (3) SCRCP** provides that a written **ex parte motion** may be heard by the Court without being served upon the party of record, Mrs. Weaver in this instant who lacked any notice of any pleadings or other papers. As noted above, the Family Court granted an Ex Parte Order for Protective Custody, a "written order" requiring filing and service pursuant to **Rule 5 (a) (1) SCRCP**

22.    So here we have an ex parte motion that may be and was in fact heard without prior service or notice, and an ex parte "written order" that requires service, issued by a Family Court without being vested in personal jurisdiction or the power to hear any motion including an ex parte motion before filing and service of the Complaint and Summons, and without the jurisdiction or power to issue any written order, including an ex parte order where pleadings and said papers were improperly served by Deputy Sheriffs one day later and after an unreasonable five hours following the subsequent filing of the Complaint and Summons. Abuse of due process is palpable..

23.    **Rule 5 (b) (1) SCRCP** defines "service" of pleadings and other papers as delivering or mailing a copy of the papers to a party and/or his attorney to their last known address or leaving it with the clerk of Court. Delivery means handing a copy of the papers to the party or his attorney, leaving it at their office or person in charge, or in a conspicuous place therein, or at his dwelling place or abode with some person therein of suitable age and discretion

24.    **Rule 6 (d) SCRCP** provides that a written ex parte motion may be heard without service. Significantly, this Rule further provides that when a motion is supported by an affidavit as in this case of the said ex parte motion filed with the Family Court, an opposing affidavit by Mrs. Weaver may be served on Defendants not later than two days before the hearing of the motion. Since there was no Court record of any Court hearing on the ex parte motion, Mrs. Weaver was arbitrarily and prejudicially denied the opportunity for rebuttal and prevention of her forcible abduction into so-called and completely unnecessary surprise "protective custody", without prior notice of any kind.

With respect to the DDSS" alleged need for "protective custody", in rebuttal to the DDSS mistaken allegation the following incidents are noted : On February 27, 2012 two days before the February 29, 2012 abduction and incarceration of Mrs. Weaver by DDSS, that

10

immediately following the completion of the last TB "shot" administered to Mrs. Weaver by Dr. Wallace's nurse "Nicole"and when nurse "Peggy" came out to the car parked at the building entrance, and patted Mrs. Weaver on her arm and strangely said "good bye." At about 2.30 p.m., Defendant Page then drove Mrs. Weaver to her hair dresser ("the Salon") for a "perm" at 3.00 p.m. and left. Later, she was returned home by a friend of Mrs. Weaver's at about 5.00 p.m. Clearly Mrs. Weaver was competent and in control of her life and not a "vulnerable adult in imminent danger of exploitation:, a fact that should have been known to Defendant Page. Being of sound mind, the demand for Mrs. Weaver's "protective custody" was a DDSS fraud, condoned by a negligent, indolent and apathetic Family Court.

25.    On the basis of flimsy factually unfounded documentation, the Family Court should not have arbitrarily denied without further exploration of the ex parte motion, Plaintiff Mrs. Weaver the opportunity to submit timely affidavits, documents or other testimony and rebuttals opposing an unnecessary and contrived bad faith and malicious ex parte motion for protective custody. The motion was granted on the basis of unfounded and inadmissible hearsay and undocumented allegations. DDSS provided no documented facts in support of their motion and there was certainly no demonstrated "emergency" requiring an ex parte motion for incarceration of Plaintiff Mrs. Weaver. Moreover, as discussed in the original Verified Complaint, there was clear personal resentment and animosity towards Mrs. Weaver on the part of Defendant Page and the DDSs senior officers. The Family Court erred and should not have granted the motion. Under the circumstances, it is reasonable for Plaintiffs to claim abuse of process. See, Dedes vs. Strickland SC 1992) 414 SE 2d 132.

26.    **Rule 5 (b)(3) SCRCP** provides that a proposed **order** submitted to the Court, shall be served on all counsel of record at the same time and by the same means. **Rule 5 (d) SCRCP** requires that the Complaint and Summons be filed before service, and **proof of service** shall be filed within ten days after service of the Summons and Complaint. **Rule 4(g) SCRCP** requires proof of service by the Sheriff be made "promptly" and by way of a certificate to the party issuing the paper. **No proof of service of the invalid pleadings and ex parte order was filed in this case with the Family Court or DDSS within ten days or after February 29, 2012.** Here again we have further abuse of due process.

27.    **Rule 7 (a)** SCRCP requires that there shall be a Complaint and an Answer. Service of process in this case was such, that Mrs. Weaver was denied the opportunity to file a timely Answer as required by Rule 7 (a).

28.    With respect to **Rule 7 (b)** SCRCP governing motions, Plaintiffs submit that the Ex Parte Motion for Protective Custody and the supporting Affidavits were factually incorrect, inadmissible hearsay; and undocumented as to allegations and claims. Defendants violated and failed to comply with the "due process" requirement in the Rules of civil procedure for Defendant DDSS to state with proven particularity the grounds therefor, and negligently processed by the Family Court as discussed herein above.

29.    Plaintiff Mrs. Weaver received no prior discussion with DDSS as required by its Rules, nor notice of the pleadings served on February 29, 2012 just five hours after filing of the Complaint and Summons, and one day and five hours after the granting of the bogus Ex Parte Custody Order  Such insufficient unreasonable notice was a surprise and shock, demonstrably prejudicial  to Plaintiffs, .If Plaintiffs had received appropriate and reasonable notice they would have done something different than adhering to the Sheriffs threats of arrest, thereby affecting the Family Court's ill advised granting of <u>the ex parte motion which for good cause was summarily dismissed some twelve days later upon subsequent rebuttal motion and affidavits of Plaintiffs.</u> Plaintiffs claim DDSS fraudulent allegations  of vulnerability and imminent danger caused extreme prejudice and damages as a result of Defendants failure to comply with the Rules of procedure as discussed herein See, **Chastain vs. Hiltabidle (SC App. 2009) 581 SC 508, 673 SE 2d 826**

30.    The above described violations of due process and equal protection of the law,  and non compliance with Court Rules by Defendants and each of them und the Dillon Family Court, were a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the cited Defendants and/ or each of them, and abuse of discretion, process and violation of law and fact by the Dillon Family Court, which include, but are not limited to those outlined in the respective counts discussed herein and the original Verified Complaint.

   **WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.**

12

<u>COUNT 4</u>

**Defendants Refused Plaintiffs Numerous Requests for Medical and Other Related**
**Records of the Case and Falsified Records in Deliberate Willful and Flagrant**
<u>**Violation of State Statutes and Agency Rules**</u>

For a separate and distinct claim for relief, Plaintiffs allege as follows:

31.    Plaintiffs re-allege and incorporate paragraphs 1-30 as if fully set forth herein.

32.    During the period February 29, 2012 to the present date, in accordance with rights provided under State statutes and Agency Rules, Plaintiffs filed numerous requests for medical and related records from Defendants, all of which have been ignored or denied in violation of the law.

33.    Said requests for medical records were filed as follows, to be documented at trial:

1.    Plaintiff filed some four separate written and several verbal requests to DDSS for case records pursuant to the rights cited under the statutes and Agency Rules. Defendants Rowland and English the Director and Manager respectively of DDSS, both refused to provide the requested records to this present date. Moreover, the said Defendants refused to recognize, accept and honor the duly notarized power of attorney granted Plaintiff Gary Weaver by his spouse Plaintiff Beatrice Weaver for whom he was then and remains the full time caregiver. Said Defendants referred the final written request for release of the case records to the S.C. Attorney General Office in an apparent attempt to avoid responsibility and accountability for reasons yet to be determined during discovery and presented at trial.

2.    Similarly, Defendants Dillon Internal Medicine Associates and Dr. Wallace have repeatedly ignored and denied several requests to provide medical records of the case, and falsified and/or committed errors and omissions in the records.

3.    Defendant Cottonwood Villa ALF has ignored some eight written requests for case records.

4.    The Dillon County Sheriff's Office and the Emergency Medical Service have also refused to provide answers to written requests for records and reports. However the Sheriffs' formal report on their activities on February 29, 2012 **blatantly lied** that Mrs. Weaver walked to get on the stretcher to be strapped down by the burly EMS officers. Mrs. Weaver was dragged out of her bed by the three Sheriffs. Under the unexpected surprise, shock and terror of threatened arrest and handcuffs if she resisted, she wanted to resist and

13

was in pain unable to walk because of her two bad hips and severely damaged spine. She was dragged by the 3 Sheriffs and the 2 EMS officers, bare footed and in her underwear only.

34.    The respective requests for Defendants' records and reports were filed by Plaintiffs pursuant to SC Code 1976 Ann. As Amended. Sections 40-47-110 (B) 9-18; 23; 25; Sect. 43-35-45 (D); Section 43-35-25. Further, Defendants were referred to the said Code, Chapter 81, Regulations, Reg. 81-10; 81-11; 81-60; and 81-204.

35.    Defendant DDSS's Refusal to Provide Case Records: In letters dated May 31, 2013, March 9 and May 30, 2012, Plaintiffs respectfully requested the DDSS officers to promptly provide the case information and records cited therein, and additional requests: These requests were filed pursuant to the cited State statutes in paragraph 34 above, and DSS Rule 405 (03),et alia. Additional requests for data were presented pursuant to SC Code 1976 Ann. Section 43-35-45 ( D ) 1-5.

36.    DDSS Rule 405.03 provides, inter alia, that the DDSS will conduct a comprehensive evaluation and write a report to cover the items addressed in SC Code 1976 Ann. Section 43-35-45 ( D )  Under this DDSS Rule, a  copy of the said report will be provided to the Court, the guardian ad litem and the attorney for the client at least five working days before the merits hearing held of March 12, 2012  Plaintiffs were repeatedly denied a copy of this report which has not been received to this date.

37.    Pursuant to the cited laws, DDSS was requested to provide a copy of the DDSS Case Report that was to be presented to the Family Court on or before March 5, 2012, within five working days, prior to the merit hearing held on March 12, 2012. This was refused.

38.    In February 2012, prior to the forced incarceration of Mrs. Weaver in Cottonwood ALF, Defendant Dr. Wallace's office was requested by an unidentified party , believed to be DDSS Defendant Pansy Page, m to test Mrs. Weaver for tuberculosis. Defendants have refused to identify the unknown party or why the order was made for the TB inoculations to be administered to Mrs. Weaver who thought they were just part of regular medical service provided by the medical office. Plaintiffs posed the following requests and questions to Defendants which they have repeatedly refused to answer:

A.    Please provide a copy of the order to Dr. Wallace requesting the said TB test.

B.    Please provide a copy of the notice to Mrs. Weaver of the legal and/or regulatory requirement for the said TB test.

C.    Please provide a copy of the Federal and State health Rules and regulations relating to the requirement that tuberculosis (TB) immunization tests and shots (and any others) are required of patients prior to entry for protective custody in "locked" institutions such as Cottonwood Villa ALF.

D.    Please provide a copy of the DDSS notice to Cottonwood ALF that the said TB test (and any others that may be required) was taken and the results.

E.    Please provide a true copy of any record/report of the TB test that your office filed with any third party.

39.    On or about November 11/12, 2011 the DDSS office was apparently notified by Dr. Wallace's office requesting contact with Plaintiff Beatrice Weaver. (Presumably this request was filed pursuant to SC Code 1976 Ann, Section 43-35-25.). Pursuant to the cited statutes and Rules, the following request was made by Plaintiffs and refused by DDSS:

A.    Please identify and inform Plaintiffs of the source and send a copy of any initial written notice/request from said source submitted to the DDSS office.

40.    On or about November 15, 2011 the DDSS Case worker Ms. Pansy Page came to Mrs. Weaver's residence, accompanied by a Deputy Sheriff. She introduced herself and DDSS to Mrs. Weaver who thought it was some kind of non government organization offering assistance with transportation to medical appointments.. The DDSS intentions or purposes were never discussed with Mrs. Weaver who was asked to sign a form of which she requested a copy and never received from DDSS.. Plaintiffs requested the following records from DDSS which were refused:

A.    Please provide a copy of the DSS Form that Ms. Page had Mrs. Weaver sign.

B.    Please provide the name of the Deputy Sheriff who accompanied Ms. Page.

41.    Plaintiffs requested DDSS for records relating to the DDSS Redirection of Mrs. Weaver's Social Security Payments to its office in Dillon after the Court hearing on March 12, 2012 when DDSS Complaint and Ex Parte Order were dismissed..:

A.    Please provide a copy of the required Social Security Administration forms, etc., that DSS submitted to the Social Security Administration on or about March 13, 2012 for redirection of Mrs. Weaver's social security payments to the DDSS office. The actual check issued to Mrs. Weaver was picked and delivered to Plaintiff Weaver by the Pastor of Pyerian Church who personally drove to the DDSS at the request of the Court appointed

15

attorney Ms. Wall. The mailing address had been changed to the DDSS Dillon office address. This request for the information on this matter was ignored

42.     DDSS Transportation Services:. DDSS provided transportation for Gary Weaver to and from Cottonwood ALF in Bishopville when his car was in the mechanic shop for repairs, to McCloud Hospital in Florence on two occasions relating to his four bypass heart surgery, to Florence Darlington Technical College with Mrs. Weaver, and to Dr. Wallace's office on several occasions on February 13, 15, 24, and 27, 2012 relating to Mrs. Weaver's TB inoculations. DDSS was requested and refused as follows:

A.     Please provide a record of all of the transportation services that your office provided both Beatrice and Gary Weaver.

B.     Please show the destinations, and the date/time to and from the destinations

43     Other DSS Services for Mrs. Weaver;

In addition to the said transportation services, which wee the only services offered Plaintiffs, under its Rules DDSS was required to provide and/or offer other services to Mrs. Weaver which it neglected to provide:

A.     Please list the additional services provided and / or offered or should have been offered to Mrs. Weaver as an alleged "abused, neglected and vulnerable adult in imminent danger," pursuant to the federal and state laws.

B.     Please provide a copy of the Dr. Wallace referral for physical therapy dated November 14/15 2011, that was picked up by Defendant Page at the Wallace Registration desk and did NOT inform Mrs. Weaver of its existence at any time. In short, the referral was intentionally kept by Defendant Page from Mrs. Weaver who knew and should have known of Mrs. Weaver's need for the physical therapy for her ailments, and Defendant Page deliberately damaged and prejudiced Mrs. Weaver in violation of DDSS Rules and statutes. Clearly, she did not want a third party physical therapist, to evaluate Mrs. Weaver.

44.     DDSS was requested and refused to provide copies of any and all correspondence and communications (letters, memoranda, notes, emails, phone call records, etc) TO AND FROM Dr. Wallace and Dillon Internal Medicine Associates with the DDSS office and personnel, for the period November 1, 2012 to the present date relating to Mrs. Weaver.

45.     Visiting Nurses:   Defendant Page cited reports from Visiting Nurses in her sworn Affidavits attached to the Ex Parte Court Order filed on February 28, 2012, and the two

16

Complaints DDSS filed with the Family Court on February 29, and March 1, 2012. Plaintiffs requested the following concerning the Visiting Nurses inadmissible hearsay evidence: Plaintiffs requested the following information which was refused by DDSS:

    A.    Please provide a copy of the said Visiting Nurses Reports.

    B.    Who ordered/requested the Visiting Nurses to visit Mrs. Weaver, and provide a copy of the order.

        (Note: This Defendant incorrectly claimed that they visited Mrs. Weaver on November 8, 2011. This was not physically possible for several reasons. The day before, Ms. Weaver had a severe accident at M.U. S..C. Hospital in Charleston, on November 7, 2011. On November 8, 2011 the next day, Mrs. Weaver was bed ridden in her residence, which was behind a locked front gate which was closed the previous evening by a witness who drove Mrs. Weaver home from. MUSC in Charleston. Since there was no one present at the house on November 8, 2011 and Mrs. Weaver was bed ridden, who opened the locked 20 foot wide front gate to the property, to admit the Visiting Nurses as claimed. The Nurses report cited in the Affidavits to the DDSS complaints, were incorrect or fraud.

46.    <u>Cottonwood Villa ALF:</u> was requested no less than eight times in writing for information related to the Period Feb. 29, 2012 through March 12, 2012 when Plaintiff Beatrice Weaver was incarcerated against her will and that of Plaintiff Gary Weaver, which fact was made known to Cottonwood officers and staff. The requests were:

    A.    Please provide a copy of the detailed billing for costs and expenses of Mrs. Weaver's brief stay at Cottonwood Villa ALF in Bishopville from Feb. 29, 2012 to March 12, 2012 that was presented to DDSS for payment. (Note: This is required for presentation of testimony to the State Legislature's new Joint Committee on Aging)

    B.    Please provide a copy of any report the DDSS office filed with Cottonwood relating to the TB test given to Mrs. Weaver by Defendant Dr. Wallace's office.

47.    Defendants above described violations and non compliance with statutes and Agency Rules governing the availability of case and medical records and information requested by Plaintiffs pursuant to the law, Medicare and Dept. of Health Rules, are a major denial of the constitutional due process and equal protection of the law rights and privileges by Defendants and each of them. The damages inflicted thereby on Plaintiffs are a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors

17

and omissions of the cited Defendants and/ or each of them, which include, but are not limited to those outlined in the respective counts discussed herein and the original Verified Complaint.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 5

### Failure To File And Serve The Complaint And Summons Rendered The Prior Ex Parte Motion Null And Void; The Family Court Lacked Personal Jurisdiction, Abused Discretion and Engaged In Ex Parte Communications With DDSS In Violation Of The Judicial Code Rule 501 (6) & (7)

For a separate and distinct claim for relief, Plaintiffs allege as follows:

48.    Plaintiffs re-allege and incorporate paragraphs 1-47 as if fully set forth herein.

49.    It has been documented herein above and in the original Verified Complaint that the Dillon Family Court granted an Ex Parte Motion for Protective Custody on February 28, 2012 when the Court lacked personal jurisdiction and authority since the Complaint and Summons in the action had not been filed, served and any verbal nor written notice has been given to Plaintiffs. .

50.    As noted herein above, the Court granted the said ex parte motion based on affidavits from Defendant: DDSS Case worker Ms. Page which cited hearsay reports from Defendant Visiting Nurses, and a hearsay Memorandum from Defendant Dr. Phil. Wallace. Both affidavits contained factual errors and omissions, and inadmissible hearsay "evidence," all of which were incorrectly cited by the Family Court as justification for granting the said ex parte motion, and incorrectly stating that "...the matter was before the Court" since the Complaint and Summons had not been filed, served, or given notice to Plaintiffs. And there is no proof of service filed with the Court.

51.    As claimed above, the Family Court knew, and should have known, that it was not vested in personal jurisdiction, power and authority over Plaintiffs. The Rule governing personal service of process serves at least two purposes; it confers personal jurisdiction on the Court, and assures the Defendant of reasonable notice of the action. See, B.B.& T vs. Taylor (S.C. 2006) 369 SC 548, 633 SE 2d 501.

18

52.    Moreover, both Plaintiffs strongly objected to the pleadings and the ex parte order for protective custody, when improperly served on them, and only complied with the order under threat of arrest and handcuffs ("shall put you in chains") for alleged contempt of Court authority threatened by the Deputy Sheriffs who forcibly abducted Plaintiff Mrs. Weaver into custody against her will and objections. Both Plaintiffs made it very clear that they did not wish or intend to conform to the custody proceedings and the Court papers. They only complied with the order under threat of arrest, duress and stress caused by the surprise, shock and lack of any notice of the unexpected intrusion on the privacy of their property and persons.  Courts decide on a case by case basis whether a Defendant's act demonstrates intent to submit t the Court's jurisdiction. See, **Stearns Bank Nat. Assoc'n vs. Glenwood Falls L.P. (S.C. App. 2007) 373 SC 331, 644 SE 2d 793.** Plaintiffs' actions in this case clearly demonstrated their reluctance and wish not to submit to the Court jurisdiction in the matter of unsubstantiated allegations of " abuse, neglect and vulnerability and imminent danger" of Mrs. Weaver.

53.    The facts and circumstances of this case, raise questions as to the Family Court's actions and decisions in deciding the ex parte matter presented by DDSS on February 28, 2012 prior to filing and a five hour service of a first Complaint and Summons and granting the ex parte order on February 29, 2012, followed thereafter by a second Complaint filed the next day on March 1, 2012.

54.    As noted and Plaintiffs allege herein above, the facts and circumstances indicate an inference that the Family Court engaged in improper ex parte communications with DDSS based on the judicial standards promulgated in **Rule 501. Judicial Conduct, Sect. 3 B. (7).**

55.    It is difficult for Plaintiffs to envision a diligent, efficient, responsible, informed and experienced Family Court ordering a serious forcible intimidating abduction into custody of a disabled, 88 year old elder women quietly minding her own business at home, by a surprise unannounced team of seven government persons including three Deputy sheriffs and two burly E.M.S. officers, entering her property and invading her privacy without a warrant, and unceremoniously dragging her out of her bed by her hands and feet, in her underwear, dumping her on a stretcher and strapping her down in her bare feet, without any prior notice of the intentions of the Court and the DDSS Agency.,

19

56.    Moreover Plaintiffs allege that the Family Court was dilatory and negligent in not properly nor definitively verifying the actual facts and circumstances (not an independent investigation) of the DDSS' inappropriate and undocumented allegations of abuse, neglect, vulnerability and imminent danger of Mrs. Weaver. These were very serious allegations with serious adverse long term consequences and hardships for Plaintiffs. Apart from some irrelevant inadmissible hearsay statements in two misleading and inaccurate, possibly fraudulent affidavits, the DDSS provided no real or substantive evidence of "abuse, neglect, vulnerability and imminent danger". There was no evidence or demonstration of any "emergency" requiring ex parte Court proceedings, evidenced by Mrs. Weaver's visit to her hairdresser on February 27, 2012, driven there by Defendant Page two days previous to the abduction on February 29, 2012 which DDSS had already planned and not informed Mrs. Weaver. These DDSS unsubstantiated claims to the Court were an undocumented figment of their imagination and fiction, which Plaintiffs claim were perpetrated with malice aforethought, bad faith and bad will towards Mrs. Weaver. Based on the conversations, experience and relationship with the officers of DDSS, Plaintiffs allege the reasons had nothing to do with the alleged need for "protective custody" but were bias and prejudice on the basis of race, sex, religion, national origin, disability, age, and other similar factors such as cultural and personality differences and incompatibility. For example, Plaintiffs cite the demonstrated resentment Defendant Page exhibited towards Mrs. Weaver through the simple act of physically assisting her into an out of the seat of the automobile she drove to transport Mrs. Weaver to her medical appointments. Instead of exhibiting gentleness and understanding of her physical handicaps, Defendant Page was routinely "rough" and resentful in helping Mrs. Weaver to get into and out of the car seat ignoring her painful hips and spine afflictions.

57.    A proper diligent Court proceeding and proper investigation of the serious matters of "protective custody" and "imminent danger", etc., conducted by the Court properly conforming to the Rules of Procedure as to acquiring jurisdiction and confirming the evidence and facts of the matter, as cited herein, would have revealed the actual and correct facts of the case in advance and prevented the Family Court from its abuse of discretion, errors and omissions of facts and law and causing damages and prejudice to Plaintiffs. For example, the Family Court (and DDSS) neglected to examine the quality of service at the

20

Defendant Cottonwood Villa ALF facility, and the financial consequences of the proposed "protective custody", and the financial impact on Plaintiff Beatrice Weaver confronted with paying some $1,500 per month with a $518 social security income, to a third rate substandard facility in a culturally incompatible social and service environment, notwithstanding other financial obligations and liabilities with limited income. Potential inevitable forced dispossession of her property is clearly evident, and an incentive to interested parties.

58.    Plaintiffs hold the Dillon Family Court responsible and accountable for its negligent violations of the Court Rules as cited herein, and Rule 501 for Judicial Conduct that could have been avoided with timely and informed, diligent conduct of Court proceedings.

59.    **Rule 501 Sect. 3. B (6)** provides that a Judge shall require lawyers in proceedings before the Judge, to refrain from manifesting by words or conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age and other similar factors against parties, witnesses, counsel or others, which includes Plaintiffs herein. The Family Court made no attempt in this regard and could have with proper appropriate conduct of Court proceedings, before the unnecessary forcible and irresponsible abduction took place.

60.    **Rule 501 Sect. 3. B (7)** provides that a Judge shall accord to every person who has a legal interest in a proceeding, the right to be heard according to law. A merits hearing scheduled 40 days after the issue of the ex parte order for custody provides for a hearing. But as it is often stated: "Justice delayed is justice denied." which in this case was the fact for Mrs. Weaver who was forced to undergo incarceration conditions that were inimical to her well being and health and a physical and mental burden on an disabled elder women residing in a "locked" and guarded alien environment by abusive staff..

61.    Court proposed incarceration for 40 days in a "locked" and guarded substandard facility comprised of 99 % culturally incompatible black patients and 99 % abusive black staff who stole her personal items and food and confiscated her medicines, confined in a small bedroom shared with one other very sick elderly woman who never spoke to her, with a small bathroom smelling of urine shared with three other inmates in an adjacent room, served uneatable "cultural food", and denied timely delivery of medicines, is punishment, not a safe, healthy haven for an alleged abused, neglected and vulnerable elder woman. The only "imminent danger" to Mrs. Weaver emanated from the culturally incompatible facility where she was incarcerated by a negligent DDSS with malice and bad faith, condoned by a

21

negligent Family Court which never even examined the adverse conditions of the facility it ordered Plaintiff Mrs. Weaver forcibly abducted to, by abusive Deputy Sheriffs, transported 70 miles out of Dillon County when other more accessible "unlocked" facilities were available in Dillon and adjacent counties such as Florence.....

62.    All of these adverse conditions and deleterious psychological stress and physical impact on Plaintiff Mrs. Weaver could have been responsively avoided if the Family Court had conducted its judicial duties in a reasoned and responsible way by conducting proper judicial process in accordance with the Rules of procedure and pursuant **to Rule 501 for Judicial Conduct**. Mrs. Weaver was a person with a legal interest in the DDSS proceedings and had a right to be heard in accordance with law that was timely and not prejudicial to her well being as a disabled, intelligent, educated elder lady known and should have been known by DDSS and the Family Court. Furtive, secretive, and evasive legal, illegal and procedural manipulations and collusive activities including improper ex parte communications, are the very definitions of bad faith, and malice removing Defendants from immunity from civil suits as in this case.

63.    Pursuant to **Rule 501. B (7) (e)** a Judge may initiate or consider any ex parte communication when expressly authorized by law to do so. In this case the Family Court engaged in ex parte communications with respect to the DDSS ex parte motion which was not properly before the Court because the Complaint and Summons had not been filed nor served. The case was not before the Court which lacked personal jurisdiction. So by definition the Court's adjudication of the ex parte motion involved engaging in ex parte communications with DDSS without the presence, knowledge or notice, for Plaintiff Beatrice Weaver. The question is, under the circumstances and facts, whether the ex parte communications between the Court and DDSS were "expressly authorized by law to do so."

64.    **Rule 501 B. (7)(a)** is an exception for ex parte communications dealing with administration matters. Pursuant to **Rule 501 (7)** governing judicial conduct, within certain restricted exceptions, a Judge shall not initiate, permit or consider ex parte communications , or consider other communications made to the Judge, outside the presence of the parties concerning a pending or impending proceeding. There were no "emergencies" that dealt with substantive matters or "issues on the merits" to justify ex parte communications. It is self evident, <u>that the only way the Family Court could consider granting the ex parte motion</u>

22

"outside the presence of the parties (Mrs. Weaver)" before the filing and service of the Complaint and Summons, was with ex parte communications with DDSS persons. The ex parte matter was not properly before the Court, and any communications were ex parte, which the Court and DDSS knew and should have known.

65.    Pursuant to a footnote to **Rule 501 (7) (Code p.363)**, "(T)o the extent reasonably possible, all parties or their lawyers, shall be included in communications with a Judge. The said footnote states: "...a Judge must discourage ex parte communication and allow it only if all the criteria stated in Section 501. 3 B(7) are clearly met. A Judge must disclose to all parties all ex parte communications described in Section 501 3 B (7) (a) and (b) regarding a proceeding pending or impending before a Judge.

66.    In this case, the facts and process history clearly show that the Family Court Judge did not discourage the ex parte communications and the exceptions criteria did not exist allowing for ex parte communications in an impending case, since the Complaint and Summons had not been filed or served and the matter was not before the Court.. Plaintiffs were denied the privilege of being informed of the ex parte communications and motion, which under the circumstances was a "right" denied by the Family Court and DDSS.

67.    Given the serious nature of the DDS ex parte motion, it is doubtful that the Judge could reasonably believe "... that no party will gain a procedural or tactical advantage as a result of the ex parte communication" under **Rule 501 (7)(a)(i)**, to authorize and justify ex parte communications or granting the ex parte motion, in the absence of a formal hearing on issues on the merits and without the presence of Mrs. Weaver, a party of interest.

68.    Further, **Rule 501 (7)(a) (ii)** permits ex parte communications if the Judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond. No such provisions were made in this case. The ex parte motion matter was conducted with ex parte communications and without Mrs. Weaver's knowledge or response, or participation or notice, and this Rule forbids ex parte communications without accommodations to a party pursuant to the Rule.

69.    **Under Rule 501 Section 3 B. (7)**, a Judge must not independently investigate facts in a case, and must consider only the evidence presented, **(Code FN, p.364)**. The only evidence of record considered in this case by the Family Court, were two affidavits attached to two Complaints, comprised of inadmissible hearsay evidence with possible fraud, and without the

attendance in Court of the parties submitting the said affidavits. There is no evidence in the Court record in support of the DDSS allegations of any "abuse, neglect and vulnerability and imminent danger" to Mrs. Weaver. Plaintiffs fault the Family Court for its dilatory consideration of the evidence, errors of fact and law and abuse of discretion which was not properly researched and verified by the Court. Witnesses should have been called, examined and cross examined, Plaintiffs should have been given notice and instructed to appear and given the opportunity to rebut the DDSS undocumented allegations. The Family Court knew and should have known, that all of such normal and customary Court process under the Rules of procedure should have taken place without the Court "independently investigating facts"

.70.    This honorable Court is respectfully requested to examine the evidence, facts and circumstances of the handing of this case by DDSS and the Family Court,, and decide any actions that may be appropriate pursuant to the **Judicial Code Rule 501. Section 3 D. Disciplinary Responsibilities.**

71.    The damages inflicted on Plaintiffs by the Family Court, the cited affidavits, the abuse of discretion, violation of due process, and ex parte communications, are a direct and proximate result of the negligent, onerous, wanton, reckless and malevolent acts and/or errors and omissions of the cited Defendants and/ or each of them, which include, but are not limited to those outlined in the respective counts discussed herein and the original Verified Complaint.

WHEREFORE, for good cause, Plaintiffs pray judgment against the Defendants, and each of them, jointly and as is hereinafter set forth.

## COUNT 6

## Summary and Conclusion

For a separate and distinct claim for relief, Plaintiffs allege as follows:

72..    Plaintiffs re-allege and incorporate paragraphs 1-71 as if fully set forth herein.

73    Plaintiffs public purposes of the original Verified Complaint and this Amended Complaint are to promote responsible transparency and accountability in government agency activities that are operating with impunity outside the scope of general public knowledge or any apparent oversight surveillance. In keeping with the admonishment of Thomas Jefferson

24

in the U. S. Declaration of Independence, that whenever any form of Government becomes destructive of the ends of democracy it is the Right of the People to alter or to abolish it, and to institute new Government and it is their Right, it is their Duty, to throw off such Government, and to provide new Guards for their future Security, in this case, based on their experience presented in the Complaints, Plaintiffs submit that it is their public duty and right in the interest of protecting the future security of the elder community, to attempt to alter and abolish the deleterious and injurious way the local government agency Defendants conduct their business relating to the elder community in this County.

74.    As a public duty, Plaintiffs have three main objectives for consideration of the Court and the Jury; viz:

1.    To seek redress for the documented civl and possibly criminal wrongs perpetrated against Plaintiffs by the Defendants and the Dillon Family Court and each of them.

2.    To request the Court and the Jury to impose severe punishment, sanctions and appropriate measures against Defendants and the Dillon Family Court as a lesson to each of them respectively, and to send a clear strong message and deterrent to the government agencies and private sector interests that operate and provide services to the elder community, especially the defenseless members who cannot or are unable to protect themselves against abusive regulatory actions..

3.    To publicly and openly inform the Courts and the general public, and to hold Defendants and the Dillon Family Court publicly responsible and accountable for their irregular, negligent, egregious abusive legal, regulatory and services activities. Public transparency is appropriate to their sinister, furtive collusive violations of the Rule of Law, statutes and Court and Agency rules and related adverse unconstitutional activities perpetrated by the Defendants and the Dillon Family Court. Demonstrably, these violations by Defendants were undertaken in bad faith and with malice aforethought, acting outside the rules with impunity or fear of official or public repercussions, under the cloak of statutory immunity from civil prosecution granted for acts of service, ostensibly in good faith, which did not exist in this case..

75.    Plaintiffs' effort to inform the public by filing this case, is supported by a recent statement published in the Dillon Herald referring to efforts to improve government

25

transparency. See, Bill Rogers, Executive Director of the S.C. Press Association, "Letting the Sun Shine on Government is Vital to Our Free Democratic System," The Dillon Herald, March 18, 2014, p.4A. This article thanks the citizens who believe they have a right to know how their money is being spent, and how decisions that impact them are being made. It thanks public officials who believe in open government and have open meetings, release public documents and understand that openness builds public trust. Thus, for example, by repeatedly refusing to release records, documents and information to Plaintiffs according to their right, Defendant DDSS clearly does not subscribe to this school of thinking. Plaintiffs submit on the basis of documented facts and Plaintiffs experience, that DDSS operates in the dark behind closed doors without openness or communication in its dealings with its elders. The local Sheriffs do not hesitate to use force under threat of arrest to man handle a defenseless disabled elder women with forcible abduction and do not hesitate to violate the rules of court procedure in doing so.

76.    Plaintiff Beatrice Weaver has personal experience and is familiar with government agency abuses. Plaintiffs' Complaints allege and claim that Defendants' demonstrated arrogant, egregious severe, furtive and deliberateabuses of Rules, process and service of process. In this case Mrs. Weaver recognizes Defendants violations characterize the same unexpected procedural surprises, shock, mental and physical abuses perpetrated by certain dictatorial foreign powers, which by law may not exist in the U.S.A. Abusive foreign government systems were emulated by Defendants, and the Dillon Family Court in their treatment of Plaintiff Beatrice Weaver.

The offensive stressful emotional and physical abuses, perpetrated by certain foreign government agencies arrogantly violated the due process and civil rights of their citizens, and discriminated on the basis of race, national origin, sex, age, and disability ( as defined under the U.S. Constitution and Federal laws). These foreign government sponsored violations of civil rights and privileges were blatantly, secretively, furtively and collusively repeated against Mrs. Weaver by the Defendants and a cooperative, negligent Family Court. The abusive legal and regulatory practices enumerated herein are antagonistic to this country's historic adherence to the Rule of Law violated by Defendants named herein. For example, the lack of any prior notice or discussions of their intentions as required by the DDSS and

Family Court Rules, discriminated against Mrs. Weaver and denied her equal protection of the law.

77.    A modern democratic society is judged by its treatment of children, elderly and disabled citizens, Plaintiffs claim that Defendants collectively, individually and collusively severely violated the privacy, dignity, intellect and well being of intelligent educated elderly Plaintiffs in this case. The Family Court and DDSS were in flagrant and negligent violation of the DDSS Rules which specifically require regulatory services in conformity with the usual and customary, social and cultural environment that are compatible with specific members of the elder community in their care.

78..    Plaintiffs respectfully submit that the Defendants' documented legal violations, intrusion and ill treatment of the elderly in this case, and a malevolent intent to dispossess her of her possessions, need to be curbed; that it is necessary for this honorable Court and jury with punitive damages and other relief to send a very clear and convincing message to the Dillon Family Court, government agencies and officials, and private sector parties, who deal with the elderly, that the privacy, dignity and well being of elder persons must be respected and promoted at all times as mandated by the State's laws, and especially DDSS Agency Rules for dealing with the elderly citizens. For example, in this case we have a Family Court not vested with personal jurisdiction because of violations and ignoring of Court Rules of Procedure for filing and service of process, where Deputy Sheriffs using a bogus ex parte Court Order that is null and void and lacking authority, forcibly removed a disabled elderly lady out of her bed and under threat of arrest forcibly incarcerating her in a remote sub standard culturally and socially alien "locked" facility. Further, five hours between filing and service of a Complaint and Summons and enforcement of a bogus ex parte order summarily removing a victimized party from her residence without a warrant or any prior notice, is unreasonable and fixes an unfair burden against the elder who is denied the opportunity to even get dressed, or make necessary and suitable arrangements for any such abduction. Such arbitrary violative Court, legal and regulatory practices must be stopped. Significant punitive damages and other sanctions and disciplinary measures imposed on each of the Defendants are the appropriate tool for that purpose. What was the urgency?

79.    Accordingly, as a public duty for the benefit of future elderly citizens of this community, Plaintiffs respectfully request this honorable Court and the jury to severely punish Defendants for their gross procedural and regulatory transgressions in this case.

80.    The question remains as to the **ulterior motives** for Defendants to have Mrs. Weaver removed, under alleged "emergency imminent danger", from her comfortable upscale convenient residence into "protective custody" at a substandard "locked" facility located some 70 miles away from her husband who they knew and should have known was temporarily without personal transportation. Plaintiffs claim that the unspoken motive was to dispossess Mrs. Weaver of her possessions and specifically of her residence, in which case criminal charges would be in order.

81.    The unexplained administration of TB inoculations through a car window while Plaintiff Beatrice Weaver was sitting in a car outside the entrance to Defendant Wallace's office was a pre-meditated collusive first step in a sinister play by the cooperating Defendants to deprive Mrs. Weaver of her possessions as described further in the original Verified Complaint. The question remains: why did Defendant Wallace not allow his patient to come into his office to have medical treatment administered properly since Mrs. Weaver was perfectly capable of walking into the office. Part of the answer is that while Plaintiff Mrs. Weaver was receiving a TB shot out in the car, Defendant Page was in Defendant's office to pick up his February 24, 2012 Letter addressed to Whom It May Concern that the Family Court improperly relied on in part for incorrectly granting the Ex Parte Motion Ordering protective custody for Mrs. Weaver.

## COUNT 7
### Relief

For a separate and distinct claim for relief, Plaintiffs allege as follows:

82.    Plaintiffs reallege and incorporate paragraphs 1- 81 as if fully set forth herein.

83.    For good cause, for relief as requested in the original Verified Complaint in Count 29 (p.133).

84    For **Actual, Special, General and Civil Damages** in such amounts as shall be shown at trial, as specified in Count 29 of the original Verified Complaint (pp.133,134) and pursuant to Code Sect.43-33-540 and Sect. **16-5-10.20 and 60** for constitutional violations.

85.    For severe **Punitive Damages** in the amounts to be shown at the time of trial and that the Court and jury deems just and proper under the circumstances of this case as a significant deterrent to Defendants, their employers, employees and others dealing with the elderly community, and to encourage and promote commitment to the strict adherence and fidelity to the Rule of Law in legal and regulatory proceedings related to the elderly community...

86.    Further relief deemed appropriate by the Court sufficient to deter Defendants from further abuses of the elderly

87.    Decide any actions that may be appropriate to apply to the Dillon family Court, pursuant to the **Judicial Code Rule 501. Section 3 D. (1-3) Disciplinary Responsibilities.**

DATED: Dillon, S.C. March 20, 2014,

_____
Beatrice Weaver, Plaintiff Pro Se

_____
Gary Weaver, Plaintiff Pro Se.

## VERIFICATION

PERSONALLY APPEARED, Gary W. Weaver, who, first being duly sworn, deposes and says:

A.    My name is Gary W. Weaver, a resident at 1253 Harllees Bridge Road, Dillon S.C. 29536, spouse and full time caregiver of Beatrice E. Weaver a Plaintiff Pro Se in the above captioned action.

B.    I am a Plaintiff Pro Se in the above captioned action.

C.    I have read the foregoing PLAINTIFFS' SUPPLEMENTAL AMENDMENTS TO ORIGINAL VERIFIED COMPLAINT, and SUMMONS and know the contents thereof and the same are true to the best of my knowledge, except as to the matters therein stated to be on information and belief, and as to those matters I believe them to be true.

_____
Gary W. Weaver, Plaintiff Pro Se

Sworn to and Subscribed
Before me this 18th
Day of March 2014.

_____
Notary Public for South Carolina;
My Commission expires: 2-8-16

A CERTIFIED TRUE COPY
CLERK OF COURT
DILLON COUNTY

FILED
GWEN T. HYATT
2014 MAR 21 PM 1:50
CLERK OF COURT
DILLON COUNTY

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
                        )   FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON        )
                        )   CIVIL CASE NO. 2014-CP-17-78
                        )
                        )   SUMMONS
BEATRICE E. WEAVER AND  )
GARY WEAVER,            )
                        )
           PLAINTIFFS,  )
                        )
              vs.       )
                        )
DILLON DEPARTMENT OF    )
SOCIAL SERVICES; AND JACKIE )
ROWLAND; KAREN ENGLISH; )
PANSY PAGE-McELVEEN;    )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A; A SOUTH )
CAROLINA CORPORATION; JAMES P. )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE AND )
DEPUTIES JOHNIE MAY SMITH, )
CHADDIE HAYES, AND LINDA )
MAIMQUIST; DILLON COUNTY )
EMERGENCY MEDICAL SERVICES, )
A SOUTH CAROLINA CORPORATION; )
FLORENCE VISITING NURSES )
SERVICES, INC, A SOUTH CAROLINA )
CORPORATION; JOHN D. McINNIS; )
AND JOHN DOES 1-10, DOE )
PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10. )
                        )
           DEFENDANTS.  )   JURY TRIAL REQUESTED
_____)

**TO THE DEFENDANTS ABOVE NAMED:**

**YOU ARE HEREBY SUMMONED**, and required to answer the Supplemental Amendments to Verified Complaint in this action, a copy of which is hereby served upon you, and to serve a copy of your Answer to said Supplemental Amendments to Verified Complaint on the subscribers at their address at 1253 Harllees Bridge Road, Dillon S.C. 29536, within thirty (30) days after the service hereof, exclusive of the date of such service; and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Supplemental Amendments to Verified Complaint.

_____

BEATRICE E. WEAVER, Plaintiff Pro Se

_____

GARY WEAVER, Plaintiff Pro Se

DATED:      Little Rock, S.C. March 12,, 2014

8.    If it stands alone, this subsection is sufficient grounds for granting a change of venue to Florence County.

9.    Case law permits the court to grant a change of venue to a county in a different judicial circuit outside of Dillon County, mitigating the requirement specified in Code Section 15-7-110 to transfer the case to a county within the same judicial circuit...

10.    Code Section 15-7-100 (3) authorizes the court to grant a change of venue when the convenience of witnesses and the ends of justice would be promoted by the change.

11.    Case law states that where there is a showing of convenience of witnesses, such constitutes a prima facie showing that the ends of justice would be promoted by the change.

7.    Plaintiffs submit that there is good cause to grant a change of venue for trial in Florence County based on sufficient reason to believe a fair and impartial trial cannot be held in Dillon County, that the convenience of witnesses and the ends of justice as grounds for the said change have been demonstrated.

8.    Finally, the facts of this action are complex and complicated in the context of the statutes authorizing a change of venue for trial, such, that plaintiffs must rely on the discretion of the court in exercising its statutory power to grant a change a venue as requested to Florence County to promote the ends of justice.

## Relief

.    For good cause, movant respectfully submits that given the facts, the law and argument cited herein above, that the Court exercise its judicial discretion, and grant Plaintiffs' Motion for Change of Venue to Florence County.


Respectfully submitted.

Gary Weaver, Plaintiff Pro Se

DATED:    Little Rock S.C., May 7, 2014
Copy to:    Defendants

STATE OF SOUTH CAROLINA  )  IN THE COURT OF COMMON PLEAS
              )  FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON     )
              )  CIVIL CASE NO.  2014-CP*.-17-078
              )
BEATRICE E. WEAVER AND  )  AFFIDAVIT OF GARY WEAVER;
GARY WEAVER,      )  EXHIBIT H
              )
    PLAINTIFFS,   )
              )
     vs.     )
              )
DILLON DEPARTMENT OF   )
SOCIAL SERVICES; AND JACKIE )
ROWLAND; KAREN ENGLISH;  )
PANSY PAGE-McELVEEN;   )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A.; A SOUTH  )
CAROLINA CORPORATION; JAMES P.  )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND  )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE AND )
DEPUTIES JOHNIE MAY SMITH, )
CHADDIE HAYES, AND LINDA  )
MAIMQUIST; DILLON COUNTY  )
EMERGENCY MEDICAL SERVICES, )
A SOUTH CAROLINA CORPORATION;  )
FLORENCE VISITING NURSES  )
SERVICES, INC, A SOUTH CAROLINA  )
CORPORATION; JOHN D. McINNIS; )
AND JOHN DOES 1-10, DOE   )
PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10,  )
              )
    DEFENDANTS.   )  JURY TRIAL REQUESTED

FILED
GWEN T. HYATT
2014 JUN -2  PM 4:00
CLERK OF COURT
DILLON COUNTY

*A CERTIFIED
TRUE COPY*

*CLERK OF COURT
DILLON COUNTY*

## AFFIDAVIT OF GARY WEAVER

   GARY WEAVER, Plaintiff Pro Se in the above entitled action, being first duly

sworn upon his oath, herein after "Affiant", deposes and says as follows:

1

1.      On February 28, 2012, Counsel for DDSS filed the Ex Parte Motion for Protective Custody, based on the improper hearsay and factually incorrect sworn Affidavit of DDSS Case Worker Pansy Page; said Affidavit was based by DDSS Counsel, DDSS, and the Family Court on an improper misleading, factually incorrect, ambiguously addressed, informal, unsworn hearsay letter from Defendant Wallace dated February 24, 2012, and on hearsay evidence of Defendant Visiting Nurses cited by said Pansy Page, and misleading incorrect factual misrepresentations of said Defendant Pansy Page as to the alleged facts claiming undocumented, unproven abuse, negligence, vulnerability and imminent danger of Plaintiff Beatrice Weaver. Defendant Wallace is an unqualified gerontology and gerontology forensic physician.

2.      The said DDSS Ex Parte Motion was filed by DDSS counsel, and granted a' priori by Family Court, one day before DDSS filed the formal Complaint and Summons on February 29, 2012. Thus there was no matter properly before the court's jurisdiction. Pursuant to Rule 7 SCRCP the said Ex Parte motion should have been filed a' posteriori after the filing and service of the Summons and Complaint pursuant to Rules 1, through 8, 65 and 81 SCRCP. Accordingly the said Ex Parte motion could not be granted in retrospect as a result of improper court procedures known and should have been known by DDSS Counsel and the Court. Hence Plaintiffs herein were negligently, willfully and knowingly denied their Federal and State constitutional rights to due process and equal protection of the law by both the court and the DDSS Counsel.

3.      Plaintiffs allege herein that these facts raise reasonable questions as to the improper court procedures and non compliance by the Family Court and DDSS Counsel contrary to DDSS rules, state statutes and the rules of SCRCP and SCRFC which both knew and should have known existed and had to be complied with in processing procedures for DDSS mis-guided compulsory protective custody in violation of Plaintiffs objections.

4.      **State Statutes**:
        SC Code 1976 Ann. Section 43-35-45 states that the DDSS will conduct a comprehensive evaluation and write a report to cover specified items cited in the statute, to be provided within five days of the merit hearing date. This report was not filed with any of the specified parties specified in the statute. In addition to violating the statute and

2

the DDSS in-house rules, Plaintiffs were denied the opportunity to study the report preparatory to participation in the merits hearing on March 12, 2012.

5. **DDSS Rules**:

    **1.**    **Rule 405.03** provides for a **"Merits Hearing"** within forty (40) days after the ill advised DSS Ex Parte Order was improperly executed by the Family Court on the basis of inadmissible hearsay evidence, improper procedures and incorrect facts...

    **2.**    **Rule 405.03** further provides that the Dept. will conduct a comprehensive evaluation and write a report to cover the items addressed in **SC Code 1976 Ann. Section 43-35-45 ( e )**. A copy of the said report will be provided to the Family Court, the guardian ad litem and the attorney for the client and the client upon request, at least five working days before the merits hearing on March 12, 2012.

    **3.**    At the request of Plaintiff Gary Weaver, the merits hearing was held on March 12, 2012, The DDSS failed to provide the said report required by the statutes.

6. **SCRFC Rules**:

    Both the Court and DDSS counsel willfully, knowingly and negligently violated SCRFC rules and procedures:

    **1**    **SC Code 1976 Sect. 15-9-20** (repealed 19850 provided that a summons in Family Court shall be issued pursuant to Rules 3 & 4 SCRFC; ( see foot note), Rule 3 SCRCP refers to forms and Rule 4 has been "reserved."

    **2.**    **Rule 2 SCRFC** does not specifically refer to ex parte motions or complaints for protective custody per se. **Rule 2(c) SCRFC** provides that procedures for "other actions" shall be provided by statute, which would include protective custody actions.

    **3.**    **Rule 6 (e) SCRFC** provides, inter alia, that the DDSS counsel shall advise the clerk of court to note on the motion calendar all requests for appearance on preliminary motions and other matters requiring a summary hearing before a family court judge, and the Family Court motion calendar shall contain the case number, date of request, name of the action, attorneys involved and the nature of the motion to be presented.

    **4.**    **Rule 6 (g) SCRFC** provides that failure to comply with the requirements of this Rule 6 shall subject the person so failing to penalties as for contempt of court,

which contempt shall be enforced by the court on motion of any aggrieved party or by the court on its own motion. **Plaintiffs submit that the DDSS counsel did not comply with this rule and is subject to contempt of court penalties pursuant to Rule 6 (g) SCRFC.**

5.    **Rule 7 SCRFC** provides that certain documents and written statements shall be admissible in evidence without requiring that persons or institutions issuing the documents or statements be present in court. Thus, **Rule 7 (c) SCRFC** provides that the written statement by a physician showing that a patient was treated at certain times and the type of ailment shall be admissible in evidence without the physician be present in court. Similarly, **Rule 7 (d)** SCRFC provides that the DDSS or other agency reporting the home investigation or any other report required by the court shall be admissible in evidence in court without the DDSS being present in court.

6.    In this case, Defendant Wallace did not issue a written statement showing that Plaintiff Beatrice Weaver was treated at certain times and the type of ailment. The physician's written letter cited by DDSS and the Family Court for granting the protective custody was inadmissible under Item 7 ( c ) as it was procured in anticipation of litigation and regulatory processing by DDSS and NOT for the purpose of treating Plaintiff Beatrice Weaver, and was of a self serving nature. See, **Cook vs. Cobb, (1978) 271 SC 136, 245 SE 2d. 612.** Moreover Item 7 ( c ) of SCRFC Rule 7 contemplates a written statement to the court showing the mere fact of medical treatment, without requiring the physician to be present in court; it was not intended to encompass written statements concerning controverted diagnosis of medical conditions. See, **S.C. Dept. of Social Services, vs. Flemming, (1978) 271 SC 15, 244 SE 2d517.** Moreover, the physician's statement constituted an implied not specific diagnosis of a medical condition which was a dispositive issue in the case. Together with the DDSS hearsay documents and the cited undocumented Visiting Nurses reports in the DDSS Affidavits, these hearsay documents were inadmissible as evidence and denied plaintiff Weaver the constitutional right to cross examine critical witnesses, file affidavits, motions, etc.

7.    In Family Court it has been stated that written affidavits and reports generally constitute inadmissible hearsay evidence, with some exceptions, although they may become admissible in whole or in part when a proper foundation is laid by a

witness's testimony. See. **Ex Parte Morris (SC 2006) 367 SC 56, 624 SE 2d 649 rhg dnd.** This was not the situation in this case. No proper foundation was laid for hearsay evidence by any of DDSS witnesses who were by rule not required to appear at the court hearings on the ex parte motion first incorrectly filed without notice to plaintiffs, and the pleadings filed subsequently. And Rule 7 SCRFC was not intended to supplant the substantive rules of evidence, which was the case here. See **DDSS vs. Flemming, op cit.** The DDSS counsel and the Family Court knew or should have known of these evidentiary and procedural transgressions, and ignored them.

8.    **Rule 8 SCRFC** provides that upon retention of counsel in a family court proceeding, the counsel shall immediately notify the court, and opposing counsel, if any, of his appearance, with name and address, etc. In this case, the Counsel for DDSS did not immediately notify the Plaintiffs herein of his retention by DDSS and his appearance in the Case. Said counsel prepared pleadings and filed the DDSS pleadings with the court on February 28 and 29, 2012 without notice or the knowledge of Plaintiffs herein. This was also a violation of the DDSS rules requiring that patients must be kept informed all times of its actions. **Keeping Plaintiffs herein ignorant of their actions and intentions, constituted bad faith violations on the part of the DDSS and its counsel.**

9.    The question arises, *arguendo*, as to whether or not the DDSS intent of the said ex parte motion for protective custody was filed by DDSS for permanent application as opposed to being a temporary relief pending a 40 day merits hearing on a complaint that had not been filed or served on February 28, 2012 the date the motion was filed, Rule **21 (a) SCRFC** provides for Motions for Temporary Relief: A hearing date as specified by the rule may be fixed by order of the court. In an emergency situation, such order may be made on ex parte application. **Rule 21 (b)** provides for evidence at the specified hearing for temporary relief be confined to pleadings, affidavits, and financial declarations. Service of Affidavits under Rule 21 SCRFC need not be served on opposing parties prior to the temporary hearing.

10.    **DDSS Bad Faith Improper Court Procedures Based on Unproven Facts, Inadmissible Hearay,and Undocumented Allegations of Mrs. Weaver's Alleged Abuse, Neglect, Vulnerability and in Imminent Danger of Exploitation.**

A.    Given the facts and circumstances of the case, the proper procedure for DSS was to file for a Family court **warrant** to investigate the situation pursuant to **S.C. Code Sect. 43-35-45 (A)** which can be issued by the Court upon a showing of probable cause that the vulnerable adult has been abused, neglected, or exploited or is at risk of abuse, neglect or exploitation.. The problem here is that DDSS never tried to obtain consent from Plaintiffs to conduct any investigation, and in fact had open cooperative and unrestricted access and contact at any time with Plaintiffs, and in violation of DDSS rules never at any time informed plaintiffs that they were investigating or planning to take any action for protective custody of Mrs. Weaver..

B.    Where a proven vulnerable adult is at substantial risk to be or has been proven to be abused, neglected and vulnerable to exploitation, and consent to protective services cannot be obtained, pursuant to **Code Sect. 43-35-45 (B)**, the DDSS may petition the court for an order to provide emergency protective services by way of expedited ex parte relief "to any extent necessary to protect the vulnerable adult" without the consent of the plaintiffs. The court can so order if it determines that there is probable cause to believe that by reason of abuse, etc. there exists an imminent danger to the vulnerable adult's life, or physical safety.

C.    In summary the pre-conditions for the issue of an ex parte court order granting emergency protective custody include: lack of consent to an investigation of alleged abuse, etc.; lack of access to the adult in question; the need to show probable cause of abuse, etc.; proof that there has in fact been abuse, neglect, vulnerability and imminent danger of death or physical safety; **issuance of a warrant to enter premises based on probable cause;** and in conformity with the statutes and rules of SCRCP and SCRFC and DDSS. None of these pre-conditions existed as confirmed by the Family Court in dismissing the DDSS complaint for permanent protective custody at the merits hearing on March 12, 2012m with prejudice.

D.    In this case, DDSS motives and actions relating to its petition for protective custody were highly irregular regulatory procedures; a fact anecdotally confirmed by Plaintiffs in conversations with professional social services personnel.

E.    DDSS filed an Ex Parte Motion for Protective Custody on February 28, 2012 without prior notice to Plaintiff Beatrice Weaver or her spouse. The said motion

was filed and improperly granted by the Family Court one day before DDSS filed its Complaint on February 29, 2012 in violation of Rule 7, SCRCP governing motions and the pre conditions of SC Code Sect. 43-35 -45 (A) (B). A motion (including an ex parte motion) cannot be granted if the matter (subject and personal jurisdiction) is not before the court by way of summons and complaint having been timely filed and served. SC Code Sect. 43-35-45 (B) does not specify that DDSS is exempt from complying with SCRCP rules for motions. And DSS did not prove any emergency situation or abuse, etc., and mis-led the Family Court in its allegations sworn affidavits of unproven claims...

11.     The said Ex Parte motion was NOT filed on the basis of an emergency by the Dillon County Sheriff pursuant to DDSS rules and S.C. Code 1976 Ann. Sect  43-35-55. Moreover, the said motion was NOT filed by DDSS counsel as a Temporary Restraining Order under Rule 21 SCRFC which in addition to SC Code Sect. 43-35-45, is the only procedural avenue for DDSS and the Family Court to issue an order on an ex parte motion. The ex parte motion was intended for permanent application and NOT filed on an emergency basis by the sheriff or DDSS, and the ex parte procedure was not precluded under Code Sect. 43-35-45 (B) from compliance with SCRCP for the issuance of a motion, summons or complaint. Thus, the said motion was not permissible for filing on an ex parte basis, which would mean that the motion could not be heard without the notice or presence of Plaintiffs herein. Moreover as noted, the motion was not properly before the court on February 28, 2012 when it was improperly granted by the court.

12.     **Rules 1-8, 65 and 81, et al, of the SCRCP** govern the conduct of the Family Court in addition to its own rules as cited herein.

13.     **Rule 65 SCRCP** provides that no <u>Temporary Restraining Order shall be granted without Notice of motion for the order</u> to the adverse party unless it clearly appears from specific facts shown by affidavit or by a verified complaint, that immediate and irreparable injury loss or damage will result to the applicant before notice can be served and a hearing had thereon. In this case, there is no injury, damage or loss to DDSS as the applicant. **Rule 65 (f)(1) SCRCP** provides that no <u>Remedial Writ</u> (example, an Ex Parte Order for Protective Custody), shall be granted without  notice of motion for the writ to the adverse party, which notice shall be served together with the summons and complaint in the event no summons and complaint have previously been filed and served

in the action, upon the adverse party pursuant to Rules 4 and 5 SCRCP. Such notice shall be supported by affidavit or verified complaint setting forth clearly the facts entitling the moving party to such writ. The adverse party (Plaintiffs herein) shall plead to the complaint and respond to such motion in the time prescribed by these rules for other civil action. Defendants Wallace and Visiting Nurses hearsay statements were not notarized.

14.    In this case, as stated herein above, DDSS filed an Ex Parte Order for Protective Custody **before** filing a Summons and Complaint which was improperly granted by the Family Court. The subject matter and persons were not properly before the court for jurisdiction on February 28, 2012, and no notice, summons or complaint had been filed and served on Plaintiffs herein on or before February 28, 2012... Pursuant to Rule 65 SCRCP it is stated in the "Notes" to the rule, that an action may no longer be commenced by the service of an order (as in this case) or a "rule to show cause", only. Rule 65 makes it clear that the various remedial writs are not causes of action but remedies or relief, the right to which must be supported by the law and the facts which was not the case here. No "emergency" was cited to the court by DDSS or Sheriffs.

15.    At 5.00 p.m. at the end of the day on February 29, 2012 the Defendants Dillon County Deputy Sheriffs served plaintiff Gary Weaver herein with a copy of the said Ex Parte Motion for Protective Custody without prior notice, together with a "scrambled" copy of a summons and complaint which were filed in court that morning, one day after the filing of the Ex parte motion the day before. Not having received prior notice of any such papers being filed, Plaintiff Gary Weaver asked the Sheriff what would be the consequences if he refused to obey the Ex Parte Order since it was procedurally filed and served without prior notice for response, incorrectly. The Deputy Sheriff informed plaintiff Gary Weaver that if he refused to comply with the court order to which he objected on various grounds, that he would be in contempt of court and would be arrested on the spot for impeding the course of justice. Weaver objected to that explanation but under duress, unwillingly complied notwithstanding his objections. On that point it has been stated in case law that a party who refuses to abide by an injunction entered by a court would be in contempt of court subject to sanctions, and the proper procedure to determine whether a party should beheld in contempt of court is to bring a summons and a rule to show cause. See, **Grosshuesch vs. Cramer, (SC 2008) 377 SC**

12, 659 SE 2d 112 **Plaintiff Gary Weaver was denied proper constitutional due process and equal protection of the law, and coerced to comply with the bogus improper Ex Parte court order under threat of immediate arrest in handcuffs.**

16.    The sheriff was not acting here in an emergency situation pursuant to SC **Code Sect. 43-35-55.** His effort to take protective custody of Mrs... Weaver was by way of enforcement of a bogus ex parte court order improperly filed and granted by the Family Court, and was not the unilateral action of the sheriff under Sect. 43-35-55,

17.    Clearly the law, cited rules, the facts and circumstances document Plaintiffs claims herein that DDSS, their counsel and the Family Court, negligently, willfully and knowingly violated Plaintiffs Federal and State constitutional rights to due process and equal protection of the law, in bad faith and malice..

7.    **SCRCP**

1.    **Rule 1, SCRCP** provides that the rules govern the procedure in all courts of the State of a civil nature as cases in law or in equity. This includes Family Court.

2.    **SC Code 1976, Sect. 15-9-10 and 20,(repealed in 1985); Rules 3 (a) and 81,** SCRCP, provide that a civil action is commenced when the summons and complaint are filed with the clerk of court as prescribed by law.

3.    Authority for filing this complaint and court jurisdiction is obtained pursuant to **Rule 81 SCRCP** which provides that the SCRCP rules shall apply insofar as practicable in family court to the extent that they are not inconsistent with the statutes and rules governing the court. In any case where no provision is made by statute or the SCRCP rules, the procedure shall be according to the practice as it has heretofore existed in the courts of this State. **Since the family court rules provide no reference to filing and service of ex parte motions for protective custody, the complaint and this motion rely on the SCRCP and statutes as may be applicable as discussed herein.**

4.    **Rule 4 (a) SCRCP** provides that copies of the original summons shall be served upon each defendant in the form and manner provided by **Rules 4 (b) & (d) SCRCP. Rule 4 (g) SCRCP** provides that failure to make proof of service does not affect the validity of the service. **Rule 4 (j) SCRCP** requires that no other proof of service shall be required when acceptance of service is acknowledged in writing and signed by the person served or his attorney, and delivered to the person making service.

9

The acknowledgement shall state the place and date service is accepted. No such acknowledgment of acceptance was executed by Plaintiffs who vociferously objected and thus no proof of service was properly filed by the sheriff with the clerk of court.

5.  Rule 5 (a) SCRCP provides that all (1) written orders; (2) pleadings subsequent to the original summons and complaint , etc; (3) written motions other than ones which may be heard ex parte; (4) written notices; (6) appearances; and (11) other similar papers shall be served upon each of the parties of record. Rule 5 (b)(3) SCRCP provides that any party providing a proposed order or other paper to the court for its consideration in any pending matter shall serve the same on all counselors of record at the same time and by the same means. Rule 5 (d) SCRCP provides procedures for filing the summons and complaint, proof of service and other papers within specified time limits. The summons and complaint shall be filed before service of all papers such as the ex parte motion.

6.  Rule 6 (d) SCRCP provides for filing applications for an ex parte motion for good cause. When the motion is to be supported by affidavit it shall be served with the motion. This rule sets the time limits for service of the motion, affidavit and response by the adverse party. Here, plaintiffs herein were denied the opportunity to file and serve reply affidavits to the ex parte motion of which no notice was given by DDSS.

7.  Rule 7 (a) SCRCP. stipulates the procedure for commencing a lawsuit as in this case by DDSS, stating that there shall be a complaint and an answer, etc, and no other pleading shall be allowed subject to certain exceptions which did not apply in this case.

8  Rule 7 (b) SCRCP provides for the filing of motions for an application for an order such as the said DDSS ex parte order for protective custody, which is not referred to in SCRFC. The ex parte motion must be filed after, and not before the filing and service of the complaint and summons, in the absence of which as stated above, the court lacks jurisdiction of the subject matter and person, thus negating any a' priori ex parte motion filed and granted before filing and serving the pleadings, notwithstanding the absence of any notice to plaintiffs; (violation of due process)

9.,  DDSS failed to file a summons and complaint before the filing of the ex parte order; there was no notice of the said order provided Plaintiffs herein; there was no

temporary retraining order filed; the "evidence" DDSS filed with the court was undocumented, inadmissible and hearsay; and there was no "emergency" filing by the Sheriff office pursuant to the DDSS rules. Plaintiffs were denied the right to respond to the ex parte motion and complaint and to cross examine critical witnesses before Mrs. Weaver was taken into protective custody and incarcerated in a third rate "locked" facility. DDSS failure to provide any notice of the motion and pleadings was done in bad faith and in violation of DDSS rules to keep patients fully informed etc of their doings. The Sheriff did not receive any written acceptance of service of the ex parte motion and pleadings and vociferously objected to by Plaintiff Gary Weaver, and the sheriff was unable to comply with **Rule 4 (j) SCRCP** and file written proof of service with the court clerk. Affiant claims that the Family Court judge abused his discretion and violated the facts and the law of the case. The Court should not have accepted the hearsay evidence at face value and procedural violations which was judicial mis conduct and negligence. The court should have conducted judicial due diligence on the facts and procedures, sufficient to justify granting an un founded ex parte motion complaint and summons.

10.    In summary, with respect to perpetrating improper code, court and regulatory procedures as cited herein, Defendants and each of them knowingly, willingly, negligently and maliciously **in bad faith**, violated the above cited case law, and at least **S.C. Code 1976 Ann. Sect. 43-35-45, and former Code Sect.15-9-20; Rules 1-8, 65, and 81 SCRCP; SCRFC Rules 2, 6, 8 and 21; and DDSS Rule 405.03 et al.**

11.    Therefore given the facts, laws, rules and circumstances there was no case to refer ex parte to alleged defendants (plaintiffs in this case). DDSS' and other defendants individual and cumulative violations of the respective court rules denied plaintiffs herein their Federal and State constitutional rights to due process of law and equal protection of the law, along with additional constitutional violations as stated herein and in Plaintiffs' Complaint. Moreover, these respective bad faith actions of DDSS et alia, in fact perpetrated physical and psychological abuse and neglect and placed . Plaintiff Beatrice Weaver in a vulnerable situation subject to imminent danger, in violation of Chapter 35, Adult Protection Act, of the S.C. Code. Further, pursuant to Code Sect. 43-35-80, **the respective defendants are subject to action as may be appropriate by the State Attorney General office.**

11

8.    **Concluding Observations**:

The issue of the importance of vicanage and other demonstrated reasons discussed herein, as justification for granting this motion for change of venue, commences with the transportation services provided by the DDSS for Plaintiff Beatrice Weaver and the attendant circumstances by which these came about, were carried out, and developed within the community of defendants designated herein.

The historical, documented facts support the conclusions that the defendants respectively and co-operatively, engaged in collusion, conspiracy, bad faith and malicious intent towards Mrs. Weaver without her prior knowledge or information as required by DDSS Rules, to abduct and incarcerate her in an out of county substandard assisted living establishment The motive for this behavior to be explored at trial, has been collectively summarized by informed, independent observers that certain defendants wanted to acquire the upscale residence and possessions of Mrs. Weaver by means of incarcerating her in Cottonwood ALF in Bishopville at the cost of three times her income and finally at forced auction pursuant to the State law.

Notwithstanding the motives to be determined definitively during discovery and trial, the foregoing events, and other related irregular incidents not reported here, illustrate the general unpleasant adverse atmosphere and the strained relationships that developed between the plaintiffs and the defendants and potential witnesses, through no cause or actions of the Weaver plaintiffs. The net result is that the negative vicanage that exists in the Dillon community and between the parties does not harbor well for Plaintiffs to receive a fair and impartial trial in Dillon County. For example, see **Exhibit H** hereto.

The facts and circumstances associated with this case are such that Plaintiffs feel it is prudent and reasonable to pettition the court for a change of venue to ensure a fair and impartial trial and to obviate in advance any such justification for potential appellate treatment of the case on these grounds.

9.    Affiant makes this affidavit from personal knowledge and belief of the facts of the case, and not for any improper purposes or to cause unnecessary delay in proceedings, or needless increase in the costs of this case; that he is competent to make this affidavit; that he alleges and avers that the facts are well grounded as stated herein, and the pleadings

filed in this suit; that Exhibits are true and correct copies of the originals and by reference made part hereof.

10.    The affidavit is filed in support of Plaintiffs Motion for Change of Venue to which it is attached. The purpose of the affidavit is to document and illustrate the adverse judicial conduct and atmosphere prevailing in Dillon County with respect to Defendants' judicial and regulatory misconduct and willful and negligent violations, where they have a long standing entrenched social, administrative and political position throughout the community prejudicial to the selection of an impartial jury from a small rural universe of personnel well known to Defendants.

Further, Affiant sayeth naught.

DATED: Dillon, S.C. 29536, May 7, 2014.

Gary Weaver, Affiant

Subscribed and sworn before me
this 27ᵗʰ day of May, 2014

Notary Public, State of South Carolina
My Commission expires:  My Commission Expires 12-10-2023

13

To:    Dr. Phil Wallace
       Via Fax: 774 1826

From: Gary Weaver
       841 1606; Fx:774 2050

Subject: Beatrice Weaver
       Order for Protective Custody
       Case No. 2012-DR-17-110
       Filed Feb. 29, 2012

Date:   March 9, 2012                                **URGENT**

Dr. Wallace:

1.      On Wed. Feb. 29, 2012, at approximately 5.00 p.m., three Deputy Sheriffs and two DSS agents turned up at our residence with a copy of the subject order which they presented to me.

2.      Mrs. Weaver was in bed deeply asleep. To cut a long story short, both Mrs. Weaver and I objected vociferously to the Order.

3.      Mrs. Weaver refused to go and the three deputy sheriffs invaded our home and her bedroom, and manhandled her out of her bedroom. As you know she has a bad back and the rough handling caused her pain, not to mention the emotional trauma caused by the Order, the invasion of privacy and the physical treatment.

4.      Personally, I will never forget the look of terror, pain and fear on her face as the sheriffs manhandled her out of her bedroom. It will haunt me till the day I die as I could do nothing to assist her.

5.      The sheriffs had called the EMS and two burly medics strapped her onto a stretcher and they took her by ambulance to an Assisted Living Facility in Bishopville out of Dillon county, some 60 miles away and in accessible to me. A few weeks ago while transporting Mrs. Weaver to Charleston for her eye injections, the motor in my Cadillac disintegrated again. Presently I am out of transportation until a new motor is installed.

6.      She has been confined to a small room of about 100 sq ft about half the size of our kitchen. There is also a second woman who is very sick in the room. Without going into details in my view the conditions are substandard and the confinement is like a prison cell. Some of the staff abuses her. She is vegetarian and does not eat canned food. She is hungry and cannot eat the cultural food served to the 99.9 percent of residents who are black. The bed mattress is unfit and hurts her back which as you know is a problem.

*EXHIBIT A p1.*

7.    The DSS director informed me that DSS took the action against Mrs. Weaver based on your letter dated February 24, 2011, conversations with the case worker on that and other dates.

8.    Your letter incorrectly states, "She is at risk staying by herself." The only time she was alone was between November 2, 2011 and December 22, 2011 when I was hospitalized for four bypass surgeries. During that short period she had the support of several friends who collectively contacted her on a daily basis to ensure she was safe, had food and other needs which they assisted her with. I have affidavits proving that situation.

9.    In February I made a routine visit to Dr. Medina in your office. Subsequently I met with your staff while accompanying Mrs. Weaver to your office to receive a TB shot. (Your staff in fact tried to give it to her on three different occasions; the left hand not knowing what the right hand had done).

10.    In short, it is my position that you and your staff knew or should have known that I was home on December 22, 2011 and that for the past three months Mrs. Weaver was not alone in her house. I was there as a full time caregiver since December 2011 and before November 2, 2011 when I was hospitalized. She is not confined to a wheelchair.

11.    Thus, your letter of Feb. 24, 2012 was incorrect, and you have managed to do a grave disservice to Mrs. Weaver in supporting an unnecessary Custody Order with an untrue statement. I was there since Dec. 22, 2011. She can and has taken care of herself during my short absence.

12.    The DSS incorrectly alleged that Mrs. Weaver suffered "abuse, neglect and vulnerability" and exposed to "immediate danger." No evidence was presented or exists to justify such an absurdity, the only "abuse, neglect and vulnerability" suffered by Mrs. Weaver is that imposed on her by the DSS ridiculous complaint requesting protective custody. Protection from what danger?

13.    There is a court hearing on the case, next Monday, March 12, 2012 at which I will seek a rescission of the court Order caused by your letter and conversations.

14.    Since the facts are contrary to your Feb. 24, 2012 statement, I request that you pen a short letter TODAY, "To Whom It May Concern" stating that due to new facts that Mrs. Weaver has not been alone since Dec. 22, 2012, and has a full time caregiver, her husband, and that you support rescission of the Court Order and return of Mrs. Weaver to her home immediately. The conditions at home are a quantum difference from the substandard conditions in her present situation.

15.    Please fax a copy to Mrs. Rowland director of DSS, and myself at  774-2050 today so I can prepare for next Monday.

16.    Finally, I draw you attention to a recent AARP study that recommends government agencies attempt to facilitate the elderly to remain in their homes rather that institutionalized. They fare better at home.

Thank you,

Gary Weaver.

E+HIBIT H₂P2

2

STATE OF SOUTH CAROLINA )   IN THE COURT OF COMMON PLEAS
                        )   FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON        )
                        )   CIVIL CASE NO.  2014-CP*.-17-078
                        )
BEATRICE E. WEAVER AND  )   AFFIDAVIT OF BEATRICE WEAVER;
GARY WEAVER,            )   EXHIBITS A-G
                        )
        PLAINTIFFS, PRO SE )
                        )
        vs.             )
                        )
DILLON DEPARTMENT OF    )
SOCIAL SERVICES; AND JACKIE )
ROWLAND; KAREN ENGLISH; )
PANSY PAGE-McELVEEN;    )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A.; A SOUTH )
CAROLINA CORPORATION; JAMES P. )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE AND )
DEPUTIES JOHNIE MAY SMITH, )
CHADDIE HAYES, AND LINDA )
MAIMQUIST; DILLON COUNTY )
EMERGENCY MEDICAL SERVICES, )
A SOUTH CAROLINA CORPORATION; )
FLORENCE VISITING NURSES )
SERVICES, INC, A SOUTH CAROLINA )
CORPORATION; JOHN D. McINNIS; )
AND JOHN DOES 1-10, DOE )
PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10, )
                        )
        DEFENDANTS.     )   JURY TRIAL REQUESTED
                        )

FILED
GWEN T. HYATT
2014 JUN -2  PM 4: 00
CLERK OF COURT
DILLON COUNTY

CLERK OF COURT
DILLON COUNTY

## AFFIDAVIT OF BEATRICE WEAVER

BEATRICE WEAVER, Plaintiff Pro Se in the above entitled action, being first duly sworn upon her oath, herein after "Affiant", deposes and says as follows:

1

1.    This Affidavit is filed in support of Plaintiffs' **Motion for Change of Venue to Florence County**, to which it is hereby attached. For the reasons discussed in the said motion, the attached Memorandum in Support thereof, and other reasons discussed herein-below, Affiant respectfully submits to the Court that based on the facts and circumstances of this case, and 20 years experience and observations of local community social and professional relationships, it will be virtually impossible for Plaintiffs, particularly appearing as Pro Se parties, to obtain a fair and impartial jury, witnesses and trial in Dillon County Court of Common Pleas. Therefore, Plaintiffs decided to respectfully petition this honorable court for a change of venue to Florence County where there is an enhanced probability that a fair and impartial jury and trial may be possible..

2.    This Affidavit discusses several phases of Defendants' respective activities leading to the necessity for Plaintiffs to file their verified complaint and supplementary amended complaint to commence a legal action for two main purposes and objectives:

1.    **To hold Defendants accountable and responsible to the public, the courts, and jury for their respective violations of the Rule of Law in dealing with elders, and to deter them from future such violations against the elder community.**

A.    Based on the facts and circumstances of this case, after lengthy, careful consideration and deliberation, including discussions with knowledgeable Dillon citizens, Plaintiffs decided it was necessary and timely to take legal action in the courts (county, state and federal if necessary), to hold both public and private entities involved in this case, publicly accountable and responsible for their willful, deliberate and negligent violations of the Rule of Law in their dealings with elderly Plaintiffs for preventative and punitive purposes.

B.    As enumerated in Plaintiffs complaints and this motion, Defendants collectively and respectively, deliberately planned and executed gross violations of Plaintiffs state and federal constitutional rights, state statutes and rules of procedure, many Rules of the Dillon Dept. of Social Services, and Dillon County ordinances and rules governing the conduct of the Sheriff's Office and the Emergency Medical Services. Plaintiffs decided that these trespasses cannot be let go unknown to the general public and the courts, and the Defendants must be deterred from continuing such adverse

2

regulatory behavior for the prospective protection of the elder community in Dillon and other counties.

      C,    <u>For this purpose, Plaintiffs seek major deterrent punitive and related damages to be granted against Defendants, collectively and respectively, as may be appropriately decided at trial by the court and the jury,</u>

      **2.**    **Thus the second main purpose and objective is for the court and jury to award damages to Plaintiffs to compensate them for the serious irresponsible and negligent violations that Defendants perpetrated against Plaintiffs**

      A.    Plaintiffs' claims against Defendants are detailed in the said complaints and this motion to change venue to Florence County court. Additional supporting details are discussed further herein-below, in summary as support for this motion. Further details will be discussed at trial following discovery in this action..

      B.    Plaintiffs request compensation for Defendants' many legal violations and abuses discussed in the complaints and this motion, and the resulting social disruption, and legal and medical costs incurred by Plaintiffs as a result of Defendants' illegal actions, involving, inter alia, **false arrest and false imprisonment (as legally defined) of Beatrice Weaver.**

      C.    Plaintiffs claim damages be awarded for the shock, terror, physical and emotional stress, physical pain and discomfort, continuing sleep apnea, the post traumatic stress disorder that remains, and the Defendants' aggravation of Affiant's medical condition at the time she was abducted by DDSS on February 29, 2012, all of which they knew and should have known as a result of their dealings and relationship with Affiant in the period from November 2011 through March 12, 2012.

      D.    Finally again, these damages claims for Plaintiffs' compensation, are also intended as a court imposed deterrent to public and private entities serving the elder community, and for the court and jury to "send them a message" that they are to respect the legal and medical rights of elder citizens in their dealings with that community. They are to be made to understand that elder citizens' rights and privacy are not to be abused by an excess of public zeal for the deprivation of rights and privacy under the color of laws.

3.    The available record as of this writing reveals the following discussed factual events leading up to the February 28/29, 2012 Family Court action by DDSS to abduct Affiant, all of which were carried out secretively, sub rosa in bad faith, malevolently, without Mr. Weaver's or Affiant's knowledge.

4.    There is further factual evidence of DDSS and Defendant Page's bad faith and malevolence in dealing with Mr. and Mrs. Weaver.

(1)    During the time that DDSS provided transportation services to and from medical appointments, Mrs. Weaver requested Defendant Pansy Page on a number of occasions to provide her with a copy of the Rules and Regulations governing the DDSS so that Mrs. Weaver could determine what DDSS services she could or could not expect.

(2)    Defendant Page repeatedly resisted these requests and refused to cooperate in this matter despite DDSS regulations requiring DDSS to provide full information of their activities to Affiant. Finally, Mrs. Weaver insisted that Defendant Page drive her to the DDSS Offices and obtain a copy of the requested Rules and Regulations.

(3)    Here again, this request was refused, Instead Defendant Page went into the DDSS Office and returned with a one page "Mission Statement" instead of the Rules which run to several hundred pages discussing the DDSS services and professional practices required in dealing with the community and specifically for Affiant..

(4)    Only after DDSS illegally incarcerated Mrs. Weaver in Defendant Cottonwood Villa ALF in Bishopville on February 29, 2012, was Mrs. Weaver several days later eventually able to obtain a copy of the DDSS Rules from the Director of Defendant Cottonwood.

(5)    In violation of DDSS Rules for the period November 2011 through March 12, 2012 and to date, all three of the DDSS staff (Director, Administrator and Case worker) defendants named in the complaint, repeatedly refused **to this day** to provide Mrs. Weaver with a copy of the DDSS Rules and Regulations and other data.

6)    Instead they referred Affiant's request to the State Attorney General's Office for handling. See attached **Exhibit E.**

(7)    Moreover, the DDSS case report required under the DDSS rules, to be filed with the Court and plaintiffs by March 6,2012, still has not been received from DDSS to date despite several requests filed with DDSS.

(8)    **This refusal to abide by its own regulations, is the quintessential definition of DDSS's regulatory bad faith, malice and malevolence mitigating any claim to immunity from litigation, pursuant to case law to be discussed at trial.**

5.    For the purpose of clarity with respect to the objectives of this affidavit, there are several phases of case activities, discussed as follows:

    1.    The Period before November 2011.

    2.    The Period November-December, 2011

    3.    The period January 'February, 29, 2012.

        A.    January 2012

        B.    February 24, 2012

        C.    February 27, 2012

        D.    February 28, 2012

        E.    February 29,2012

        F.    Cottonwood ALF-February 29, 2012

        G.    Treatment of Affiant-February 29-March 12, 2012

        H.    Period Following March 12, 2012

    4.    The Period February 29,-March 12 2012

    5.    The Period Following March 12, 2012.

6..    **The Period Before November, 2011.**

(1)    Defendant Wallace was the primary physician for Affiant during the period from about 1995 through March 12, 2012, some 17 years.. In 2011 the main illness he treated Affiant for was scoliosis of the spine, and the pain in her hips..

(2)    Following an X ray of her spine in October 2011 Dr. Wallace was heard by Affiant to remark to his nurse "Peggy" that "this is the worst case of scoliosis I have ever seen."

(3)    The DDSS staff and sheriffs knew and should have known of this medical fact and Affiant's pain when they forcibly pulled Mrs. Weaver out of her bed and forcibly dragged her intothe hallway to be "dumped" and strapped on a stretcher by EMS staff.

(4)    At one time during this period, Dr. Wallace informed Affiant that he was interested in buying her residence before she had done so. At no time did Dr. Wallace ever visit Affiant in her home, and he knew nothing about the living conditions, or her

quality of life and life style. Thus, Defendant Wallace had no factual bases for the comments in his mis leading letter dated February 24, 2012, including his incorrect comment that she was home alone, Mr. Weaver was at home acting as her caregiver and Wallace knew or should have known that fact before making factually unfounded and an incorrect letter to a court of law leading to abduction and incarceration for life in a "locked" institution.

(5)    Moreover, notwithstanding his lack of training and professional experience in gerontology and forensic gerontology, as her primary physician for some 17 years as of 2012,and knowing of Affiant's background, education, psychology personality and her medical and physical condition, Defendant Wallace should have known that incarceration of Affiant in a "locked" facility comprised of some 99 % black inmates and staff would be devastating to her and she would not survive in that alien atmosphere for very long at her advanced age. Both Defendants Wallace and DDSS dealing with the elderly knew or should have known from professional experience and the professional literature, that it has been demonstrated the elderly fare better living in their own homes than being incarcerated in an alien institution, particularly a substandard culturally incompatible facility such as Defendant Cottonwood Villa.

.7.    **The Period November-December 2011.**

(1)    At this stage all of the facts are not clear and are to be determined during discovery. What is known is that on or about November 2, 2011, Plaintiff Gary Weaver and Affiant's spouse was hospitalized for four by pass heart surgery, and he returned home permanently on December 22, 2011.  Further, that on or about December 28, 2011 he visited the offices of Defendant Wallace and spoke with members of his staff and Dr. Medina, one of his doctors who was Mr. Weaver's primary physician.

(2)    On or about December 18, 2011 two officers from the Rehabilitation Center accompanied Mr. Weaver to his home for an investigation to determine if Plaintiff Gary Weaver could survive on his own at home without assistance, and could act as a full time caregiver for his spouse Plaintiff Beatrice Weaver.

(3)    Following their taking measurements and investigation of the access, ingress and egress, inspections of the kitchen, bedrooms, bathrooms, etc, the

rehabilitation officials approved the plan for Mr. Weaver to return home and assume full time duty as caregiver to his spouse.

(4)    Meanwhile early in November, 2011 Defendant Wallace had contacted Defendants DDSS and/or Visiting Nurses bringing to their attention that Mrs. Weaver was home "alone."

(5)    Defendant DDSS Page stated in her two Affidavits filed with the Family Court on February 28 and 29, 2012, that Defendant Visiting Nurses claimed in their inaccurate, bogus reports to Defendants Wallace and DDSS that they visited Mrs. Weaver on November 8, 2011 and again on November 11, 2011.

(6)    **Mrs. Weaver disputes this contention as being factually incorrect and misleading, for various reasons to be discussed at trial.**

(7)    In short, on November 7, 2011, Mrs. Weaver was involved in an accident at Storm Eye Institute, MUSC in Charleston and received emergency treatment at that hospital. Together with her friend Mrs. Carter, Mrs. Weaver returned home late that same evening at about 9.00 p.m. For security reasons, Mrs. Carter locked the front gate when she left Affiant's house later that bight.

(8)    The next day, November 8, 2011 Mrs. Weaver was bed ridden, and Mr. Weaver was in hospital for heart surgery. Physically, it was impossible for Visiting Nurses to visit Mrs. Weaver on November 8, 2011 as claimed. No one was present to open the 20 foot locked gate to permit them to enter the property as Mrs., Weaver was in bed recovering from the MUSC accident the day before.

(9)    Apart from being factually incorrect, the respective Visiting Nurses reports were not notarized, and were hearsay evidence filed by Defendant Pansy Page in her affidavit filed with the Family Court to justify the bogus Ex Parte Order for Protective Custody.

(10)    Either before or after the alleged Visiting Nurses hearsay reports filed in November 2011, to Defendant Wallace and DDSS, Defendant Page, together with an accompanying Deputy Sheriff, visited and contacted Mrs. Weaver at her home un-announced, sometime in mid-November, 2011.

(11)    Defendant Page introduced herself as being from DDSS and requested Mrs. Weaver to sign a form. Mrs. Weaver thought DDSS was a social services

organization offering her assistance with transportation during Mr. Weaver's hospitalization for heart surgery. Defendant DDSS case worker Page explained that Defendant Wallace had suggested DDSS could assist Mrs. Weaver with transportation to and from her medical appointments.

(12)    In fact, the only on-going services DDSS provided Mrs. Weaver between November 2011 and February 29, 2012 was transportation to and from her medical appointments, In violation of DDSS Rules, no other home assistances were provided, explained, nor offered to Mrs. Weaver by DDSS.

(13)    Last but not least the records show that on November 14/15, 2011, Defendant Wallace issued a prescription referring physical therapy be provided for Affiant. This prescription was left by his nurse "Lynn" to be picked up by Defendant Pansy Page at the front desk of the Wallace office for her transmittal to Mrs. Weaver. This was not done either deliberately or negligently by the DDSS case worker, and Affiant only discovered this omission after dismissal of the case by the court on March 12, 2012.

8.    **The Period January-February 2012:**

A.    **January:** During the month of January 2012, both Mr. and Mrs. Weaver visited the offices of Dr. Wallace and spoke with Dr. Wallace, members of his staff and Dr. Medina. So contrary to his letter dated February 24, 2012 that Affiant was home alone, Dr. Wallace knew and should have known that this was not the fact; that Mr. Weaver was home taking care of affiant.

B.    **February 24, 2012:**

(1)    On or about February 20, 2011, Defendant Pansy Page contacted Defendant Cottonwood Villa ALF in Bishopville and reserved a "bed" for Affiant for February 25, 2012. This was in violation of DDSS Rules that require accommodations to be in the patient's county of residence, in this case. Dillon County.

(2)    While Affiant received a TB inoculation on February 24, 2012 Defendant Page met with Defendant Wallace in his office. Thereafter, on February 27, 2011 she received from him the February 24th un-notarized, unverified, hearsay letter addressed ambiguously "To Whom It May Concern" stating inter alia, that Affiant was "at home alone" and including other misleading and incorrect comments. See **Exhibit A** hereto.

(3)    Both Defendants Dr. Wallace and Page knew and should have known that Plaintiff Gary Weaver has returned from rehabilitation on December 22, 2011, and was present at home as full time caregiver, since between December 22, 2011 and February 29, 2012, Mr. Weaver was Dr. Medina's patient at Dr. Wallace's medical office, and had visited Defendant Wallace/s office on several occasions during that period and spoke with Dr .Medina, Dr. Wallace and their staff on several occasions.

(4)    Defendant Page drove Mr. Gary Weaver to medical consultations to McCloud hospital in Florence and Dr. Wallace's offices, both with and without Affiant during this period.

(5)    Note that it was on February 24th, 2012 that Defendant DDSS Case Worker Page drove both Mr. Weaver and Affiant to Defendant Wallace's office, and parked her car at the front glass door entrance to the office building with Affiant in the back seat of the car where she received a TB inoculation.

(6) .    Dr. Wallace's Nurse "Nicole" came out from the Wallace office to the car. Through the open window to the back seat, said "Nicole" administered an anti-tuberculosis inoculation in Affiant's arm. No explanation was given to Affiant s the reason for the inoculation.

(7)    While the inoculation was being done, as noted, Defendant Pansy Page left the car and went inside Dr. Wallace's office and received the aforesaid letter dated February 24th, addressed "To Whom It May Concern" Neither Dr. Wallace nor Defendant Page informed Affiant of the intent or existence of the said letter in violation of DDSS rules requiring continuing information be given to Affiant of DDSS activities and plans for her

(8)    While the said inoculation was being administered to Affiant, Dr. Wallace's Nurse "Debra" came out to the car, patted Affiant on the arm and said "good bye." Apparently she knew what Affiant did not know, was that State Law required that Affiant was to be prepared for incarceration in a "locked" facility at Defendant Cottonwood Villa ALF with a TB inoculation.

(9)    Returning to the car from Dr. Wallace's office and after the inoculation was completed by "Nicole", Defendant Page then drove both Mr. and Affiant to and from

their appointment at the Florence Darlington Technical College Dental Clinic in Florence on February 24, 2012..

C.    **February 27, 2012:**

.    Thereafter on February 27th there occurred another incident of Defendant Page's bad faith, antagonism and malice towards Affiant:

(1)    Three days after February 24, 2012, on February 27th, 2012, Defendant Page came to Affiant's residence to pick her up and take her to and from Dr. Wallace's office for another anti tuberculosis inoculation. Defendant Page also contacted Defendant Cottonwood Villa ALF and re-scheduled the 3.demand for "a bed" for Affiant from February 25, 2012 until February 29, 2012, **Since February 20, 2012 she knew until February 28, 2012 without telling Mr. Weaver or Affiant, that DDSS was going to go to court to have Affiant abducted. In bad faith and contrary to DDSS Rules, she maliciously neglected to inform or discuss the matter with either Mr. Weaver as caregiver, or Affiant of the intention in advance.**

(2)    On February 27th, 2012, while waiting for Affiant in the residence hallway, as a token of thanks and appreciation for the transportation services, Affiant had a fine gift of her own genuine pearl bracelet, gift wrapped with a lovely card which she presented to Defendant Page..

(3)    Defendant Page responded very ungraciously and accepted the gift antagonistically commenting to the effect that she "was paid for her work and did not need any gift." She "reluctantly" accepted the gift and put the gift package in her purse..."

(4)    During the administration of the tuberculosis inoculation, Dr. Wallace's Nurse "Peggy" came out to the car and patted Affiant on the arm and also said "Good Bye" to her. Like Nurse "Debra" and unlike Affiant, she apparently knew that Affiant was being prepared for incarceration at Defendant Cottonwood villa ALF.

(5)    After the 2.00 p.m inoculation appointment at Dr. Wallace's office administered out in the parking lot on February 27, 2012, Defendant Page then again went in to the medical office and received from Dr. Wallace the aforesaid letter dated February 24, 2012, addressed "To Whom It May Concern."

(6)    Defendant Page came out and then drove Affiant for an appointment with Affiant's long time hair dresser at "The Salon" located on Highway 301 Nth, Dillon, and

left her there. At 5.00 p.m. Affiant was picked up by her friend, Mrs. Carter who drove her home where together with affiant Gary Weaver, they enjoyed refreshments.

(7)    The facts clearly show the bad faith, neglect and willful violation of DDSS Rules by Defendants who obviously knew at least since February 20, 2012 that they intended to take Affiant into "protective custody" on February 28/29 2012, based on fatuous and specious rationale Dr. Wallace's two Nurses knew and came out to say "goodbye" to Affiant, who did not understand why, and to whom was never explained the reason for tuberculosis inoculations as required by State law, prior to incarceration of a person in a "locked" facility.

(8)    Clearly under these circumstances it is hard for DDSS to justify that Affiant was "abused, neglected, vulnerable and in any imminent danger" as DDSS Defendant Pansy Page claimed to the Family Court the very next day on February 28, 2012 and again on February 29, 2012. The facts clearly show otherwise and by any legal standard, the DDSS' Defendant Page's flagrant adverse claims to the Family Court one and two days later, can only be classified as bad faith and malevolence on the part of DDSS staff.

D.    **Tuesday February 28,2012**

(2).    On February 28, 2012, DDSS secretively filed an Ex Parte Motion for Protective Custody of Affiant, having omitted any prior discussions of their intentions or plans with affiant or her spouse in violation, of DDSS Rules.

(3)    Defendant Page filed an factually inaccurate affidavit based on hearsay evidence, in support of the said motion.

(4)    The said motion was filed by DDSS in the absence of any declared "emergency" authorizing the sheriff to act, as required by DDSS and court rules and state statutes.

(5)    The said motion was filed before DDSS filed, served and gave notice of a complaint or summons to affiant or her spouse. Thus the said motion was improperly granted on February 28, 2012 by the family court on the basis of unfounded hearsay evidence and a factually incorrect Affidavit filed in support of the said motion by Defendant Pansy Page. The "matter" was NOT before the Famiy court as it claimed in the said Order.

11

**E.**    **Wednesday, February 29, 2012:**

(1)    On the morning of February 29, 2012 the DDSS filed a Complaint and Summons with the Family Court thus bringing the matter before the court one day after filing the said Ex Parte Motion for Protective Custody the day before. Again an improper affidavit from Defendant Page was filed, without supporting evidence other than hearsay statements of Defendants Wallace and Visiting Nurses, contained in support of an affidavit filed by Defendant Pansy Page, that Mrs. Weaver was "abused, neglected vulnerable and an adult an imminent danger" with no documentation other than the inadmissible un-notarized hearsay and subjective statements, citing incorrect facts.

(2)    In the afternoon of Wednesday, February 29, 2012 an event occurred that refutes the DDSS claim that Affiant was an abused, neglected and vulnerable adult in imminent danger of exploitation. At about 4.00 p.m. that day, two staff members of a medical equipment supply company, "Lincare" came to Affiant's residence to check on Affiant and that her oxygen equipment was functioning properly. The meeting and discussions went well and there were no indications of any adverse conditions as claimed by DDSS. Just before 5.00 p.m. all was well, The Lincare personnel left the residence and Mr. Weaver closed the 20 foot front gate at the end of the long driveway, after they left the property.

(3)    Mr. Weaver told Affiant, that at about 5.00 p.m. on Wednesday, February 29, 2012, the DDSS 7 member team comprised of two DDSS staff, three Deputy Sheriffs and two burly EMS staff opened the front gate and unannounced, entered the property **without a warrant.** They parked their automobiles in the front and side driveways of the property and came up the approximately 100 yards from the front gate to the front porch of the residence. On reaching the front porch, Mr. Weaver noticed their presence and came out of his office located to the side of the front porch and asked the Sheriffs what they wanted. The male Deputy handed him a "scrambled" copies of some papers that turned out to be copies of the DDSS Ex Parte Motion for Protective Custody and the DDSS Complaint and Summons filed in Family Court that same morning.

(4).    Mr. Weaver sat down on a chair on the front porch and made the team wait while he unscrambled and tried to read and make some sense of the papers. Mr. Weaver objected to the claims and informed the team that he wanted to telephone the

judge, the DDSS attorney and his own attorney before going any further in the matter.. The male Deputy informed Affiant that he could not enter his residence unless accompanied by a Deputy Sheriff. Mr. Weaver objected on various grounds including the violation of his constitutional right to privacy and notwithstanding the bogus Ex Parte Motion, the lack of a warrant for search and seizure. However, accompanied by the male Deputy he went inside the front door and used a telephone located in the hallway. Since the time was after 5.00 p.m, none of the three parties called was available. Mr. Weaver asked the Sheriff what would be the consequences if he and/or Affiant refused to comply with the Ex Parte Order. The Deputy informed him that he would be in contempt of court and would be arrested, placed in hand cuffs and taken to jail. Affiant informed the Deputy that he objected to the bogus Order and complaint, and that they were violating the constitutional rights of him and his wife. He said he would go and fetch his wife and the Deputy informed him that he could not go alone into the house; that he had to have a Deputy accompany him into the house. Again Mr. Weaver reiterated that this was invasion of privacy and a violation of his constitutional rights, lack of a warrant, etc.

(5)    They went back out to the front porch and one of the female deputies known to Mr. Weaver accompanied him to the kitchen to fetch Affiant. She was not there and Mr. Weaver said she would be in her bed.

(6)    Thereafter, the three deputies came in the front door to the hallway and one of them accompanied Mr. Weaver into his wife's bedroom where he informed her what was going on, Affiant refused to comply and remained in bed. The three Deputies then forcibly man handled her out of the bed. Two females grabbed her, one on each leg and the male grabbed her by both arms and they dragged her out of her bed into the hallway while she was in shock and great pain, where the Deputies handed Affiant to the two burly male EMS staff waiting in the hallway with their stretcher, against Mr. Weaver's request to wait outside on the porch.

(7)    The two EMS staff man-handled, and dumped Affiant like a "sack of potatoes" and strapped her down on to their mobile stretcher. Affiant was in complete shock and suffering great pain as she has two bad hips and a deficient scoliosis spine. The two burly EMS staff had brought the stretched inside the front door to the hallway over

13

Affiant's objections and they ignored his request to keep the stretcher out on the front porch in order to prevent possible damage to furnishings in the hallway. All this while Affiant objected to the assembled defendants stating they were violating the law and the constitutions...

(8).    Affiant was resting in bed dressed only in underwear (3 piece "Cuddle Duds") without any socks or warm clothing. The EMS staff dragged the stretcher with Affiant strapped down out of the Hallway to the front porch and along the 100 yard driveway in freezing cold weather and placed her in the waiting police wagon vehicle parked outside the front gate. Mr. Weaver ran out of the house with a blanket and a pair of socks and gave it to the attendants for Affiant.

(9)    The vehicle was then driven for about one hour with Affiant strapped on the stretcher, to Defendant Cottonwood Villa ALF some 70 miles to Bishopville, in Lee County, Affiant was accompanied by two female deputies sitting on a bench alongside the stretcher who refused to tell her where she was being taken and told her "not to talk"

(10)    Following the Deputies forcible removal of Affiant from her bed, en route down the driveway to the police vehicle located outside the front gate, Affiant suddenly noticed Defendant Pansy Page standing near her car located on the right side of the driveway in front of the house. Affiant still in shock, raised her voice and shouted to Defendant Page "you bitch. I shall see you in court." **It was only at that moment that Affiant came to understand for the first time, that it was Defendant Pansy Page who had caused the forcible abduction.**

F.    Cottonwood Villa ALF  Wednesday, February 29, 2012:

Further bad faith, malicious activities and violations of DDSS Rules and S.c. State statutes occurred on the evening of February 29, 2012 and during the 12 days thereafter, when DDSS and the cottonwood officials entered Affiant as an inmate at Defendant Cottonwood Villa ALF in Bishopville:

(1)    First, as noted, under DDSS Rules, the location should have been in Dillon County, not 70 miles way in Bishopville, Lee County..

(2)    Upon request, DDSS Defendant Pansy Page refused to tell Mr. Weaver and Affiant the address, location or phone numbers to which they were abducting Affiant

when the Sheriffs forcibly pulled Mrs. Weaver out of her bed and forcibly placed her in the police wagon to transport her to Bishopville.

(3)     In response to his enquiry while Affiant was being removed from the residence on February 29, 2012, Defendant Page informed  Mr. Weaver who told Affiant that she would have a comfortable studio apartment for her use, Instead on entry at Defendant Cottonwood Villa, Affiant was dumped unceremoniously onto a very small uncomfortable narrow bed ina small dark room with minimal furniture, and was incarcerated in a small 10 foot by 20 foot, 2 bed ward with a small shared bathroom that smelled of urine, and  was shared with a very ill elder woman in the same room.

(4)     Defendant Page and the Sheriffs refused to permit Mr. Weaver to accompany his wife to Defendant Cottonwood Villa in Bishopville, Lee County.

(5)     Defendant Page illegally signed the Defendant Cottonwood entry documents as "guardian ad litem" for Affiant in violation of the DDSS Rules, having initially refused to permit Mr. Weaver to accompany Affiant his wife and as a relative (as defined in DDSS Rules governing such entries as in Bishopville), to approve the establishment and supervise the related (illegal) entry arrangements. The Family Court had not appointed Defendant Page as the guardian ad litem and as Affiant's spouse Mr. Weaver would have been able to be in attendance to execute the entry  documents under protest, pursuant to the DDSS Rules that provide for relatives to carry out such duties in the best interests of the institutionalized inmates.

### G.     Treatment of Affiant During the Period February 29, to March 12, 2012 at Cottonwood Villa ALF:

(1)     Since March 12, 2012 until the present day, Defendant Cottonwood Villa ALF has steadfastly refused any responses to Affiant's seven requests for records relating to the billings, stolen food and medicines, and Affiant's personal items. See **Exhibit D** hereto, by reference made part hereof.

(2)     As noted, Affiant was falsely arrested, falsely abducted from her residence at about 6.00 p.m. on February 29, 2012, and falsely imprisoned. As noted, Affiant was transported fastened down to a stretcher in the back of a police wagon with two sheriff deputies sitting on a bench alongside the stretcher.

15

(3).    I did not know where I was being taken to; when I asked, I was told "do not talk." The ride took about one hour and it was cold and dark. I had no socks when I was dragged out of my bed dressed only in a 3 piece underwear (Cuddle Duds) Mr. Weaver gave a deputy sheriff a housecoat. socks and slippers to take to the police wagon to give to me.

(4)    When we arrived at Cottonwood in Lee County, I was taken to a very small room. There was another bed in there with an ill old lady in it. I had a bed stand and a narrow closet for shoes and clothes; no telephone. This was a "locked" facility and I could not move around freely at will as the doors were locked.

(5)    As I was being transported into the room, I saw Defendant Pansy Page at a registration desk down the hallway. Apparently she was signing me in as an "inmate" under the assumed authority as "guardian ad liem" which she was not and could not be.

(6)    The bed I occupied was narrow bunk, hard and very uncomfortable. I suffer from painful hips and scoliosis of the spine which they knew and should have known existed, Notwithstanding, neither DDSS nor Cottonwood made any provisions or allowances to mitigate the pain and discomfort initially or thereafter during my stay. Lying on that wooden "bed" with hard, thin mattress was extremely painful for me and despite my requests, the Cottonwood staff made no effort to alleviate the discomfort.

(7)    The very next day on March 1, 2012, I made it to the Director's office and stated to her that I objected to be in the facility and that I shall not be liable for any expenses related to my stay there.:

(a)    I asked for her for a pen and paper and for a copy of the Rules that govern my stay there. She provided them for me.

(b)    Thereafter that day, through the whole day and part of the night, I worked on a lengthy, detailed, hand written legal statement of my objections and my opposition to the illegal abduction and false incarceration at that facility. Also I prepared a list of personal items that I needed for my stay there, such as toiletries, etc.

( c )    The following day, I asked the Director to please telefax the documents to my spouse and caregiver Mr. Weaver. To her credit she did so.

(d)    I was abducted under the false undocumented pretense that I was "in immediate danger." I was! From the Dillon Sheriff's office and DDSS Defendant

16

Pansy Page in collusion with Defendant Wallace who misleadingly stated to his discredit, inter alia, in his ill fated, subjective and factually incorrect letter dated February 24, 2012, that I hada "confused" mind.

(e)     To the contrary!  The legal documents I produced with only pen and paper, alone at night in that cold, dark little room lacking amenities, was of a first rate legal quality prepared by an alert, excellent legally trained mind written under such emotional and stressful conditions without the benefit of access to research materials and legal references. These documents will be shown at trial as proof of the lack of any "confused" mind .

(f)     Mr. Weaver subsequently used my legal documentation and incorporated it in his motions filed with the Family Court. The Court  granted his request for a Merit Hearing on March 12, 2012 instead of 40 days hence, and the Court summarily dismissed the DDSS case on March 12, 2012.

(g)     Affiant raises the reasonable question for the Court and Jury to consider at trialm the real reason as to why Defendant Pansy Page together with Defendant Wallace chose Cottonwood Villa ALF, a "locked," culturally incompatible facility located in another County, some 70 miles and over an hour drive from Dillon? They knew and should have known that the location was at that time inaccessible to Mr. Weaver whose automobile was in the mechanic shop for major repairs. This action was in direct violation of DDSSs Rules to be discussed at trial, and the discussion in Affiant's forthcoming book on this whole incident.

(h)     The Defendant Cottonwood Villa ALF facility is a "locked" institution serving mainly an African American inmate population; i.e., the impression that Affiant had, as some 90% or more of the inmates and staff, were African American And culturally incompatible with Affiant. So was the abominable food and service .

(i)     The physical and emotional abuse and stress I suffered, mainly from the staff, is to be discussed at trial, and is also described in detail in my forthcoming book on the experience. In summary, it consisted of theft of my personal items, and special foods provided to me as a gift by my friends and spouse, misappropriation of my personal medications brought to me over the course of my incarceration, periodic search of my personal items, verbal abuse on a consistent basis, "punishment" by denying me

17

use of a telephone, "rough" physical handling and generally a stressful alien unfriendly and uncooperative atmosphere.

    (j)    The " cultural" food provided at the facility was simply not fit to eat, for me, and some others I witnessed in the dining hall. My friends and spouse brought me food so that I would not go hungry. The entrance to the facility dining room had a "Menu" posted at the door. Reading it seemed like a menu of "gourmet" meals, When the actual food was served to the inmates, I asked myself the question: why do they cook the food that way?. In the true sense of the word, it was "not fit to eat " and the staff knew that most inmates usually threw away much of the dishes.? More of this feature in my forthcoming book on the subject.

    8.    **I was advised that the cost of this abomination of a stay at Cottonwood, was some $1,500 per month. That was the financial liability that the DDSS staff obligated me to, without my consent, or that of my spouse and caregiver.**

    9.    **Payment for what?  A bunk bed ina small room shared with a sick elder lady, a toilet stinking of urine, food not fit to eat, abusive staff and treatment, theft of personal items, food and medications, locked in a facility without even a telephone, no radio and no newspapers, and inferior physical therapy service.** Defendant Cottonwood's public relations, advertising and printed brochures, etc., misrepresents its services. For example:

    (1)    No exercise or physical therapy was provided, although Defendant Cottonwood claims it is available, It is not.

    (2)    The thieving is something to behold.

    (3)    Contrary to its literature, in reality  there is actually nothing, whatever redeeming or of interest at the facility for inmates

    10.    Since March 12, 2012, despite seven written and several verbal requests, Defendant Cottonwood has steadfastly refused to remit to Affiant, a copy of its statement of its billing for Affiant's stay at the facility and its liability to Afiant for the theft of items.

    **H.**    **The Period Following March 12, 2012:**

    (1)    The Family Court appointed an attorney/guardian ad litem on March 6, 2012 who visited Affiant at Cottonwood Villa in Bishopville for the first time, at noon on

18

March 12, 2012, the day of the Merit Hearing. The court appointed attorney, Ms. Holly Wall, drove Mrs. Weaver back to Dillon for the merits hearing which took place at about 2.00 p.m. (Note: An attorney cannot be simultaneously appointed as guardian ad litem to represent a party. It is a conflict of interest.)

(2)    During the conduct of the merits hearing on March 12, 2012, Defendants Wallace, Page and Sheriff Deputy Smith did not even look at Mr. Weaver or Affiant during the entire hearing when the court summarily dismissed the DDSS case for protective custody and permitted Affiant to go home "as of this moment."

(3)    Defendant Wallace testified at the merits hearing that because Mr. Weaver was home and Mrs. Weaver was "no longer alone in her home" he saw no reason why she should not go home. See the Court Order ..

(4)    Apparently defendant Wallace covered up and conveniently forgot that the Family Court had improperly granted the bogus February 28, 2012 Ex Parte Order for Protective Custody of Affiant, based on Wallace's (incorrect hearsay) letter dated February 24, 2012 stating inter alia, that Mrs. Weaver was home alone in her house.

(5)    Had Defendant Wallace taken the trouble to carry out proper due diligence as a professional medical doctor should in giving formal evidence, and had he properly checked out the facts before committing himself to an inaccurate letter, he would have and should have known that Mr. Weaver was home from rehabilitation from December 22, 2011 through March 12, 2012, and he had in fact visited his offices during January and February 2012, and had spoken with him and his staff and Dr. Medina on his staff.

(6).    The Family Court summarily dismissed the DDSS case for protective custody of Affiant, on March 12, 2012 .

(7)    Following the court's decision on March 12, 2012 dismissing the DDSS complaint, Mr. Weaver and Pastor Orr of Pyerian Baptist Church immediately drove to Bishopville to collect Affiant's belongings from Cottonwood Villa ALF. On arrival they found that most of Affiant's food and medical items were gone, together with a very special nightgown made of and intricately hand crocheted Portugese lace and cotton of sentimental value to Affiant. The special night gown was never returned to Affiant which Mr. weaver brought her, despite several subsequent requests spanning the past two years.

(8)    The very next day following the merit hearing held on March 12, 2012,

19

On March 13, 2012, Defendant Wallace reportedly sent a letter "discharging" Affiant from his practice as a patient alleging "irreconcilable differences" In fact the said letter was apparently never posted by the sender and was not received by Beatrice Weaver,

(9)    For several weeks following the March 12, 2011 merit hearing, Affiant was not aware that she had been "discharged" from Dr. Wallace's practice on March 13, 2012. When at a later date she telephoned Dr. Wallace's office to make an appointment, his staff ("Debra") told her that she had been discharged from the office as a patient. As of this date, her subsequent requests for a copy of the said discharge letter have not been honored by Defendant Wallace's office.

(10).    On March 13, 2011 the day after the March 12 2011 merit hearing in in court, and the dismissal of Affiant from custody, there occurred, another incident of DDSS and Defendant Page's bad faith. Apparently Defendant Page or someone at DDSS had instructed the Federal Social Security office to change the address from Affiant's residence and to remit Affiant's social security check to the DDSS office address in Dillon.

(11)    Affiant knew nothing about this DDSS action and did not authorize nor sign for any such change of address. Following word from Affiant's bank that the monthly social security payment had not been deposited in the bank, and after locating the check at the DDSS office in Dillon, Pastor Orr of Pyerian Baptist Church offered to collect the check from DDSS in Dillon and deliver it to Mrs. Weaver., which he did.

9.    **Defendants Refuse to Provide Affiant's Medical Records**.

(1)    During the two year period March 12, 2012 to the date hereof, Affiant filed several requests for medical records and related data with the respective Defendants, These requests have been repeatedly ignored, refused or provided incompletely , as follows:

> Visiting Nurses: Refused. See **Exhibit B** (p.1)
>
> Office of Sheriff-Dillon County: Refused. See **Exhibit C** (pp.2)
>
> Cottonwood Villa -7 Requests: Refused See **Exhibit D** (p.1)
>
> Dillon Dept. of Social Services: Refused, See **Exhibit .E** (pp.4)
>
> Dillon Internal Medicine: Incomplete. See **Exhibits F** (pp.3) and **G** (p.1).:

(2)     These requests were filed pursuant to **SC Code 1976 Ann. As Amended, Sections 40-47-110 (B) 9-18; 23; 25; Sect. 43-35-45 (D); Section 43-35-25; DSS Rule 405 (03), and Chapter 81, Regulations, Reg. 81-10; 81-11; 81-60; and 81-204.**

(3)     As of this date the Defendants have been in deliberate and flagrant violation and obstruction of these statutes and rules. In particular, Defendant Wallace has repeatedly refused to provide the records relating to his office's providing the tuberculosis inoculations to Affiant on February 13, 24 and 27, 2012 just a few days prior to the February 29, 2012 false abduction of Affiant into the ill fated protective custody. Defendants are to be held responsible and accountable through punitive damages as deemed appropriate by the court and jury at trial..

**Conclusion.**

10..    The foregoing adverse actions and legal violations of Plaintiffs' (in this case) legal and regulatory rights and privileges are a direct and proximate result thereof by the amoral, willful, negligent and illegal acts, errors and/or omissions of Defendants , and each of them, by and through the acts of their employees, agents, and/or servants which include but are not limited to: wantonly, improperly, negligently, carelessly, maliciously, tortiously, and/or wrongly imposing so-called Adult Protective Services on Plaintiffs Beatrice and Gary Weaver over the vociferous objections of both Plaintiffs at the time of the events complained of herein, in a wholesale violation of the DDSS procedural rules and regulations, Federal and State statutes, court rules and case law.

11.     Based on Affiant's experiences, and the factual evidence and circumstances of this case, the only logical conclusion concerning the underlying reason for the aberrant legal, police and regulatory behavior of Defendants, is that under the cover of law, they were guilty of criminal intent was to mis appropriate her money and residence using their excessive violations of the Rule of Law as discussed in Affiant's Verified Complaint and pending motions. On this note, Affiant submits the following observations and conclusions for the Court's consideration:

(1)     Defendants attempted to mis appropriate my money and eventually  my residence after they criminally deprived me of my liberty with their false arrest and false imprisonment (as legally defined) aided and abetted by the misconduct, poor judgment, and judicial negligence of the Dillon Family Court judge..

21

(2)    Without my consent, Defendants illegally committed me to expenditures and liabilities that were far greater than my income with the malevolent intent to eventually sell my residence at a court approved auction for non payment of the Cottonwood Facility monthly charges. On March 13, 2012, DDSS also attempted to re direct my social security payments to their address in Dillon.

(3)    Thus we can speculate on who would want to buy the residence at a "fire sale" auction, ordered by the court? The first and obvious candidate, is Defendant Wallace who wanted to purchase the residence long before Affiant even came to Dillon County some 20 years ago. Then there is Defendant Pansy Page whose husband is in the funeral business and they could make a fine funeral house out of Affiant's property. This view is a consensus of persons who know about and have considered this case.

(4)    Considering the reasons for the unwarranted incarceration of Affiant, it comes to mind that what better way is there to acquire a fine, property? Abduct the old lady; put her in a "locked" facility **for life,** away from the reach of anyone; charge more than her monthly income; create debts and liabilities beyond her control; and finally sell the residence and possessions at a low, court ordered fire sale auction; while the old lady perishes in a sub standard, inferior "locked" facility; alone, abused, mal nourished and hungry, with no proper care. What an easy way to deprive an elder old lady of her home, possessions, and family life?.

(5)    The story of this case, is described in more detail in my forthcoming book written for national and world wide distribution., It describes the State's invitation to the public to retire in this State of ":beautiful places and smiling faces." After some 20 years in this State, and the recent experience with DDSS failed attempt to incarcerate me for life in a third rate, sub standard facility, I have yet to experience those "smiling face."

(6)    Finally, as a result of having wronged me, DDSS now refuses to provide me any social services to which I am entitled.

12.    The affidavit is filed in support of Plaintiffs Motion for Change of Venue to which it is attached. The purpose of the affidavit is to document and illustrate the adverse judicial conduct and atmosphere prevailing in Dillon County with respect to Defendants' judicial and regulatory misconduct and willful and negligent violations, where they have a long standing entrenched social, administrative and political position throughout the

community prejudicial to the selection of an impartial jury from a small rural community of personnel well known to Defendants, especially the Sheriff's office, E.M.s., Dr. Wallace and DDSS,.

13.    Affiant makes this affidavit from personal knowledge and belief of the facts of the case, and not for any improper purposes or to cause unnecessary delay in proceedings, or needless increase in the costs of this case; that he is competent to make this affidavit; that he alleges and avers that the facts are well grounded as stated herein, and the pleadings filed in this suit; that Exhibits are true and correct copies of the originals and by reference made part hereof.


Further, Affiant sayeth naught.


DATED: Dillon, S.C. 29536, May 27 2014.

_Beatrice E. Weaver_
Beatrice Weaver, Affiant


I concur with the statements contained herein above:

_Gary Weaver_
Gary Weaver
Plaintiff Pro Se


Subscribed and sworn before me
this  27th  day of May, 2014

_Cynthia L. Phillips_
Notary Public, State of South Carolina
My Commission expires:  My Commission Expires 12-10-2023

DILLON INTERNAL MEDICINE ASSOCIATES, PA
705 N. 8TH AVENUE, SUITE 1A
DILLON, SC 29536
843-774-2478
843-774-1826

2/24/2012

Ms. Beatrice  Weaver
1253 Harlees Bridge Rd
Dillon, SC    29536

To Whom It May Concern:

Beatrice Weaver has severe degenerative joint disease. She is confined to a wheelchair. She can no longer take care of herself at home. Patient has difficulty at times with confusion. She is at risk staying by herself.

If further information is needed, please feel free to call or write.

Sincerely,


Phil Wallace, MD


EXHIBIT A. p 1.

DILLON INTERNAL MEDICINE ASSOCIATES, PA
705 N. 8TH AVENUE, SUITE 1A
DILLON, SC 29536
843-774-2478
843-774-1826

2/22/2012

Ms. Beatrice Weaver
1253 Harlees Bridge Rd
Dillon, SC   29536

To Whom It May Concern:

Beatrice Weaver has severe degenerative joint disease. She is confined to a wheelchair. Patient has difficulty at times with confusion. She is at risk staying by herself.

If further information is needed, please feel free to call or write.

Sincerely,


Phil Wallace, MD

EXHIBIT A    P. 2-

P.O. Box 539
Little Rock S.C.
29567

August 9, 2012

Director
Florence Visiting Nurses Services
1605-C West Palmetto St
Florence S.C. 29502

Dear Sir:                Subject: Home Health Care Statement for Services

1.       This letter is written pursuant to the Home Health Care Statement dated June 8, 2012 we have received from Medicare.

2.       The said statement refers to services rendered to the undersigned by your organization on November 8 and 10, 2011.

3.       Pursuant to the Medicare statement you are respectfully requested to provide an itemized statement detailing each Medicare item or service received from your organization on the said dates of November 8 and 10, 2011.

4.       Specifically, please itemize the following information:

   1.       Please re-confirm the two dates the services were received.

   2.       Who provided the services (name)?

   3.       What services were provided, each date?

   4.       Who ordered the services, both dates?

   5.       What times did your representative arrive and leave each date?

   6.       If you have any reports of the services rendered or relating to the visits of your representatives filed in your records, please send me copies.

   7.       How did your representatives enter the property; the gates are locked?

Thank you.

                                        Yours sincerely,

                                        Beatrice Weaver

EXHIBIT    B

1253 Harllees Bridge Road
Dillon SC 29536

August 9, 2012

Mr. Major Hulon
Dillon County Sheriff
PO Box 627, 303 West Hampton Street
Dillon SC 29536
Ph: 843 841 3722; Fx: 843 841 3229                    CONFIDENTIAL

Dear Sheriff Hulon:

Subject: Request for Information and Copy of Records

Reference:    Dillon Family Court Docket No: 2012-DR-17-110
              DSS vs. Beatrice Weaver

**This request is filed pursuant to the Freedom of Information Act of South Carolina.**
Thank you for your response dated April 23, 2012 to my earlier enquiry dated April 12, 2012 concerning the cited case. I contacted the additional Offices you suggested in your letter. Further, pursuant to your invitation to provide further assistance I am filing this additional request.

For the record on March 12, 2012 the Family Court summarily dismissed the improper and probably illegal DSS action instigated by DSS against Mrs. Weaver, the motive for which shall yet be determined.

. The legal authority for involvement of your Office in this case is stated in your letter and the Incident Report you provided, to be the Ex parte Court Order of the Family Court. For your information, the said Order was improperly executed on February 28, 2012 in violation of court rules of procedure. As you suggested, I have obtained a copy of the improper bogus Ex Parte Court Order from the DSS Office. However, I need more precise information from your office. Accordingly I am respectfully submitting this additional request for your continued assistance. I need the information from your Office as detailed in the attached List of Questions.

Thank you in anticipation of your kind cooperation in this matter.

                                          Sincerely,


                                          Gary Weaver
                                          Caregiver


p.s.    The Incident Report copy you sent me contains certain errors and omissions. Under separate cover I shall file for the record, the corrections deemed necessary

EXHIBIT C                                                1

LIST OF QUESTIONS

1.    On what date/time did your office receive a copy of the said Ex parte Order? From the Family Court? Or from DSS? (I assume your office date/timed its receipt with a stamp). **Please provide a certified true copy of the Order clearly showing the date/time stamp of receipt by your office, and from what source.** It is important that I receive the said copy for my record at your earliest convenience.

2.    How was the said Order delivered to your office: by mail, hand delivered, special delivery, etc? Who delivered it? Who received it at your office (name)?

3.    Did the DSS Office (Case Worker Pansy Page) contact your Office to discuss the case **before and after** the Court Order was delivered to your office on or about Feb. 28, or 29, 2012?

4.    If yes, name of the contact of the DSS and your officer, and the subject discussed ?

5.    Following the delivery of the bogus Court Order to your office, did the DSS staff contact and/or visit your office **prior to** the illegal raid on the residence on February 29, 2012, to take Mrs. Weaver into the "protective custody" because she was in alleged "imminent danger." If so, what was discussed?

6.    What is the definition of "imminent danger" and "emergency custody" used by your office?

7.    Did the DSS Staff (Caseworker Pansy Page) visit/contact your office **after** the forced abduction was executed on February 29, 2012 at 5.00 pm ? If so, what was reported or discussed?

8.    Did any of your deputy sheriffs accompany Mrs. Weaver while she was in the ambulance being illegally transferred against her will to the Bishopville facility? If so, please provide their names.

9.    What is the legal justification and legal/administrative definition of the equivalent of the "all necessary force" standard as used by your sheriffs in this case? If any, please cite Cases, SC Statutes and Rules and Regulations, etc as appropriate to the issue.

10.    When was the last time your sheriffs conducted a forced abduction for an "emergency custody" of an alleged so-called "vulnerable adult" in an alleged "imminent danger" of "exploitation" by forces unknown, of an 86 year old lady dragged by her feet out of her bed in her underwear, without socks on a cold winter night, under threat of "chains" and arrest for non compliance, strapped like a criminal on a stretcher, and taken by ambulance to an address unknown, by authority of a questionable Court Ex Parte Order?.

END

Ex. H. C. p2

2

1253 Harllees Bridge Rd
Dillon SC 29536

Feb. 10, 2014

Ms. Harriette Shealy, Administrator
Cottonwood Villa ALF
800 West Church St
Bishopville Sc 29010                                    SEVENTH REQUEST
Fax: 1 803 484 3023;; Ph: 1803 484 5303

Dear Ms. Shealy:

Subject: Request for Billing Data Beatrice Weaver, Lost Property & Records
Ref:      Letters dated January 30, 2013; August 10, 2012; April 3, 2013

1.      Enclosed please find a copy of our April 3, 2012 letter (sixth request) for your attention.

2.      As of this date we have not received your response.

3.      Please promptly attend to our request.

4.      Be advised that your failure to promptly respond affirmatively may lead to legal action.

Yours sincerely,

Beatrice Weaver

Encl: Copy of April 3, 2013 letter.

Via US Certificate of Mailing

EXHIBIT D

1253 Harllees Bridge Road
Dillon S.C. 29536

September 27, 2012

Celeste Moore, Esq.
Assistant General Counsel
S.C. Dept. of Social services
Office of General Counsel
P.O. Box 1520
Colombia S.C. 29202-7245
Ph: 1 803 896 7368
Fx: 1 803 896 7245

Dear Ms. Moore:'

Subject:   Repeat Request for Information

Ref:     DSS vs. Beatrice Weaver
         Family Court No: 2012-DR-17-110
         Order for Protective Custody filed Feb. 28, 2012
         Our letter dated May 30, 2012
         Our letter dated July 4, 2012

Thank you for your response dated July 10, 2012 to my letter dated May 30, 2012 addressed to Dillon DSS received on June 22, 2012 and forwarded to your office for reply. Please be advised that I also filed two letters relating to a request for data with DSS on March 9, 2012; (copies attached hereto as Exhibits A, B and C)

Again, I hereby respectfully repeat my request for the information contained in the said letters, and also the letter to DSS dated July 4, 2012 from Mrs. Weaver; (copy attached hereto as Exhibit D for your reference). DSS has not responded to the latter letter, presumably in compliance with the views expressed in your letter to me. Following is my rebuttal response to the arguments for non-compliance presented in your letter of July 10, 2012.

1.     I interpret your argument to address two points: (1) whether or not the requested records are considered to be "public" records covered by the two cited statutes; and (2) the data referring to the two DSS employees.

2.     With respect to the former issue I refer to my request for a copy of the "Report of the Event" when DSS abducted Mrs. Weaver from her residence on February 29, 2012 at 5.00 p.m. I still request that copy, together with the data requested in the letter to DSS dated July 4, 2012 by Mrs. Weaver. The following argument justifies our right to obtain said information from DSS who has no legal right to refuse these documents which by any definition are private and not public as claimed.

*EXHIBIT E*

1

3.    With respect to the second issue, thank you for sending preliminary information referring to the two DSS employees. Under separate cover I will address any further issues related to that matter.

4.    Your letter states that "due to statutory restrictions, DSS is unable to comply with your request" Thus, it is your legal interpretation of the two cited statutes that you rely on in denying the requested data. This raises two issues:

(1) What if your alleged legal interpretation of the application of the two cited statutes is incorrect and inappropriate given the facts and circumstances of this case?

(2) If in fact, due to the facts and circumstances and interpretation thereof, the cited statutes do NOT apply, then it reasonably follows there is no question that the alleged statutory restrictions on DSS providing the requested data, do not apply as argued by you. Let us explore these issues further. . .

5.    You cite Code Sect. **30-4-20 ( c )** of the FOIA as defining what records are "public records" for the purpose of the media and/or public access, etc. Further you cite this statute that "...other records **which by law are required to be closed to the public,** are not considered to be made open to the public under the provisions of the (FOIA) act..." (emphasis added). This statute does not cover "other records" which are DSS public agency records covered by a different statute as cited, Code Sect. 43-35-60, as "public records."

6.    **The error is in your argument is that we are not discussing "the public" or "public records" as defined under Sect. 30-4-40,** or Sect. 43-35-60. These statutes do not define what is "the public" as applied to this case, and do not apply to a demand for records from a "private party" as in this case of a DSS client and who is entitled to copies of records pursuant to the Rules as discussed further below. Mrs. Weaver was a private not a public client of Dillon DSS, and without her consent to boot. Under case law, the burden of proof is on DSS to justify any exemption from providing the records as demanded. Thus, any governmental agency attempting to avail itself of an exception from the state's FOIA bears the burden of proving the exemption applies. Further, the state's FOIA "grants the public an immutable right to access public records; however this right of access is viewed differently where commercial use of public information is concerned", See, **Seago vs. Horry County (S.C. 2008) 378 S.C. 414, 663 S.E. 2d 38, 88 U.S.P.Q. 2d 1520**

7.    The common element in both the cited statutes is the reference to "public", "public records," and not to the "private" status of Mrs. Weaver in this case that was initiated unilaterally and processed by DSS in wholesale violation of statutes and its governing rules, not Mrs. Weaver. It is now hiding case records in an inexplicable "cover up" mode refusing to provide the private records that Mrs. Weaver is legally entitled to under the applicable statutes and administrative rules.

8.    We respectfully submit that your office has not proven that the cited "public" exemption applies given the facts and circumstances of this case, that Mrs. Weaver was a private client of DSS and was not as member of "the public;" and that you have not

*Exh. E.*

2

demonstrated that she is a member of "the public" and that the case records are "public records" as defined in both statutes. Nor is this request for information to be used for commercial purposes, but is for the private use of Mrs. Weaver, who is not "the public". Moreover, under the statutes and rules governing DSS, a public agency, Mrs. Weaver is being denied records that she is entitled to by statute and Rules governing the activities of DSS as discussed further below. See, **New York Times Co, vs. Spartanburg County School Dist. No. 7 (S.C. 2007) 374 SC 307, 649 SE 2d 28.**

9.    You cite **Code Sect. 45-35-60** which we could not locate. We think you made a typographical error and meant to cite **Code Sect. 43-35-60** of the Adult Protection Act (APS), that "… investigative records must not be disclosed publicly" You then interpret this statute that APS records be closed to the public and not subject to disclosure under the FOIA. Again to repeat, the subject requests are made by a private person who was a client of DSS, and not for "public" purposes by the public. The DSS case records are not "public records"; they are "private case records" involving a DSS case participant, not a public person for public uses.

10.    **Code Sect. 43-35-45 (D)** provides that before the merits hearing on March 12, 2012, the APS must conduct a comprehensive evaluation of the alleged "vulnerable adult," to include a list of conditions (1) through (5). " A copy of the evaluation must be provided to the court, the guardian ad litem, and the attorney at least five working days before the hearing on the merits;" i.e., by March 7, 2012. The merits hearing was held on March 12, 2012 and the unwarranted DSS case for protective custody was dismissed by the court, forthwith. Said evaluation was NOT provided to the court, the guardian ad litem or the attorney by the required date or subsequently. In this case the court appointed the same person as the guardian ad litem and the attorney for Mrs. Weaver thus creating a questionable conflict of interest which, inter alia, created an issue of court conduct your office may yet have to consider.

11.    However, the main point here is that the said evaluation to be submitted to the guardian ad litem and the attorney involves a private, not public professional-client relationship, particularly the private, privileged, not public, attorney-client relationship and an evaluation that is not public, pursuant to **Code Sect. 43-35-50**. Any such evaluation report received by the guardian ad litem and the attorney is available on a privileged basis to Mrs. Weaver as a private, not a public document. The attorney-client relationship is an exception to the "public" restrictions provided in the two cited statutes. See, **New York Times Co. op cit; Wilson vs. Preston, (S.c. 2008) 378 S.C. 348, 662 SE 2d 580.** Moreover, we note that we have standing under the FOIA which provides that any citizen of the state could apply for declaratory and injunctive relief. See, **Sloan vs. Friends of Hunley, Inc. (S.C. 2006) 368 S.C. 20, 630 SE 2d 474.**

12.    We have already noted that **Code Sect. 43-35-50** provides an exception to **Code Sect. 43-35-60** as related to attorney-client relationships, justifying our claim that demand for Mrs. Weaver's case records is a private not a public matter, in this case. Pursuant to **Code Sect. 43-35-75** we submit that the DSS refusal to provide us with the case records under the rubric cited in Code Sect.30-4-20 ( c) and 43-35-60 is done in bad

EXH. E

3

faith in an effort to cover up their violations of statutes and rules in the conduct of this case. See Exhibits A and B hereto my letters to DSS. DSS should cooperate in this matter in the spirit and law provided in **Code Sect. 43-35-590 (A)** and provide the case records as necessary to carry out the purposes and responsibilities provided in the DSS rules applicable to this request for case records. Let us examine the said rules..

13.    Rule 408.02 of the DSS Adult Services Policy and Procedure Manual (Rules) provides that clients such as Mrs. Weaver, may receive copies of the APS Records "upon request,". See Exhibits A –D hereto for such requests which have been denied in violation of the rule.

14.    Please refer to the case records requested in **Exhibit D**. Mrs. Weaver's letter to DSS dated July 4, 2012. This list of 13 records is additional to the evaluation report cited herein above, and the Report of the Event cited in Exhibit C, my letter dated May 30, 2012. By any standards, none of the case records may be considered "public" under the DSS rules cited.

In summary and conclusion we respectfully submit that the case records in question, are not public documents and are exempt from any consideration of denial pursuant to the two statutes cited in your letter.
Finally, we ask the question:
What does DSS have to hide in denying us access to the case records?
What are they trying to cover up? And why?
It has been said that the purpose of the FOIA is to protect citizens from secret government activity. The exemptions to the FOIA should be narrowly construed to ensure public access to documents. **Seago, op cit.** Wwe submit that the FOIA is not intended to deny Mrs. Weaver access to the private case records, nor for DSS to deny such access in a secretive, uncooperative manner that can only be construed as bad faith. We feel the evidence, statutes and rules, facts and circumstances associated with this case would render a court decision in our favor should the matter be presented for adjudication.

Respectfully submitted.

Yours sincerely,

_____
Gary Weaver

cc.    Office of the Lt. Governor
Division on Ageing.

*Exh. E.*

4

Beatrice Weaver
1253 Harllees Bridge Rd
Dillon SC 29536

April 3, 2013

Director, Medical Records Dept.,
Dillon Internal Medicine Associates
705 Nth 8th Ave, Suite 1A
PO Box 512, Dillon Sc  29536

Dear Sir/Madam::

Subject: Request for Medical Records
November 2011 to the Present 2013.

Ref:    Beatrice Weaver; Patient: 1995-2012.

This request is for patient Mrs. Weaver's medical records hereby submitted for your prompt attention, pursuant to the below cited laws as follows:

1.    On or about November 7, 2011 your office filed a report with the Dept. of Social Services (DSS) and the Visiting Nurses organization located in Florence, concerning Mrs. Weaver, presumably pursuant to SC Code 1976 Ann. Sect. 43-35-25..

   **A.    Please provide a copy of the said reports filed by your office with DSS and Visiting Nurses.**

   **B.    Please provide the legal authorization for filing the said two reports.**

2.    On or about February 5, 2012 your office contacted Mrs. Weaver requesting her to undergo a test for tuberculosis.(TB) Your office explained to Mrs. Weaver that this request was part of a regular inoculation program. In fact it was part of  a DSS program related to court ordered protective custody at a DSS designated facility..

   **A.    Please provide a copy of the order/request your office received from DSS or Cottonwood Villa, requesting your office to undertake a TB test of Mrs. Weaver, showing the date and nature of the request.**

   **B.    Please provide a copy of your formal office request to Mrs. Weaver to undertake the said TB test.**

   **C.    Please provide copies of your in-office reports on the TB activity your office took with Mrs. Weaver on February 5, 13,15, 24, and 27, 2012**

EXHIBIT F

1

D.    Please provide a copy of your report(s) on the forms relating to the said TB activity that your office filed with the DSS, Cottonwood Villa ALF, and any government reports/forms required to be filed reporting the tests ( e.g. DHEC pursuant to Code Chapt. 29).

E.    Please provide a copy of the chest XRay required for the TB test pursuant to the regulations, and the in house report on the Xray, and any forms filed with any person or agency.

F.    Please state which private and/or public office has the direct legal responsibility for initiating the said TB test under the statutes and DSS/DHEC regulations.

3.    On February 24, 2012 Dr. Wallace issued a letter to DSS relating to Mrs. Weaver.

A.    Please provide a true copy of the said letter.

B.    Please provide a copy of the DSS request or order for the said letter; and/or the leal authority for issuing the said letter.

C.    What date was the said letter delivered to DSS?

D.    Was the said letter hand delivered or mailed to the DSS? Please provide the Proof of Service of the said letter.

E.    Was a copy of the said letter delivered to any other party?

F.    What was the purpose and reason of the said letter?

G    Was a copy of the said letter delivered to Mrs. Weaver? If so provide proof of service

4.    It was reported to Mrs. Weaver that Dr. Wallace mailed her a letter dated March 13, 2012, dismissing her as a patient due to an alleged strained relationship.

A.    Please provide a true copy of the said letter.

B.    Please provide proof of service of the said letter delivery to Mrs. Weaver.

C.    Please explain the nature of the strained relationship and how it occurred.

5.    On or about November 14/15, 2011, your office issued a prescription from Dr. Wallace referring physical therapy to be provided for Mrs. Weaver. According to your in-house record/report on the matter, the prescription was apparently left by your nurse

$Ex H. F$

2

(Linda) at your front Registration desk to be picked up by a DSS social worker to transmit to Mrs. Weaver.

**A.    Please provide a certified true copy of the in-house record/report on the matter filed by your nurse Linda with your Registration desk that was addressed for delivery to the DSS social worker.**

**b.    Please provide the in-house record that the DSS social worker picked up the said prescription, and state the date it was collected from your office.**

**C.    If there is no such record, please confirm the date the said referral prescription was collected by the DSS social worker.**

**D.    Please provide a copy of any notice to the DSS to pick up the said referral.**

6.    Please provide copies of any and all correspondence/communications (letters, memoranda, notes, emails, phone call records, etc) TO AND FROM Dr. Wallace and Dillon Internal Medicine Associates with the office and personnel of the Dillon Dept. of Social Services, for the period November 1, 2012 to the present date, relating to Mrs. Weaver.

7.    This request is filed pursuant to **SC Code 1976 Ann. As Amended. Sections 40-47-110 (B) 9-18; 23; 25; Sect. 43-35-45 (D); Section 43-35-25; DSS Rule 405 (03).** Further, your office is referred to the said Code, **Chapter 81, Regulations, Reg. 81-10; 81-11; 81-60; and 81-204.**

8.    You are respectfully advised that your failure to comply with this request for Mrs. Weaver's medical records, will render you and your office in willful and knowing violation of the cited laws, and regulations, et alia..

9.    Time is of the essence in promptly providing the requested data. (It is required relevant to the newly formed Joint Committee on Ageing in the State Legislature.)


Thank you.

                                                                Beatrice Weaver

Confirmation copy for legal reference.


Ex H. F                                                           3

Beatrice Weaver
1253 Harllees Bridge Rd
Dillon SC 29536

February 10, 2014

Dr. Phil Wallace
Dillon Internal Medicine
705 Nth 8th Ave, Suite 1a
PO Box 512
Dillon Sc 29536

Dear Dr. Wallace:

Subject: Request for Medical Records
Period: November 01, 2012 to Present.

Ref:    Beatrice E. Weaver
        Patient 1995.- 2012

Letters dated March 9, 2012; April 31, 2012;
August 10, 2012; April 3, 2013 (copy attached)

1.    Enclosed please find copies of the referenced memoranda for your attention.

2.    As of this date we have not received your response.

3.    Please promptly attend to our request.

4.    Be advised that your failure to promptly respond affirmatively may lead to legal action.

Yours sincerely,

Beatrice Weaver.

Encl: Copies of referenced letters..

Via US Certificate of Mailing

EXHIBIT S

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| | FOURTH JUDICIAL CIRCUIT |
| COUNTY OF DILLON | |
| | CIVIL CASE NO. |
| | |
| BEATRICE E. WEAVER AND | NOTICE OF MOTION AND |
| GARY WEAVER, | CERTIFICATE OF SERVICE |
| | |
| PLAINTIFFS, PRO SE, | |
| | |
| vs. | |
| | |
| DILLON DEPARTMENT OF | |
| SOCIAL SERVICES; JACKIE | |
| ROWLAND; KAREN ENGLISH; | |
| PANSY PAGE-McELVEEN; | |
| DILLON INTERNAL MEDICINE | |
| ASSOCIATES P.A.; A SOUTH | |
| CAROLINA CORPORATION; JAMES P. | |
| WALLACE, M.D; FELICA GAINEY, | |
| AND HARRIET SHEALEY AND | |
| COTTONWOOD VILLA ASSISTED | |
| LIVING FACILITY, INC, A SOUTH | |
| CAROLINA CORPORATION; DILLON | |
| COUNTY SHERIFF'S OFFICE; | |
| DILLON COUNTY EMERGENCY | |
| MEDICAL SERVICES, A SOUTH | |
| CAROLINA CORPORATION; | |
| VISITING NURSES, INC, A SOUTH | |
| CAROLINA CORPORATION; JOHN D. | |
| McINNIS; AND JOHN DOES 1-10 | |
| DOE PARTNERSHIPS, CORPORATIONS | |
| AND/OR OTHER ENTITIES 1-10, | |
| | |
| DEFENDANTS. | JURY TRIAL REQUESTED |

FILED
GWEN T. HYATT
2014 JUN -2 PM 4:01
CLERK OF COURT
DILLON COUNTY

CERTIFIED
TRUE COPY

CLERK OF COURT
DILLON COUNTY

## NOTICE OF MOTION FOR CHANGE OF VENUE TO FLORENCE COUNTY.

TO:   DILLON DEPARTMENT OF SOCIAL SERVICES, AND JACKIE
      ROWLAND,  KAREN ENGLISH AND PANSY PAGE MCELVEEN

      1211 HIGHWAY 34 WEST, DILLON S.C. 29536

1

AND

DILLON INTERNAL MEDICINE, AND JAMES .P. WALLACE

705 NORTH 8TH AVE, DILLON S.C. 29536

AND

COTTONWOOD VILA ASSISTED LIVING FACILITY, AND FELICIA GAINEY AND HARRIET SHEALY,

800 WEST CHURCH ST, BISHOPVILLE S.C. 29010

AND

DILLON COUNTY SHERIFF'S OFFICE

303 WEST HAMPTON ST, DILLON S.C. 29536.

AND

DILLON COUNTY EMERGENCY MEDICAL SERVICES

1415 EAST MAIN ST, DILLON S.C. 29536

AND

FLORENCE VISITING NURSES SERVICE

1605-C WEST PALMETTO ST, FLORENCE S.C. 29502.

AND

JOHN D. McINNIS

304 WEST HARRISON STREET, DILLON S.C. 20536

DEFENDANTS

Notice is hereby given that the above-identified Plaintiff's Motion for Change of Venue to Florence County in this action has been timely filed with the above entitled court on or before June 10, 2014.

DATED: Little Rock S.C. June 3, 2014

Gary Weaver, Plaintiff Pro Se
P.O. Box 539,  Little Rock
S.C. 29567
Ph:  843 841 1606
Fx:  843 774 2050

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a notice and copy of the foregoing Plaintiff's Motion for Change of Venue to Florence County in this action, will be or was served on the above identified Defendants at the stated addresses by means of United States regular mail, on or before June 10, 2014.

DATED: Little Rock S.C.  June 3, 2014

Gary Weaver, Plaintiff Pro Se
P.O. Box 539,  Little Rock
S.C. 29567
Ph:  843 841 1606
Fx:  843 774 2050

# (State Court Pleadings)

## Motion for Change of Venue

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | FOURTH JUDICIAL CIRCUIT |
| COUNTY OF DILLON | ) | |
| | ) | CIVIL CASE NO. 2014-CP-17-078 |
| | ) | |
| | ) | |
| BEATRICE E. WEAVER AND | ) | MOTION FOR CHANGE OF |
| GARY WEAVER, | ) | VENUE TO FLORENCE |
| | ) | COUNTY; MEMORANDUM |
| PLAINTIFFS, PRO SE, | ) | IN SUPPORT OF MOTION; |
| | ) | AFFIDAVIT OF GARY WEAVER; |
| vs. | ) | AFFIDAVIT OF BEATRICE WEAVER; |
| | ) | EXHIBITS A-H; NOTICE AND |
| DILLON DEPARTMENT OF | ) | CERTIFICATE OF SERVICE |
| SOCIAL SERVICES; AND JACKIE | ) | |
| ROWLAND; KAREN ENGLISH; | ) | |
| PANSY PAGE-McELVEEN; | ) | |
| DILLON INTERNAL MEDICINE | ) | |
| ASSOCIATES P.A.; A SOUTH | ) | |
| CAROLINA CORPORATION; JAMES P. | ) | |
| WALLACE, M.D; FELICA GAINEY, | ) | |
| AND HARRIET SHEALEY, AND | ) | |
| COTTONWOOD VILLA ASSISTED | ) | |
| LIVING FACILITY, INC, A SOUTH | ) | |
| CAROLINA CORPORATION; DILLON | ) | |
| COUNTY SHERIFF'S OFFICE AND | ) | |
| DEPUTIES JOHNIE MAY SMITH, | ) | |
| CHADDIE HAYES, AND LINDA | ) | |
| MAIMQUIST; DILLON COUNTY | ) | |
| EMERGENCY MEDICAL SERVICES, | ) | |
| A SOUTH CAROLINA CORPORATION; | ) | |
| FLORENCE VISITING NURSES | ) | |
| SERVICES, INC, A SOUTH CAROLINA | ) | |
| CORPORATION; JOHN D. McINNIS; | ) | |
| AND JOHN DOES 1-10, DOE | ) | |
| PARTNERSHIPS, CORPORATIONS | ) | |
| AND/OR OTHER ENTITIES 1-10, | ) | |
| | ) | |
| DEFENDANTS. | ) | JURY TRIAL REQUESTED |
| | ) | |

A CERTIFIED
TRUE COPY

_Gwen T. Hyatt_

CLERK OF COURT
DILLON COUNTY

FILED
GWEN T. HYATT
2014 JUN -2  PM 4:00
CLERK OF COURT
DILLON COUNTY

## __MOTION FOR CHANGE OF VENUE TO FLORENCE COUNTY__

COME NOW, PLAINTIFFS BEATRICE E. WEAVER AND GARY WEAVER

(hereinafter referred to as "Plaintiff(s)"), and pursuant to **Rules 5 (e), 12, 41 (b), 72 and 82 SCRCP  and S.C. Code 1976 Ann. Sections 15-7-10, 15-7-20 (2), 15-7-30, 15-7-100 (2) and (3),  and 15-7-110,** hereby files this **Motion for Change of Venue to Florence County jurisdiction.**

Pursuant to **S.C. Code 15-7-20,** this honorable court has jurisdiction of the subject matter and persons in this action, and in particular in actions against public officers for bad faith actions. But this law is silent on the court's statutory jurisdiction of a public agency such as the Dillon County Department of Social Services, a State agency, other than the duty to be tried in the county where the cause arose (subject matter jurisdiction). However there are mitigating circumstances that may be considered and decided at the court's discretion in this action...

Accordingly, the grounds for this motion are based on the law, cases, facts and circumstances of this case. Pursuant to **S.C. Code Section 15-7-100 (2) and (3)** there is good reason to believe that a fair and impartial trial cannot be had in Dillon County and the convenience of witnesses and the ends of justice would be promoted by the requested change of venue to Florence County jurisdiction where the Circuit Court of Common Pleas has jurisdiction over persons and a corporate defendants authorized under **S.C. Code Section 15-7-30**

Of the fifteen named defendants in this action, nine (9) individuals and government organizations reside in Dillon County, two (2) persons and one corporate defendant reside in Florence County and two persons and one corporate defendant reside in Bishopville, Lee County. Pursuant to **S.C. Code Section 15-7-30** if there is more than one defendant then the action may be tried in any county in which one or more of the defendants to such action resides at the time of the commencement of the action. Therefore pursuant to **Code Section 15-7-30,** the law permits a change of venue to Florence County as requested by Plaintiffs, subject to the discretion of the Court.

Plaintiffs submit that the balance of the factual and circumstantial evidence provides a valid cause of action and justifies a right for a change of venue for a fair and impartial trial and selected defendants' right of trial in the county of residence with minimal if any inconvenience to Dillon County residents.

Plaintiffs submit that there exist sufficient facts and circumstances in this case to warrant that because of the factor of vicinage, there may be considerable prejudice against Plaintiffs from local witnesses and local jury members, and also there may be prejudice in favor of Defendants such as to prevent Plaintiffs from receiving a fair and impartial trial. See, **Johntson vs. Belk-McKnight co., 194 SC 490, 10 SE 2d 1 (1940).**

This motion is based on the above cited rules and statutes, the attached Memorandum in Support of the Motion, the Affidavits of Plaintiffs Pro Se Beatrice Weaver and Gary Weaver attached hereto, and **Exhibits A-H**, all made a part hereof by reference,, and the pleadings, record and files herein, and such other and further oral and/or documentary evidence as may be presented or demanded.

DATED: Dillon S..C. May 7, 2014.

Gary Weaver, Plaintiff Pro Se

3

STATE OF SOUTH CAROLINA )    IN THE COURT OF COMMON PLEAS
                        )    FOURTH JUDICIAL CIRCUIT
COUNTY OF DILLON        )
                        )    CIVIL CASE NO. 2014-CP-17-078
                        )
BEATRICE E. WEAVER AND  )    MEMORANDUM IN SUPPORT
GARY WEAVER             )    OF MOTION FOR CHANGE OF
                        )    VENUE TO FLORENCE COUNTY
        PLAINTIFFS,     )
                        )
            vs.         )
                        )
DILLON DEPARTMENTS OF   )
SOCIAL SERVICES; JACKIE )
ROWLAND; KAREN ENGLISH; )
PANSY PAGE-McELVEEN;    )
DILLON INTERNAL MEDICINE )
ASSOCIATES P.A.; A SOUTH )
CAROLINA CORPORATION; JAMES P. )
WALLACE, M.D; FELICA GAINEY, )
AND HARRIET SHEALEY, AND )
COTTONWOOD VILLA ASSISTED )
LIVING FACILITY, INC, A SOUTH )
CAROLINA CORPORATION; DILLON )
COUNTY SHERIFF'S OFFICE )
DILLON COUNTY EMERGENCY )
MEDICAL SERVICES, A SOUTH )
CAROLINA CORPORATION; )
VISITING NURSES, INC, A SOUTH )
CAROLINA CORPORATION; JOHN D. )
McINNIS; AND JOHN DOES 1-10 )
DOE PARTNERSHIPS, CORPORATIONS )
AND/OR OTHER ENTITIES 1-10, )
                        )
        DEFENDANTS.     )    JURY TRIAL REQUESTED
                        )

FILED
GWEN T. HYATT
2014 JUN -2 PM 4: 00
CLERK OF COURT
DILLON COUNTY

CERTIFIED
TRUE COPY

CLERK OF COURT
DILLON COUNTY

## MEMORANDUM IN SUPPORT OF MOTION FOR CHANGE OF VENUE

### Introduction

1.    The statutes of the **S.C. Code 1976 Ann,** ("Code"), relevant to this motion, are as follows: **Code Section 15-7-20:** Actions which must be tried where the cause of action arose; **Code Section 15-7-30:** Actions which must be tried in the county where the defendant resides; and **Code Section 15-7-100:** Changing the place of a trial.

1

2.    Initially, this Memorandum is directed at the issue of the court's jurisdiction of the subject matter and of the persons of the defendants.

3.    There follows discussion of the three main factors for justifying a change of venue from Dillon County to Florence County, in accordance with the statutes and cases:

      1.    There is reason to believe that a fair and impartial trial cannot be had in Dillon County; "and", "or",

      2.    When the convenience of witnesses, and

      3.    The ends of justice would be promoted by the change.

<u>Discussion</u>

<u>The Jurisdictional and Resident Issues</u>

**I.    This honorable court has jurisdiction of the subject matter and the parties named in this action, subject to a change of venue at the discretion of the court, upon motion of Plaintiffs pursuant to statutory and case law rights, where more than one defendant, county and subject matter are involved in the case.**

1.    Pursuant to **S.C. Code 1976 Ann. Section 15-7-20** the court has jurisdiction of the subject matter and the persons in this action which must be tried in the county where the cause or some part thereof arose, **subject to the power of the court to change the place of trial in certain cases as provided in Code Sect. 15-7-100.**

2.    **Code Section 15-7-20 (2)** provides jurisdiction over a public officer or any supervising person who by his command or in his aid, shall do anything touching the duties of the officer. However this code provision (and case law) as to jurisdiction over public officers **is subject to the court's statutory authority to change the place of trial at the court's discretion.**

3.    Furthermore, **Code Section 15-7-20**, while granting court jurisdiction of the subject matter in an action involving public officers, it is silent on court jurisdiction of the Dillon County Department of Social Services, a public State Agency. Therefore, pursuant to the court's discretion based on the facts and circumstances of the case, it appears there is nothing in this statute to prevent the court at its discretion, from changing venue for trial of public officers and a public agency from Dillon County to Florence County.

4.    **Code Section 15-7-30** provides that in <u>all other cases than those involving public officers</u>, the action shall be tried in the county in which the defendant <u>resides at the time</u>

2

of the commencement of the action. **If there be more than one defendant (as in this case), then the action may be tried in any county in which one or more of the defendants to such action resides at the time of the commencement of the action.** Here again, this statute is subject to the discretionary power of the court to change the place of trial in certain cases as provided in law.

5.    Clearly both S.C. **Code Sections 15-7-20 and 30,** authorize the court in its discretion to change the venue of the trial as requested herein, including the public officers and the State agency.

6.    In this action, there are some fifteen (15) defendants named, and unknown DOE defendants cited, who are resident in three (3) different counties. Of these, there are nine (9) defendants residing in Dillon County at the commencement of this action. There are three (3) defendants resident in Florence County and three (3) defendants resident in Bishopville, in Lee County. Thus we have nine defendants resident in Dillon County including five resident individuals, three government agencies and one private medical organization, and six (6) defendants resident in two other counties, including one domestic corporation in each county.

7.    The right to be tried in one's own county, does not constitute a limitation on subject matter jurisdiction. See, **Triangle Auto Spring Co., vs Gromlovitz, 270 SC 386, 242 SE 2d430.** In this case, we have a corporate defendant and two individuals resident in Bishopville, Lee County. The offenses committed by these defendants against Plaintiffs cited in this action, occurred out of Dillon County in Lee County. So the question arises, a' priori, as to whether or not the court has subject matter jurisdiction of these defendants. Given the court's statutory authority to exercise its discretion in such matters, this question would probably be rendered moot, but the right remains for these defendants as to subject matter and residence and Plaintiffs' designation..

8.    It has been stated that where there is more than one defendant, so that the action may be tried in any county in which one or more of the defendants resides, the plaintiff ordinarily has the right to elect the county in which the action will be tried. See, **Carroll vs. Guess, 302 SC 175, 394 SE 2d 707 ( S.C. 1990); Mack vs. Nationwide Mut. Ins. Co., 245 SC 619, 142 SE 2d 50 (1965); Jeter vs. S.C. Dept. of Transp. 369 SC 433;**

633 SE 2d 143. However, the plaintiff's right of election is secondary to the substantial right of a defendant to be tried in the county of his or her residence. **Carroll, op cit.**

9.      Since we have more than one corporate and individual defendant in this case, resident in three counties, with two separate subject matter jurisdictions, the plaintiff has a right to nominate the county for trial and the court has the statutory authority at its discretion pursuant to Code Sect. 15-7-30 to designate the place of trial outside of Dillon County to Florence County as requested herein. Since plaintiffs' right to change venue is secondary to the nine defendants' rights to be tried in their place of residence, in this case it follows that <u>other factors</u> must probably be considered in the discretion of the court which has the statutory authority to change venue as requested.

10.     Finally, with respect to the jurisdiction and place of trial for the public officer defendants in this case, it has been pointed out in the courts that in an action against a public officer, which was not brought in the county where the cause of action arose as required by the Code, the defendant <u>could</u> take the position that the trial court was without jurisdiction, notwithstanding his failure to make any motion for a change of venue to the proper county, since the question of jurisdiction of the <u>subject matter may even be raised for the first time upon appeal.</u> See, **Langford, vs, State Bd. of Fisheries, 217 SC 118, 60 SE 2d 59 (1950).**

**II.     Plaintiffs claim the defendants rights for trial in the county of residency and subject matter jurisdiction are "balanced" by plaintiffs' compliance with the statute permitting change of venue.**

11.     **S.C. Code Section 15-7-100** provides the statutory exceptions to Code Sections 15-7-10, 20 and 30 statutory conditions, subject to court discretion. Additional to the above cited code statutory authorities, specific statutory authority for the court to change the venue is cited in **Code Section 15-7-100**. The court may change the place of trial in the following cases: **Subsection (2)** When there is reason to believe that a fair and impartial trial cannot be had therein; **and, or, Subsection (3)** When the convenience of witnesses **and** the ends of justice would be promoted by the change.

12.     The right of a resident defendant to a trial in the county of his residency has been aptly described as a substantial and valuable right and subject to defeat only when the requirements of the statute permitting such change (SC Code Sect. 15-7-100) have met

4

with compliance. See, **Wingard vs. Sims, 222 SC 396, 73 SE 2d 279 (1952).** And he who asserts the right to maintain the action in a different county should at least "balance" the testimony showing such right of departure. See, **Warren vs. Padgett, 225 SC 447, 82 SE 2d 810 (1954).** Thus, in addition to promoting a fair and impartial trial, the plaintiff must also show that changing the place of trial would promote not only the convenience of witnesses, but also the ends of justice. See, **Basha vs. Waccamaw Lumber and Supply Co., 240 SC 140, 124 SE 2d 912 (1962)**

13      There is a contradiction in the official literature as to whether subsections 2 or 3 of Code Sect. 15-7-100 are <u>separate conditions</u> to be met by plaintiffs on the merits alone of each respective subsection, or whether subsections 2 and 3 require <u>both conditions</u> to be met together for court consideration. See **Code, Title 15, Vol. 7, p. 172 (subsect. 2 "and" 3);** c/f **2007 Cumulative Supplement, Vol. 7, p.25, (subsect 2 "or" 3).** Whether the statutory requirement for plaintiffs to comply with, is subsect. 2 **and** 3, or subsect. 2 <u>or</u> 3, must be left to the discretion of the court to decide based on the facts and circumstances of the case as described herein as to whether both conditions must be considered coupled together, or may be considered separately each subsection on its own merits. The following discussion addresses both possibilities. .

14.     Notwithstanding this "and /or" situation, Plaintiffs claim that a fair and impartial trial cannot be held in Dillon County under Code Sect. 15-7-100; but this claim does not affect the court's power to change the venue on the other grounds specified in this section. See, **Hanley vs. Charleston Light, etc., Co., 110 SC 340, 96 SE 519.**

15.     Thus, it has been ruled that on motions to change venue the facts are quite variant and no fixed rules can be laid down to cover each case; therefore, a great deal must be left to the discretion of the trial judge in deciding whether a proper showing has been made for a change. That discretion is judicial, and must not be arbitrarily exercised. See, **O'Shields vs. Caldwell , 208 SC 245, 37 SE 2d 665 (1939).**

16.     **Code Section 15-7-110** provides that when a change of venue is ordered because a fair and impartial trial cannot be held in Dillon County, <u>it shall be to a county in the same judicial circuit.</u> On the other hand, **Rule 82 SCRCP** provides that the rules shall not extend or limit any State court's jurisdiction or the venue of any action, and any court may transfer the action to any proper county or court. And it is an error to change the

5

venue to a place of trial other than that stated in the motion, in this case to Florence County. See, **Coogler vs. Calif. Ins. Co., 192 SC 54, 5 SE 2d 459 (1939)**. Florence County and Lee County are not in the same circuit as Dillon County. Therefore in addition to proving that a fair and impartial trail cannot be held in Dillon County, plaintiffs must rely on other factors to justify the change of venue to Florence County.

III.   **Plaintiffs claim there is reason to believe that a fair and impartial trial cannot be held in Dillon County, and that Florence County is the proper compromise location for trial, given the composition, the several residencies and subject matter of defendants, and adverse vicinage in Dillon County.**

17.   The procedure for plaintiffs to seek a change of venue on the ground that a fair and impartial trial cannot be had in Dillon County where the main action was commenced is provided in **Code Section 15-7-110**. This statute requires Plaintiffs to file with the court supported by affidavit, attached hereto and made part hereof, that a fair and impartial trial cannot be had in Dillon County.  Consideration of this ground for change involves at least three factors: jury vicinage, witness credibility, and jury panel selection and composition.

18.   The Vicinage Issue:

Courts have stated that the ends of justice are promoted by having a jury from the same vicinage pass upon the credibility of witnesses. See, **Oswald vs. Oswald, 245 SC 44, 138 SE 2d 639 (1964)**. And this formula is applicable to both plaintiffs and defendants and is a matter addressed to the sound judicial discretion of the judge hearing the motion, though it is not determinative of the issue. See, **Bryan vs. Ross, 238 SC 299, 114 SE 2d 97 (1960)**

19.   It has been stated that sound as may be the view that the credibility of a witness is best judged and his testimony therefore best evaluated, by a jury of his own county, its importance to the promotion of the "ends of justice" must of necessity depend on many collateral factors, and it is not, in itself, a formula determinative of the issue, **Ibid.**

20.   The significance of a Dillon County jury of vicinage passing on the credibility of witnesses in this case may be viewed from several perspectives: promoting the cause of defendants on the one hand and prejudicial to plaintiffs cause on the other; the

6

availability of eligible witnesses and jurors, and the socio-economic, racial and political demographics of the Dillon County community.

21.    The Dillon County community groupings have diverse interests. Many collateral factors may include the number of eligible jurors in the county, the diversity of their interests, and consequently the degree of knowledge or information that the members of the panel may likely have concerning the character of the witness, the nature of the testimony to be expected from the witness, and its relation to the issue of liability. It is applicable no less to the witnesses of one party than to those of the other, and like other factors bearing upon the issue under discussion, it is a matter addressed to the sound judicial discretion of the judge who hears the motion. See, **Bouvy vs. N.W. White and Co., 254 SC 164, 174 SE 2d 347 (1979).**

22.    Dillon County is a relatively remote, economically and culturally deprived, insular, rural community comprised of some sixty percent black, some forty percent white, and a small minority class of residents respectively, characterized by family, clan, church, professional, medical/health, hunting, ethnic and racial social groupings. The Dillon Herald newspaper has reported that some twenty five to thirty percent (25% to 30%) of the Dillon County population are illiterate or functionally illiterate. The newspaper reports that the unemployment rate exceeds thirteen percent, some sixty percent of births are to single teen age mothers; high school drop out rates exceed fifty percent, the State's 2nd highest crime rate, and college educated residents comprise some 1 % of 36,000 county residents. This socio economic mix is not a promising scenario for selecting a qualified and informed jury panel of peers to try a highly complex court case as in this action. In this respect, the statistics for Florence County are more promising related to reduction of respective counsels' voir dire court activity, and for promoting the efficiency and cost reductions of court procedures..

23.    This action involves a complicated case involving many issues comprising violations of Code statutes, violations of agency rules, regulatory authority and license, negligence, medical malpractice, police brutality, violation of plaintiffs' constitutional and statutory rights, government personnel bad faith and malevolence, etc.. Even allowing for the "common sense" of the average adult, and the court's "voir dire" process for striking and selecting a quailed jury panel, there remains the question of the

availability and selection of eligible jury of peers in Dillon County given the close knit structure, intellectual and educational levels of society, that can be expected to provide a fair and impartial trial given the complexities of the case.

24.    The well known English legal humorist A.P. Herbert has called a jury, twelve people of average ignorance. Here we are looking for a panel of jury peers of above average intelligence and common sense as a minimum qualification for jury duty, and it is a risk for plaintiffs to select a jury from a small rural community that is some thirty percent functionally illiterate, with questionable vicinage. Florence County offers the availability of a broader base of a pool of prospective jurors with the qualifications needed to adjudicate this action, without the disadvantage of vicinage prejudicial to plaintiffs and supporting defendants.

25.    The Witness Credibility Issue.

        Vicinage has to do with the ability of jurors to judge witnesses in order to provide a fair and impartial trial, given their proximity as neighbors, and community associations, etc. At this time it is not possible to predict the number of prospective witnesses in this case, or who is likely to be a witness, either for the plaintiffs or the defendants. What we do know is that there will be at least seven individual defendant witnesses from Dillon County, two from Florence County and two from Lee County, called by plaintiffs.

26.    Defendant Wallace in this case is a well known and established physician and a member of the Dillon City Council for many years. Over the decades his medical practice has served many thousands of local Dillon residents, both black and white, but the majority being of the black race. In those roles this defendant has a direct and indirect doctor-patient and citizen voter relationship with residents who are potential jurors for selection in this case from a small pool of eligible qualified jurors. Although unpredictable a' priori, the evidence is prima facie, and there is the statistical probability that one of these jurors or one of his/her family members, relatives, "extended families" or community individual relationships will have an direct or indirect relationship with this defendant in his capacity as a City Councilman or as a doctor, or the local hospital that the defendant doctor services, in which capacities favors, benefits and services can be provided. In this case, the factor of vicinage would work to promote the interests of

8

the defendant as a witness, confronted by a jury with members who may be his patient or a political supporter, and be prejudicial to plaintiffs in denial of a fair and impartial trial. Such a situation makes vicinage a material factor in the decision to change the venue as requested herein in order to promote the possibility of a fair and impartial trial.

27.    Defendants from the Dillon Department of Social Services, Director Rowland, Administrator English and Caseworker Pansy Page, particularly the latter individual, are in a similar situation as defendant Wallace pertaining to vicinage direct and indirect relationships within the Dillon County community. Here again, although unpredictable a' priori, the evidence is prima facie, and there is the statistical probability that one of the potential jurors or one of his/her family members, relatives, extended families, or community individual relationships will have an direct or indirect relationship with one or all of these three defendants. As employees of the Department of Social Services, they have provided favors, benefits and services to many of the elderly, abused and neglected children and wives, and families in the Dillon County community. In their individual capacities as social service providers they are in a position to grant and deprive social service recipients of many social service favors, benefits and services such as homemaker services, food stamps, etc., in which capacities such favors, benefits and services can be provided or withheld at will. Here again, the factor of vicinage would work to promote the interest of the defendants as witnesses confronted by a jury with members who were or are their clients, and be prejudicial to plaintiffs in denial of a fair and impartial trial. Such a situation makes vicinage a material factor in the decision to change the venue as requested herein in order to promote the possibility of a fair and impartial trial.

28.    Similarly, the Deputy Sheriffs of the Office of the Sheriff, Dillon County, and the personnel of the Dillon County Emergency Medical Service have deep roots in the Dillon Community, spanning many years. In their respective roles these defendants have a direct and indirect community service relationship with residents who are actual or potential jurors for selection in this case. Although unpredictable a' priori, the evidence is prima facie, and there is the statistical probability that one of these jurors or one of his/her family members, relatives, "extended families" or community individual relationships will have a direct or indirect relationship with these defendants in their respective capacities as a Sheriff or medical service person, in which capacities favors, benefits and

9

services can be provided. Similarly, the factor of vicinage would work to promote the interests of the defendants as a witness and defendant, confronted by a jury with members who may have had or has a beneficial direct or indirect relationship with the defendants prejudicial to plaintiffs in denial of a fair and impartial trial. Such a situation makes vicinage a material factor in the decision to change the venue as requested herein in order to promote the possibility of a fair and impartial trial.

29.   Given these actual and potential factual conditions, it seems clear a' priori, that the factor of vicinage as a consideration for deciding a change of venue in this case, if denied, would work to benefit the credibility of defendant witnesses and be prejudicial to plaintiffs in the evaluation of jurors having an actual or potential direct or indirect relationship with defendants.

30.   Thus, it has been ruled that the trial court applied the proper legal standard to determine that the venue of a medical malpractice action should be transferred <u>after trial</u>, where (1) although the plaintiff exercised all her strikes, 14 members of the jury had a direct or indirect doctor-patient relationship with the defendant doctor, (2) 8 of the jurors seated were either patients of or had family members treated by the doctor, (3) during trial it was discovered that 2 seated jurors had connections, with the defendant hospital, and (4) the trial ended in a hung jury, and (5) the judge stated that he was of the opinion that the interest of justice " would be served by moving the venue to obtain a jury that would be free from any outside relationships or knowledge about the subject matter of the case." See. **Lancaster vs. Fielder, 305 SC 418, 409 SE 2d 375.(S.C. 1991)** . .

31.   Here, plaintiffs respectfully submit that it is better to err conservatively on this issue a'priori and change the venue given the merits, facts and arguments presented herein, than to go to trial and a' posteriori move for change of venue either in court or on appeal, under like circumstances cited in the **Lancaster** case. **Ibid.** For this case, it is reasonable to submit that adverse vicinage is a material factor in the decision to grant a change of venue from Dillon to Florence County.

**IV.   The issue of jury selection and composition argues for a change of venue necessary for a fair and impartial trial in Florence County**

32.   Plaintiffs submit that it is not possible for a fair and impartial trial in Dillon County and have the burden of persuading the court of the necessity to remove the trial

10

from a local jury as discussed herein. See, **Stevens vs. Sun News**, 267 S.C. 63, 226 SE 2d 236 (SC 1976).

33.    The above discussion on the material factors of vicinage and establishing the credibility of the witnesses, and the attached affidavit, justifies the change of venue to promote a fair and impartial trial and to promote the "ends of justice." This motion is predicated on the argument that it will be actually and potentially very difficult, if not impossible, for the selection and composition of an uncompromised jury panel from the available relatively small pool of potential jurors in Dillon County sufficiently erudite and impartial to judge this complex and complicated case fairly and impartially given the direct and indirect professional, social and economic relationships that exist in a small rural county community. Therefore as further substantiating argument, it is germane to briefly explore relevant social science research and techniques related to the selection of fair and impartial jury panels, dating since around 1970. .

34.    *The Psychology of the Courtroom* is a seminal collection of social science studies edited by Norbert L. Kerr and Robert M. Bray discussing various psychological factors that seem to preclude fair and rational jury results in the courtroom  Some of these are relevant to  the arguments presented herein. For example, studies have shown that jurors appear more willing to favor parties of their own race, and less willing to favor those of another race. Further that juries consider someone of higher socioeconomic station more trustworthy than someone of lower station **Ibid**.  In this case one of the defendants is an established black member of the community with deep professional, family and sociological local roots. Another is an established local doctor and Council member and a member of the higher socioeconomic station. The "residents"  and staff of the Cottonwood defendant organization located in Bishopville, Lee County, are some ninety nine percent (99%) black.

35.    We have noted that local Dillon residents comprise some thirty percent of illiterate persons. On the question of juror intelligence, studies show that jurors with high intelligence tend to be more influenced than jurors of low intellectual ability by persuasive, logical arguments.  Conversely, jurors with high intelligence are less susceptible than jurors with lower intelligence to unsupported generalities or false, illogical irrelevant arguments. **Ibid p.30**. If the findings of the studies reported here have

11

any credence, then plaintiffs face an actual and potentially prejudicial environment and attitudes from a local jury in Dillon County.

36.    Pretrial studies of the demographics of the County's previous juries can provide attorneys with the information that is useful in predicting the attitudinal nature of the forthcoming jury. **Ibid, p. 29.** Thus, a demographic profile of the Dillon County community would differentiate between a small community that would be receptive to an "outsider" attorney, and a small community where an outsider would be viewed suspiciously and not trusted, or plaintiffs (who have been treated as outsiders in this community for the past fifteen years). Such information could determine whether local attorneys should be hired to handle the case. In Dillon County the local attorneys generally have the same vicinage disadvantage as the defendants as discussed herein above.

37.    Eyewitness testimony and information processing will be important in the trial of this action. It deals with the forcible sheriff and EMS police abduction on February 29, 2012, of the elderly disabled plaintiff from her bedroom and home; removing and placing an 86 year old sick woman with painful degenerative hip and back problems known to defendants, in the third rate substandard facility with inadequate wellness resources, of defendant Cottonwood Villa. That "locked" Assisted Living Facility is located out of county in Bishopville, Lee County some 70 miles from Dillon County, where its residents and staff are 99 percent black and sub standard eating and service conditions are not of the level of social environment required by the rules and regulations for plaintiffs…The credibility and veracity of defendants' fifteen witnesses and plaintiffs' two "outsider" witnesses will be on trial. The issues of eye witness testimony and information processing will be material and important for jury consideration.

38.    Social scientists have reduced the jury information processing to four stages relevant to this discussion: perception, encoding, remembering, and recall. In the first stage of **perception,** distortion in perceptual judgment is commonplace. Subjects will overestimate distance and time duration, but underestimate the size of filled spaces, such as a room filled with furniture. Thus, we focus on the respective witness views of the substandard small two bed room and toilet facilities at Woodland Villa and the uneatable food confronted by Plaintiffs in this action.

39.    **Encoding** means taking in the facts. Studies show that the more unusual the event or scene the more likely it is to be absorbed in some detail. Similarly the same axiom holds as the situation becomes stressful. Here we have an extremely stressful situation faced by Plaintiffs suffering the surprise unconstitutional entry into the privacy of plaintiffs' bedroom and home, and forcible abduction strapped like a criminal on an EMS stretcher under threat of arrest and being placed in chains, under a bogus court ex parte order that was improperly executed by the Family Court. Plaintiff is more likely to recall the facts in detail than defendants who were not under stress in an unusual situation.

40.    **Remembering**:  The actual storage of retained, encoded information is also vulnerable to various vicissitudes. It is well known that the accuracy of witnesses dims with the passage of time  But something called **interference** can also undermine accuracy of witnesses. Thus, ask a witness a few misleading questions about a central event before he can testify to it, may well diminish his memory of the event itself.

41.    Finally **recall,** or the retrieval of stored information can be affected by the form in which questions are asked. Word choices have been shown to produce significantly varying estimates or statements of facts and circumstances.

42.    Such issues as these four factors are important in anticipating a juror's biases and response to eyewitness testimony to which jurors tend to respond strongly.  In this case, it is not likely that plaintiffs as witnesses will not remember the shock, stress, and terror, of a forced abduction by the Deputy Sheriff witnesses, strapped to a stretcher under a bogus court order that was dismissed two weeks later by the court upon application of plaintiffs. The question is for plaintiffs as witnesses to have access to a panel of jurors that are intellectually qualified, and intellectually sympathetic to plaintiffs arguments  rather than defendants under the rubric of adverse vicinage. Given the facts of the case and the factors cited against Dillon County for selection of a fair and impartial jury panel, plaintiffs respectfully submit that a change of venue will err on the side of promoting the ends of justice and convenience of witnesses. A fair and impartial trial in Dillon County is most unlikely to happen and a change of venue will promote the ends of justice and remove the potential for appellate processes.

**V.    Plaintiffs argue that the convenience of witnesses and the ends of justice support the argument for granting a change of venue from Dillon County to Florence County.**

43.    **Code Section 15-7-100 (2) and/or (3)** provide for a change of venue. It has been noted above that it is not clear if the standards of subsections (2) and (3) are to be considered separately on their own merits as separate grounds, or coupled together and considered as one single ground for change of venue. Consideration of this conundrum falls to the discretion of the court in its deliberations on this motion. The foregoing discussion addressed the fair and impartial trial standard. Here we address the convenience of witnesses and the ends of justice standards.

44.    The venue statute requires that both convenience of witnesses and promotion of the ends of justice must appear together for a change of venue to be granted and is addressed to the discretion of the trial judge. See, **Varnadoe vs. Hicks, 213 SE 2d 736 (1975 S.C.).** Plaintiffs must show that both "the convenience of the witnesses" **and** "the ends of justice" will be promoted by the change. Both requirements of this section of the statute must be met. See, **Doss vs. Douglas Consttr. Co., 232 SC 261, 101 SE 2d 661 (1958)**

45.    **Code Section 15-7-110** requires a change of venue to be to a county in the same judicial circuit. However, if the venue is changed under subsection (3) on account of the convenience of witnesses and to promote the ends of justice, the cause may be removed to another circuit. See, **Hanley vs. Charleston Light and Water co., 110 SC 340, 96 SE 519 (1918).** Here, we are requesting a change of venue from Dillon County to Florence County in another judicial circuit. To mitigate the dictate of Code Section 15-7-110, in light of this case law, to prevail, it is necessary to argue the convenience of witnesses and the promotion of the ends of justice.

46.    Where there is a showing of convenience of witnesses, such constitutes a prima facie showing that the ends of justice would be promoted by the change. See, **Beard vs. Billups Petroleum Co., 228 SC 481, 90 Se 2d 685 (1956).** Pursuant to this case law, both grounds appear together as required by the statute and other case law, upon a showing of convenience to witnesses, thus meeting the requirement for promotion of the ends of justice as a single ground.

47.    In this action we have shown that there are at least fifteen defendants who will be called as witnesses and two plaintiffs who will be witnesses. These are the known

witnesses, and it is not possible to predict the unknown witnesses or DOE witnesses who will be called by either party. Of the defendant witnesses, two individuals reside in Bishopville some 70 miles from Dillon County and about 30 miles from Florence County. There are two witnesses who reside in Florence County. A change of venue to Florence County would be convenient for these four witnesses. Thus we promote the convenience for four out of county witnesses, and there is not any inconvenience for the Dillon County witnesses.

50.    There are ten known defendant individual witnesses who will be called who reside in Dillon County which is some 30 miles and about half an hour drive to Florence County courtroom on Interstate I-95 and TV road. All of the known Dillon witnesses are professional, literate, have government agency employment that permits available time for being a witness, and have ready transportation for the purpose of traveling to the Florence County courthouse, without any inconvenience. . .

51.    It has been ruled that when a short distance is involved and with the quick facility of modern travel, the mere statement of the witnesses, without further explanation, that it would be more convenient for them to testify in one courthouse than in another, only 16 miles away, amounts to nothing more than a conclusion of the witnesses, and is of no probative value in determining the issue of convenience under this section. See, **Mixson vs. Agricultural Helicopters, Inc., 260 SC 532, 197 SE 32d 883 (1973).** The corollary argument applies where a witness states that it would be more **inconvenient** to testify in one courthouse (say Florence) than in another ( say Dillon) only 30 miles away, would amount to a conclusion of the witness and of no probative value in determining the issue of convenience.

52.    Having shown that there is convenience for some witnesses and the lack of any inconvenience for other witnesses, it follows that the ends of justice has been served pursuant to the **Beard** case noted above **Op cit.** Once a showing has been made that both the convenience of witnesses and the ends of justice would be promoted by changing the venue from Dillon to Florence County, the burden shifts to any party opposing the motion to overcome at least one of the two requirements. See, **Whaley vs. CSX Tptn, Inc., 362 SC 456, 609 SE 2d 286 Rehg dnd. (SC 2005)**

15

53.    Finally, when a motion for change of venue is predicated on grounds of convenience of witnesses and ends of justice, the trial judge must resolve the questions of facts; because facts often vary, no fixed rules can be laid down and a great deal must be left to the trial judge's discretion, and the question is whether convenience of witnesses would be promoted by change rather than the degree to which it would be promoted. See **McKissick vs. J.f. Cleckley and Co. 325 SC 327, 479 SE 2d 67, (S.C. App. 1996)**

## Summary and Conclusion

1    **Code Section 15-7-20** provides for change of venue when actions must be tried where the cause of action arose, subject to the courts power to change the place of trial.. The cause of action in this case involves three counties, Dillon, Florence and Lee.

2.    This statute also provides that causes involving public officers must be tried in the county where the cause arose. Case law provides an exception under certain circumstances as applied in this case.

3.    **Code Section 15-7-30** provides that actions must be tried in the county where defendants reside, subject to the court power to change the venue as provided by law.

4.    The individual and organizational defendants in this action reside in three separate counties.

5.    This statute also provides that where there is more than one defendant, then the action may be tried in any county in which one or more of the defendants to such action resides at the time of the commencement of the action. Case law permits the plaintiff to nominate the county for trial.

6.    Pursuant to **Code Section 15-7-100 (2),** plaintiffs have shown that there is reason to believe a fair and impartial trial cannot be held in Dillon County. The facts and case law of the case renders the factor of vicinage to have an adverse impact on Plaintiffs ability to obtain a fair and impartial trial in Dillon County. Given the facts and circumstances of this action, plaintiffs are more likely to experience a fair and impartial jury panel in Florence County.

7.    It is not clear if this subsection (2) of the statute stands alone or is coupled as one single ground with subsection (3), and must be left to the discretion of the judge.

16